# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW GREEN, ET AL.,  )
          Appellants,  )
           )
    v.  )
           )  **CASE NO.:  23-5159**
UNITED STATES DEPARTMENT  )
OF JUSTICE, ET AL.,  )
          Appellees.  )
           )
           )
           )

## APPELLANTS MATTHEW GREEN, ANDREW BUNNIE HUANG, AND ALPHAMAX, LLC'S RULE 28(a)(1) CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1.    *Parties and Amici*.  The following were parties in the district court proceeding from which this appeal was taken and are the parties before this Court:

    a.    Matthew Green

    b.    Andrew Bunnie Huang

    c.    Alphamax, LLC

    d.    United States Department of Justice

    e.    Library of Congress

    f.    United States Copyright Office

    g.    Carla Hayden

    h.    Shira Perlmutter (successor to Maria Pallante, *see* Fed. R. Civ. P. 25(d))

-1-

      i.        Merrick Garland (successor to Loretta E. Lynch, *see* Fed. R. Civ. P. 25(d))

      j.        Digital Content Protection, LLC (amicus)

      k.       Intel Corporation (amicus)

      l.        Advanced Access Content System Licensing Administrator, LLC (amicus)

      m.     DVD Copy Control Association (amicus)

      n.       Association of American Publishers, Inc. (amicus)

      o.       Entertainment Software Association (amicus)

      p.       Motion Picture Association, Inc. (amicus)

      q.       Recording Industry Association of America, Inc. (amicus)

2.    *Ruling Under Review*.  The rulings under review are the district court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. Nos. 24, 25) attached hereto as Exhibit A. The ruling was entered by Emmet G. Sullivan, United States District Judge for the District of Columbia, on June 27, 2019 in Case No. 1:16-cv-01492-EGS.

3.    *Related Cases*.  There are no related cases currently before this court, or any other court. There was previously an appeal before this court—Case No. 21-5195. Attached as Exhibit B is the Judgment and Opinion entered in that appeal dated December 6, 2022, affirming the District Court's denial of Appellants' motion for preliminary injunction.

Dated:  August 14, 2023

Respectfully submitted,

*/s/ Brian M. Willen*
Brian M. Willen (D.C. Bar No. 490471)
WILSON SONSINI GOODRICH &ROSATI
Professional Corporation
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6022
Email:  bwillen@wsgr.com
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899

*Counsel for Appellants Matthew Green, Andrew*
*Bunnie Huang, and Alphamax, LLC*

## CERTIFICATE OF SERVICE

I, Brian M. Willen, hereby certify that on August 14, 2023, I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system, which will serve all Counsel who are registered CM/ECF users.

By: */s/ Brian M. Willen*
Brian M. Willen

Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

                                  )
MATTHEW GREEN, *et al.*,           )
                                  )
          Plaintiffs,             )
                                  )
     v.                           ) Civil Action No. 16-1492 (EGS)
                                  )
U.S. DEPARTMENT OF JUSTICE,        )
*et al.*,                          )
                                  )
          Defendants.             )
_____)

<u>**ORDER**</u>


    For the reasons stated in the accompanying Memorandum
Opinion, defendants' motion to dismiss is **GRANTED IN PART and
DENIED IN PART;** and it is hereby

    **ORDERED** that plaintiffs' overbreadth claim is **DISMISSED;**
and it is further

    **ORDERED** that plaintiffs' prior restraint claim is
**DISMISSED;** and it is further

    **ORDERED** that defendants' motion to dismiss plaintiffs' as-
applied claims is **DENIED;** and it is further

    **ORDERED** that plaintiffs' Administrative Procedure Act
claims are **DISMISSED;** and it is further

**ORDERED** that plaintiffs' motion to take judicial notice is

**GRANTED.**

SO ORDERED.

Signed:    Emmet G. Sullivan
           United States District Judge
           June 27, 2019

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                      )
MATTHEW GREEN, *et al.*,               )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )   Civil Action No. 16-1492 (EGS)
                                      )
U.S. DEPARTMENT OF JUSTICE,            )
*et al.*,                             )
                                      )
            Defendants.               )
_____)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Matthew Green, Andrew Huang, and Alphamax, LLC seek to engage in certain activities for which they fear they will be prosecuted under the "anti-circumvention" provision and one of the "anti-trafficking" provisions of the Digital Millennium Copyright Act ("DMCA"). Accordingly, they have brought a pre-enforcement challenge to those two provisions alleging that they violate the First Amendment to the United States Constitution facially and as applied to their proposed activities. They additionally claim that the Librarian of Congress's failure to include certain exemptions from the reach of the anti-circumvention provision in a 2015 final rule promulgated under a rulemaking procedure created by the DMCA violated the First Amendment and the Administrative Procedure Act ("APA"). They seek declaratory and injunctive relief.

Defendants——the United States Department of Justice, Attorney General William Barr, the Library of Congress, Librarian of Congress Carla Hayden, the United States Copyright Office, and Register of Copyrights Karyn Temple Claggett[1]——have moved to dismiss plaintiffs' claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and, alternatively, for failure to state a claim under Federal Rule 12(b)(6). Upon consideration of defendants' motion, the response and reply thereto, the applicable law, and the entire record, defendants' motion to dismiss is **GRANTED IN PART and DENIED IN PART**.

I.   **Background**

   A.   **Statutory Background**

   Congress enacted the DMCA, 17 U.S.C. § 1201 *et seq.*, in 1998 to implement the World Intellectual Property Organization Copyright Treaty and the World Intellectual Property Organization Performances and Phonograms Treaty. S. Rep. No. 105-190, at 2 (1998). In implementing those treaties via the DMCA, Congress was primarily responding to "the ease with which digital works can be copied and distributed worldwide virtually instantaneously." *Id.* at 8. In short, Congress was concerned

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Barr has been substituted for former Attorney General Loretta Lynch, and Register Claggett has been substituted for former Register Maria Pallante as a defendant in this action.

with the pirating of copyrighted works in the digital world. Three of the DMCA's central provisions respond directly to that concern.

The first——section 1201(a)(1)(A)——is an "anti-circumvention" provision. It prohibits a person from "circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17, governing copyright]." 17 U.S.C. § 1201(a)(1)(A). A "technological measure"——often referred to as a "technological protection measure" ("TPM"), Compl., ECF No. 1 ¶ 18——"effectively controls access to a work" if it, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work," 17 U.S.C. § 1201(a)(3)(B). To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). Section 1201(a)(1)(A) thus prohibits persons from bypassing technological barriers put in place to prevent access to copyrighted works.

The second and third provisions——sections 1201(a)(2) and 1201(b)——are "anti-trafficking provisions." That is, instead of prohibiting the circumvention of TPMs, they prohibit the

dissemination of the technological means that enable such circumvention. The anti-trafficking provision at issue in this case, section 1201(a)(2), prohibits, in relevant part, a person from "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted] work." *Id.* § 1201(a)(2)(A).[2]

The DMCA also includes certain fine-grained permanent exemptions, some of which apply to the anti-circumvention provision and to both anti-trafficking provisions, *see, e.g., id.* § 1201(e) (broadly exempting official law enforcement activity); some of which apply to the anti-circumvention provision and only one of the anti-trafficking provisions, *see, e.g., id.* § 1201(j) (exempting security testing "solely for the

---

[2] Section 1201(b), in relevant part, prohibits a person from "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [Title 17, governing copyright]." 17 U.S.C. § 1201(b)(1)(A). Although sections 1201(a)(2) and 1201(b) employ similar wording, section 1201(a)(2) is aimed at circumvention technologies that permit access to a copyrighted work, whereas 1201(b) is aimed at circumvention technologies that permit copyrighted works to actually be copied. S. Rep. at 12.

purpose of good faith testing, investigating, or correcting, a
security flaw or vulnerability"); and some of which apply only
to the anti-circumvention provision *see, e.g.*, *id.* § 1201(d)
(exempting nonprofit libraries, archives, and educational
institutions that seek to circumvent TPMs to determine whether
to purchase a copyrighted product).

Additionally, cognizant of its "longstanding commitment to
the principle of fair use," H.R. Rep. No. 105-551, pt. 2, at 35
(1998) ("Commerce Comm. Rep."), Congress sought to balance its
efforts to curtail digital piracy with users' rights of fair use
by putting in place a triennial rulemaking process to exempt
certain noninfringing uses of certain classes of copyrighted
works from the anti-circumvention provision for three-year
periods. *See* 17 U.S.C. §§ 1201(a)(1)(B)-(E). Accordingly, every
three years, the Librarian of Congress, "upon the recommendation
of the Register of Copyrights, who shall consult with the
Assistant Secretary for Communications and Information of the
Department of Commerce and report and comment on his or her
views in making such recommendation, shall make the
determination in a rulemaking proceeding . . . of whether
persons who are users of a copyrighted work are, or are likely
to be in the succeeding 3-year period, adversely affected by the
[anti-circumvention provision] in their ability to make
noninfringing uses under [Title 17] of a particular class of

copyrighted works." *Id.* § 1201(a)(1)(C). To make the relevant determination, the Librarian must consider: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.*

### B.   Factual Background

Plaintiff Matthew Green is a computer science professor at Johns Hopkins University. Compl., ECF No. 1 ¶¶ 5, 75. Plaintiff Andrew Huang is a Singapore-based electrical engineer who owns and operates several technology-related business entities, including plaintiff Alphamax, LLC. *Id.* ¶¶ 6-7, 88. Plaintiffs seek to engage in certain activities that they fear will run afoul of section 1201(a)(1)(A)'s circumvention prohibition and section 1201(a)(2)'s trafficking prohibition, exposing them to potential civil liability under the DMCA's private right of action, 17 U.S.C. § 1203, and potential criminal liability under the DMCA's criminal offense provision, 17 U.S.C. § 1204. *Id.* ¶¶ 86-87, 109-10.

Specifically, Dr. Green "investigates the security of electronic systems," and "[h]e would like to include detailed information regarding how to circumvent security systems" in a forthcoming book, *id.* ¶ 75, but he "has declined to investigate certain devices due to the possibility of litigation based on [s]ection 1201," *id.* ¶ 80. Dr. Green requested an exemption to cover his security research as part of the 2015 triennial rulemaking process, but the exemption that the Librarian of Congress finally put in place was not broad enough to cover all of his proposed research. *Id.* ¶¶ 78-79, 84-85.

Mr. Huang and Alphamax are the creators of "NeTV," a device for editing high-definition digital video. *Id.* ¶ 89. They seek to create an "improved" NeTV—a "NeTVCR"—that would allow its users "to save content for later viewing, move content to a viewing device of the user's choice, or convert content to a more useful format." *Id.* ¶¶ 90-91. To create the NeTVCR, Huang and Alphamax have to circumvent the TPMs—High-Bandwidth Digital Content Protection ("HDCP")—that restrict the viewing of High-Definition Multimedia Interface ("HDMI") signals. *Id.* ¶¶ 92-93. They have been deterred from doing so because of the risk of prosecution under section 1201. *Id.* ¶¶ 109-10. Although Huang and Alphamax did not apply for any exemptions to the anti-circumvention provision in the 2015 triennial rulemaking, they allege that if the Librarian of Congress had granted "several"

7

exemptions proposed by other parties, they "would be able to circumvent HDCP as necessary to use the NeTVCR, without violating the anti-circumvention provision of [s]ection 1201." *Id.* ¶ 108.

