NO. 23-5159

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW D. GREEN, ET AL.,

PLAINTIFFS- APPELLANTS,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

DEFENDANTS-APPELLEES.

Appeal from the United States District Court for the District of Columbia
No. 1:16-cv-01492-EGS
Hon. Emmet G. Sullivan

## APPELLANTS' OPENING BRIEF

Corynne McSherry
Kit Walsh
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: corynne@eff.org
Email: kit@eff.org
Email: mitch@eff.org

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Email: bwillen@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300,
San Francisco, CA 94105
Telephone: (415) 947-2000
Email: lwhite@wsgr.com

*Counsel for Plaintiff-Appellants Matthew D. Green, Andrew "bunnie" Huang, and Alphamax, LLC*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Appellants hereby certify as follows:

**A.    Parties and Amici**

The following were parties in the district court proceeding from which this appeal was taken and are the parties before this Court:

a) Matthew D. Green

b) Andrew Bunnie Huang

c) Alphamax, LLC

d) United States Department of Justice

e) Library of Congress

f) United States Copyright Office

g) Carla Hayden

h) Shira Perlmutter (successor to Maria Pallante, *see* Fed. R. Civ. P. 25(d))

i) Merrick Garland (successor to Loretta E. Lynch, *see* Fed. R. Civ. P. 25(d))

j) Digital Content Protection, LLC (amicus)

k) Intel Corporation (amicus)

l) Advanced Access Content System Licensing Administrator, LLC (amicus)

m) DVD Copy Control Association (amicus)

n) Association of American Publishers, Inc. (amicus)

o) Entertainment Software Association (amicus)

p) Motion Picture Association, Inc. (amicus)

q) Recording Industry Association of America, Inc. (amicus)

**B.     Rulings Under Review**

The ruling under review is the district court's June 27, 2019 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (ECF. Nos. 24, 25). The ruling was entered by Hon. Emmet G. Sullivan, United States District Judge for the District of Columbia, in Case No. 1:16-cv-01492-EGS.

**C.     Related Cases**

This case has previously been before this Court as Case No. 21-5195. There are no related cases currently before this court, or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant Alphamax LLC states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........................i

CORPORATE DISCLOSURE STATEMENT ................................................. iii

GLOSSARY OF ABBREVIATIONS ........................................................xi

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF ISSUES FOR REVIEW ................................................1

STATUTES AND REGULATIONS.........................................................1

INTRODUCTION ...........................................................................2

STATEMENT OF THE CASE .............................................................4

I.      FACTUAL BACKGROUND ......................................................4

        A.      The Challenged Regime of Section 1201(a)...............................4

                1.      The Anti-Circumvention and Anti-Trafficking Provisions ................4

                2.      Section 1201's Triennial Rulemaking Process ...................6

                3.      The 2015 Rulemaking .................................................10

                4.      The Copyright Office's 2017 Report................................12

        B.      Section 1201(a)'s Chilling Effects on Plaintiffs .........................13

                1.      Plaintiff Matthew Green .............................................13

                2.      Plaintiffs Andrew "bunnie" Huang and Alphamax ..........................15

II.     PROCEDURAL BACKGROUND.......................................................17

STANDARD OF REVIEW ................................................................19

SUMMARY OF ARGUMENT .............................................................20

ARGUMENT ...............................................................................21

I.      BY DESIGN, SECTION 1201(a) RESTRICTS LAWFUL
        EXPRESSION..........................................................................21

II.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS'
FACIAL CHALLENGE TO SECTION 1201(a)'s LICENSING
SCHEME...............................................................................................26

    A.    Section 1201(a) Establishes a Presumptively Unconstitutional
Speech-Licensing Regime. ...............................................................27

    B.    Section 1201(a) Lacks the "Narrow, Objective, and Definite
Standards" Constitutionally Required of Speech-Licensing
Regimes ...............................................................................................30

    C.    Section 1201(a) Does Not Satisfy the *Freedman* Factors ............36

        1.    The Librarian's Decision Is Not Prompt. ............................36

        2.    There Is No Opportunity for Prompt Judicial Review. ....37

III.    THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS'
FACIAL OVERBREADTH CHALLENGE..........................................40

    A.    Third-Party Claims Present Different Issues from Appellants'
As-Applied Claims. ...........................................................................40

    B.    Section 1201(a) Is Overbroad Because It Imposes Significant
Burdens on a Vast Amount of Protected Speech While Rarely
Being Used for Its Supposed Purposes.............................................44

        1.    Section 1201 Burdens Speech and Conduct That Are
Plainly Lawful Under the First Amendment. ....................45

        2.    Any Legitimate Application of Section 1201 Is
Overshadowed by the Burden on Legitimate Speech. ......46

        3.    It Would Be Unconstitutional to Apply Section 1201(a) to
Bar the Third-Party Activities Described in the
Complaint. ...............................................................................49

CONCLUSION .............................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012) ........................................................ 25

*Adams Outdoor Adver. Ltd. P'ship v. Pa. DOT*,
  930 F.3d 199 (3rd Cir. 2019) ....................................................... 36

*Alexander v. United States*,
  509 U.S. 544 (1993) ..................................................................... 27

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ..................................................... 25

*Andy Warhol Found. for the Visual Arts v. Goldsmith*,
  143 S. Ct. 1258 (2023) ................................................................... 7

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986) ..................................................................... 24

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ..................................................................... 44

*Bernstein v. U.S. Dep't of State*,
  974 F. Supp. 1288 (N.D. Cal. 1997) ............................................ 28

*Boardley v. United States DOJ*,
  615 F.3d 508 (D.C. Cir. 2010) ................................................ 49, 51

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ..................................................................... 44

*Bronco's Entm't v. Charter Twp. of Van Buren*,
  421 F.3d 440 (6th Cir. 2005) ....................................................... 37

*Brown v. Ent. Ass'n*,
  564 U.S. 786 (2011) ..................................................................... 24

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..................................................................... 41

*Carter v. Washington Metro. Area Transit Auth.*,
    503 F.3d 143 (D.C. Cir. 2007) ................................................................ 19

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
    381 F.3d 1178 (Fed. Cir. 2004) ............................................................ 42

*Cincinnati v. Discovery Network*,
    507 U.S. 410 (1993) .............................................................................. 30

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ................................................................................ 49

*City of Littleton v. ZJ Gifts D-4, LLC*,
    541 U.S. 774 (2004) ........................................................................ 36, 37

*Edwards v. Dist. of D.C.*,
    755 F.3d 996 (D.D.C. 2014) .................................................................. 49

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) .............................................................................. 22

*Elsevier Inc. v. WWW.Schi-Hub.org*,
    15 Civ. 4282(RWS), 2015 U.S. Dist. LEXIS 147639
    (S.D.N.Y. Oct. 28, 2015) ...................................................................... 48

*Epona v. Cnty. of Ventura*,
    876 F.3d 1214 (9th Cir. 2017) .............................................................. 27

*Forsyth Cty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ........................................................................ 34, 35

*Freedman v. Maryland*,
    380 U.S. 51 (1965) ..............................................................20, 27, 36, 38, 46

*FW/PBS, Inc. v. Dallas*,
    493 U.S. 215 (1990) (plurality opinion) .......................................... 28, 36

*Georgia v. Public.Resource.Org, Inc.*,
    140 S. Ct. 1498 (2019) .......................................................................... 22

*Golan v. Holder*,
    565 U.S. 302 (2012) ........................................................................ 22, 23

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021) .................................................................... 43, 47

*Green v. United States DOJ*,
 392 F. Supp. 3d 68 (D.D.C. 2019) ................................ 18, 26, 27, 30, 39, 40

*Green v. United States DOJ*,
 54 F.4th 738 (2022) ..................................................... 15, 19, 24

*Green v. United States DOJ*,
 No. 16-1492 (EGS), 2021 U.S. Dist. LEXIS 266496
 (D.D.C. July 15, 2021) ................................................... 18, 39, 43

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
 471 U.S. 539 (1985) ..................................................... 22, 33, 41

*Interstate Circuit v. Dallas*,
 390 U.S. 685 (1968) ................................................................. 28

*Irizarry v. Yehia*,
 38 F.4th 1282 (10th Cir. 2022) ................................................ 25

*Kaahumanu v. Hawaii*,
 682 F.3d 789 (9th Cir. 2012) .................................................. 31

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
 385 U.S. 589 (1967) ............................................................... 48

*Kissinger v. Reps. Comm. for the Freedom of the Press*,
 445 U.S. 136 (1980) ............................................................... 38

*Lakewood v. Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1988) ............................... 20, 27, 28, 29, 30, 31, 34, 35, 36

*Lenz v. Universal Music Corp.*,
 815 F.3d 1145 (9th Cir. 2015) ............................................... 7, 21

*Massachusetts v. Oakes*,
 491 U.S. 576 (1989) ........................................................... 45, 50

*McCullen v. Coakley*,
 573 U.S. 464 (2014) ............................................................... 34

*Med. Imaging & Tech. All. v. Library of Cong.*,
 Civil Action No. 22-499 (BAH), 2023 U.S. Dist. LEXIS 39168
 (D.D.C. Mar. 7, 2023) ........................................................... 38

