NO. 23-5159

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW D. GREEN, ET AL.,

PLAINTIFFS-APPELLANTS,

V.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

DEFENDANTS-APPELLEES.

Appeal from the United States District Court for the District of Columbia
No. 1:16-cv-01492-EGS
Hon. Emmet G. Sullivan

**AMICUS CURIAE BRIEF OF LEGAL SCHOLARS IN SUPPORT OF
PLAINTIFF-APPELLANTS AND REVERSAL**

John W. Crittenden
UCLA School of Law
385 Charles E. Young Drive East
Los Angeles, CA 90095
Telephone:  415 216-9705
Email: crittenden@law.ucla.edu
*Counsel for amicus curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amicus curiae* certifies as follows.

**(A) Parties and Amici.** Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Plaintiffs-Appellants.

**(B) Rulings Under Review.** References to the rulings at issue appear in the Brief for Plaintiffs-Appellants.

**(C) Related Cases.** To the knowledge of counsel, other than any cases listed in the Brief for Plaintiffs-Appellants, the case on review was not previously before this Court or any other court, and there are no other related cases currently pending in this Court or in any other court.

Dated: December 6, 2023        _____

                                John W. Crittenden
                                Counsel for amicus curiae

## STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties received appropriate notice of and consented to the filing of this brief. Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than amici, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), counsel endeavored to contact all other potential amicus parties and counsel in advance of the deadline for briefing. The undersigned counsel certifies that a separate brief is necessary to represent the distinct and unique interests of the legal scholars, which differ from those of the parties or other amici, and to advise this Court of relevant issues regarding the relationship between the First Amendment and the Copyright Act.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE
BRIEFING ................................................................................................ ii

TABLE OF AUTHORITIES .......................................................................v

INTEREST OF *AMICUS CURIAE* .........................................................1

SUMMARY OF ARGUMENT ....................................................................3

ARGUMENT ..............................................................................................5

   I.   Practical Experience Shows That Section 1201 Prevents Core First
   Amendment Protected Activities Like Research and Education, Even When The
   Triennial Rulemaking Process Grants Exemptions ...............................5

   II.  Fair Use Safeguards First Amendment Rights In Copyright Law ................8

     A.  *Eldred v. Ashcroft* Upholds the Fair Use Defense as a First Amendment
     Accommodation Within Copyright Law .........................................10

     B.  *Golan v. Holder* Similarly Upholds the Fair Use Defense as a First
     Amendment Accommodation Within Copyright Law .....................................11

     C.  *Eldred* And *Golan* Suggest That Any Effort by Congress or the Courts to
     Eviscerate Copyright Law's Fair Use Defense Would Violate the First
     Amendment + .................................................................................13

   III.   Section 1201 Violates the First Amendment Because it Has No Fair Use
   Defense .................................................................................................14

     A.  The Anti-Circumvention Provision Violates the First Amendment Because
     It Has No Fair Use Defense............................................................14

     B.  The Anti-Trafficking Provisions Similarly Violate the First Amendment
     Because They Have No Fair Use Defense ......................................17

     C.  The Triennial Rulemaking Process Is No Substitute For A Fair Use
     Defense .........................................................................................18

a.    The Triennial Rulemaking Process Inadequately Protects Fair Use Because It Makes Generalized Determinations About Entire Classes Of Works, But Fair Use And The First Amendment Require An Individualized Determination..................................................................................18

b.    The Triennial Rulemaking Process Is Inadequate Even For The Fair Uses It Purports To Protect, Because It Only Exempts Circumvention, Not Manufacture And Distribution ....................................................................19

c.    The Triennial Rulemaking Process is Inadequate Because It Places the Burden of Proof on Speakers and Future Speakers, Not On The Party That Will Stifle Their Speech..............................................................................20

d.    The Exemptions Flowing from the Triennial Rulemaking Process Demonstrate its Deficiencies ........................................................................22

CONCLUSION ..............................................................................................23

CERTIFICATE OF COMPLIANCE ....................................................................24

CERTIFICATE OF SERVICE..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)..............................14, 15, 16, 17, 19

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ........................................................4, 10, 11

*Golan v. Holder* 565 U.S. 302 (2011) ......................................................4, 10, 11, 12

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985).......21

*Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 137-38 (E.D.N.Y. 2001) ......16

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ...............................................9, 12

*Snyder v. Phelps*, 131 S. Ct. 1207 (2011) ................................................................9