Wanting to engage in activity that would qualify as prohibited circumvention and trafficking but fearing criminal prosecution if they do so, Dr. Green, Mr. Huang, and Alphamax have brought a pre-enforcement challenge to the two relevant provisions of the DMCA on First Amendment grounds. *See generally id.* ¶¶ 111-49. Specifically, they claim that both provisions are facially overbroad, *id.* ¶¶ 111-20; that the anti-circumvention provision amounts to an unconstitutional speech-licensing regime, *id.* ¶¶ 121-28; and that both provisions are unconstitutional as applied to their proposed activities. *Id.* ¶¶ 129-49. They also contend that the Librarian of Congress's denial of exemptions that "would have applied to [Dr.] Green's security research," *id.* ¶ 155; and that "would have applied to [Mr.] Huang and Alphamax's creation and use of NeTVCR," *id.* ¶ 162, violated both the First Amendment and the Administrative Procedure Act ("APA"), *id.* ¶¶ 150-62.[3]

---

[3] Dr. Green has filed a motion for preliminary injunction, seeking to bar the government from prosecuting him under the DMCA during the pendency of this lawsuit. *See* Mot. for PI on Behalf of Pl. Matthew Green Pursuant to Fed. R. Civ. P. 65(a), ECF No. 16. The Court stayed that motion pending resolution of

**C.  Defendants' Motion to Dismiss**

Defendants have moved to dismiss all of plaintiffs' claims. *See generally* Defs.' Mot. to Dismiss, ECF No. 15. Defendants argue that plaintiffs' First Amendment challenges to DMCA sections 1201(a)(1)(A) and 1201(a)(2) should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because plaintiffs lack the standing required to bring such challenges. Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem. Supp."), ECF No. 15-1 at 23-30.[4] Alternatively, defendants argue that those First Amendment challenges to the DMCA provisions, along with the First Amendment challenges to the Librarian of Congress's 2015 final rule, should be dismissed under Federal Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Id.* at 30-51. Defendants also argue that plaintiffs' APA challenge to the Librarian's 2015 final rule should be dismissed under Federal Rule 12(b)(1) for lack of subject matter jurisdiction because the APA's waiver of sovereign immunity "does not apply to the Librarian's [exemption] determination under the § 1201(a)(1)(C) rulemaking process." *Id.* at 51-54.

---

the instant motion to dismiss. *See* Minute Entry of September 30, 2016.

[4] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

The remainder of the Court's Opinion proceeds as follows:
In Part II, the Court briefly discusses the relevant Standards
of Review. In Part III.A, the Court determines that the
plaintiffs have standing to bring their claims. In Part III.B,
the Court addresses plaintiffs' first amendment challenges, and
finds that plaintiffs' facial claims fail, but that plaintiffs'
as-applied claims survive defendants' motion to dismiss. In Part
III.C, the Court determines that plaintiffs' APA challenges
fail.

## II.  Standards of Review

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss for lack of standing and a motion to
dismiss on sovereign immunity grounds are both reviewed under
Federal Rule of Civil Procedure 12(b)(1). *Coulibaly v. Kerry*,
No. 14-0189, 2016 WL 5674821, at *15 (D.D.C. Sept. 30, 2016);
*Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). To
survive a Rule 12(b)(1) motion to dismiss, "the plaintiff bears
the burden of establishing jurisdiction by a preponderance of
the evidence." *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d
48, 53 (D.D.C. 2011) (citing *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 561 (1992)). Because Rule 12(b)(1) concerns a court's
ability to hear a particular claim, the court "must scrutinize
the plaintiff's allegations more closely when considering a

motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Federal Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). In so doing, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but the court need not "accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 63 (D.D.C. 2001). Finally, in reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**B.   Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007) (quotation marks omitted).

Despite this liberal pleading standard, to survive a motion
to dismiss, a complaint "must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible
on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quotation marks omitted). A claim is facially plausible when
the facts pled in the complaint allow the court "to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Id.* The standard does not amount to a
"probability requirement," but it does require more than a
"sheer possibility that a defendant has acted unlawfully." *Id.*

The court must give the plaintiff the "benefit of all
inferences that can be derived from the facts alleged," *Kowal v.
MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994),
considering "the facts alleged in the complaint, documents
attached as exhibits or incorporated by reference in the
complaint, and matters about which the Court may take judicial
notice," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196
(D.D.C. 2002). The court need not "accept inferences drawn by
plaintiffs if such inferences are unsupported by the facts set
out in the complaint" or "legal conclusions cast in the form of
factual allegations." *Kowal*, 16 F.3d at 1276. Further,
"[t]hreadbare recitals of the elements of a cause of action,

12

supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678. Only a complaint that "states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

## III. Analysis

### A.   Standing

"Article III of the Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560-61).

The injury-in-fact requirement is only satisfied when an injury is "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*,

504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* (quoting *Clapper*, 133 S. Ct. at 1147, 1150 n.5). In the context of a statute that contemplates criminal liability, plaintiffs do not need to expose themselves to actual arrest or prosecution to be subject to "certainly impending" injury. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Instead, the injury-in-fact requirement is satisfied when plaintiffs allege "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *id.*). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

Here, defendants argue that plaintiffs fail to satisfy the injury-in-fact requirement. They argue that plaintiffs' proposed course of conduct is not proscribed by the DMCA, that plaintiffs

are not subject to a credible threat of prosecution, and that
plaintiffs' proposed course of conduct is not arguably affected
with a constitutional interest. Defs.' Mem. Supp., ECF No. 15-1
at 24-27. None of these arguments is availing.

>       1.   **Proposed Course of Conduct Arguably Proscribed by
>            a Statute**

First, plaintiffs have sufficiently alleged that their
proposed course of conduct is arguably proscribed by the DMCA.
With regard to section 1201(a)(1)(A)'s circumvention
prohibition, Dr. Green has alleged that he plans to circumvent
TPMs for purposes of his academic research, Compl., ECF No. 1 ¶¶
75-77, 80; and Mr. Huang and Alphamax have alleged that they
plan to circumvent TPMs to create the NeTVCR, *id.* ¶¶ 93, 109.
With regard to section 1201(a)(2)'s trafficking prohibition, Dr.
Green has sufficiently alleged that he plans to include
"detailed information regarding how to circumvent security
systems" in a book about his research, *id.* ¶ 75, and he has
indicated that the "detailed information" will include computer
code. Decl. of Matthew Green in Supp. of Mot. for PI, ECF No.
16-2 ¶ 19 ("I am now writing an academic book . . . . I would
like to include examples of code capable of bypassing security
measures, for readers to learn from.").[5] And Mr. Huang and

---

[5] It is appropriate to "consider materials outside the pleadings
in deciding whether to grant a motion to dismiss for lack of
jurisdiction." *Jerome Stevens Pharms., Inc.*, 402 F.3d at 1253.

Alphamax have alleged that they intend to disseminate "information about how to build NeTVCR," Compl., ECF No. 1 ¶ 110, which permits the reasonable inference that they will disseminate the technological know-how and computer code required to circumvent the TPMs that bar access to HDMI signals, *see Rann*, 154 F. Supp. 2d at 64 ("In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor."). Accordingly, plaintiffs have put forth a sufficiently "credible statement of intent to engage in violative conduct." *Act Now to Stop War and End Racism Coalition v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) ("*ANSWER*").

## 2.  Credible Threat of Prosecution

Second, plaintiffs have sufficiently alleged that they are subject to a "credible threat of prosecution" under the DMCA. *United Farm Workers*, 442 U.S. at 298. In *United Farm Workers*, the Supreme Court held that a "credible threat of prosecution" existed to permit plaintiffs to challenge a state criminal law prohibiting certain union practices because, even though the criminal penalty provision had never been applied, the state had "not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices."

16

442 U.S. at 302. Thus, *United Farm Workers* only requires "a conventional background expectation that the government will enforce the law." *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005). But, not inaccurately, defendants point to a line of cases in this Circuit suggesting that something more than the government's failure to disavow criminal prosecution under a given statute is required to show a "credible threat of prosecution." *See* Defs.' Mem. Supp., ECF No. 15-1 at 25-26.

That line starts with *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), where the court confronted a pre-enforcement challenge to certain provisions of the Violent Crime Control and Law Enforcement Act of 1994. 103 F.3d at 996-97. The court held that there was a "credible threat of prosecution" as to the provisions of the Act that, by their very terms, singled out plaintiffs——certain gun manufacturers——as the "intended targets." *Id.* at 1000-01. But the court held that there was no such "credible threat of prosecution" as to the provisions that only generically referred to the characteristics of prohibited weapons and that, consequently, "could be enforced against a great number of weapon manufacturers or distributors." *Id.* at 1001. In *Seegars*, the court acknowledged that *Navegar*'s demanding "credible threat of prosecution" analysis was in tension with the permissive *United Farm Workers* analysis and Court of Appeals for the District of Columbia ("D.C. Circuit")

17

cases following *United Farm Workers* and upholding pre-
enforcement review of First Amendment challenges to criminal
statutes. *See* 396 F.3d at 1253-54. Even though in *Seegars* the
court thought that a "special First Amendment rule for
preenforcement review of statutes seems to have no explicit
grounding in Supreme Court decisions," *id.* at 1254, it still
decided to apply *Navegar*'s more demanding test in lieu of *United
Farm Workers*' test outside of the First Amendment context
precisely because *Navegar* represented "the only circuit case
dealing with a non-First Amendment challenge to a criminal
statute." *Id.* The court therefore drew a line between First
Amendment and non-First Amendment pre-enforcement challenges to
criminal laws.

The existence of that line is confirmed by the D.C.
Circuit's post-*Seegars* decisions. In *Parker v. District of
Columbia*, 478 F.3d 370 (D.C. Cir. 2007) and *Ord v. District of
Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), the court considered
non-First Amendment pre-enforcement challenges and applied the
heightened *Navegar* "credible threat of prosecution" test,
demanding that the plaintiff be able to point to "a special law
enforcement priority" that makes prosecution imminent, 587 F.3d
at 1141, or that the plaintiff indicate that he has been
"singled out or uniquely targeted" for prosecution. 478 F.3d at
375. In *ANSWER*, however, the court confronted a First Amendment

18

challenge to regulations governing the placement of posters in the District of Columbia and held that a "credible threat of prosecution" existed. 589 F.3d at 435-36. Although in *ANSWER* the court noted that it was confronted with "somewhat more than the conventional background expectation that the government will enforce the law"——namely that a co-plaintiff was already subject to an enforcement action under the regulations, *id.*——it nowhere indicated that the "somewhat more" was required in the First Amendment context. The D.C. Circuit's more recent decision in *United States Telecom Association v. FCC*, 825 F.3d 674 (D.C. Cir. 2015) seems to confirm that the "somewhat more" is not required, as it cited *ANSWER* solely for the proposition that standing "'to challenge laws *burdening expressive rights* requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" 825 F.3d at 739 (quoting *ANSWER*, 589 F.3d at 435) (emphasis added). Even though in *United States Telecom* the court noted that that principle applied with "particular force" when an agency rule, as opposed to a statute, is challenged, *id.* (citing *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995)), it subsequently emphasized that "'courts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First

Amendment,'" *Id.* at 740 (quoting *New York Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015)).