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ................................................................ 48

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ................................................................ 25

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ............................................................ 51

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
    287 F.3d 1130 (D.C. Cir. 2002) .............................................. 39

*Ness v. City of Bloomington*,
    11 F. 4th 914 (8th Cir. 2021) ................................................. 25

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................ 33

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
    489 F.3d 474 (2d Cir. 2007) ................................................... 23

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969) ........................................................... 30, 31

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ................................................................ 41

*Sony Music Entm't v. Cox Communs., Inc.*,
    Civil Action No. 1:18-cv-00950, 2021 U.S. Dist. LEXIS 68168
    (E.D. Va. Jan. 12, 2021) ......................................................... 48

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ................................................................ 28

*Spirit of Aloha Temp. v. Cnty. of Maui*,
    49 F.4th 1180 (9th Cir. 2022) ................................................. 32

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
    742 F.3d 17 (2d Cir. 2014) ..................................................... 23

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................... 20, 44, 47

*Universal City Studios, Inc. v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ................................ 5, 50

ix

*Vill. of Schaumburg v. Citizens for a Better Env't,*
  444 U.S. 620 (1980) ................................................................. 49

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ................................................................. 45

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ................................................................. 42

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
  17 F.3d 1446 (D.C. Cir. 1994) ............................................... 38

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,*
  536 U.S. 150 (2002) ................................................................. 45

## STATUTES

17 U.S.C. § 106 ........................................................................... 41

17 U.S.C. § 107 ........................................................................ 7, 41

17 U.S.C. § 1201(a)(1) ...................................... 4, 6, 7, 26, 31, 32, 36

17 U.S.C. § 1201(a)(2) ................................................................. 5

17 U.S.C. § 1201(b) ..................................................................... 45

17 U.S.C. § 1203 ......................................................................... 5

17 U.S.C. § 1204 ......................................................................... 5

## OTHER AUTHORITIES

144 Cong. Rec. H10615 (Oct. 12, 1998) ...................................... 6

80 Fed. Reg. 65,944 (Oct. 28, 2015) .......................................... 12

H.R. Rep. No. 105-551, pt. 2 (1998) ...................................... 6, 26

U.S. Const. art. I, § 8 .................................................................. 47

## GLOSSARY OF ABBREVIATIONS

APA                 Administrative Procedure Act

DMCA                Digital Millennium Copyright Act

EPA                 Environmental Protection Agency

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, based on the timely notice of appeal filed by Appellants on July 13, 2023. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES FOR REVIEW

1.      Did the district court err in holding that Plaintiffs-Appellants failed to state a facial claim that Section 1201(a) of the Digital Millennium Copyright Act creates an unconstitutional speech-licensing regime contrary to the First Amendment?

2.      Did the district court err in holding that Plaintiffs-Appellants failed to state a facial claim that Section 1201(a) of the Digital Millennium Copyright Act is contrary to the First Amendment, despite the fact that Section 1201 sweeps up a vast amount of protected speech including fair uses of copyrighted materials which has no connection to the Government's stated interest in preventing copyright infringement?

## STATUTES AND REGULATIONS

All pertinent statutes and regulations cited in this Brief are included in the addendum.

1

## INTRODUCTION

Congress disturbed the careful balance between copyright and the First Amendment when it enacted Section 1201 of the Digital Millennium Copyright Act ("DMCA"). Ostensibly intended to foster the distribution of copyrighted works by providing a legal buttress to copyright owners' technical locks on copyrighted works—and assuming that the massive penalties the Copyright Act already provided would not suffice—in practice Section 1201 inhibits many activities that both copyright and the First Amendment explicitly encourage, like making films, teaching classes, or simply reading literary works that people have purchased. For the first time, it became unlawful to engage in fair uses for purposes such as education, to analyze and reproduce the non-copyrightable elements of a work, or even to read a lawfully purchased e-book, because copyrighted works are frequently encumbered with restriction technologies and Section 1201(a) makes it unlawful to read or use works in ways that conflict with those restrictions.

As a result, for more than twenty years, Americans have been unable to access, create, and publish all kinds of constitutionally-protected expression, including film, art, books, games, and computer code, whenever those activities require circumvention as a necessary predicate.

The Complaint and supporting documents clearly delineate these practical and legally impermissible effects. Nevertheless, the district court treated this case as one

limited to whether or not Section 1201 restricts communication of software that can be used to circumvent, as if lines of code were the only expression being harmed. This fundamental error, in combination with legal errors regarding the scope of the First Amendment, led the district court to dismiss valid claims that seek to vindicate the rights of both Plaintiffs and the American public. No court has yet evaluated whether Section 1201(a) creates an unconstitutional speech-licensing regime, nor considered the decades of accumulated evidence that its impact falls predominantly on legitimate and important speech.

This Court should fill that gap, and then take the further step of recognizing the fundamental conflict between Section 1201(a) and black-letter copyright and constitutional law. Section 1201(a)'s harms are practical, well-documented, and far-reaching. It not only prevents a person from making an otherwise lawful fair use of a clip from a Blu-Ray disc to effectively comment on it or teach students media literacy or filmmaking skills, it also prevents a person with print disabilities from using text-to-speech software to enjoy the book they purchased, or consumer protection researchers from reading the code in personal devices to understand how they work and whether they are invading people's privacy. Further, it prevents communicating *how* to do these things. As a result, it has chilled legitimate teaching and communication about circumvention technology and computer security and has

even been used to censor a news website from simply linking to another internet location where circumvention software could be obtained.

Congress anticipated at least some of these harms, so it created a supposed "safety valve" that operates instead as an unconstitutional speech-licensing regime. That regime lacks both clear, definite standards and the procedural safeguards the First Amendment requires, and, as a result, has generated rules that improperly discriminate against certain types of expression and speakers.

If Congress believes that there is lawful speech that must be restricted to prevent copyright infringement, it must draft a law that is narrowly tailored to the ills it seeks to prevent. Section 1201 is not that law.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

#### A.    The Challenged Regime of Section 1201(a)

##### 1.    The Anti-Circumvention and Anti-Trafficking Provisions

Plaintiffs challenge two provisions of Section 1201(a): the anti-circumvention provision in Section 1201(a)(1), and the anti-trafficking provision in Section 1201(a)(2).

The first provision prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected [by copyright]." 17 U.S.C. § 1201(a)(1). Such measures include encryption, username/password combinations,

4

and physical memory restrictions that prevent a user from accessing stored information. JA16-17 ¶ 18.

The second provision prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that . . . is primarily designed or produced for the purpose of" circumventing an access control technological protection measure. 17 U.S.C. § 1201(a)(2). This language has been interpreted to bar the distribution of not only physical devices, but also knowledge in the form of specific numbers used as encryption keys, instructions describing the mathematical steps that can be used to read encrypted information, and even links telling a reader where this information can be found. *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 308-310, 317-18 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

Both provisions include a private right of action with the possibility of injunctive relief, statutory damages, and the award of fees and costs. 17 U.S.C. § 1203. If the circumvention or trafficking is done for a commercial purpose, it is a federal crime punishable by up to $500,000 in fines and imprisonment for up to 5 years. 17 U.S.C. § 1204(a). Prosecutors are taught that they may pursue individuals even where the circumvention or trafficking has no nexus with actual infringement. JA18-19 ¶ 27.

Under this regime, people across the United States are barred from making educational, critical, and expressive uses of copyrighted works. They cannot read works encumbered by access controls, such as the software in their personal devices, or use excerpts from digital media they lawfully own.

### 2.    Section 1201's Triennial Rulemaking Process

Congress recognized that the statute's breadth could adversely impact legitimate and beneficial speech. H.R. Rep. No. 105-551 (Part 2), at 36 (1998). Accordingly, Congress directed the U.S. Copyright Office ("Office") and the Librarian of Congress ("Librarian") to conduct a rulemaking once every three years to determine "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under this title of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C); 144 Cong. Rec. H10615, H10621 (daily ed. Oct. 12, 1998) (statement of Rep. Klug). If so, the statute instructs the Librarian to grant an exemption for such uses, which expires at the end of each three-year period. 17 U.S.C. § 1201(a)(1)(D). The exemption process applies only to the circumvention ban and provides no shield to trafficking liability.

Many of the important noninfringing uses that can be adversely affected by Section 1201(a) are fair uses. Fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that

law is designed to foster." *Andy Warhol Found. for the Visual Arts v. Goldsmith*, 143

S. Ct. 1258, 1274 (2023) (quoting *Stewart v. Abend,* 495 U.S. 207, 236 (1990)).

Courts determine fair use based on four non-exclusive factors:

> (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2)    the nature of the copyrighted work;
> (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use is "a flexible concept, and its application may well vary

depending on context." *Andy Warhol Found.*, 143 S. Ct. at 1274 (cleaned up).

Nonetheless, fair use "is not just excused by the law, it is wholly authorized by the

law." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2015), *cert.

denied*, 582 U.S. 914 (2017).