*Sony of Am. v. Universal City Studios*, 464 U.S. 417 (1984)..................................18

*Speiser v. Randall*, 357 U.S. 513, 526 (1958).........................................................21

*Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 458-59 (2d Cir. 2001).........15

## STATUTES

17 U.S.C. § 1201(c)..................................................................................................13

Pub. L. 103-465, 108 Stat. 4809..............................................................................11

Pub. L. 105-304, Title I, § 103(a), 112 Stat. 2863 (1998)........................................22

## OTHER AUTHORITIES

37 C.F.R. pt. 201.40(b)(1)(ii) ....................................................................................6

65 Fed. Reg. 64,574 (Oct. 27, 2000) .......................................................22

86 Fed. Reg. 59,637-41 (Oct. 28, 2021).................................................22

Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a*

    *Technology? From the Framing to Today*, 160 U. Pa. L. Rev. 459 (2012).........15

Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts*

    *After* Eldred, Liquormart, *and* Bartnicki, 40 Hous. L. Rev. 697 (2003)..............21

Exemption to Prohibition on Circumvention of Copyright Protection Systems for

    Access Control Technologies, 77 Fed. Reg. 65,260, 65,268 (Oct. 26, 2012)......19

Exemption to Prohibition on Circumvention of Copyright Protection Systems for

    Access Control Technologies, 83 Fed. Reg. 54,028-29 (Oct. 26, 2018) ...............8

Exemption to Prohibition on Circumvention of Copyright Protection Systems for

    Access Control Technologies, 86 Fed. Reg. 59,637-39 (Oct. 28, 2021) ...........6, 8

H.R. Conf. Rep. 105-796 (1998)..........................................................22

Joint Educators, Petition to Renew a Current Exemption Under 17 U.S.C. § 1201

    (July 22, 2020),

    https://www.copyright.gov/1201/2021/petitions/renewal/Renewal%20Pet.%20-

    %20AV%20Educ.%20-%20Joint%20Educators%20&%20AAUP.pdf..........8, 17

Maria A. Pallante, Register of Copyright, Section 1201 Rulemaking: Fifth

    Triennial Proceeding to Determine Exemptions to the Prohibition on

    Circumvention 108 (Oct. 2012) ........................................................16

Melville B. Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?*, 17 UCLA L. Rev. 1180 (1970) ...................................9

Neil Netanel, *First Amendment Constraints on Copyright After* Golan v. Holder, 60 UCLA L. Rev. 1082 (2013) .............................................................10, 12, 13

S. Rep. No. 105-190 (1998) ............................................................................13, 14

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ....................................................................................8

## INTEREST OF *AMICUS CURIAE*[1]

*Amici curiae* are faculty and researchers at universities across the United States. *Amici* have extensive experience studying and teaching communications studies and the doctrines of copyright law and the First Amendment, including doctrines implicated by this case. *Amici* believe their knowledge and collective experiences can inform this Court's consideration of the pending matter. *Amici* submit this brief solely on their own behalf, not as representatives of their universities.

Amici are identified below. Their affiliations are provided to demonstrate their expertise and interest in the subject matter of this case; this brief contains amici's own analysis, not the views of their affiliate institutions.

**Patricia Aufderheide** is University Professor of Communication Studies in the School of Communication at American University in Washington, D.C. She founded the School's Center for Media & Social Impact, where she continues as Senior Research Fellow. She is also affiliate faculty in the School of International Service and the History department at American University, and a member of the Film and Media Arts division in the School of Communication.

---

[1] Research for this brief was prepared by the UCLA Institute for Technology, Law & Policy. The research team comprised Tyler Emeney, Nathan Siegel, Yan Sun, and Nicholas Wilson.

**Michael Karanicolas** is the Executive Director of the UCLA Institute for Technology, Law & Policy, and an affiliated fellow with the Yale Information Society Project. His scholarly research encompasses a number of thematic areas, but generally revolves around the application of human rights standards in an online context.

**Mark McKenna** is a Professor of Law at UCLA, the Vice Dean of Faculty & Intellectual Life, and the Faculty Co-Director of the UCLA Institute for Technology, Law & Policy. Professor McKenna teaches and writes in intellectual property and technology law, including copyright, and he has written on the First Amendment implications of IP rights

**Art Neill** is an Associate Clinical Professor at California Western School of Law who specializes in internet, intellectual property, privacy, and media law. He is also the founder and Executive Director of New Media Rights, an independently funded non-profit program of California Western School of Law that provides legal services to creators, entrepreneurs, journalists, and internet users whose projects require specialized internet, intellectual property, privacy, and media law expertise.