The scenario currently before this Court falls on the *ANSWER-United States Telecom* side of the line that *Seegars* drew, not the *Navegar-Parker-Ord* side of that line, because plaintiffs challenge DMCA sections 1201(a)(1)(A) and 1201(a)(2) on various First Amendment grounds. In this First Amendment context, there is a "credible threat of prosecution" so long as there is "a conventional background expectation that the government will enforce the law." *United States Telecom*, 825 F.3d at 739. That conventional background expectation exists here. Plaintiffs have adequately alleged that the government has brought charges under section 1201 in the past, Compl., ECF No. 1 ¶ 28, and past enforcement "is good evidence that the threat of enforcement is not chimerical," *Susan B. Anthony List*, 134 S. Ct. at 2345 (internal quotation marks omitted). Additionally, the government has not disavowed enforcement if plaintiffs undertake their proposed course of conduct. *See Susan B. Anthony List*, 134 S. Ct. at 2345; *Humanitarian Law Project*, 561 U.S. at 16; *cf. Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 162 (D.D.C. 2014) (holding that there was no "credible threat of prosecution" in part because "the government has disavowed any intention to prosecute"). Accordingly, plaintiffs have

sufficiently alleged that they are subject to a "credible threat
of prosecution" under the DMCA.

### 3.   Proposed Course of Conduct Arguably Affected with a Constitutional Interest

Finally, plaintiffs have alleged "an intention to engage in
a course of conduct arguably affected with a constitutional
interest." *United Farm Workers*, 442 U.S. at 298. Defendants put
forth an extensive argument as to why plaintiffs' proposed
course of conduct is not arguably affected with a constitutional
interest. *See* Defs.' Mem. Supp. at 18-21; Reply in Supp. of
Defs.' Mot. to Dismiss ("Defs.' Reply"), ECF No. 19 at 7-11.
That argument reduces to the assertion that plaintiffs' proposed
activities of circumvention and trafficking do not amount to the
speech or expressive conduct that implicates First Amendment
rights. But that is a premature merits argument: Whether
plaintiffs' proposed course of conduct squarely implicates First
Amendment rights is certainly an important question in this
case, *see supra* Part III.B, but the resolution of that question
does not determine whether the conduct that plaintiffs would
engage in is at least *arguably* affected with a constitutional
interest. *See Parker*, 478 U.S. at 377 ("[W]hen considering
whether a plaintiff has Article III standing, a federal court
must assume *arguendo* the merits of his or her legal claim.").
*United States Telecom* confirms that "*arguably* affected with a

21

constitutional interest" simply means that a plaintiff has challenged a law on constitutional grounds. There, the court held that a plaintiff had standing in the context of a pre-enforcement First Amendment challenge to certain regulations even though the court, on the merits, concluded that the regulations did not "raise a First Amendment concern." 825 F.3d at 740-44. Logically, then, the standing inquiry only requires a challenge to a given law on constitutional grounds. Because plaintiffs have put forth such a challenge, their proposed course of conduct is "arguably affected with a constitutional interest." *United Farm Workers*, 442 U.S. at 298.

Plaintiffs have thus "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* Accordingly, they have satisfied Article III standing's injury-in-fact requirement. Defendants have not challenged the remaining standing requirements, and it appears to the Court that those causality and redressability requirements are satisfied. Accordingly, plaintiffs have standing as to their challenges to the DMCA's anti-circumvention and anti-trafficking provisions.[6]

---

[6] Having found that plaintiffs satisfy the *United Farm Workers* injury-in-fact inquiry and the remaining requirements to establish their standing to challenge DMCA sections 1201(a)(1)(A) and 1201(a)(2), the Court will not address the

B.    First Amendment Challenges

Plaintiffs make various claims grounded in the First
Amendment. They allege that: (1) DMCA section 1201 is facially
overbroad, burdening "a substantial range of protected speech
that is disproportionate to its legitimate sweep," Compl., ECF
No. 1 ¶¶ 111-20; (2) section 1201(a)(1) creates an
unconstitutional prior restraint and speech-licensing regime,
*id.* ¶¶ 121-28; and (3) the DMCA's anti-circumvention and anti-
trafficking provisions violate the First Amendment as applied to
their proposed course of conduct, *id.* ¶¶ 129-49, and that the
Librarian of Congress violated the First Amendment when she
failed to grant certain exemptions potentially applicable to
plaintiffs' proposed course of conduct as part of the 2015
rulemaking carried out pursuant to DMCA sections 1201(a)(1)(B)-
(D), *id.* ¶¶ 150-62.

The parties dispute the threshold First Amendment question:
Whether plaintiffs have alleged that they intend to engage in
conduct that is protected by the First Amendment. Defendants
first argue that plaintiffs have not alleged that the conduct

---

alternative argument that Dr. Green has standing to challenge
the DMCA provisions because his requested exemption was not
fully granted in the 2015 triennial rulemaking process. *See*
Pls.' Opp'n to Mot. to Dismiss, ECF No. 18 at 17-18.
Additionally, defendants do not challenge plaintiffs' standing
as to their facial First Amendment and APA claims vis-à-vis the
Librarian of Congress's 2015 final rule, and it appears to the
Court that plaintiffs have standing to make those claims.

they intend to engage in—circumventing access controls in
violation of section 1201(a)(1)(A)—qualifies as protected speech
or expressive conduct. Defs.' Mem. Supp., ECF No. 15-1 at 28.
Rather, according to defendants, it is the activities that would
take place after plaintiffs violate section 1201(a)(1)(A) that
is constitutionally protected—specifically, informing
manufacturers of security vulnerabilities, publishing a book
about circumventing security systems, and creating a device that
would allow copyrighted materials to be copied and altered in a
high resolution format. *Id*. Therefore, according to defendants,
circumventing access controls is not protected. Second,
defendants argue that plaintiffs have not alleged that any item
they wish to disseminate in violation of section 1201(a)(2)
qualifies as protected speech. *Id*. at 29. To support that
position, defendants principally rely on *Zemel v. Rusk*, 381 U.S.
1 (1965) and *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978). Defs.'
Mem. Supp., ECF No. 15-1 at 28-29, 31-32, 41-42; Defs.' Reply,
ECF No. 19 at 13. In the former case, Mr. Zemel sought to travel
to Cuba to learn about the state of affairs in that country and
to become a better informed citizen, but the Secretary of State
refused to render the permission necessary for him to travel to
Cuba. *Zemel*, 381 U.S. at 3-4. Although the Court acknowledged
that the "Secretary's refusal to validate passports for Cuba
renders less than wholly free the flow of information concerning

that country," it reasoned that no First Amendment right was implicated because the Secretary's refusal to validate the passports was "an inhibition of action." *Id.* at 16. The Court concluded that the "right to speak and publish does not carry with it the unrestrained right to gather information." *Id.* at 17. In *Houchins*, the Court held that no First Amendment right was implicated by a county policy barring the media from accessing a county jail where such access was requested "to prevent officials from concealing prison conditions from the voters and impairing the public's right to discuss and criticize the prison system and its administration." 438 U.S. at 8. The Court indicated that even if the First Amendment guarantees a right to communicate or publish, it does not guarantee a right to access information in the first place. *See id.* at 10-12. Accordingly, defendants assert that in these cases the Supreme Court made clear "that the subsequent *use* an individual intends to make of certain information does not confer any First Amendment right to *acquire* that information in the first place." Defs.' Mem. Supp., ECF No. 15-1 at 28.

Plaintiffs respond that they have alleged a viable First Amendment claim because they alleged that they: (1) "have created computer programs that are designed to circumvent access controls on certain copyrighted works" and "[s]ection 1201 burdens the right to create and use computer code," Pls.' Opp'n

to Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 18 at 27 (citing

Compl., ECF No. 1 ¶¶ 132, 139); (2) "seek to gather factual

information that they intend to share with the public" and

"[s]ection 1201 burdens the right to gather information," *id.* at

28 (citing Compl., ECF No. 1 ¶¶ 78-82, 93, 98-106); (3) "seek to

create new information that they intend to share with others"

and "[s]ection 1201 burdens the right to create and share

information," *id.* at 29 (citing Compl., ECF No. 1 ¶¶ 75, 90-91,

98-106); (4) "seek to disseminate the technological information

they have developed" and "[s]ection 1201 burdens the right to

publish speech," *id.* at 31 (citing Compl., ECF No. 1 ¶¶ 75, 110,

112-13); (5) "[m]any people want to receive the information

[they] seek to offer" and "[s]ection 1201 burdens the right to

receive information," *id.* at 31-32 (citing Compl., ECF No. 1

¶¶ 90-91, 100-01, 107). Defendants concede that Dr. Green's

intended publication of decryption code is protected by the

First Amendment, but disagrees that any of the other activities

in which plaintiffs want to engage are protected. Defs.' Reply,

ECF No. 19 at 12-16.

The Court, as do defendants, *see id.* at 10 n.6, agrees with

plaintiffs that the DMCA and its triennial rulemaking process

burden the use and dissemination of computer code, thereby

implicating the First Amendment. Although the question has not

been addressed by the D.C. Circuit, as other courts have

explained, code "at some level contains expression, thus
implicating the First Amendment." *United States v. Elcom, Ltd.*,
203 F. Supp. 2d 1111, 1126 (N.D. Cal. 2002). Code is speech
precisely because, like a recipe or a musical score, it has the
capacity to convey information to a human. *Universal Studios,
Inc. v. Corley*, 273 F.3d 429, 448 (2d Cir. 2001); *see also
Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because
computer source code is an expressive means for the exchange of
information and ideas about computer programming, we hold that
it is protected by the First Amendment."); *Universal City
Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 327 (S.D.N.Y.
2000) ("As computer code . . . is a means of expressing ideas,
the First Amendment must be considered before its dissemination
may be prohibited or regulated.").

Additionally, it is at least arguable that the DMCA and its
triennial rulemaking process implicate the other First Amendment
interests to which plaintiffs point. Despite *Zemel*'s holding
that a law that inhibits access to information does not
implicate the First Amendment, elsewhere the Court has put that
holding under strain. *See, e.g.*, *First Nat'l Bank of Boston v.
Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes
beyond protection of the press and self-expression of
individuals to prohibit government from limiting the stock of
information from which members of the public may draw."). The

Court has also indicated that the activities of publishing and
sharing information fall within the First Amendment's purview,
*see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) ("An
individual's right to speak is implicated when information he or
she possesses is subjected to 'restraints on the way in which
information might be used' or disseminated.") (quoting *Seattle
Times Co. v. Rhineart*, 467 U.S. 20, 32 (1984)), as does the
right to receive information and ideas, *see Kleindienst v.
Mandel*, 408 U.S. 753, 762-63 (1972) ("'It is now well
established that the Constitution protects the right to receive
information and ideas.'") (quoting *Martin v. City of Struthers*,
319 U.S. 141, 143 (1943)). The course of conduct that plaintiffs
intend to undertake——principally, using computer code to
circumvent TPMs to access copyrighted materials and sharing that
code with others, whether through books, articles, or otherwise,
*see* Pls.' Opp'n, ECF No. 18 at 28-32——arguably implicates each
of these various First Amendment rights, as the DMCA's
prohibition on circumvention and trafficking appears to burden
the accessing, sharing, publishing, and receiving of
information, with "information" understood as both the code that
does the circumventing and the TPM-protected material to which
the circumventing code enables access. Accordingly, it is
appropriate to consider plaintiffs' First Amendment challenges.