Section 1201(a) instructs the Librarian to consider several factors in the

exemption process: (i) the availability for use of copyrighted works; (ii) the

availability for use of works for nonprofit archival, preservation, and educational

purposes; (iii) the impact of the anti-circumvention rule on criticism, comment, news

reporting, teaching, scholarship, or research; and (iv) the effect of circumvention of

technological measures on the market for or value of copyrighted works. 17 U.S.C.

§ 1201(a)(1)(C). In addition, the Librarian may consider "such other factors as the

Librarian considers appropriate." 17 U.S.C. § 1201(a)(1)(C)(v).

In implementing Section 1201(a), the Copyright Office and the Librarian have also imposed additional requirements. JA20-21 ¶ 33. Those include:

- Placing the burden on the party seeking an exemption to establish that their speech should be permitted. The Office explained that because the "'prohibition [of section 1201(a)(1)] is presumed to apply to any and all kinds of works' until the Librarian determines that the requirements for the adoption of an exemption have been met with respect to a particular class of works," the burden remains on the creators seeking exemptions. JA20 ¶ 33(a) (citing U.S. Copyright Office, *Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights*, ("2015 Recommendation"), at 13-15) (October 28, 2015), https://www.copyright.gov/1201/2015/.

- Placing the burden on applicants to demonstrate a widespread impact on noninfringing uses with factual and legal support, rather than a less burdensome showing of impact on the applicant's own speech. JA20 ¶ 33(b) (citing 2015 Recommendation at 16).

- Requiring evidence that people are already engaging in circumvention, inviting criminal and other legal jeopardy. JA20 ¶ 33(c); JA56, U.S. Copyright Office, Section 1207 of Title 17: *A Report of the Register of*

8

*Copyrights* (June 2017) at JA97-98, https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ("Report") (evidence of "anticipated, rather than actual, adverse impacts" is only sufficient in "extraordinary circumstances.").

- Requiring a showing that there is no viable alternative means of engaging in the proposed fair use, including denying exemptions where the only alternatives are either significantly more onerous and expensive or result in lower-quality creations. JA20 ¶ 33(d) (citing, *e.g.*, 2015 Recommendation at 85-87).

- Imposing vague or overbroad restrictions on the exemptions that are granted. *See, e.g.*, 2015 Recommendation at 104-06 (allowing circumvention of audiovisual works "where the person engaging in circumvention ***reasonably believes*** that screen-capture software or other non-circumventing alternatives are unable to produce the ***required level*** of high-quality content") (emphasis added).

Exemptions, once granted, expire at the end of each three-year period unless renewed, and there is no statutory presumption favoring renewal. The Librarian has refused to renew certain exemptions previously granted, including an exemption to research Internet blocklists, an exemption to test for malicious software, and an exemption to allow mobile phone owners to change carriers. JA21 ¶ 35; JA190.

9

### 3.     The 2015 Rulemaking

In the 2015 Rulemaking, members of the public presented evidence that Section 1201 adversely affected a variety of protected and noninfringing speech activities. The Librarian nonetheless denied multiple exemptions while simultaneously granting comparable requests:

- ***Denying*** an exemption request that would have allowed "narrative" filmmakers to circumvent in order to extract, and make fair use of, excerpts of motion pictures while ***permitting*** documentary filmmakers to do the same;

- ***Denying*** an exemption request that would have allowed circumvention to pull short video clips for use in the education of K-12 students in media literacy or critical media studies while ***permitting*** circumvention for educational uses by faculty and students at colleges and universities (for film students or other courses requiring close analysis of film and media excerpts);

- ***Denying*** an exemption that would have allowed circumvention to access videos for educational uses by students and instructors outside the school environment (such as adult education programs) or by students in "massive open online courses" while ***permitting*** circumvention for educational uses by faculty and students at colleges and universities;

10

- ***Denying*** an exemption that would have allowed circumvention of videos for educational uses by museums, libraries, and nonprofits while (again) ***permitting*** circumvention for educational uses by faculty and students at colleges and universities;

- ***Denying*** an exemption for circumvention to access videos to create commercial films while ***permitting*** an exemption for creation of noncommercial films;

- ***Denying*** an exemption for circumvention to support continued use of multiplayer games after they are no longer supported by the maker, but ***permitting*** circumvention to support continued use of single-user video games no longer supported by the maker**.**

- ***Denying*** an exemption for "format shifting" (converting lawfully-acquired media from one format to another, for example, so that it takes up less disk space or is compatible with a wider range of playback or editing software) or "space shifting" (moving lawfully-acquired media from one device to another, *e.g.*, on a tablet for portable viewing, or a phone or mp3 player for portable listening, or a newer or older device for compatibility reasons) while ***permitting*** similar conversions of media to accessible formats for the visually impaired.

JA22 ¶¶ 38, 39 (citing 2015 Recommendation); *see* Library of Congress, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologie*s, 80 Fed. Reg. 65,944 (Oct. 28, 2015) ("2015 Final Rule"); *compare* JA22-23 ¶ 41 (citing 2015 Recommendation) *with* 2015 Final Rule.

### 4.    The Copyright Office's 2017 Report

In 2017, the Copyright Office published a comprehensive report, which documented the toll of Section 1201 on noninfringing and protected speech. JA56, Report. The Report provides ample evidence that seeking exemptions is highly burdensome. Anyone seeking an exemption must show "substantial adverse impact" on noninfringing uses (a requirement not in the statute). JA97. A petitioner must also show that the circumvention ban affects other parties besides themselves— "individual cases" do not suffice. *Id.*

Conceding the toll of the renewal process in particular, the Report recommended shifting the burden so that there is a presumption of renewal but concluded that, while the Office has authority to alter the "process for evaluating proposals," it lacks authority to shift the burden because the statute requires "fresh determination[s] concerning the next three-year period." JA202-04, 210-12.

The Report also acknowledges that the rulemaking does not fully ameliorate Section 1201's chilling effect on speech even where exemptions are granted, because "uncertainty over the reach of [anti-trafficking] provisions may prevent some users

from taking full advantage of exemptions to which they are entitled pursuant to the rulemaking." JA66, 123.

Further, the Report suggests that even the permanent exemptions for certain categories of circumvention fail to adequately protect creation and innovation. JA140. It notes that "several commenters called for an overhaul of the permanent exemption for security testing under section 1201(j), characterizing the statutory language as insufficient to insulate good-faith security researchers from the reach of the circumvention and trafficking prohibitions." JA142. Other commenters explained that even when a permanent exemption existed it was unclear whether their work was covered, forcing them to seek temporary exemptions every three years. "[T]he fact that it was necessary to petition for exemptions covering security research of medical devices and automobiles, even though security research is already a hardcoded exemption in Section 1201, shows why a much more definitive solution . . . is needed." *Id.*

## B.    Section 1201(a)'s Chilling Effects on Plaintiffs

### 1.    Plaintiff Matthew Green

Dr. Matthew Green is a professor of computer science and applied cryptography at the Johns Hopkins Information Security Institute. JA15 ¶ 5, JA29 ¶ 75. He studies the security of computer systems and teaches others how to do the same. JA29 ¶ 75. Computer systems often have serious vulnerabilities that can be

exploited by wrongdoers; security researchers like Dr. Green help manufacturers of these systems to identify those vulnerabilities so they may be fixed. *Id.*

To analyze the security of a given technology, researchers like Dr. Green must understand how the system they wish to analyze works and where it might be vulnerable, including flaws in technological protection measures intended to control access to the systems. JA16-17 ¶ 18, JA29 ¶ 75-77. That requires Dr. Green and his team to circumvent technological protection measures in order to evaluate both the measures themselves and the copyrighted computer code that the measures ordinarily render unreadable. JA16-17 ¶ 18, JA29 ¶ 75-77. Dr. Green has used these methods to identify flaws and suggest fixes for widely used software, such as the automotive anti-theft systems in millions of Ford, Toyota, and Nissan vehicles, Apple's iMessage text messaging system, and the encryption algorithms underlying nearly one third of the world's websites that protect secure online communication and transactions. JA29 ¶ 76. Dr. Green's research is currently protected from Section 1201(a)(1) by a temporary exemption, but security researchers must invest time and resources seeking a renewed permission every three years, with no guarantee of success. And the narrow and vague temporary exemption (*e.g.*, limiting the exemption for security research on electronic devices to "consumer-oriented devices" (JA27-28 ¶¶ 65-72)) creates considerable uncertainty for Dr. Green. As a

result, he has declined to investigate certain technologies and devices. JA30 ¶¶ 80-81.