**Neil Netanel** is the Pete Kameron Professor of Law at UCLA. Professor Netanel teaches and writes in the areas of copyright, free speech, international

2

intellectual property, and media and the future of democracy, and has been on faculty at UCLA since 2004.

**Pamela Samuelson** is the Richard M. Sherman Distinguished Professor of Law and Information at the University of California, Berkeley. She is recognized as a pioneer in digital copyright law, intellectual property, cyberlaw and information policy.

**Rebecca Tushnet** is the Frank Stanton Professor of the First Amendment at Harvard Law School. After clerking for Chief Judge Edward R. Becker of the Third Circuit and Associate Justice David H. Souter on the Supreme Court, she practiced intellectual property law at Debevoise & Plimpton before beginning teaching. Professor Tushnet's work currently focuses on copyright, trademark and false advertising law.

## SUMMARY OF ARGUMENT

Section 1201 contains three main provisions: 1) an anti-circumvention provision, restricting use of technologies to circumvent Technological Protection Measures (TPMs); 2) an anti-trafficking provision, restricting the manufacture or distribution of any technologies that have the capability of circumventing a TPM; and 3) a triennial rulemaking provision, establishing a bureaucratic process for creating exceptions to those first two restrictions. Unless they are interpreted to exempt uses that would qualify as fair uses under § 107 of the Copyright Act,

Section 1201's anti-circumvention and anti-trafficking provisions violate the First Amendment.

Fair use is copyright law's internal First Amendment accommodation. Copyright law burdens speech, by penalizing expressions using protected materials without authorization. Fair use, among other doctrines, accommodates First Amendment rights, by insulating many First Amendment-protected activities from copyright liability. Fair use is not just a privilege granted by the courts and blessed by Congress; it is a constitutional requirement. (*Eldred v. Ashcroft*, 537 U.S. 186 (2003); *Golan v. Holder* 565 U.S. 302 (2011)).

Section 1201's anti-circumvention and anti-trafficking provisions also burden speech. Section 1201 interferes with the use of copyrighted works in education and research, core First Amendment protected activities routinely protected by the fair use doctrine. Educators who want to do something as simple as compare two pieces of modern media side by side are stymied by an inability to access media files guarded by TPMs. Researchers trying to analyze modern media or train machine learning models are similarly blocked from accessing media files that they need to conduct their analyses or train their models. There are simply no tools available to access the files, even for approved circumventions.

Unlike copyright infringement, section 1201 has no express fair use defense. But without fair use, those provisions are unconstitutional and must be invalidated.

4

The triennial rulemaking process is no substitute for fair use because it is cumbersome, inefficient, and only exempts broad categories of uses, leaving out niche, more individualized uses.

This Court could read section 1201 to protect fair use by allowing uses of circumvention technologies in order to engage in fair use, and by allowing trafficking of circumvention technologies that can be used to engage in fair use. Otherwise, the Court should invalidate section 1201 as unconstitutional under the First Amendment.

## ARGUMENT

## I.   Practical Experience Shows That Section 1201 Prevents Core First Amendment Protected Activities Like Research and Education, Even When The Triennial Rulemaking Process Grants Exemptions

In the Amici's experience, researchers are prevented from fully researching audiovisual media or computer modifications to audiovisual media because of Section 1201's anti-circumvention and anti-trafficking provisions. For instance, researchers training generative artificial intelligence would also benefit from using streamed film and television to train their models. But streamed film and television is guarded by TPMs. The last triennial rulemaking granted an exemption to the anti-circumvention provision for "[m]otion pictures" when "[t]he circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the

5

institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of motion pictures for the purpose of scholarly research and teaching." Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 86 Fed. Reg. 59,637-39 (Oct. 28, 2021) (codified at 37 C.F.R. pt. 201.40(b)(4)).

However, even when the triennial rulemaking process grants an exemption, it is an inadequate substitute for a fair use defense. For example, some forms of research can be fair use, but not fall under "text and data mining techniques," such as testing image manipulation algorithms. The triennial rulemaking process typically only considers uses in broad categories, and as a result, it often leaves out uses that would still be considered fair uses. For example, the 2021 triennial rulemaking for motion pictures using anti-circumvention technology granted exemptions to educational uses only for students and teachers (K-12, university and GED), nonprofit educational institutions, and certain nonprofit programs run by libraries and museums. 37 C.F.R. pt. 201.40(b)(1)(ii). These broad categories cover a substantial portion of educational uses, but are not comprehensive, and fail to facilitate a practice avenue for actually circumventing the restrictions.