1. **Facial First Amendment Challenges to the Anti-Circumvention and Anti-Trafficking Provisions**

Plaintiffs claim that the DMCA's anti-circumvention and anti-trafficking provisions are unconstitutionally overbroad, Compl., ECF No. 1 ¶¶ 111-20, and that section 1201(a)(1)──the portion of the statute that prohibits circumvention but puts in place the triennial rulemaking process to exempt certain uses of certain classes of copyrighted works from the anti-circumvention provision──amounts to an unconstitutional prior restraint on speech. *Id.* ¶¶ 121-28.

"Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (citing *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, and n.15 (1984).

a. **Plaintiffs Fail to State an Overbreadth Claim**

Plaintiffs' overbreadth argument proceeds in two steps: Consistent with their as-applied fair use argument, *see infra* Section III.B.2, plaintiffs contend that fair use is constitutionally required, Pls.' Opp'n, ECF No. 18 at 45 n.15, and because the DMCA provisions burden a substantial number of possible fair uses of copyrighted materials that third parties

might make, those provisions are unconstitutionally overbroad, *id.* at 45-46. Defendants counter that section 1201(a) is not subject to an overbreadth claim because the challenged provisions do not directly regulate speech, Defs.' Mem. Supp., ECF No. 15-1 at 30-32, and that an overbreadth claim is inappropriate because plaintiffs do not adequately distinguish their as applied fair use arguments from their overbreadth arguments, *id.* at 33-34. Defendants also argue that even if the Court reaches the merits of the overbreadth claim, that claim still fails because the "DMCA's anti-circumvention and anti-trafficking provisions are plainly legitimate in the vast majority of applications." *Id.* at 34.

A First Amendment overbreadth challenge asserts that a law is written so broadly that it inhibits the constitutionally protected speech of third parties. *Taxpayers for Vincent*, 466 U.S. at 798. This type of facial First Amendment challenge "is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988) (citing *Thornhill v. Alabama*, 310 U.S. 88, 97-98 (1940)). "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the

statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Application of the overbreadth doctrine is "strong medicine" and should be employed "sparingly and only as a last resort," *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) because "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds," *Taxpayers for Vincent*, 466 U.S. at 801.

The Court is not persuaded that plaintiffs have alleged facts sufficient to state a claim that DMCA provisions are unconstitutionally overbroad because they "have failed to identify any significant difference" between their claim that the DMCA provisions are invalid on overbreadth grounds and their claim that those provisions are unconstitutional when applied to their proposed course of conduct. *See Taxpayers for Vincent*, 466 U.S. at 802. Plaintiffs' argument in both scenarios is that fair use is constitutionally required and that the DMCA inhibits fair use rights and thus is unconstitutional. Pls.' Opp'n, ECF No. 18 at 45 n.15, 45-46. Plaintiffs allege a number of potential fair uses that the DMCA burdens because the Librarian denied exemptions requested by third parties in the 2015 triennial rulemaking process. Compl., ECF No. 1 ¶ 39. Plaintiffs' as-

applied claims, however, arise out of the denials of exemptions either they requested, or that would have covered their conduct. *Id.* ¶¶ 78, 107, 108. Plaintiffs have not alleged that the DMCA "will have any different impact on third parties' interests in free speech than it has on" their own. *Taxpayers for Vincent*, 466 U.S. at 801; *see also Waters v. Barry*, 711 F. Supp. 1125, 1133 (D.D.C. 1989) ("[W]hen, as here, the plaintiffs are themselves engaged in protected activity—when the challenged statute would have no greater impact upon the rights of nonparties than it would have upon the rights of the parties before the Court—there is no need to employ a traditional overbreadth analysis."). The Court therefore need not reach the question of whether the "DMCA's anti-circumvention and anti-trafficking provisions are plainly legitimate in the vast majority of applications." Defs.' Mem. Supp., ECF No. 15-1 at 34.

Accordingly, defendants' motion to dismiss plaintiffs' overbreadth claim is **GRANTED** and that claim is **DISMISSED**.

> **b.  Plaintiffs Fail to State a Prior Restraint Claim**

Plaintiffs allege that the triennial exemption process is a speech-licensing regime and, as such, it lacks "the safeguards the First Amendment requires," Compl., ECF No. 1 ¶ 122, because the rulemaking process "lacks definite standards," Pls.' Opp'n,

ECF No. 18 at 26, and because the process does not include the requirements described by *Freedman v. Maryland*, 380 U.S. 51 (1965)——namely, prompt licensing decisions, expeditious judicial review of those decisions, and a mandate that the censor go to court to obtain a judicial order permitting the suppression of speech, Pls.' Opp'n, ECF No. 18 at 33, 35 (citing *Freedman*, 380 U.S. at 58-60). Defendants counter that "the triennial rulemaking provided by section 1201(a)(1)(c) simply does not qualify as a prior restraint on speech" because: (1) it created exemptions based on class-by-class, as opposed to case-by-case, determinations, Defs.' Mem. Supp., ECF No. 15-1 at 40-41; (2) it "does not impose direct limitations on an individual's own speech," but rather "restrict[s] access to *someone else's* copyrighted materials," *id.* at 41; and (3) it is a mechanism for granting exemptions to an otherwise constitutional prohibition on circumvention, *id.* at 43-44. In any event, defendants argue, if the exemption regime can be contemplated under prior restraint doctrine, it is a content-neutral regime that satisfies intermediate scrutiny. *Id.* at 43-45.

The question at this juncture is whether plaintiffs have sufficiently alleged facts to state a facial claim that the exemption rulemaking process is an unconstitutional speech-licensing regime. A challenge to a law as a prior restraint on speech is a challenge to that law because it results in

censorship: "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 758 (1988). Whether there is a prior restraint on speech depends on whether the licensor has "unconfined authority to pass judgment on the content of speech." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002).

The Court is not persuaded that plaintiffs have sufficiently alleged facts to state a claim that the exemption rulemaking process is an unconstitutional speech-licensing regime because plaintiffs have not alleged that the rulemaking process results in censorship through "suppressing disfavored speech or disliked speakers," *Plain Dealer Pub. Co.*, 486 U.S. at 759, nor that the rulemaking defendants are "pass[ing] judgment on the content of speech," *Thomas*, 534 U.S. at 320. Rather, plaintiffs allege that: (1) other applicants for exemptions in the 2015 rulemaking process provided evidence of various categories of protected and noninfringing speech activities that were "adversely affected" by section 1201, Compl., ECF No. 1 ¶ 39; (2) the circumvention ban "has an adverse effect on computer research like [Dr.] Green's," *id*. at 79; (3) "[f]ear of liability [and criminal prosecution] under [s]ection 1201

34

prevents [Dr.] Green from engaging in . . . research and publishing the results, *id.* ¶¶ 86-87; and (4) "[f]ear of prosecution under [s]ection 1201 deters [Mr.] Huang and Alphamax" from engaging in the activities they want to engage in, *id.* ¶¶ 109-10. Taking the facts alleged to be true and in the light most favorable to plaintiffs, they have not alleged that the rulemaking defendants, in declining to grant certain exemptions, have engaged in censorship based on what plaintiffs want to express, their viewpoint, or who they are.

Plaintiffs argue that they have stated a claim that the exemption process is an unconstitutional speech-licensing regime because it prohibits "a broad array of activities protected by the First Amendment," it "adversely affects legitimate activity," and "[t]he only way that citizens can overcome that ban is to obtain the Government's permission before they are allowed to engage in activities." Pls.' Opp'n, ECF No. 18 at 34. But plaintiffs' arguments provide no support for their claim because they do not argue that the exemption process results in censorship based on what they want to express, their viewpoint, or who they are. And as the Court will explain in detail, the DMCA and its rulemaking process cannot be deemed content-based. *See infra* Section III.B.2.a.

Plaintiffs contend that the alleged lack of safeguards in the rulemaking process enables the rulemaking defendants to

"routinely use their discretion to favor some lawful speech over others." Pls.' Opp'n, ECF No. 18 at 34. Defendants respond that "[t]he exemption determination, as set forth in the statute, is not focused on the speech of the particular individual who proposed the exemption; rather, the Librarian must determine whether the type of proposed use is in fact noninfringing under copyright law, and the factors set forth in section 1201(a)(1)(C) have to do with the general market for copyrighted works and the availability of those works for noninfringing uses." Defs.' Reply, ECF No. 19 at 22. The Court agrees with defendants. Plaintiffs have not alleged facts indicating that the rulemaking defendants' decision of whether to grant exemptions in the 2015 rulemaking process was based on the content of what those who sought exemptions wanted to say, their viewpoint, or who they are. *See generally* Compl., ECF No. 1. The allegations here are therefore entirely distinguishable from speech licensing regimes where the scheme created a prior restraint based on the content of what the speaker wanted to express. *See e.g., Plain Dealer Pub. Co.*, 486 U.S. at 758, 759 (ordinance creating a permitting scheme for the placement of newsracks on public property where decision of whether to approve the permit could be based on the content of the newspaper); *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)

(statute requiring the submission of motion pictures to censor before they could be exhibited).

Because plaintiffs have failed to allege facts to state a facial claim that the exemption rulemaking process has resulted in censorship based on "the content or viewpoint of speech by suppressing disfavored speech or disliked speakers," *Plain Dealer Pub. Co.*, 486 U.S. at 758, the Court need not reach what procedural protections would be required if the process were a speech-licensing regime.

Accordingly, defendants' motion to dismiss plaintiffs' prior restraint claim is **GRANTED** and that claim is dismissed.

### 2. As-Applied First Amendment Challenges to the Anti-Circumvention and Anti-Trafficking Provisions

Plaintiffs allege that the anti-circumvention and anti-trafficking provisions are unconstitutional as applied to Dr. Green's proposed circumvention and trafficking for purposes of his security research and as applied to Mr. Huang's and Alphamax's proposed circumvention and trafficking for purposes of their creation, use, and dissemination of the NeTVCR. Compl., ECF No. 1 ¶¶ 129-49. Defendants argue that plaintiffs have failed to state an as-applied challenge that survives intermediate scrutiny. Defs.' Mem. Supp., ECF No. 15-1 at 45-51. For the reasons explained below, the Court is persuaded that

plaintiffs have adequately alleged as-applied First Amendment claims.

> **a.  The Anti-Circumvention and Anti-Trafficking Provisions of the DMCA Trigger Intermediate Scrutiny**

To determine whether plaintiffs have alleged facts sufficient to show that section 1201, as applied to their intended conduct, violates the First Amendment, it is necessary to determine what level of scrutiny applies to the intended conduct. The level of scrutiny depends on whether the relevant restriction is content-neutral or content-based. A content-based restriction triggers strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (internal quotation marks omitted). A content-neutral restriction, on the other hand, triggers intermediate scrutiny, which only requires the government to prove that the restriction serves a substantial governmental interest; that the interest served is unrelated to the suppression of free expression; and that the restriction does not burden substantially more speech than is necessary to further the government's legitimate interest. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994) (citing *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 799 (1989); *United States v. O'Brien*, 391
U.S. 367, 377 (1968)).