At the time the Complaint was filed, Dr. Green was also writing a book about his research, which he wanted to offer for sale via typical distribution channels, such as bookstores and online retailers. JA29 ¶ 75. To inform readers about the methods of security research, including how to identify vulnerabilities in computer systems, Dr. Green planned to include examples of code capable of bypassing security measures that restrict access to copyrighted software. *Id*. The marketing materials for his book would also highlight detailed information about bypassing security measures since that is part of the book's value as a tool for understanding cutting-edge security research. *Id*. However, he feared that sharing this information would put him at risk of liability under Section 1201(a). JA18 ¶ 25, JA31 ¶ 87.[1]

### 2.    Plaintiffs Andrew "bunnie" Huang and Alphamax

Dr. Huang is an engineer with a Ph.D. from the Massachusetts Institute of Technology. JA31 ¶ 88. He owns and runs several small businesses, including

---

[1] At oral argument for the first appeal in this lawsuit, "government counsel made quite clear that in its view, Green's proposed course of conduct would not run afoul of the DMCA." *Green v. United States DOJ*, 54 F.4th 738, 744 (2022). Notably, however, the Government's position that Dr. Green's proposed book would not violate Section 1201(a) was not clear to Dr. Green *ex ante*: the Government did not mention it in the district court proceedings or in its appellate brief, only conceding it for the first time at oral argument. Further, the Department of Justice has never committed to this position in writing or purported to bind future Attorneys General to the same view.

Plaintiff Alphamax, and he is a Research Affiliate of the MIT Media Lab. *Id.* Among his inventions is the "NeTV" device, which allows people to edit high-definition digital video streams. JA32 ¶ 89.

Dr. Huang, through Alphamax, wishes to create an improved version of the NeTV device, called "NetTVCR." JA32 ¶ 90. This upgrade would allow people to edit their high-definition digital videos—via "High-Definition Multimedia Interface" signals[2]—and store that edited material at a different location (space-shifting) or in a different format (format-shifting) so that it can be used later. JA32 ¶ 92, JA34 ¶ 101. That capability, in turn, would facilitate a wide range of noninfringing speech. For example, it would enable users to display a live presidential debate along with text from a commentator's live blog, or display coverage from multiple sources at once. JA34 ¶ 100. It would enable the creation of remix videos combining snippets of different works—much like a traditional videocassette recorder could do—or the creation of materials for media literacy education, and versions of videos that are more accessible to persons with visual impairment. *Id.* Teachers could create side-by-side comparisons of rescaled videos. *Id.* NeTVCR would also allow people to recapture the functionality of a videocassette recorder: a person could save content for later viewing, move content

---

[2] High-Definition Multimedia Interface is a digital video standard used to send video signals from devices like computers, digital video disc players, and video game consoles to televisions and computer monitors. JA32 ¶ 92.

to a different device, or convert it to a more useful format. JA32 ¶ 91. Dr. Huang also wishes to publish software instructions about NeTVCR to facilitate the development of new functions. JA35 ¶ 107, JA40 ¶ 140.

NeTVCR's new features depend upon reading encrypted video data so that it can be transformed and analyzed, which requires circumventing the technological protection measure that restricts the reading of High-Definition Multimedia Interface signals: High-Bandwidth Digital Content Protection. JA33 ¶ 93. The "secret" keys needed to decode High-Bandwidth Digital Content Protection have been public since 2010, so less scrupulous technologists can already break this measure. JA33 ¶ 95.

But, like Dr. Green, Dr. Huang and Alphamax fear the possibility of prosecution under Section 1201(a). Accordingly, Section 1201(a) has deterred Dr. Huang from pursuing any of the above activities.[3] JA35 ¶¶ 109-10.

## II.     PROCEDURAL BACKGROUND

On July 21, 2016, Plaintiffs filed this lawsuit—a challenge to both the constitutionality of Section 1201(a) and the resolution of the 2015 triennial

---

[3] The "master key," a collection of numbers that can be used to decrypt High-Bandwidth Digital Content Protection restrictions, was anonymously calculated and uploaded to the Internet in 2010. JA33 ¶¶ 95-96. Intel Corporation has made it clear that it would bring a Section 1201(a) claim against anyone who uses the numbers to create an unauthorized device for High-Bandwidth Digital Content Protection playback. JA33 ¶ 97.

rulemaking. JA16-23 ¶¶ 13-44. On September 29, 2016, Dr. Green moved to preliminarily enjoin enforcement of Section 1201(a). JA6 ECF No. 16. The district court stayed briefing and resolution of that motion pending briefing and resolution of the Government's concurrently filed motion to dismiss the underlying lawsuit. JA6 Minute Order (Sept. 30, 2016).

Nearly three years later, on June 27, 2019, the district court issued an order granting in part and denying in part the Government's motion. *See Green v. United States DOJ*, 392 F. Supp. 3d 68 (D.D.C. 2019) ("*Green I*"). The court correctly determined that Plaintiffs had standing to bring their claims. The court dismissed Plaintiffs' facial challenges to Section 1201(a) (overbreadth and prior restraint) and Administrative Procedure Act claims, but held that in light of Plaintiffs' intended course of conduct, Plaintiffs had stated a claim that the application of Section 1201(a) against them violated the First Amendment. In addition, the court affirmed that code is speech, and that using code to circumvent technological protection measures, and sharing that code with others, are forms of expression protected by the First Amendment. *Green I*, 392 F. Supp. 3d at 86, 96.

On September 19, 2019, Dr. Green again moved for injunctive relief, now joined by Dr. Huang and Alphamax. On July 15, 2021, the district court denied the motion. *Green v. United States DOJ*, No. 16-1492 (EGS), 2021 U.S. Dist. LEXIS 266496, at *34 (D.D.C. July 15, 2021) ("*Green II*"). Plaintiffs timely appealed the

denial of their preliminary injunction motion as well as the underlying Order granting Defendant's motion to dismiss the facial claims.

This Court upheld the district court's preliminary injunction ruling, holding that Section 1201(a) did not target speech and sustaining the district court's finding that, with regard to Plaintiffs' as-applied claims, the statute was "content neutral" and survived intermediate scrutiny. *Green v. United States DOJ*, 54 F.4th 738, 746 (D.C. Cir. 2022) ("*Green III*"). This Court did not consider Plaintiffs' facial challenges that were dismissed at the Motion to Dismiss stage, holding that the Court did not have jurisdiction to consider the facial challenges because the Preliminary Injunction decision was based on Plaintiff's as-applied challenges. *Id.* at 744.

On May 9, 2023, the district court entered final judgment in the case pursuant to Plaintiffs' agreement to voluntarily dismiss the as-applied claims that this Court found unlikely to succeed on the merits in *Green III*. JA356 ECF No. 63. Plaintiffs timely appealed the district court's earlier decision to dismiss Plaintiff's facial challenges.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's order on a motion to dismiss based on the pleadings. *See, e.g.*, *Carter v. Washington Metro. Area Transit Auth.*, 503 F.3d 143, 145 (D.C. Cir. 2007).

## SUMMARY OF ARGUMENT

By design, Section 1201(a) necessarily targets lawful expression: it bans a wide variety of speech, and conduct predicate to speech, that is noninfringing and constitutionally protected. Congress acknowledged this, but its chosen solution—having would-be speakers ask the Librarian of Congress for an exemption to the bans—only deepens the statute's constitutional infirmity by introducing a speech licensing regime. Section 1201(a) lacks narrow, objective, and definite standards for the Librarian to follow, which the First Amendment requires of any speech licensing regime. *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). While Plaintiffs do not need to show that the Librarian has in fact misused their discretion, the Librarian has done so, discriminating among different types of creative expression and would-be speakers, and applying public policy criteria unrelated to copyright. The First Amendment also requires a prompt licensing decision and prompt judicial review. *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965). Section 1201 provides neither.

Section 1201 is also unconstitutional on its face because it is overbroad, burdening vast amounts of protected speech while being superfluous at best for its supposed purposes. *United States v. Stevens*, 559 U.S. 460, 473 (2010). Contrary to the district court's ruling, that broad range of impacted speech raises different and varied constitutional issues that go far beyond those raised by Plaintiffs' as-applied

20

challenges. The statute burdens a range of plainly lawful speech, either by banning it outright, outlawing the actions that make it possible such as excerpting digital media, or by requiring participation in an onerous and expensive rulemaking process every three years. Those burdens reach far beyond what is necessary to prevent copyright infringement and foster the market for digital works.

## ARGUMENT

## I.    BY DESIGN, SECTION 1201(a) RESTRICTS LAWFUL EXPRESSION

As a matter of law, fair uses, pure ideas, and other non-copyrightable expression, such as works in the public domain, *scènes à faire*, and non-creative factual statements, do not infringe copyright. Fair use, in particular, "is not just excused by the law, it is wholly authorized by the law." *Lenz*, 815 F.3d at 1151.

And therein lies the rub. If expression is noninfringing under the Copyright Act, and especially if it is wholly ***authorized*** by the Act, it lies outside the boundaries of copyright and warrants full First Amendment protection. A law that categorically forbade selling factual works like dictionaries would be obviously unconstitutional; the First Amendment would protect the bookseller, and copyright would have no role to play. Fair uses fall into the same category: like public domain works, facts, and ideas, they are excluded from copyright's statutory monopoly, and are therefore deserving of the same constitutional protections as any other expressive activity.

21

This principle animates the Supreme Court's jurisprudence addressing the inherent tension between the Copyright Act and the First Amendment. While both can act as engines for expression, "some restriction on expression is the inherent and intended effect of every grant of copyright." *Golan v. Holder*, 565 U.S. 302, 327-28 (2012).

By marking the "traditional contours" of copyright, however, fair use and the idea/expression dichotomy operate as "built-in First Amendment accommodations." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) (the "idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression'" (citation omitted); *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2019) (fair use is "designed to accommodate First Amendment concerns").