Because the triennial rulemaking only exempts circumvention of the TPMs, not the trafficking of circumvention tools, there are no tools available to download the media files that fall under a protected circumvention category. Without being

able to download those files, researchers cannot apply machine learning transformations or train their artificial intelligence models. Perhaps not every use that researchers wish to engage in is a fair use. But Section 1201 blocks all uses, including fair uses.

Similarly, Section 1201 curbs teachers' ability to educate their students. For instance, teachers of film, television, and media studies are unable to flexibly use films to teach. Things as simple as comparing films that are streamed on Netflix to those that are streamed on other platforms, or comparing films on streaming platforms to older films, are more difficult because teachers cannot access the film files directly. Teachers can only access them by paying the subscription fee to Netflix and streaming through their platform. Advances in technology should facilitate concomitant advances in educational uses for creative works, but Section 1201 has forced educators to remain several steps behind the times, treating streaming media as if we were still in the age of VHS tapes. They are unable to utilize the technology, and therefore cannot access the works to their fullest potential. Discourse, criticism, and commentary, which rely on similar audio-visual techniques, are likewise limited by the challenges in comparing contemporary digital media. In this way, Section 1201 heavily burdens fair use. Similarly to research uses, the last two triennial rulemakings granted an exemption for "[m]otion pictures (including television shows and videos)" when circumvention is

"[f]or educational purposes." Exemption to Prohibition on Circumvention of
Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg.
54,028-29 (Oct. 26, 2018) (codified at 37 C.F.R. pt. 201.40(b)(1)(ii), now
amended); Exemption to Prohibition on Circumvention of Copyright Protection
Systems for Access Control Technologies, 86 Fed. Reg. 59,637-38 (Oct. 28, 2021)
(codified at 37 C.F.R. pt. 201.40(b)(1)(ii)).

But again, there are no legally developed tools available to download these
media files, and the use of such tools that do exist creates unacceptable legal and
security risks for institutions, so the interference with education is the same as if
there were no exemption granted. *See also, e.g.*, Joint Educators, Petition to Renew
a Current Exemption Under 17 U.S.C. § 1201 (July 22, 2020),
https://www.copyright.gov/1201/2021/petitions/renewal/Renewal%20Pet.%20-
%20AV%20Educ.%20-%20Joint%20Educators%20&%20AAUP.pdf ("Educators
are unable to provide an enriching and accurate description and analysis of
cinematic or other audiovisual works when prevented from accessing such works
due to TPM that block uses that would otherwise be considered fair use but for the
TPM circumvention.").

## II.    Fair Use Safeguards First Amendment Rights In Copyright Law

The First Amendment guarantees that "Congress shall make no law…
abridging the freedom of speech, or of the press." U.S. Const. amend. I. Yet by its

8

very nature, copyright law has the potential to abridge such freedoms as it penalizes expressions consisting of the unauthorized use of copyright-protected materials, like if researchers sought to use such materials in their work, or educators tried to incorporate such materials into their lessons. Melville B. Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?*, 17 UCLA L. Rev. 1180, 1181 (1970). Scholars have proposed that this tension between copyright law and the First Amendment can be resolved by "definitional balancing," a method by which "a court considering whether a given law unconstitutionally abridges speech weighs the non-speech interests that the law aims to serve against the speech interests that the law burdens." *Id.* at 1184-93.

Definitional balancing is an established methodology used by the Supreme Court to resolve what would otherwise be conflicts between private law rights and the First Amendment. For example, in defamation law, the Court has carved out exceptions for otherwise defamatory statements that instead enjoy First Amendment privilege in recognition of free speech and public discourse interests. *New York Times v. Sullivan*, 376 U.S. 254 (1964). Similarly, the Court has found that speech on a matter of public concern was not liable for intentional infliction of emotional distress, even when the speaker knowingly caused severe emotional distress. *Snyder v. Phelps*, 131 S. Ct. 1207 (2011).

9

Fair use is an example of such definitional balancing, a safeguard that serves as a vital accommodation for First Amendment interests within copyright law. Neil Netanel, *First Amendment Constraints on Copyright After* Golan v. Holder, 60 UCLA L. Rev. 1082, 1085 (2013). That is why the Supreme Court emphasized the critical role of fair use in copyright law's constitutionality. *Golan*, 565 U.S. at 329 (First Amendment scrutiny of copyright law is unwarranted so long as fair use, copyright's "built-in First Amendment accommodation[,]" remains "undisturbed"); *see also*, *Eldred* 537 U.S. at 219.