The Court is persuaded that the restrictions on speech here
are content-neutral, thereby triggering intermediate, rather
than strict, scrutiny. Even when conduct or activity is
sufficiently expressive to be appropriately designated as
"speech" that implicates First Amendment rights, that does not
mean that that expressive activity cannot be bifurcated into
separate speech and non-speech components. *See O'Brien*, 391 U.S.
at 376 ("[W]hen 'speech' and 'nonspeech' elements are combined
in the same course of conduct, a sufficiently important
governmental interest in regulating the nonspeech element can
justify incidental limitations on First Amendment freedoms.").
The expressive activity in which plaintiffs intend to engage
that runs afoul of the DMCA's anti-circumvention and anti-
trafficking provisions——the use of code to circumvent TPMs and
the dissemination of that code to others——involves these
separate speech and non-speech components and, critically, the
DMCA targets only the non-speech component.

The Court of Appeals for the Second Circuit in *Universal
City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001),
cogently explained the distinction between the speech and non-
speech components of expressive activity in the DMCA context.
The court explained that code capable of circumventing TPMs is

39

purely functional (*i.e.*, non-speech) when it communicates a
decryption message through a computer. *Corley*, 273 F.3d at 451,
454. And because circumventing (the concern of section
1201(a)(1)(A)) is so closely linked with trafficking in code
capable of circumvention (the concern of section 1201(a)(2)),
the functional, non-speech aspect of code is implicated by both
of the DMCA's prohibitions. *See id.* at 451-52 (citing *Universal
City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 331-32
(S.D.N.Y. 2000)). In other words, because trafficking assuredly
results in circumvention, it is appropriate to consider the
functional, non-expressive use of code in the context of both
the anti-circumvention and anti-trafficking provisions. The
court then held that the DMCA and an injunction issued pursuant
to its anti-trafficking provisions prohibiting the posting of a
specific code capable of circumvention——DeCSS——was content-
neutral because only the functional, non-speech component of the
code was targeted:

> [T]he target of the posting provisions of the
> injunction——DeCSS——has both a nonspeech and a
> speech component, and . . . the DMCA, as
> applied to the Appellants, and the posting
> prohibition of the injunction target only the
> nonspeech component. Neither the DMCA nor the
> posting prohibition is concerned with whatever
> capacity DeCSS might have for conveying
> information to a human being, and that
> capacity, as previously explained, is what
> arguably creates a speech component of the
> decryption code. The DMCA and the posting
> prohibition are applied to DeCSS solely

>       because of its capacity to instruct a computer
>       to decrypt CSS. That functional capability is
>       not speech within the meaning of the First
>       Amendment.

*Id.* at 454. Because the DMCA targeted only the non-speech

component of the expressive activity of using and disseminating

code and thereby only incidentally burdened the speech

component——the code's ability to communicate to a human——the

restriction was deemed content-neutral. *See id.*

The same analysis is warranted in this case. As concerns

plaintiffs' First Amendment right to use and disseminate

computer code, the appropriate analysis is indistinguishable

from that in *Corley* and from two district court decisions that

followed *Corley*. *See 321 Studios v. Metro Goldwyn Mayer Studios,

Inc.*, 307 F. Supp. 2d 1085, 1101 (N.D. Cal. 2004) ("This Court

comes to the same conclusion as the courts who previously

considered this question, and determines that intermediate

scrutiny is the appropriate standard under which the DMCA should

be analyzed."); *United States v. Elcom Ltd.*, 203 F. Supp. 2d

1111, 1128-29 (N.D. Cal. 2002) ("Divorcing the function from the

message . . . is precisely what the courts have done in other

contexts . . . . Accordingly, the court concludes that

intermediate scrutiny, rather than strict scrutiny, is the

appropriate standard to apply."). Thus, because the anti-

circumvention and anti-trafficking provisions target the

functional, non-speech component of plaintiffs' use and
dissemination of code and only incidentally burden the ability
of the code to express a message to a human (*i.e.*, the "speech"
component), those provisions are properly deemed content-
neutral. Those provisions are also properly deemed content-
neutral even when plaintiffs' various other arguably-burdened
First Amendment rights are considered. Those expressive rights——
the rights to gather, share, publish, and receive information——
are only incidentally burdened for the same reason the right to
use and disseminate expressive code is only incidentally
burdened: The DMCA provisions target the functional, non-speech
capacity of code to communicate messages to a computer.
Accordingly, no matter which of plaintiffs' First Amendment
rights is implicated, the DMCA provisions are appropriately
deemed content-neutral.

The Court is not persuaded by plaintiffs' arguments to the
contrary. Plaintiffs argue that the anti-trafficking provision
bans speech about "the particular subject matter . . . of
circumventing TPMs, while allowing speech on every other subject
matter," thereby making it a content-based restriction. Pls.'
Opp'n, ECF No. 18 at 38. But this argument was considered and
rejected in *Corley* and *Elcom* and should be here as well for the
reason explained by those courts and explained above: It
overlooks that the DMCA targets only the non-speech component of

plaintiffs' proposed expressive activity and therefore cannot be considered a content-based restriction. *Corley*, 273 F.3d at 454; *Elcom*, 203 F. Supp. 2d at 1128-29. The code's functional capability——the target of the DMCA provisions——"is not speech within the meaning of the First Amendment." *Corley*, 273 F.3d at 454.

Plaintiffs also argue that the DMCA's permanent exemptions and the criteria that the DMCA directs the Librarian of Congress to consider when deciding upon exemptions under the triennial rulemaking process draw categorical distinctions and thus give rise to a content-based statute. Pls.' Opp'n, ECF No. 18 at 38-39. But that argument fails because it overlooks that what the DMCA directly targets is the functional, non-speech component of expressive activity. That functional capability is not speech. *Corley*, 273 F.3d at 454. Even if the statute and its rulemaking process use certain categorical distinctions——for instance, permanently exempting certain kinds of "reverse engineering" and "encryption research" but not other activities from the reach of the anti-circumvention and anti-trafficking provisions, Pls.' Opp'n, ECF No. 18 at 38 (citing 17 U.S.C. §§ 1201(f)-(g)), and directing the Librarian to consider the impact that the prohibition on circumvention has "on criticism, comment, news reporting, teaching, scholarship, or research" when deciding upon triennial exemptions, *id.* (citing 17 U.S.C.

43

§ 1201(a)(1)(C)(iii)), those categorical distinctions are overlaid on a regime that is regulating something that "is not speech within the meaning of the First Amendment," *Corley*, 273 F.3d at 454. In other words, plaintiffs identify various categorical distinctions that arise in this statutory and rulemaking context, but those categorical distinctions are ultimately concerned with the functional, non-speech capability of code to circumvent TPMs. Identifying categorical distinctions does not convert a regulation of non-speech into a content-based regulation of speech. Accordingly, because the target of the DMCA is the functional, non-speech component of the expressive activity in which plaintiffs intend to engage, the DMCA and the rulemaking process remain content-neutral regulations with only an incidental burden on the speech component of plaintiffs' proposed expressive activity.

The conclusion that the various categorical distinctions in play here do not give rise to a content-based statute and rulemaking process is consistent with *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), which plaintiffs contend supports their position. Pls.' Opp'n, ECF No. 18 at 38. There, the Supreme Court made clear that a court is required "to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." 135 S. Ct. at 2227 (internal quotation marks omitted). If the regulation is content-based on

44

its face, it is "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 2228 (internal quotation marks omitted). If the regulation is not content-based on its face, it can still be deemed content-based if it was enacted because of disagreement with the message that the regulated speech conveys. *Id.* at 2227. Here, the DMCA and its rulemaking process cannot be deemed content-based at either step of the *Reed* inquiry. First, even though categorical distinctions appear on the face of the statute, those categorical distinctions are overlaid on a regulation of the non-speech component of expressive activity and thus are not the sort of facial subject matter- or message-related distinctions that make a regulation content-based; that is, the distinctions are not "based on the message a speaker conveys." *Id.* Second, as other courts have persuasively concluded, with the DMCA and its triennial rulemaking, "Congress was not concerned with suppressing ideas" but rather was concerned with code's functional ability to circumvent TPMs. *Elcom*, 203 F. Supp. 2d at 1128.

45

**b. Defendants Have Failed to Meet Their Burden of Showing that the Anti-Circumvention and Anti-Trafficking Provisions Do Not Burden Substantially More Speech than Is Necessary**

As content-neutral regulations of speech, the anti-circumvention and anti-trafficking provisions trigger intermediate, rather than strict, scrutiny. Subject to intermediate scrutiny, the anti-circumvention and anti-trafficking provisions will be upheld so long as they further a substantial governmental interest; the interest furthered is unrelated to the suppression of free expression; and the provisions do not burden substantially more speech than is necessary to further the government's interest. *Turner Broad. Sys., Inc.* 512 U.S. at 662 (citing *Ward*, 491 U.S. at 799; *O'Brien*, 391 U.S. at 377). "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interest. 'Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Turner*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799). And "the Government . . . bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 665 (quoting *Ward*, 491 U.S. at 799).

Plaintiffs do not dispute that the DMCA is aimed at
furthering a substantial interest and that that interest is
unrelated to the suppression of free expression. *See* Pls.'
Opp'n, ECF No. 18 at 42-44. Congress enacted the DMCA in large
part because of substantial fears of "massive piracy" of
copyrighted works in the digital environment. S. Rep. at 8.
Thus, the government's interest is in "preventing trafficking in
devices and technologies that would undermine the access
controls that protect copyrighted works," Defs.' Mem. Supp., ECF
No. 15-1 at 50, and that interest is "unquestionably
substantial" and, moreover, "that interest is unrelated to the
suppression of free expression." *Corley*, 273 F.3d at 454.

With only the third prong of the applicable test in
dispute, plaintiffs argue that the relevant DMCA provisions
burden substantially more speech than is necessary to further
the government's interest. *See* Pls.' Opp'n, ECF No. 18 at 43-44.
Defendants disagree, arguing that this prong is

> satisfied because the anti-trafficking
> restriction in § 1201(a)(2) would be less
> effective if individuals and companies such as
> Plaintiffs were allowed to disseminate
> decryption technologies, even if they intended
> the dissemination to serve a limited purpose.
> After all, if [Dr.] Green were able to publish
> decryption code as part of a publication
> discussing his security research, there would
> be no guarantee that the recipients of the
> code would similarly restrict their use of the
> code to security research or other likely
> noninfringing uses. Similarly, even if [Mr.]

47

> Huang and Alphamax intend that the NeTVCR
> device they wish to commercially distribute
> would be used by others for noninfringing
> purposes, once the device was available, there
> would be a far higher risk that others might
> use the device in ways that would facilitate
> copyright infringement, including piracy.
> Such results would undermine the effectiveness
> of access controls, thus interfering with the
> online market for copyrighted works by
> deterring copyright owners from making works
> available online at all.

Defs.' Mem. Supp., ECF No. 15-1 at 50.