As a result, laws that do not restrict fair uses, nor other noninfringing speech or conduct, generally do not raise First Amendment concerns. In *Golan*, for example, the Court reasoned that heightened First Amendment scrutiny was unnecessary where, *inter alia*, the challenged law "leaves undisturbed the 'idea/expression' distinction and the 'fair use' defense." *Golan*, 565 U.S. at 305. Following the same reasoning in an earlier case, the Second Circuit Court of Appeals found that a French court's judgment of copyright infringement would be repugnant to U.S. public policy

(as embodied in the First Amendment) if it did not accommodate fair use, because "the fair use doctrine balances the competing interests of the copyright laws and the First Amendment." *Sarl Louis Feraud Int'l v. Viewfinder, Inc.,* 489 F.3d 474, 482 (2d Cir. 2007).

Circuit courts have also built First Amendment concerns into the fair use analysis itself. In *Swatch,* for example, the Second Circuit found that "the purpose and character of the use" favored fair use where the defendant's "overriding purpose" was to deliver newsworthy information. *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, 742 F.3d 17, 25, 28 (2d Cir. 2014). "[A]ctivity whose protection lies at the core of the First Amendment, would be crippled if the news media and similar organizations were limited to authorized sources of information." *Id.*

The natural corollary is that where a law ***does*** either "disturb[] the 'idea/expression' distinction and the 'fair use' defense" or "transgress[es] a generally applicable First Amendment prohibition," then First Amendment scrutiny ***is*** warranted. *Golan*, 565 U.S. at 329, 331; *see generally* Neil Netanel, *First Amendment Constraints on Copyright After Golan v. Holder*, 60 U.C.L.A. Law Rev. 1082, 1086 (2013) ("Following *Golan* and *Eldred*, neither Congress nor the courts may eviscerate copyright law's idea/expression dichotomy or fair use privilege without running afoul of the First Amendment.").

Section 1201(a) does both. ***First***, it "disturbs" the fair use defense and the idea/expression dichotomy by impeding a wide range of expressive uses—*e.g.,* constitutionally protected speech such as movies that make fair use of clips from copyrighted works—if extracting those clips requires circumventing technological protection measures. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706-7 (1986) (statute based on non-expressive activity subject to First Amendment scrutiny where it "has the inevitable effect of singling out those engaged in expressive activity"). ***Second***, Section 1201(a) transgresses a general First Amendment prohibition by giving government officials broad discretion to enable some fair uses—such as documentaries that make fair use of clips from copyrighted works—and burden others, such as fictional works using those same clips.

Neither the district court nor this Court have addressed these issues because, having dismissed the facial claims, they focused their analysis of the as-applied claims on whether circumvention code itself is speech, and whether Section 1201 impermissibly burdens that speech. *See Green III*, 54 F.4th at 743-44, 747.

This appeal, however, presents facial challenges that implicate far more than the expressive or functional content of a piece of code. Section 1201 restricts Americans' First Amendment-protected right to access and learn from digital works, including works they already own or embedded in physical objects they own. *See Brown v. Ent. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation

applies to creating, distributing, or consuming speech makes no difference"). It also burdens their rights to create their own protected expression, whether that expression involves fair-use copying of portions of others' works or reflects the uncopyrightable facts and ideas in those works. *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983) (tax on ink and paper "burdens rights protected by the First Amendment"); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) ("video recording is 'unambiguously' speech-creation, not mere conduct"); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (First Amendment protects the "process of expression through a medium" as well as "the expression itself"); *Ness v. City of Bloomington*, 11 F. 4th 914, 923 (8th Cir. 2021) (act facilitating speech that will follow is "a step in the 'speech process,' and thus qualifies itself as speech protected by the First Amendment"); *ACLU v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (laws restricting "an early step in the speech process rather than the end result" are nevertheless subject to the First Amendment).

And as the Complaint explains (subsequently supported by the practical experiences described by multiple amici) Section 1201(a) burdens are not incidental. If they were, thousands of people would not have invested tens of thousands of hours pleading for exemptions from the Library of Congress. What is worse, as technological protection measures become increasingly ubiquitous, the burden of a

prohibition on circumventing them grows as well—a burden far beyond what Congress anticipated in 1998.

It is past time for courts to give Section 1201(a) the constitutional scrutiny it deserves.

## II.     THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' FACIAL CHALLENGE TO SECTION 1201(a)'S LICENSING SCHEME

Congress knew that Section 1201(a)'s ban on circumvention would impair lawful, noninfringing speech. H.R. Rep. No. 105-551 (Part 2), at 36 (1998); JA21 ¶ 34. Rather than narrowing the ban so that it would only implicate acts connected to copyright infringement, Congress instead created a mechanism for would-be speakers to obtain temporary permission to circumvent, at the discretion of the Librarian of Congress. *See* 17 U.S.C. § 1201(a)(1)(B)-(E).

The Complaint explains that Section 1201 adversely affects categories of noninfringing speech and that the threat of prosecution has already chilled the speech of Plaintiffs and other would-be speakers. *Green I*, 392 F. Supp. 3d at 89-90. The district court acknowledged the allegations (*e.g.*, JA38 ¶¶ 125-26) that Section 1201 provided the Librarian with broad discretion in the rulemaking process and that the Librarian "routinely use[s] their discretion to favor some lawful speech over others." *Green I*, 392 F. Supp. 3d at 90. Nonetheless, the district court refused to analyze whether Section 1201 provided the required procedural protections, because it found

that Plaintiffs failed to allege the rulemaking "resulted in censorship based on 'the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.'" *Id.* (quoting *Lakewood*, 486 U.S. at 758).

This was error, for at least three reasons. First, the Librarian is given unbridled discretion and instructed to consider vague factors, and "a permitting scheme is not 'content neutral' if it vests unbridled discretion in a permitting official." *Epona v. Cnty. of Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017). Second, Plaintiffs **did** explain in the Complaint how the rulemaking has led to improper distinctions based on content, speaker, and media. JA19 ¶ 31, JA22-24 ¶¶ 38-41, 49. And third, even content-neutral speech-licensing regimes must have clear and definite standards to pass constitutional muster. *Lakewood,* 486 U.S. at 763-64.

## A.    Section 1201(a) Establishes a Presumptively Unconstitutional Speech-Licensing Regime.

A prior restraint is any law "*forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). A speech-licensing regime that requires would-be speakers to seek permission from the Government before engaging in protected expression—or an activity with a "nexus to expression, or to conduct commonly associated with expression"—is a quintessential prior restraint subject to a facial challenge. *Lakewood*, 486 U.S. at 757 (finding unconstitutional an ordinance requiring a permit to operate newsracks); *accord Freedman*, 380 U.S. at 58-60

(ordinance requiring a license to show motion pictures); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) (plurality opinion) (ordinance requiring a permit to operate a business selling sexually explicit books and movies); *Bernstein v. U.S. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) (regulation requiring a license to export encryption technology).

"[T]he evils attendant on prior restraint 'are not rendered less objectionable because the regulation of expression is one of classification rather than direct suppression.'" *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975); *see also Interstate Circuit v. Dallas*, 390 U.S. 685 (1968) (striking down ordinance empowering a local board to classify films as "not suitable for young persons" without clear standards). And a licensing scheme need not be content-based to constitute a prior restraint. *See Lakewood*, 486 U.S. at 764 (explaining that even a "content-neutral prohibitions on a particular manner of speech" requires constitutional review to determine if the government has "boundless discretion").

Section 1201(a) constitutes a speech-licensing regime because would-be speakers must ask the government for permission before engaging in a host of lawful speech activities if they require the circumvention of a technological protection measure. JA22-23 ¶¶ 38-41. To take just a few examples from the record in this case:

- Certain educators cannot use high quality video clips as teaching materials in the classroom.

- Certain filmmakers cannot use high quality video clips in new creative works.

- Independent repair shops cannot extract and share information about how "smart" appliances work and how to repair them.

- Print-disabled users cannot make full use of electronic book readers.

- Libraries and museums cannot preserve "born-digital" works never published in a physical medium.

- Media artists cannot create high-quality noncommercial "fan fiction" and new artistic commentary.

- Security researchers cannot extract and share information regarding potential security and privacy risks in cars, appliances, and telephones.

JA22-23 ¶¶ 38-41.

As discussed *supra*, the ban on circumvention is both a direct ban on First-Amendment-protected acts of reading lawfully-acquired works, and a ban on a step in the chain of expression with a close nexus to speech. *See Lakewood*, 486 U.S. at 757. Such bans must withstand First Amendment scrutiny under *Lakewood*, *Freedman*, and their progeny.

29

**B.    Section 1201(a) Lacks the "Narrow, Objective, and Definite Standards" Constitutionally Required of Speech-Licensing Regimes**

Speech-licensing regimes that give government officials unbounded discretion to approve or deny an applicant's ability to engage in protected speech create an unacceptably high risk that officials will abuse that discretion, or "intimidate[] parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood*, 486 U.S. at 757-58; *see also Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) (a licensing scheme that allows the "uncontrolled will of an official" to decide whether lawful speech is permitted is an unconstitutional prior restraint).