## A. *Eldred v. Ashcroft* Upholds the Fair Use Defense as a First Amendment Accommodation Within Copyright Law

In *Eldred v. Ashcroft*, the Supreme Court heard challenges to the 1998 Copyright Term Extension Act (CTEA), which extended the statutory copyright term for an additional twenty years. 537 U.S. 186, 193 (2003). In part, petitioners argued that the CTEA was unconstitutional under the First Amendment as a content-neutral regulation of speech that failed intermediate scrutiny. *Id.* at 193-94.

In upholding the CTEA, however, the Court did not consider whether the CTEA constituted content-neutral speech regulation. *See* Netanel, *supra* at 1096. Instead, the Court's analysis centered on the relationship between copyright law and the First Amendment. According to the Court, copyright law contains built-in First Amendment accommodations, such as the fair use defense, which "allows the public to use not only facts and ideas contained in a copyrighted work, but also

10

expression itself in certain circumstances." *Eldred*, 537 U.S. at 219. The fair use

defense affords considerable "latitude for scholarship and comment[.]" *Id.* (citing

*Harper & Row*, 471 U.S. at 560). Those built-in safeguards are generally adequate

to address any First Amendment concerns: "when… Congress has not altered the

traditional contours of copyright protection, further First Amendment scrutiny is

unnecessary." *Id.* at 221 (citing *Harper & Row*, 471 U.S. at 560).

Although the *Eldred* Court upheld the CTEA, this decision establishes the

notion that safeguards within copyright law like the fair use doctrine are

accommodations that settle general First Amendment concerns. But because it is

by virtue of the fair use defense that such provisions do not violate the First

Amendment, this holding suggests that any provision burdening fair use can and

should be invalidated.

### B. *Golan v. Holder* Similarly Upholds the Fair Use Defense as a First Amendment Accommodation Within Copyright Law

*Golan v. Holder* involved a First Amendment challenge to Section 514 of

the Uruguay Round Agreements Act of 1994 (URAA), which amended the

Copyright Act of 1976 to restore copyright protection to certain foreign works

which had previously been in the public domain in the United States. 565 U.S. 302,

307 (2012); Pub. L. 103-465, 108 Stat. 4809. While the Supreme Court in *Golan*

rejected the petitioners' First Amendment challenge that the URAA "altered the

traditional contours of copyright law," it doubled down on copyright law's inherent

First Amendment safeguards: the idea/expression distinction and the fair use defense. *Golan*, 565 U.S. at 326-27. The fact that Congress did not disturb those safeguards made it unnecessary to apply a heightened level of First Amendment review.

The *Golan* Court appeared to firmly embrace the definitional balancing approach in treating the fair use defense as both copyright's essential built-in First Amendment accommodations, as well as the basis for rendering it immune from First Amendment scrutiny. *See* Netanel, *supra* at 1101. Though it is generally permissible for copyright law to burden infringing speech, the *Golan* ruling carves out copying work in a manner that constitutes fair use as a type of speech that enjoys an absolute First Amendment privilege from copyright infringement liability. Unlike in *New York Times v. Sullivan*, 376 U.S. 254 (1964), where the Court held that defamation law must privilege most false statements about public officials absent actual malice, the *Golan* Court did not have to create a requirement that copyright law be modified to include a First Amendment privilege of engaging in fair use because copyright law already contains such a built-in requirement. It is this requirement that is essential to reconciling the constitutional conflict between the First Amendment and copyright law.

*Golan* suggests, therefore, that Congress cannot expand or extend copyright protection in any way that diminishes the fair use defense unless it provides

adequate alternative First Amendment protections. In other words, under Supreme

Court precedent, any Copyright Act provision or amendment that eliminates or

substantially weakens the First Amendment protections inherent in the fair use

defense as generally applied in copyright law conflicts with the First Amendment

and is unconstitutional absent some adequate protection in replacement. *See*

Netanel, *supra* at 1103.