Plaintiffs respond that this assertion is unsupported by any factual allegations and is illogical. Pls.' Opp'n, ECF No. 18 at 43. First, plaintiffs point out that in certain manifestations of Dr. Green's research or in many of the NeTVCR's applications, the risk of digital piracy is minimal. Pls.' Opp'n, ECF No. 18 at 43. According to plaintiffs, there is no online marketplace for certain "subjects of Dr. Green's research" and that, as concerns NeTVCR, "many applications" relate to "physical media played via an HDCP-enabled device, which would have no effect on copyright owners' decision to make works available online." *Id.* at 43. Defendants do not respond directly to this argument, Defs.' Reply, ECF No. 19 at 27, pivoting instead to rebutting plaintiffs' argument that the various permanent exemptions to the anti-circumvention and anti-trafficking provisions are "insufficient to accommodate fair use and protected speech," which demonstrates that those provisions

are not narrowly tailored, Pls.' Opp'n, ECF No. 18 at 43-44,
pointing to their argument responding to plaintiffs' claim that
the statute is constitutionally overbroad, Defs.' Reply, ECF No.
19 at 27.

At this juncture, the question before the Court is whether,
assuming the facts alleged in the complaint to be true and taken
in the light most favorable to plaintiffs, plaintiffs have
alleged facts sufficient to show that the DMCA provisions, as
applied to their intended conduct, burdens substantially more
speech than is necessary to further the government's legitimate
interests. And it is the government's burden to demonstrate
that the provisions do not burden substantially more speech than
is necessary to further the government's legitimate interest.
The Court is not persuaded that the government has met this
burden.

As to section 1201(a)(1)(A), defendants have conceded that
Dr. Green's intended publication of decryption code is protected
by the First Amendment. Defs.' Reply, ECF No. 19 at 12-16.
Although it is defendants' burden, they have failed to meet that
burden because they have not explained why the provision does
not burden substantially more speech than is necessary to
further the government's legitimate interests. *See* Defs.' Mem.
Supp., ECF No. 15-1 at 45-47; Defs.' Reply, ECF No. 19 at 24-29.

As to section 1201(a)(2), the government asserts that "the anti-trafficking restriction in [section] 1201(a)(2) would be less effective if individuals and companies such as [p]laintiffs were allowed to disseminate decryption technologies, even if they intended the dissemination to serve a limited purpose," and that they "would undermine the effectiveness of access controls, thus interfering with the online market for copyrighted works by deterring copyright owners from making works available online at all." Defs.' Mem. Supp., ECF No. 15-1 at 50. This assertion falls far short of demonstrating that "the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner,* 512 U.S. at 665 (quoting *Ward*, 491 U.S. at 799). At this juncture, none of the facts supporting the asserted risks identified by the government, *see* Defs.' Mem. Supp., ECF No. 15-1 at 50, are in the record in this case. Accordingly, taking the facts alleged in the complaint to be true and affording plaintiffs the benefit of all reasonable inferences, plaintiffs have alleged facts sufficient to state a claim that section 1201, as applied to their intended conduct, violates the First Amendment.[7] Because

---

[7] In another variant of an as-applied challenge, plaintiffs also allege that the Librarian of Congress violated the First Amendment when she failed to grant Dr. Green's exemption request in full and when she failed to grant "exemptions that would have protected [Mr.] Huang and Alphamax's creation and use of NeTVCR" in the most recent triennial exemption rulemaking. Compl., ECF

plaintiffs have alleged facts sufficient to state a claim that

section 1201, as applied to their intended conduct, violates the

First Amendment, the Court need not, at this juncture, reach the

question of whether the anti-circumvention and anti-trafficking

provisions in the DMCA run afoul of the First Amendment because

plaintiffs have alleged that they would make non-infringing uses

of content protected by section 1201. Compl., ECF No. 1 ¶¶ 78,

100, 106, 109. Accordingly, defendants' motion to dismiss

plaintiffs' as-applied claims is **DENIED**.

### C.   The Triennial Rulemaking Process is Not Subject to the Administrative Procedure Act

Plaintiffs claim that the Library of Congress, the

Librarian of Congress, the Copyright Office, and the Register of

Copyrights violated the APA by denying "portions of the

exemptions that apply to [Dr.] Green's security research" and

---

No. 1 ¶¶ 151-52, 157-58. Defendants argue that these First
Amendment challenges to the Librarian's most recent rulemaking
should be dismissed because the anti-circumvention provision is
constitutional as applied to plaintiffs, so any denial of an
exemption to that provision must also be constitutional. Defs.'
Mem. Supp., ECF No. 15-1at 51. Plaintiffs offer no rejoinder to
defendants' argument that the Librarian's denial of exemptions
did not violate the First Amendment. Accordingly, defendants'
unopposed argument can be treated as conceded. *See Hopkins v.
Women's Div., General Bd. Of Global Ministries*, 238 F. Supp. 2d
174, 178 (D.D.C. 2002) ("It is well understood in this Circuit
that when a plaintiff files an opposition to a motion to dismiss
addressing only certain arguments raised by the defendant, a
court may treat those arguments that the plaintiff failed to
address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67-
68 (D.C. Cir. 1997)).

"the exemptions that would have applied to [Mr.] Huang and Alphamax's creation and use of NeTVCR" during the 2015 triennial exemption rulemaking. Compl., ECF No. 1 ¶¶ 154, 161. An APA claim against the Copyright Office and the Register of Copyrights, however, does not lie here——a conclusion that plaintiffs do not seriously contest. *See* Pls.' Opp'n, ECF No. 18 at 52 n.17. Claims under the APA can only challenge "final agency action." 5 U.S.C. § 704. For an agency action to be "final," "the action must mark the consummation of the agency's decisionmaking process" and, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). Because it is the Librarian of Congress, who on behalf of the Library of Congress, "consummates" the triennial exemptions to the DMCA's circumvention prohibition and is only obligated to consider "the *recommendation* of the Register of Copyrights" in that exemption process, 17 U.S.C. § 1201(a)(1)(C) (emphasis added), the challenged "final" action at issue here is an action taken by the Librarian and Library of Congress. Accordingly, the statutory provision subjecting the actions of the Register of Copyrights to the APA, *see* 17 U.S.C. § 701(e), does not permit an APA claim against the Copyright Office or the Register of

Copyrights for agency action taken pursuant to the DMCA's triennial rulemaking process.

Thus, plaintiffs' APA claims are restricted to claims against the Library and Librarian of Congress. Defendants contend that these claims still are not viable, arguing that the APA claims should be dismissed for lack of subject matter jurisdiction because the Library of Congress is not an "agency" as that term is defined in the APA and, accordingly, the APA's waiver of sovereign immunity does not apply to the Librarian's exemption rulemaking. Defs.' Mem. Supp., ECF No. 15-1 at 51. Plaintiffs counter that the APA excludes "the Congress" from its definition of "agency," but the Library of Congress has a "hybrid character" such that in the context of the DMCA's triennial rulemaking it is an Executive Branch agency subject to review under the APA. Pls.' Opp'n, ECF No. 18 at 50-51. Plaintiffs further contend that not understanding the Library to be an Executive Branch agency in connection with its rulemaking authority "would raise grave constitutional questions." *Id.* at 52-53.

The APA waives the sovereign immunity of the United States for claims "in a court of the United States seeking relief other than money damages" when those claims are made against "an agency or an officer or employee thereof." 5 U.S.C. § 702. "The APA defines 'agency' as 'each authority of the Government of the

United States, whether or not it is within or subject to review

by another agency, but does not include——(A) the Congress;

(B) the courts of the United States; (C) the governments of the

territories or possessions of the United States; (D) the

government of the District of Columbia.'" *Franklin v.*

*Massachusetts*, 505 U.S. 788, 800 (1992) (quoting 5 U.S.C.

§§ 701(b)(1), 551(1)).

　　Defendants contend that since the Library of Congress is

part of "the Congress," it falls within "the Congress['s]"

exemption from the APA's definition of "agency," pointing to

abundant authority that would seem to support that conclusion.

Defs.' Mem. Supp., ECF No. 15-1 at 51-52. In *Clark v. Library of*

*Congress*, 750 F.2d 89 (D.C. Cir. 1984), the court observed that

"the Library of Congress is not an 'agency' as defined under the

[APA]" in the context of determining that the plaintiffs relief

in the form of damages from the Librarian was barred by

sovereign immunity, but not certain non-monetary relief. 750

F.2d at 102-03. (citing 5 U.S.C. § 701(b)(1)(A)). And in *Ethnic*

*Employees of Library of Congress v. Boorstin*, 751 F.2d 1405

(D.C. Cir. 1985), the court likewise observed "that the Library

is not an agency under the Administrative Procedure Act." 751

F.2d at 1416 n.15. In *Boorstin*, the court explained that the

Supreme Court in *Kissinger v. Reporters Committee for Freedom of*

*the Press*, 445 U.S. 136 (1980) had "noted that the Library of

Congress is not an agency under the Freedom of Information Act,"
and because the Freedom of Information Act incorporates the
APA's definition of "agency," it follows that the Library is not
an "agency" under the APA. 751 F.2d at 1416 n.15 (citing
*Kissinger*, 445 U.S. at 145); *accord Terveer v. Billington*, 34 F.
Supp. 3d 100, 122 n.10 (D.D.C. 2014).

    Plaintiffs, however, note that both *Clark* and *Boorstin* were
cases involving the Library in its capacity as an employer,
Pls.' Opp'n, ECF No. 18 at 51, and instead point to the more
recent D.C. Circuit case *Intercollegiate Broadcasting System,
Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012)
for the proposition that the Library of Congress has a "hybrid
character" such that when it performs certain functions it is
part of the Legislative Branch, but when it performs certain
other functions it is part of the Executive Branch. Pls.' Opp'n
at 51 (citing 684 F.3d at 1341-42; *Eltra Corp. v. Ringer*, 579
F.2d 294, 301 (4th Cir. 1978)). In *Intercollegiate*, the court
needed to determine whether the Librarian is a "Head of
Department" within the meaning of the Constitution's
Appointments Clause. 684 F.3d at 1341. The court acknowledged
that "Departments" in the Appointments Clause "are themselves in
the Executive Branch or at least have some connection with that
branch," *id.* (citing *Buckley v. Valeo*, 424 U.S. 1, 127 (1976)),
and that the D.C. Circuit had previously referred to the Library

of Congress as a "congressional agency." *Id.* (citing *Keeffe v. Library of Congress*, 777 F.2d 1573, 1574 (D.C. Cir. 1985)). Even so, the court concluded that "the Library of Congress is a freestanding entity that clearly meets the definition of "Department" that performs a range of functions, some of which are primarily for legislative purposes, because the Librarian "is appointed by the President with advice and consent of the Senate and is subject to unrestricted removal by the President," *id.* (internal citations omitted), and because the Library's specific functions at issue in the case——"to promulgate copyright regulations, to apply the statute to affected parties, and to set rates and terms case by case," *id.* at 1342——"are ones generally associated in modern times with executive agencies rather than legislators," *id.* Accordingly, the court concluded that "[i]n this role the Library is undoubtedly a component of the Executive Branch." *Id.* (internal quotation marks omitted).

Defendants respond that the question of "whether, for constitutional purposes, the Library operates as an executive agency"——the question addressed in *Intercollegiate*——is "entirely separate" from the question of whether the Library is part of "the Congress" that is exempt from the APA's definition of "agency." Defs.' Reply, ECF No. 19 at 30. Defendants note that the term "Congress" in the APA is not ambiguous, nor is there any dispute that the Library is part of Congress. *Id.* Defendants

56

also point out that "when Congress intends to subject actions by a Library component to APA review, it does that expressly by enacting statutory language to that effect." *Id.* (citing 17 U.S.C. § 701(e)).