To mitigate this risk, speech-licensing regimes must include "narrow, objective, and definite standards to guide the licensing authority" rendering it subject to effective judicial review. *Shuttlesworth,* 394 U.S. at 150-51; *see, e.g., Cincinnati v. Discovery Network*, 507 U.S. 410, 423 n.19 (1993) ("[B]ecause the distinction between a 'newspaper' and a 'commercial handbill' is by no means clear . . . the responsibility for distinguishing between the two carries with it the potential for invidious discrimination of disfavored subjects.").

Contrary to the district court's assumption, a licensing regime need not expressly target speech based on the viewpoint, content or identity of the speaker. *Green I*, 392 F. Supp. 3d at 90. The question is not whether an official has engaged

30

in viewpoint discrimination, but whether the statutory scheme has established clear and definite standards. *Lakewood*, 486 U.S. at 757-58; *see* JA19 ¶ 31, JA22-24 ¶¶ 38-41, 49.

Here, the broad factors that the Librarian may consider are not "narrow, objective, and definite." *Shuttlesworth*, 394 U.S. at 150-51. In addition to the statutorily prescribed factors, Section 1201 grants the Librarian unfettered discretion to consider "***such other factors as the Librarian considers appropriate***." 17 U.S.C. § 1201(a)(1)(C)(v) (emphasis added). This is nearly identical to the provision deemed unconstitutional in *Lakewood*. There, a newspaper publisher sought to place newsracks on city sidewalks, but under an updated city ordinance the publisher was required to seek city officials' permission for a permit to do so. *Lakewood*, 486 U.S. at 753. Under the ordinance, the mayor had the authority to grant or deny annual newsrack permits. In the event a permit was granted, the permit was subject to several terms and conditions including "***any 'other terms and conditions deemed necessary and reasonable by the Mayor***.'" *Id.* at 754 (emphasis added). The Supreme Court explained that it "is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion," recognizing that "nothing in the law as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id.* at 769; *see also Kaahumanu v. Hawaii*, 682 F.3d 789, (9th Cir. 2012) ("Adequate guiding standards

31

are not provided here, given that DLNR may revoke a permit 'at anytime,' 'for any reason,' and 'in the sole and absolute discretion of the Chairperson.'").

Indeed, the Ninth Circuit has held that just one such overly discretionary factor renders a speech-licensing regime unconstitutional. *See Spirit of Aloha Temp. v. Cnty. of Maui*, 49 F.4th 1180, 1192 (9th Cir. 2022) ("[I]n a facial challenge, arbitrary guidelines cannot hide behind more objective criteria when the latter are unnecessary to consider when denying a permit.").

Even the statutorily prescribed factors are vague at best. For example, the statute provides no guidance on what amounts to a "nonprofit archival, preservation, and educational purpose[]," 17 U.S.C. § 1201(a)(1)(C)(ii), nor does it define "criticism, comment, news reporting, teaching, scholarship, or research," *id.* § 1201(a)(1)(C)(iii). The statute does not specify whether a proposed "educational" use must be affiliated with an accredited academic institution, or whether it can be less formal or vocational. The statute likewise does not define whether a "research" use must be academic or scientific, or if a more niche or hobbyist subject would qualify. It is left to the Librarian's unguided discretion to assess whether a proposed speech activity falls within one of these categories.

The fact that some of these terms have analogs in Section 107 does not help matters. The sufficiency of those terms to guide judges in their application of the fair use doctrine does not suggest that they are sufficient to cabin the discretion of an

administrative official empowered to restrict or permit First Amendment-protected activity by large number of people. Moreover, the Librarian is not required, as judges are, to conduct a fact-intensive "case-by-case analysis" within the parameters set by a substantial body of case law. *Harper & Row*, 471 U.S. at 561. Rather, the Librarian is broadly empowered to make discretionary decisions that affect the speech of entire creative industries and media of expression, such as films and video games, all based on a limited record.

That power is not only excessive, it invites content-based distinctions among would-be speakers. The Librarian must determine, for example, what types of educational speech is worthy of more favorable treatment. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (holding that sign ordinance that treats signs pointing to educational events differently from other events was an unconstitutional content-based restriction on speech).

In practice, Section 1201's lack of limits has led to precisely the confusing and unpredictable outcomes speech-licensing limits are intended to forestall. For example, the Librarian has used the "catch-all" provision to deny or modify exemptions based on wide-ranging policy concerns that have ***nothing to do with copyright*** and that fall outside the competence of the Office and the Librarian. The Librarian delayed by one year an exemption to allow automobile owners to access the software in their vehicles in order to repair them, based on the concern that

owners might "increase engine power or boost fuel economy" and thus "increase vehicle emissions." JA21 ¶ 33(e) (citing 2015 Final Rule at 65,954-55). The Librarian has also considered "interoperability, consumer choice, competition, and cybersecurity" in the course of the rulemakings. JA98 (citing 2015 Recommendation at 29).

What is worse, "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *Lakewood*, 486 U.S. at 763-64. The Librarian could also abuse their unfettered discretion by granting or denying exemptions based on facially objectionable factors, such as denying an exemption for noninfringing speech based on a prejudiced belief that the persons seeking the exemption are not trustworthy based on their political affiliation or opinions about copyright law, or denying an exemption because the government did not believe the proposed speech to be important. *See Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (ordinance allowing administrator to decide fee for license was content-based because "fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content"); *see also McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (citation omitted) (explaining that restrictions are content-based when they require enforcement authorities to

"examine the content of the message that is conveyed to determine whether a violation has occurred").

Finally, while Plaintiffs do not need to show that the Librarian has in fact misused their discretion, *see Lakewood*, 486 U.S. at 756, the Librarian's "implementation and interpretation" of the regime has in fact discriminated between particular types of content and would-be speakers. *See Forsyth Cty.*, 505 U.S. at 131-133 (county administrator's past permitting decisions illustrated that the speech-licensing scheme was implemented at "the whim of the administrator"). For example, in the 2015 Rulemaking, the Librarian considered the type of film an applicant wanted to make (favoring documentary film over narrative film, and noncommercial over commercial film). JA22-24 ¶¶ 38, 41-49. The Librarian also considered the identity of students in granting a media literacy exemption for university students, but not K-12 students and adult students in non-traditional programs. JA22-24 ¶¶ 38-41, 49. And the Librarian adopted a recommendation based on the premise that "libraries and archives, along with museums, engage in valuable preservation activities with respect to video games," in contrast to preservation by "other types of institutions or individual actors for more general 'preservation' purposes". 2015 Recommendation at 351; JA22-23 ¶ 41.

The discretion built into Section 1201 is especially problematic because speakers must repeatedly apply for licenses every three years, incentivizing creators

to self-censor in order to safeguard future requests for exemptions. *See* 17 U.S.C. § 1201(a)(1)(C). As described in *Lakewood*, "a multiple or periodic licensing requirement is sufficiently threatening to invite judicial concern." *Lakewood*, 486 U.S. at 760.

### C.    Section 1201(a) Does Not Satisfy the *Freedman* Factors

Section 1201 must also satisfy the procedural requirements set forth in *Freedman v. Maryland*. Among those are the requirements that (1) the licensing decision itself must be prompt; and (2) judicial review must be available and also prompt. *See Freedman*, 380 U.S. at 58-60. The 1201(a) rulemaking process fails both requirements.

### 1.    The Librarian's Decision Is Not Prompt.

First, the 1201(a) rulemaking process does not ensure a prompt decision by the Librarian. To address the dangers of speech-licensing regimes, the First Amendment requires "strict administrative time limits" on permitting decisions. *City of Littleton v. ZJ Gifts D-4, LLC*, 541 U.S. 774, 779 (2004) (construing *FW/PBS*, 493 U.S. at 220-21). Having "no time limit" clearly fails this requirement. *Adams Outdoor Adver. Ltd. P'ship v. Pa. DOT*, 930 F.3d 199, 208 (3rd Cir. 2019) (holding that a statute regulating signs did not meet the "prompt decision" requirement where there was no time limit for permitting decisions and permit applications "remain[ed] pending for prolonged periods of time—sometimes more than a year.").

Here, the 1201(a) rulemaking occurs just once every three years. JA19 ¶ 29. If someone's need to speak arises after the deadline, they must wait until the following session, up to three years. *Id.* This hinders speech on current events, as well as new cultural and scientific developments. For instance, a filmmaker looking to compile news footage of a current event in order to create a parody would need to wait for permission to circumvent the measures protecting that footage before reproducing it and commenting on those current events, potentially long after they occurred. Further, nothing requires the Librarian to make a prompt decision regarding the applications submitted. For example, the Librarian initiated one triennial process on October 6, 2008; they issued their final decision almost two years later, on July 26, 2010. Copyright.gov, *Rulemaking* https://www.copyright.gov/rulemaking/. The statutory scheme thus permits delay longer than was tolerated in any speech-licensing case—hardly the "speedy administrative decision" that regulation of speech requires. *City of Littleton*, 541 U.S. at 779.