### C. *Eldred* And *Golan* Suggest That Any Effort by Congress or the Courts to Eviscerate Copyright Law's Fair Use Defense Would Violate the First Amendment +

A possible alternative to declaring Section 1201 unconstitutional would be

for this Court to fairly read in a fair use defense to keep Section 1201 in line with

the First Amendment. Section 1201(c)(1) already provides that "[n]othing in this

section shall affect rights, remedies, limitations, or defenses to copyright

infringement, including fair use, under this title." 17 U.S.C. § 1201(c). Yet,

although section 1201(c)(1) expressly provides that the fair use defense to

copyright *infringement* shall not be affected, it does not explicitly maintain fair use

as a defense to Section 1201's restrictions themselves.

The legislative history of Section 1201 indicates that Section 1201(c)(1) was

"intended to ensure that none of the provisions in section 1201 affect the existing

legal regime established in the Copyright Act and case law interpreting that

statute." S. Rep. No. 105-190, at 1–2, 8–9 (1998). Because the fair use defense is

13

necessary to copyright law's compliance with the First Amendment, this Court could read a fair use defense into Section 1201 to prevent that Section from running afoul of First Amendment strictures. This Court could do so by allowing uses of circumvention technologies as needed to engage in fair use, and allowing trafficking of circumvention technologies that can be used to engage in fair use, in the same way that Congress has allowed for fair uses that would otherwise constitute copyright infringement. *Id.* Alternatively, this Court could also suggest this legislative fix as a way for Congress to maintain Section 1201 in force without violating the First Amendment.

## III.    Section 1201 Violates the First Amendment Because it Has No Fair Use Defense

### A. The Anti-Circumvention Provision Violates the First Amendment Because It Has No Fair Use Defense

Without circumventing technical protection measures (TPMs), artists and creators cannot use the material locked behind a TPM, so fair use of that material is impossible without circumvention measures. This kind of burden on fair use violates the First Amendment. *See* discussion *supra* Section II. When needed to engage in fair use, circumvention must be allowed.

Put differently, foreclosing a medium of expression burdens the expression itself. *See, e.g.*, *ACLU v. Alvarez*, 679 F.3d 583, 595-97 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 651 (2012). The anti-circumvention provision forecloses every circumvention measure that is not exempted in the triennial rulemaking process.

14

Just as audiovisual recording is not a communication itself, but rather a step in the creation of speech, yet it still enjoys First Amendment projection, *id.* at 597; so too are circumvention measures a step in the creation of speech. Circumvention measures should similarly be protected by the First Amendment. *See also* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. Pa. L. Rev. 459 (2012) (individuals have a First Amendment right to use the technology of mass communication).

Respondents may argue that this case should follow the Second Circuit's approach in *Universal City Studios, Inc. v. Corley*, which held that there is no fair use defense to violation of the DMCA and that this absence did not violate the First Amendment. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 458-59 (2d Cir. 2001). But *Corley* does not govern this case, for two reasons.

First, *Corley* was decided before *Golan* and *Eldred*, and its assertion that the "Supreme Court has never held that fair use is constitutionally required," *id.* at 458, is inconsistent with those decisions. *See* discussion *supra* Section II.

Second, *Corley*'s assertion is outdated insofar as the technology, and the means of distribution, has changed considerably in the intervening decades. *Corley* was decided in 2001, which predates developments like high-definition video and 4k resolution which have widened the gap between direct copying and whatever improvised measures educators seeking to exercise their fair use rights may find

available. The resolution for video displays and the size of video file packages have substantially increased in the last 20 years, creating a wider gap between the original files and a screen captured or other DMCA-friendly circumvention method of copying. Fair use, especially for commentary on an original work including sounds or images, often requires direct copying. *See, e.g.*, *Hofheinz v. AMC Prods., Inc.*, 147 F. Supp. 2d 127, 137-38 (E.D.N.Y. 2001) (copying clips from a film to use in a documentary film about an actor was fair use, even though it included direct copying). The Seventh Circuit's reasoning in *Alvarez* is instructive: there, although police watchdogs had available substitutes to recording the police, such as "tak[ing] shorthand notes and transcrib[ing] the conversations or otherwise reconstruct[ing] the dialogue later," that was not sufficient to criminalize audiovisual recordings. 679 F.3d at 606. This lesser substitute could not replace the First Amendment right to make audiovisual recordings. *Id.* In other words, the availability of grossly inferior substitutes is not enough to make the provision constitutional.