Plaintiffs further argue that Congress made the DMCA's triennial rulemaking process subject to APA review when it enacted the DMCA, pointing to the House Commerce Committee's Report on the DMCA that states that the rulemaking proceeding should be "consistent with the requirements of the Administrative Procedure[] Act," Pls.' Opp'n, ECF No. 18 at 44. (citing Commerce Comm. Rep. at 37); as well as President Clinton's statement upon signing the DMCA that "the Copyright Office is, for constitutional purposes, an executive branch entity," *id.* (citing President William J. Clinton, Statement on Signing the Digital Millennium Copyright Act, (Oct. 28, 1998)); and the fact that the final actions of the Register of Copyrights, who works closely with the Librarian in the DMCA rulemaking, are subject to APA review, *id.* (citing 17 U.S.C. § 701(e)). Defendants respond that the fact that Congress used express statutory language to make the Register's final actions subject to APA review indicates that by not using similar statutory language in the DMCA as to the Librarian's final exemption rulemaking actions, Congress intended to shield that exemption rulemaking from APA review. Defs.' Mem. Supp., ECF No.

15-1 at 52-53; Defs.' Reply, ECF No. 19 at 30. Defendants also argue that because the D.C. Circuit "held the APA did not apply" when it considered another regulatory structure that involved the Librarian acting on a recommendation of the Register of Copyrights, that same conclusion is warranted in this case. Defs.' Mem. Supp., ECF No. 15-1 at 53-54 (citing *Nat'l Ass'n of Broadcasters v. Librarian of Congress*, 146 F.3d 907, 913, 919 (D.C. Cir. 1998).

*Intercollegiate* suggests that the Court should consider the question of whether in its role in the DMCA's triennial rulemaking process "the Library is undoubtedly a 'component of the Executive Branch,'" *id.* at 1341 (citing *Free Enterprise Fund*, 130 S. Ct. at 3163), and if so, whether that affects the exclusion of the Library as part of "Congress" as an agency subject to the APA. The rulemaking process empowers the Librarian to, among other things, determine whether the anti-circumvention provision will, or is likely to, adversely affect a person's ability to make noninfringing uses of a class of copyrighted works. *See* 17 U.S.C. § 1201(a)(1)(C). Just as the Library in its role in *Intercollegiate* in promulgating copyright regulations was "undoubtedly a 'component of the Executive Branch,'" so here too is it arguably a component of the Executive Branch in its role in the triennial rulemaking process.

However, plaintiffs have pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions in "the Congress" that it exempted from the APA's definition of "agency." The fact that the legislative history of the DMCA indicates that Congress intended the rulemaking proceedings to be "consistent" with the APA does not persuade the Court that Congress intended the APA to apply to the DMCA because Congress has demonstrated that when it intends to make a Library component subject to APA review, it does so through express statements in legislative text, not arguably ambiguous statements in legislative history. *See* 17 U.S.C. § 701(e) ("Except as provided by section 706(b) and the regulations issued thereunder, all actions taken by the Register of Copyrights under this title are subject to the provisions of the Administrative Procedure Act of June 11, 1946, as amended (c. 324, 60 Stat. 237, title 5, United States Code, Chapter 5, Subchapter II and Chapter 7"). Furthermore, President Clinton's signing statement says nothing at all about whether the APA should apply to the DMCA. Finally, since the DMCA was enacted in 1998, the Library, while adopting certain APA standards and procedures, has not understood the triennial rulemaking process to be subject to the APA. *See* U.S. Copyright Office, Section 1201 of

TITLE 17, A REPORT OF THE REGISTER OF COPYRIGHTS at 106, 108 (June 2017) (noting that the Librarian's determinations are not subject to challenge under the APA because "[a]lthough the Register of Copyrights issues a recommendation based on the information generated in the rulemaking proceeding, it is the Librarian who adopts the final rule [and] [t]he Library of Congress is not subject to the APA.");[8] *see also N.L.R.B. v. Canning*, 573 U.S. 513, 525 (2014) (noting that "the longstanding 'practice of the government' . . . is an important interpretive factor) (citations omitted)).

Plaintiffs argue if the Library is "undoubtedly" a "component of the Executive Branch" when it promulgates rules but is deemed "the Congress" under the APA, then this creates a separation of powers issue because Congress is unconstitutionally exercising Executive Branch power when DMCA exemptions are promulgated. *Id.* 51-53 (citing *Metro. Washington Airports Auth. V. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 299-300 (1991); *Springer v. Philippine Islands*, 277 U.S. 189, 202 (1928)). Plaintiffs urge the Court to avoid this constitutional problem by understanding the Library

---

[8]  In deciding a motion to dismiss, "a Court may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012) (citing *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010)). Accordingly, the Court **GRANTS** [20] motion to take judicial notice.

to be "an 'agency' for the purposes of the APA when it
promulgates rules under [s]ection 1201." *Id.* at 53. Plaintiffs
have not, however, challenged the DMCA on the grounds that its
structure violates separation of powers. *See generally* Compl.,
ECF No. 1. Rather, plaintiffs ask this Court to alter the
meaning of "Congress" as an "agency" in the APA because of an
alleged separation of powers problem not alleged in the
Complaint and in an entirely different statute. The Court has no
basis to do so.

Accordingly, because the Library of Congress is not an
"agency" as that term is defined in the APA, and because
Congress did not expressly apply the APA to the DMCA,
defendants' motion to dismiss plaintiffs' APA claims is **GRANTED**
and those claims are **DISMISSED.**

## IV.  Conclusion

For the reasons stated above, defendants' motion to dismiss
is **GRANTED IN PART** and **DENIED IN PART.** An appropriate Order
accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **June 27, 2019**

61

# Exhibit B

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 21-5195**

**September Term, 2022**

FILED ON: DECEMBER 6, 2022

MATTHEW D. GREEN, ET AL.,
              APPELLANTS

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
              APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01492)

---

Before: WALKER, *Circuit Judge*, and ROGERS and TATEL, *Senior Circuit Judges*

## J U D G M E N T

This cause came on to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. On consideration thereof, it is

**ORDERED** and **ADJUDGED** that the District Court's denial of Green and Huang's motion for a preliminary injunction be affirmed and the case be remanded for further proceedings, in accordance with the opinion of the court filed herein this date.

## Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/

Daniel J. Reidy
Deputy Clerk

Date: December 6, 2022

Opinion for the court filed by Senior Circuit Judge Tatel.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2022     Decided December 6, 2022

No. 21-5195

MATTHEW D. GREEN, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01492)

———

*Corynne McSherry* argued the cause for appellants. With her on the briefs were *Kit Walsh*, *Brian M. Willen*, and *Lauren Gallo White*.

*Rebecca Tushnet* and *Catherine Crump* were on the brief for *amici curiae* Copyright Scholars Pamela Samuelson and Rebecca Tushnet in support of appellants.

*Jack I. Lerner* was on the brief for *amici curiae* Kartemquin Educational Films and International Documentary Association in support of appellants.

2

*Jonathan Skinner-Thompson* was on the brief for *amicus curiae* Accessibility, Security, and Repair Fair Users in support of appellants.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Scott R. McIntosh*, Attorney. *Sonia M. Carson* and *Adam C. Jed*, Attorneys, entered appearances.

*Eleanor M. Lackman* and *John Matthew DeWeese Williams* were on the brief for *amici curiae* Association of American Publishers, Inc. et al. in support of appellees.

*David Jonathan Taylor* was on the brief for *amici curiae* DVD Copy Control Association, Inc. et al. in support of appellees.

Before: WALKER, *Circuit Judge*, and ROGERS and TATEL, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* TATEL.

TATEL, *Senior Circuit Judge*: In this digital age, when content creators choose to make their copyrighted materials— like books, movies, and music—available online, they employ computer code to block unauthorized access, copying, and use. To fortify the protection offered by that code, Congress enacted the Digital Millennium Copyright Act, which makes it unlawful to bypass such technological measures. The question in this case, which comes to us at the preliminary injunction stage, is whether the statute is likely to violate the First Amendment rights of two individuals who write computer code designed to circumvent those measures. The district court answered no, and we agree.

3

## I.

In the 1990s, a growing number of digital tools facilitated "massive piracy" by increasing "the ease with which digital works [could] be copied and distributed worldwide virtually instantaneously." S. Rep. No. 105-190, at 8 (1996). Congress feared that "copyright owners [would] hesitate to make their works readily available on the Internet without reasonable assurances that they [would] be protected." *Id.* In order to provide that protection and adapt copyright law to the digital age, Congress enacted the Digital Millennium Copyright Act (DMCA), 17 U.S.C. §§ 1201 et seq., which "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001).

The DMCA accomplishes its goal through two principal provisions. First, the statute's anticircumvention provision prohibits "circumvent[ing] a technological measure that effectively controls access to a [copyrighted work]." 17 U.S.C. § 1201(a)(1)(A). A "technological measure," also called a "technological protection measure," effectively controls access to a work if it, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). For example, Netflix requires a password to access its digital movie catalog, and electronic books contain code that prevents readers from copying the book into another format. Circumvention occurs when someone descrambles a scrambled work, decrypts an encrypted work, or otherwise avoids, bypasses, removes, deactivates, or impairs a technological measure, without authority from the copyright owner. *Id.* § 1201(a)(3)(A). The statute's second principal provision—the antitrafficking provision—works

4

together with the anticircumvention provision to target the technological tools that facilitate circumvention. It prohibits "manufacturing, importing, offering to the public, providing, or otherwise trafficking in any technology, product, service, device, component, or part thereof" if it (1) "is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyrighted] work;" (2) "has only limited commercially significant purpose or use other than to circumvent;" or (3) "is marketed . . . for use in circumventing." *Id.* §§ 1201(a)(2)(A)–(C) (cleaned up). Those who violate either the anticircumvention or antitrafficking provision are subject to civil actions and criminal sanctions. *Id.* § 1203(a).

In order to ensure that the DMCA does not interfere with the fair use of copyrighted digital content, Congress included a "'fail-safe' mechanism." H.R. Rep. No. 105-551 (Part 2), at 36 (1998). Every three years "the Librarian of Congress, upon the recommendation of the Register of Copyrights," determines in a rulemaking proceeding "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by [the anticircumvention provision]." 17 U.S.C. § 1201(a)(1)(C). If so, the statute instructs the Librarian to grant an exemption for such uses for a three-year period. *Id.* § 1201(a)(1)(D).

The Register also monitors "changes to the copyright system spurred by digital technologies" and their impact on the DMCA. U.S. Copyright Office, *Section 1201 of Title 17* i (2017). In 2017, in order to address "deep and widespread debate among copyright stakeholders" regarding the continued value of the statute, the Register conducted a "comprehensive public study on the operation of section 1201." *Id.* at ii–iii. Emphasizing that "digital [content] marketplace[s] . . . succeed only if copyright owners have the legal right to prohibit persons

5

from evading electronic paywalls or other technical measures," the Register declined to recommend "broad changes" to the DMCA. *Id.* at 44, 152. "[T]he statute's overall structure and scope," it concluded, "remain sound." *Id.* at iii.