### 2.     There Is No Opportunity for Prompt Judicial Review.

Second, Section 1201 fails to ensure prompt judicial review in the event of an unfavorable decision. *Bronco's Entm't v. Charter Twp. of Van Buren*, 421 F.3d 440, 446 (6th Cir. 2005).

As the Court in *Freedman* explained, without an assurance of prompt judicial review, speakers with adverse decisions may be censored for far too long if forced to navigate standard court procedures. *Freedman*, 380 U.S. at 55 (explaining that "risk of delay" is built into a prior restraint when there is no "assurance of prompt judicial review"). In that case, the Court held that a standard court procedure where the "initial judicial determination has taken four months and final vindication of the film on appellate review, six months" was not prompt enough given the ongoing censorship. *Id*.

Section 1201 comes nowhere close to satisfying this requirement. Would-be speakers whose petitions to the Librarian are denied have virtually no recourse because courts have held that, unlike most executive branch decisions, the triennial rulemaking is not subject to the Administrative Procedure Act ("APA"). *See, e.g.*, *Kissinger v. Reps. Comm. for the Freedom of the Press*, 445 U.S. 136, 145 (1980) (noting that the district court recognized that the Library of Congress "is not an 'agency'" within the meaning of the term used in the Freedom of Information Act, the same definition that applies to the APA); *Washington Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (exempting the Library of Congress from APA review); *Med. Imaging & Tech. All. v. Library of Cong.*, Civil Action No. 22-499 (BAH), 2023 U.S. Dist. LEXIS 39168, at *31 (D.D.C. Mar. 7, 2023) ("[T]he Library is not subject to the APA since Congress explicitly declined

38

to waive sovereign immunity for APA challenges to the Library's actions."), *appeal docketed*, No. 23-5067 (D.C. Cir. Mar. 31, 2023).

This has led to manifestly unjust results beyond the impact on expression. Consider, for example, the Librarian's decision to delay implementation of an exemption for repair based on concerns about fuel economy. *See supra* at 33-34. The Librarian did so on the recommendation of the Environmental Protection Agency ("EPA") (*id.*). But if a fuel economy rule had been promulgated by the EPA itself, it would be subject to judicial review under the APA. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1135 (D.C. Cir. 2002). The Librarian's ruling, in contrast, was insulated from that review.

A would-be speaker can only challenge the statute itself using a lengthy process that necessarily imposes additional burdens. Here, for example, the district court took nearly three years to rule on Appellees' Motion to Dismiss. *Green I*, 392 F. Supp. 3d at 68. And it did not rule on the initial motion for a preliminary injunction at all, requiring Appellees to file a renewed motion that was not decided for another two years. *See Green II*, 2021 U.S. Dist. LEXIS 266496. In the meantime, Dr. Green continued to self-censor by not engaging in certain research outside the bounds of his narrow exemption while Dr. Huang and numerous others were chilled entirely after being denied exemptions in the 2015 and 2018 Rulemakings. JA22 ¶¶ 39, 40, JA31 ¶ 85, JA35 ¶¶ 108-10.

## III.  THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFFS' FACIAL OVERBREADTH CHALLENGE

The district court erroneously held that Plaintiffs failed to sufficiently distinguish their facial claims from their as-applied claims. *Green I*, 392 F. Supp. 3d at 88. It reasoned that Plaintiffs' only argument as to both the overbreadth claim and the as-applied claim was that "fair use is constitutionally required and that the DMCA inhibits fair use rights and thus is unconstitutional." *Id.* As a result, the district court did not consider the question of whether Section 1201 is "plainly legitimate in the vast majority of applications." *Id.* at 88-89.

In fact, Plaintiffs alleged many applications of Section 1201 beyond their own claims, impacting a broad range of third parties. These applications affect speech far beyond the expressive aspect of software, including speech with highly variable relations to copyright law and requiring context-specific fair use analysis. A closer examination of these significantly different applications on nonparties reveals that Section 1201 reaches far beyond its legitimate sweep.

### A.  Third-Party Claims Present Different Issues from Appellants' As-Applied Claims.

Read correctly, the Complaint and its supporting documents offer detailed allegations and evidence of the harms Section 1201 imposes on third-party speech that are different in kind and degree to the harm suffered by Plaintiffs themselves.

40

As an initial matter, the relationship between copyright and the speech predicate activities varies significantly. For some First Amendment-protected activities described in the Complaint, such as a person reading software or an e-book they own, copyright simply does not govern the act in question. A person who purchased a software program may wish to decrypt the program so that she can read the code; that act of reading would not involve copyright law at all, since the exclusive rights protected by the Copyright Act do not include the right to choose who may or may not read copies of a work. *See* 17 U.S.C. § 106. A reporter may wish to inspect a program protected by a technological protection measure in order to report true, newsworthy facts about security vulnerabilities or privacy abuses; again, copyright would not restrict that activity because "[n]o author may copyright his ideas or the facts he narrates." *Harper & Row*, 471 U.S. at 556. In still other instances, such as decrypting an encrypted film in order to create a parody video using clips from the film, the speech at issue would be quintessential fair use. *See* 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). Finally, offering technological information, software, or services could be protected from secondary copyright liability so long as there are substantial noninfringing uses. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984).

The Complaint also described specific constitutional infirmities in the regulation of third-party speech that did not pertain to the as-applied claims. For

41

example, the Complaint alleged that certain exemptions granted to third parties under Section 1201 engage in content- and speaker-based discrimination: they allow the use of video clips in "documentary" film but not "narrative" film; permit the creation of ebooks offering close media critique but not others; authorize research on some devices but not others; and tolerate educational uses at universities but not grade schools or adult education programs. JA21-23 ¶¶ 37-42. Plaintiffs also explained how the law would interfere with third-party commentary on political debates (JA24 ¶ 50), which is at the heart of democratic governance and thus, unlike Plaintiffs' as-applied claims, would demand (and fail) the more searching strict scrutiny.[4] *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Beyond these examples, Plaintiffs identified numerous other effects of Section 1201(a) on protected speech, some of which would be analyzed as a direct ban on speech or reading, and some of which would be analyzed under the framework of a law targeting a close predicate of speech. *Compare, e.g.*, JA33 ¶ 94 (publication of code) *with* JA27 ¶ 65 (gathering information for security research). Some of the subject matter would be highly expressive comment on matters of public import, and

---

[4] Section 1201(a) fails strict scrutiny because it is demonstrably not the least restrictive means to ban acts related to copyright infringement. Less-restrictive alternatives include reliance on traditional direct and indirect infringement doctrines, or enacting a version of 1201(a) that required a nexus to copyright infringement. *See Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202-03 (Fed. Cir. 2004).

some would be of purely private interest. *Compare, e.g.*, JA24 ¶ 50 (creation of critical public commentary) *with* ¶ 39.d (format shifting). The variety of third-party speech impacted by Section 1201 highlights how different the analysis would be for a facial challenge as opposed to the district court's limited as-applied analysis.

Even if the court's strawman characterization of Plaintiffs' arguments had been correct, as explained *supra* at 40, it was error for the district court to treat all fair use analyses uniformly. *See generally Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (fair use is a fact specific inquiry). Fair use in documentary film, for instance, has little in common with fair use in security research. *Compare* 2015 Recommendation at 85-86, 90 *with* 188-89. They have different purposes, relate to different types of media (highly creative films versus highly functional software), borrow very different amounts of the original works (clips versus analyzing the entire software), and operate in entirely different markets. *Id.*

The difference between Plaintiffs' as-applied claims and third-party speech is further underscored by the district court's own finding that it was appropriate to restrain publication of Plaintiffs' code because of how it could be used by third parties. *See Green II*, 2021 U.S. Dist. LEXIS 266496 at *22-30.[5] This conclusion

---

[5] The District Court's error is also evident in that the code it considered in evaluating the as-applied claims is not even an instance of fair use; it is noninfringing instead because it does not incorporate any of the copyrighted works in question. *Green II*, 2021 U.S. Dist. LEXIS 266496 at *26-27; JA32 ¶¶ 90-91.

could not apply to the many non-code examples of forbidden speech identified in the Complaint, since this code-specific rule diverges from the ordinary rule that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (articulating the standard for incitement that may be punished without offense to the First Amendment). The court did not consider the rights of third parties to make films, to read works they own, to teach media literacy, comment on political debates, or to publish numbers, information about where circumvention tools may be found, or provide verbal or written services that could help a third party circumvent. Nor did it consider the many kinds of speech that the Copyright Office and Library of Congress acknowledged to be legitimate and adversely impacted. *See* JA21-23 ¶¶ 37-42.

**B.** **Section 1201(a) Is Overbroad Because It Imposes Significant Burdens on a Vast Amount of Protected Speech While Rarely Being Used for Its Supposed Purposes.**

If the district court had considered Plaintiffs' overbreadth challenge, it would have found that Section 1201 is indeed overbroad. The overbreadth doctrine provides that a statute is contrary to the First Amendment on its face where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. at 473 (quoting

44

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). That is true here.