Here, non-circumventing substitutes are substantially inferior to circumvention. Even the Register of Copyright has said so. *See, e.g.*, Maria A. Pallante, Register of Copyright, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention 108 (Oct. 2012) (screen capture is often not an adequate substitute for using digital

16

technology to make direct digital copies of portions of movies and of TV shows); *see also, e.g.*, Joint Educators, Petition to Renew a Current Exemption Under 17 U.S.C. § 1201 (July 22, 2020), https://www.copyright.gov/1201/2021/petitions/renewal/Renewal%20Pet.%20-%20AV%20Educ.%20-%20Joint%20Educators%20&%20AAUP.pdf ("Educators are unable to provide an enriching and accurate description and analysis of cinematic or other audiovisual works when prevented from accessing such works due to TPM that block uses that would otherwise be considered fair use but for the TPM circumvention.").

## B. The Anti-Trafficking Provisions Similarly Violate the First Amendment Because They Have No Fair Use Defense

To hold first that the anti-circumvention provision violates the First Amendment but then that the anti-trafficking provisions do not would render the holding regarding the anti-circumvention provision meaningless. The anti-trafficking provisions are necessary for the anti-circumvention provision to have practical effect: no technology can be used if it is never made available. Again, foreclosing a medium of expression in a particular context inevitably burdens the expression itself. *Alvarez*, 679 F.3d at 595-97. The anti-trafficking provisions foreclose media of expression by banning the technology to engage in those media.

The statutory text of 1201(a)(1)(A) is also difficult to reconcile with fair use and free speech principles. Of the seven statutory exceptions to 1201(a)(1)(A)

17

allowing circumvention, only three explicitly permit the creation of tools to accomplish those circumventions. A literal interpretation of these provisions would mean that those rights could not be exercised due to lack of access to the required technology, rendering them meaningless. As drafted, the only way to protect these rights would be to read a fair use principle into the anti-trafficking provision through 1201(c)(1) and (c)(4).

The reading of a fair use principle into the anti-trafficking provision would leave copyright holders with sufficient protection from the manufacture and distribution of technology that lack legitimate uses. See, e.g., *Sony of Am. v. Universal City Studios*, 464 U.S. 417 (1984). A fair use principle would simply require that copyright holders prove circumvention technology is incapable of substantial noninfringing uses.

### C. The Triennial Rulemaking Process Is No Substitute For A Fair Use Defense

#### a. The Triennial Rulemaking Process Inadequately Protects Fair Use Because It Makes Generalized Determinations About Entire Classes Of Works, But Fair Use And The First Amendment Require An Individualized Determination

The triennial rulemaking process allows the Librarian of Congress to create exceptions to the anticircumvention limitations. While theoretically this process allows workarounds for fair use, the reality of the process is insufficient for fair use protection. The Librarian's rulemaking is limited to generalized determinations, with the librarian grouping requests into categories of uses, and determining

18

whether entire classes should be given an exception. When the Librarian determines that a given type of use of a particular class of work is primarily fair use and that the anticircumvention provisions adversely affect users' ability to make such noninfringing uses, the Librarian will grant a 3-year exemption.

While this triennial rulemaking process insulates some uses, it does not sufficiently protect the first amendment interests protected by fair use. Claims of a first amendment defense require an individualized determination when evaluating the claim. There will inevitably be instances where a user will require circumvention to engage in fair use, but the use will not fall within one of the exempt classes. *See, e.g.*, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 77 Fed. Reg. 65,260, 65,268 (Oct. 26, 2012) (exempting circumvention for copying short clips of movies for use in documentary films, but not fictional films, even though fictional films can sometimes use clips under fair use).

### b. The Triennial Rulemaking Process Is Inadequate Even For The Fair Uses It Purports To Protect, Because It Only Exempts Circumvention, Not Manufacture And Distribution

As discussed above, when devices cannot be manufactured or distributed, the right to use them is meaningless. By foreclosing the means of expression, via manufacture and distribution of those means, the DMCA forecloses the expression. *Alvarez*, 679 F.3d at 595-97. With this principle in mind, an exemption granted by

19

the Triennial Rulemaking Process would only provide any real protections if the user could also access technology that allowed them to accomplish the exempted circumvention. However, the DMCA does not give the Triennial Rulemaking Process the power to exempt technologies or devices; the process is only able to grant exemptions to categories of works. When the products of these technologies can be protected, but the manufacturing and distribution of the technologies cannot benefit from the same exemptions, in many cases the result will be the same as if the works were not exempted in the first place.