Plaintiff Matthew Green, a security researcher and computer science professor at Johns Hopkins University, wants to publish an academic book "to instruct readers in the methods of security research," which will include "examples of code capable of bypassing security measures." Green Decl. ¶ 20. He is concerned that including "instructions in both English and in software code" for "circumvent[ing] technological protection measures" would likely violate the DMCA. *Id.* ¶¶ 20–21. Plaintiff Andrew "bunnie" Huang, an inventor and electrical engineer, wants to create and sell a device called "NeTVCR." Huang Decl. ¶ 12. His device contains computer code capable of circumventing High-Bandwidth Digital Content Protection, a technological protection measure that prevents digital content from being copied or played on unauthorized devices. *Id.* ¶¶ 4–6, 12. He also intends to publish that computer code to "communicate to others how the technology works and encourage them to discuss edits to improve the code." *Id.* ¶ 16. Huang fears that distribution of the code contained in his NeTVCR device "could [risk] prosecut[ion] under Section 1201(a)(1) or (a)(2)." *Id.* ¶ 11.

Claiming that the code they write qualifies as speech protected by the First Amendment, Green and Huang brought a pre-enforcement action challenging the DMCA on facial and as-applied First Amendment grounds. The government moved to dismiss all claims, and the district court partially granted the motion. Concluding that Green and Huang failed to allege "facts sufficient to state a claim that DMCA provisions are unconstitutionally overbroad because they 'have failed to identify any significant difference'" between their facial and

as-applied challenges, the district court dismissed all but the as-applied First Amendment claims. *Green v. DOJ*, 392 F. Supp. 3d 68, 88 (D.D.C. 2019) (quoting *City Council Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984)). Three months later, Green and Huang filed a preliminary injunction motion, seeking relief for their surviving as-applied claims as well as their dismissed facial claims. The district court summarily denied an injunction for the dismissed claims. As to Green's as-applied challenge, the district court concluded that his planned publication was unlikely to implicate section 1201(a) because the book would be designed, used, and marketed for educational purposes rather than for the purpose of circumvention. The district court then addressed Huang's as-applied claim. Favorably citing the Second Circuit's analysis in *Universal City Studios, Inc. v. Corley*—the only decision by a circuit court to have squarely addressed the constitutionality of the DMCA—the district court found that Huang was unlikely to succeed on his as-applied claim and denied him preliminary injunctive relief. Green and Huang now appeal the district court's dismissal of their facial challenge and denial of injunctive relief.

## II.

We start with two preliminary issues: subject-matter jurisdiction and standing.

First, the government contends that Green and Huang's facial challenge is not properly before us because the district court denied preliminary injunctive relief "based [only] on plaintiffs' as-applied challenge." Appellees' Br. 29. There is no question that the usual route to appeal—28 U.S.C. § 1291, which gives this court jurisdiction of timely appealed "final decisions"—is unavailable here. The district court dismissed only Green and Huang's facial challenge, "clear[ly] signal[ing]

7

that it intended [their as-applied claims] to continue." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017). Because the district court's order "le[ft] . . . more for the [district] court to do," it was not final and could not yet be appealed. *North American Butterfly Association v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020) (internal quotation marks omitted).

Green and Huang nonetheless argue that we have jurisdiction because the district court's dismissal was "inextricably bound to the subsequent preliminary injunction ruling." Appellants' Reply Br. 3. It is true that "[o]n interlocutory review of petitions for injunctive relief, this court may reach the merits of a claim inextricably bound up with the issues on appeal." *Arkansas Dairy Cooperative Association v. Department of Agriculture*, 573 F.3d 815, 832 (D.C. Cir. 2009) (internal quotation marks omitted). We do so to determine "'whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the case], and if so, to direct a final decree dismissing it.'" *Id.* at 833 (quoting *Munaf v. Geren*, 553 U.S. 674, 691 (2008)). No such insuperable objection is present here. Plaintiffs need not succeed on their facial First Amendment challenge to succeed on their as-applied claims. *See Hodge v. Talkin*, 799 F.3d 1145, 1156 (D.C. Cir. 2015). Declaring the DMCA facially unconstitutional would resolve Green and Huang's as-applied claims, but not so in reverse, ensuring that their as-applied claims remain anything but inextricably bound to their facial challenge. We therefore lack jurisdiction over Green and Huang's facial challenge.

We next consider standing. A party seeking a preliminary injunction "must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted). In pre-enforcement challenges, like this one, "a plaintiff satisfies the

8

injury-in-fact [standing] requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). Green seeks to publish an academic book "to instruct readers in the methods of security research, including . . . examples of code capable of bypassing security measures, for readers to learn from, as well as instructions written in English." Green Decl. ¶ 20. He plans to "offer [his] book for sale via typical distribution channels," highlighting "the detailed information it contains about bypassing security measures," and "to receive royalties on its sale." *Id.* ¶¶ 24–25. Because Green intends to provide code able to circumvent technological protection measures, he believes the book would likely violate the antitrafficking provision. At oral argument, however, government counsel made quite clear that in its view, Green's proposed course of conduct would not run afoul of the DMCA. Asked by the court whether "[i]t's legal for Green to publish his book even if the book includes enough code to allow someone to piece together a circumvention technology," counsel replied, "[t]hat is correct." Oral Arg. Rec. 33.50–34.11. The government's concession ends any "credible threat of prosecution" against Green, leaving him without standing to obtain a preliminary injunction. *See Food & Water Watch*, 808 F.3d at 913 ("An inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction."). We shall therefore affirm the district court's denial of a preliminary injunction for Green.

### III.

Confident of our jurisdiction, we turn to the merits, asking whether Huang's as-applied claim meets the requirements for

9

a preliminary injunction: that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Given that this case presents only questions of law, our review is de novo. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (explaining that "[w]e review the district court's legal conclusions de novo" in appeals from denials of preliminary injunctions).

"In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted). To succeed on the merits, Huang must show that the DMCA is unconstitutional as applied to his alleged speech activity. *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). We analyze as-applied First Amendment claims in three steps. First, we "decide whether [the activity at issue] is speech protected by the First Amendment." *Cornelius v. NAACP Legal Defense & Education Fund, Inc.*, 473 U.S. 788, 797 (1985). Second, we determine whether the regulation at issue is content based or content neutral, *i.e.*, "if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). This sets the level of scrutiny we apply at the third step: strict scrutiny for content-based statutes and intermediate scrutiny for content-neutral statutes. *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641–42 (1994).

Step one gives us no trouble. Huang wants to sell his NeTVCR device. The device contains "code designed to circumvent certain access controls," which Huang will also

10

publish so that those who own an earlier iteration of his device may upgrade it, and the public may edit and improve his code. Appellants' Reply Br. 10; Oral Arg. Rec. 13.15–13.40. According to Huang, writing and communicating computer code capable of circumventing technological protection measures qualifies as First Amendment protected speech. But we have no need to address that question because the government never challenged that proposition in its brief, and at oral argument it conceded that "if you write code so somebody can read it," it is "expressive" speech. Oral Arg. Rec. 48:32–48:55. All of our sister circuits to have addressed the issue agree. *See, e.g.*, *Corley*, 273 F.3d at 448 ("Instructions that communicate information comprehensible to a human qualify as speech whether the instructions are designed for execution by a computer or a human (or both)."); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (holding that "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming," it is protected by the First Amendment).

We turn then to whether the DMCA "'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *See City of Austin*, 142 S. Ct. at 1471 (quoting *Reed*, 576 U.S. at 163). It does not. The DMCA's anticircumvention and antitrafficking provisions target not the expressive content of computer code, but rather the act of circumvention and the provision of circumvention-enabling tools. *See* 17 U.S.C. § 1201(a)(1)(A) ("No person shall circumvent a technological measure that effectively controls access to a [copyrighted work.]"); *id.* § 1201(a)(2) ("No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any [circumvention technology or product].") To be sure, the DMCA may incidentally make it more difficult to express things with computer code if that code

11

also facilitates circumvention, but that expressive activity is not the statute's target. As the Second Circuit explained in *Corley*, the DMCA "is [not] concerned with whatever capacity [code] might have for conveying information to a human being." 273 F.3d at 454. Rather, it applies to code "solely because of its capacity to instruct a computer." *Id.*

The Supreme Court's recent free speech case, *City of Austin v. Reagan National Advertising of Austin, LLC*, 142 S. Ct. 1464 (2022), is virtually dispositive. There, the Court rejected a First Amendment challenge to a city ordinance that distinguished between signs advertising products not located near the sign (prohibited) and signs advertising products located near the sign (permitted). Rejecting the idea that "a regulation cannot be content neutral if it requires reading the sign at issue," the Court emphasized that the ordinance cared about the expressive message on a sign "only to the extent that it informs the sign's relative location"; "[a] sign's substantive message itself is irrelevant." *Id.* at 1471–73.

The same logic applies here. Although the DMCA requires reading computer code to determine what digital act the code carries out, it is nonetheless content neutral because, in the words of *City of Austin*, it cares about the expressive message in the code "only to the extent that it informs" the code's function. *Id.* at 1473. The code's "substantive message itself is irrelevant." *Id.* at 1472. Indeed, this case is easier than *City of Austin* because the sign ordinance regulated speech as speech, whereas the DMCA looks only to the code's function, not its expressive content. *See Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (explaining that content-neutral laws can be "'justified without reference to the content of the regulated speech'"). Accordingly, the DMCA is content neutral and subject to intermediate scrutiny, a test it easily survives.

12

Under intermediate scrutiny, we will sustain a content-neutral statute if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 662 (internal quotation marks omitted). Congress enacted the DMCA to combat fears of "massive piracy" in the digital environment. S. Rep. No. 105-190, at 8. It intended that section 1201(a) would "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works," so that content owners would be willing to "make available via the Internet . . . movies, music, software, and literary works." *Id.* at 2. In its 2017 study of section 1201, the Register of Copyrights found that the DMCA continues to serve the "essential" purpose of protecting "the right of copyright owners to exercise meaningful control over the terms of access to their works online," and declined to "recommend broad changes to the statute's overall scope." U.S. Copyright Office, *Section 1201 of Title 17* 42–43, 152 (2017). The government's evidence makes clear that "without adequate protection against infringing serial copying," content owners "would not disseminate their valuable copyrighted [digital] content." Traw Decl. ¶ 3. Huang's NeTVCR device would, by design, "permit virtually anything displayable on a modern television screen to be recorded in the clear and made available online" by making obsolete the technological protection measure it targets. U.S. Copyright Office, *Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* 143 (2018). This would "eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement," Balogh Decl. ¶ 5, gutting the government's substantial interest in ensuring the broadest distribution of copyrighted materials. Huang, who

13

spends most of his brief addressing strict scrutiny, offers no meaningful response and is thus unlikely to succeed on the merits.

We have little left to say because "[i]n first Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness*, 831 F.3d at 511 (internal quotation marks omitted). That is especially true here, given that Huang's arguments on the remaining preliminary injunction factors rest entirely on his flawed claim that continued enforcement of the DMCA imperils his First Amendment rights.

For the foregoing reasons, we affirm the district court's denial of Green and Huang's motion for a preliminary injunction and remand for further proceedings consistent with this opinion.

*So ordered.*