Overbreadth provides a means to evaluate the facial validity of a statute based on its impact on third parties, where, as here, the parties no longer have as-applied claims that would bar its enforcement as to their activities. *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989); *see also Virginia v. Hicks*, 539 U.S. 113, 119 (2003); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166 n.14 (2002). And it incentivizes legislatures to be careful and precise when enacting bans that implicate First Amendment rights. *See Oakes*, 491 U.S. at 586 (Scalia, J., concurring in the judgment in part and dissenting in part).

Congress could have enacted a version of Section 1201(a) that only covered acts connected to copyright infringement. Or it could have declined to enact Section 1201(a) and relied upon Section 1201(b) (which bans circumvention of technologies that restrict use, rather than access, and accommodates noninfringing uses). *See* 17 U.S.C. § 1201(b). Instead, it enacted a statute whose sweep far exceeds what the First Amendment allows.

### 1. Section 1201 Burdens Speech and Conduct That Are Plainly Lawful Under the First Amendment.

As discussed above (*see supra* Section II), the Complaint identifies numerous specific categories of third-party speech impermissibly burdened by Section 1201(a). JA21-23 ¶¶ 37-42, JA24-29 ¶¶ 48-75, JA30-31 ¶¶ 79-87, JA34 ¶¶ 100-101,

JA35 ¶¶ 107, 109, 110. For many of these categories, ***there is no dispute*** that Section 1201(a)(1) imposes substantial burdens, as the Copyright Office and Librarian of Congress found in regulatory proceedings. JA179, 209 (acknowledging burdens on applicants). Such indisputably burdened speech includes documentary filmmaking, creation of short noncommercial films, creation of ebooks discussing media analysis, educational uses by faculty and students at colleges and universities and by nonprofit institutions offering certain online courses (for film studies or other courses requiring close analysis of film and media excerpts), various kinds of security research, reading e-books and other media for the visually impaired, creation of videos that "remix" content from other videos into a new work, restoration of lawfully acquired video games where such games are no longer supported by the maker, and analysis of medical device data. JA22 ¶¶ 38-39, 41(a)-(i); *see supra* at 10-11.

Section 1201(a) provides for substantial criminal and civil penalties that deter speech, and even speakers who have obtained a license from the government have had their rights impinged by the burdensome process of seeking permission and having to wait up to three years to even ask for permission. *Freedman*, 380 U.S. at 59.

### 2.    Any Legitimate Application of Section 1201 Is Overshadowed by the Burden on Legitimate Speech.

Section 1201(a) is contrary to the First Amendment because "a substantial number of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep." *United States v. Stevens*, 559 U.S. at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Overbreadth is often established by examining hypothetical applications of a statute (*see Stevens*, 559 U.S. 460), but here dozens of categories of speech have demonstrably been burdened, causing tens of thousands of people to seek temporary relief from the challenged law. 2015 Recommendation at 2; JA209.

As their pleas demonstrate, Section 1201(a)'s prohibitions reach far beyond what is necessary to prevent copyright infringement or encourage the marketplace for digital works. Indeed, the universe of speech burdened by the challenged provisions consists substantially of noninfringing speech that the First Amendment protects. JA22-23 ¶¶ 39(a)-(f), 41(a)-(i), JA36 ¶ 114. Deprived of fair use protections, filmmakers, media literacy teachers, researchers, technologists and others who are trying to stay on the right side of the law find that it is not copyright but rather Section 1201(a)(1) that bars them from reading or using the works at issue and Section 1201(a)(2) that makes it unlawful to share the knowledge necessary to make such uses. JA22 ¶¶ 38-39. This outcome impedes, rather than advances, copyright law's goal "to promote the progress of Science and the useful Arts." U.S. Const. art. I, § 8; *Google*, 141 S. Ct. at 1195 ("exclusive rights" awarded by copyright "can sometimes stand in the way of others exercising their own creative powers").

On the other side of the ledger, there is no evidence other than mere assertion that Section 1201(a) prevents copyright infringement or encourages the market for digital works beyond what the Copyright Act itself does. It is already possible to sue infringers, in civil or criminal actions, including contributory infringers who effectively aid and abet infringement by distributing technology that has no other significant use, and the penalties can be ruinous. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932 (2005); *Sony Music Entm't v. Cox Communs., Inc.*, Civil Action No. 1:18-cv-00950, 2021 U.S. Dist. LEXIS 68168, at *11 (E.D. Va. Jan. 12, 2021) (affirming verdict of one billion dollars against provider of internet access technology for contributory and vicarious infringement), *appeal docketed*, No. 21-1168 (4th Cir. Feb. 16, 2021). Similarly, existing law allows civil and criminal actions to deter unauthorized access to computers containing copyrighted information. *Elsevier Inc. v. WWW.Schi-Hub.org*, 15 Civ. 4282(RWS), 2015 U.S. Dist. LEXIS 147639, at *6-7 (S.D.N.Y. Oct. 28, 2015) (finding a likelihood of success for a Computer Fraud and Abuse Act claim against defendant that allegedly accessed a publisher's website with fraudulent credentials). *See generally Keyishian v. Bd. of Regents of Univ. of State of N.Y.* , 385 U.S. 589, 609, (1967) ("The breadth of legislative abridgement must be viewed in light of less drastic action for achieving the same basic purpose.")

### 3. It Would Be Unconstitutional to Apply Section 1201(a) to Bar the Third-Party Activities Described in the Complaint.

Since third-party speech impacted by Section 1201(a) is legitimate and important and has no connection to the statute's stated goals, it would not be consistent with the First Amendment to suppress it.

In a hypothetical prosecution of those activities, Section 1201(a) would fail intermediate scrutiny because it targets far more than the "source of the 'evil' [they] seek to remedy." *Boardley v. United States DOJ*, 615 F.3d 508, 522-23 (D.C. Cir. 2010). And, as discussed, some of those applications would be analyzed under strict scrutiny and held to an even higher standard that the government certainly could not meet thanks to Section 1201(a)'s failure to tailor its prohibitions to its supposed purpose.

Section 1201(a) also fails intermediate scrutiny in its application to third-party activities because it is fatally under-inclusive. As this Court explained, "an arbitrary exemption from or 'under-inclusiveness of the scheme chosen by the government'" can show "the asserted interests either are not pressing or are not the real objects animating the restriction on speech." *Edwards v. Dist. of D.C.*, 755 F.3d 996, 1007 (D.D.C. 2014); *see also, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (exceptions from speech limits "may diminish the credibility of the government's rationale for restricting speech in the first place"); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 638 (1980) (limit on door-to-door solicitation was not

49

narrowly drawn where it exempted similarly situated solicitors). It may also be a sign that the legislature has not taken the due care in crafting a law that impacts First Amendment rights. *See Oakes,* 491 U.S. at 586 (Scalia, J., concurring in the judgment in part and dissenting in part).

That is precisely the case here. While its proponents argue that a blanket ban on circumvention and communicating related technologies is necessary, Section 1201's statutory exemptions already permit certain limited forms of reverse engineering, encryption research, and security testing, while forbidding a wide range of lawful and valuable research—something the Librarian has recognized. 2015 Final Rule at 65,945 (recognizing that the law impedes legitimate and valuable research and analysis not covered by the statutory exemptions). The reverse engineering provision even provides an exemption for the researcher to communicate their findings—while continuing to prohibit anyone else from repeating them—as it "permits information acquired through reverse engineering to be made available to others only by the person who acquired the information." *Universal City Studios, Inc.*, 111 F. Supp. 2d at 320. True, newsworthy information can be obtained through reverse engineering, such as enabling important competition, discovering violations of privacy, or revealing shoddy coding that renders a vehicle or other device unsafe. But the bizarre restriction on who may share

the information both demonstrates that Section 1201(a) is underinclusive and highlights the conflict between the statute and First Amendment interests.

"Precision . . . must be the touchstone" for regulations that target speech, and "[t]he First Amendment does not permit the State to sacrifice speech for efficiency." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018). Section 1201(a)'s prohibitions are hardly precise; rather, they target far more than the "source of the 'evil' [they] seek to remedy." *Boardley*, 615 F.3d at 522-23. Accordingly, the government cannot meet its burden to show why the law passes muster under even intermediate scrutiny.

Plaintiffs have pled in detail the necessity of relief for third parties whose speech and reading activities are prohibited by the overbroad provisions of Section 1201(a). The law should not be allowed to escape review on its merits.

## CONCLUSION

Plaintiffs-Appellants respectfully request that this Court reverse the lower court's decision to grant Appellees' motion to dismiss and remand this matter for further proceedings.

Dated:  November 29, 2023       Respectfully submitted,

By: */s/ Corynne McSherry*
Corynne McSherry
Kit Walsh
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: corynne@eff.org
Email: kit@eff.org
Email: mitch@eff.org

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Email: bwillen@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300, San
Francisco, CA 94105
Telephone: (415) 947-2000
Email: lwhite@wsgr.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I, Corynne McSherry, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 11,470 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in Times New Roman 14-point font, a proportionately spaced typeface, using Microsoft Word 2021.

Dated: November 29, 2023          */s/ Corynne McSherry*_____

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 29, 2023                    */s/ Corynne McSherry*_____