Furthermore, the decisions of the Triennial Rulemaking Process are subject to change, limiting the reliability of the system. The technology may be protected by a fair use exemption when a user first implements it, but the Librarian must review all exempted categories at every Triennial Rulemaking Process, and the Librarian accepts oppositions to the readoption of existing categories. That means that currently-recognized exemptions might be eliminated in the future, which creates uncertainty as to whether a party's individual use of circumventing technology will be protected.

   c.  **The Triennial Rulemaking Process is Inadequate Because It Places the Burden of Proof on Speakers and Future Speakers, Not On The Party That Will Stifle Their Speech**

In situations where a party aspires to stifle free speech, the standard First Amendment rule is that the party hoping to stifle speech has the burden of proof as

to constitutionally relevant facts, and not the speaker themself. Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After* Eldred, Liquormart, *and* Bartnicki, 40 Hous. L. Rev. 697, 719-22 (2003). For example, in cases of libel the Court has held that placing the burden of proof on the speaker would risk punishing legitimate speech based on mistaken fact finding, and the fear of such punishment could cause people to steer unnecessarily far away from that risk, limiting speech. *Speiser v. Randall*, 357 U.S. 513, 526 (1958).

In 1985 fair use was determined to be an affirmative defense, and as such the defendant bears the burden of proof. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985). However, this standard predates cases like *Eldred* and *Golan* which found that fair use is a first amendment accommodation built into copyright law. In the wake of these decisions, defendants arguing fair use should receive the same protections as the defendants in a case of libel, obscenity or any other free speech right.

As currently designed, the triennial rulemaking process puts the burden on speakers to not only justify their speech, but do so up to three years in advance. This system has a similar chilling effect on speech as the court feared in *Spieser*, requiring speakers to steer away from valid speech due to the burden of proof being on the defendant. Essentially, the default is that they cannot comfortably speak until their speech is approved by the triennial rulemaking process.

21

### d.  The Exemptions Flowing from the Triennial Rulemaking Process Demonstrate its Deficiencies

Congress could have just passed a blanket ban on circumvention, without an arduous public rulemaking process every three years. The exemption process has been part of the Digital Millennium Copyright Act (DMCA) from the beginning. Pub. L. 105-304, Title I, § 103(a), 112 Stat. 2863 (1998). The inclusion of this process indicates a recognition of the need to facilitate fair uses of circumventing technologies, and that there are drawbacks to ubiquitous uncircumventable TPMs. H.R. Conf. Rep. 105-796, at 64-65 (1998).

However, the large number of exemptions granted thus far are evidence that Section 1201 does not adequately accommodate fair use, and represents an unacceptable burden on speech. Even if the triennial exemption appeared to sufficiently protect fair use in 2000, when only two exemptions were granted, 65 Fed. Reg. 64,574 (Oct. 27, 2000) (later codified at 37 C.F.R. pt. 201), it certainly does not make sense now, when more than 10 times that number of exemptions are granted. 86 Fed. Reg. 59,637-41 (Oct. 28, 2021) (later codified at 37 C.F.R. pt. 201) (exempting 21 classes of works). The fact that there are this many exceptions to the rule indicates that the triennial rulemaking process is an inadequate substitute for a fair use defense to Section 1201, since even with the exceptions, speakers face an undue burden on exercising their speech rights. The level of process required to obtain an exception means that individuals facing obstacles are

22

unlikely to be accommodated until a sufficiently large and organized community of practice emerges to dedicate the time and effort necessary to engage. Individual speakers are still and increasingly suffering suppression of their speech before a critical mass of substantially suppressed uses develops. Section 1201 therefore still runs afoul of the First Amendment without a fair use defense.

## CONCLUSION

For the foregoing reasons, the Court should invalidate the Digital Millennium Copyright Act's anti-circumvention and anti-trafficking provisions as unconstitutional under the First Amendment. In the alternative, the court should read a fair use defense into Section 1201.

Respectfully submitted,

Dated: December 6, 2023     _____

John W. Crittenden
*Counsel of Record*
UCLA School of Law
385 Charles E. Young Drive East
Telephone: 415 216-9705
Email: crittenden@law.ucla.edu
Los Angeles, CA 90095

*Counsel for amicus curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains 5051 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in Times New Roman 14-point font, a proportionally spaced typeface, using Microsoft Word.

Dated: December 6, 2023         _____
                                John W. Crittenden
                                Counsel for amicus curiae

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2023, I caused the foregoing **Brief of Legal Scholars as Amicus Curiae in Support of Plaintiffs-Appellants and Reversal** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: December 6, 2023

_____
John W. Crittenden
Counsel for amicus curiae