ORAL ARGUMENT NOT YET SCHEDULED

No. 23-5159

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

MATTHEW D. GREEN, ET AL.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of Columbia,
No. 1:16-cv-01492-EGS, Hon. Emmet G. Sullivan

_____

**BRIEF *AMICUS CURIAE* OF KARTEMQUIN EDUCATIONAL FILMS
AND INTERNATIONAL DOCUMENTARY ASSOCIATION
IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL**

_____

Jack I. Lerner (CA SBN 220661)
UCI INTELLECTUAL PROPERTY, ARTS, AND
    TECHNOLOGY CLINIC
401 E. Peltason Dr.
Irvine, CA 96297
(949) 824-7684
jlerner@law.uci.edu

*Counsel for* Amici Curiae

December 6, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), *amici curiae* certify as follows.

**(A) Parties and *Amici*.** Except for *amici* listed herein and any other *amici* who have not yet entered an appearance in this Court, all parties, intervenors, and *amici* appearing before the district court are listed in the Brief for Plaintiffs-Appellants filed November 29, 2023.

**(B) Rulings Under Review.** References to the rulings at issue appear in the Joint Appendix filed November 29, 2023 (Docket No. BL-19). The ruling under review is the district court's June 27, 2019 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (ECF. Nos. 24, 25).

**(C) Related Cases**. This case has previously been before this Court as Case No. 21-5195. There are no related cases currently before this court, or any other court.

## STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

*Amici curiae* are nonprofit organizations that produce and fund independent films, support the independent filmmaking community, and advocate for independent filmmakers. *Amici*—together with a group of organizations representing thousands of independent filmmakers across the nation—have since 2008 participated in every rulemaking conducted pursuant to the statute at issue in this appeal. *Amici* seek to share with this Court their unique experience with this statute. This brief uniquely represents the interests of independent filmmakers whose First Amendment-protected expressive conduct has been harmed by the statute at issue in this case. No other *amici* are known to intend to file a brief on behalf of this particular position or are in a position to articulate the particular experiences of *amici*.

Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a), *amici* represent that they have no parent corporations and that no publicly held company has a 10% or greater ownership interest in them.

*Amici* are nonprofit organizations.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

STATEMENT OF IDENTITY, INTEREST IN CASE,  AND SOURCE OF AUTHORITY TO FILE ........................................................................ iii

CORPORATE DISCLOSURE STATEMENT .......................................iv

TABLE OF AUTHORITIES ................................................... vii

GLOSSARY OF ABBREVIATIONS .................................................. xii

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS .........1

INTEREST OF *AMICI CURIAE* ..............................................................2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..............................4

ARGUMENT ...............................................................................7

   I.   The experience of independent filmmakers demonstrates that Section 1201 is substantially overbroad and therefore violates the First Amendment............7

    A.  Fair use is essential to filmmaking as we know it..........................................8

    B.  To make fair use, filmmakers must be able to access high-quality digital materials...........................................................................9

    C.  Section 1201 impedes fair use by making it impossible for filmmakers to access the material they need. ........................................................10

    D.  Filmmakers' experience with Section 1201 exposes the statute's constitutional defects. ................................................................12

   II.  Filmmakers' experience with Section 1201 demonstrates that the triennial rulemaking violates the First Amendment. ..................................................13

    A.  Section 1201's triennial rulemaking process lacks constitutionally required narrow, objective, and definite standards....................................................14

    B.  Section 1201's triennial rulemaking process lacks constitutionally required procedural safeguards.....................................................................19

    C.  Even when exemptions are issued for filmmakers, they come with burdensome and confusing conditions that impose uncertainty in practice...........................................................................21

   III.  Section 1201 merits close First Amendment scrutiny because it overrides copyright's traditional contours..................................................23

IV. Constitutional avoidance and congressional intent mandate a narrowing construction..................................................................................25

CONCLUSION ...........................................................................................26

CERTIFICATE OF COMPLIANCE......................................................28

CERTIFICATE OF SERVICE ...............................................................29

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ......................................................12

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir. 2010).......................12

*Board of Education v. Pico*, 457 U.S. 853 (1982) ....................................................14

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)........................... 4, 23, 24

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004)...........................................................................................................................25

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .............................................................4, 23

*Freedman v. Maryland*, 380 U.S. 51 (1965)............................................................19

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) .................................................. 14, 22

*Golan v. Holder*, 565 U.S. 302 (2012)....................................................................23

*Hofheinz v. Discovery Communications, Inc.*, 2001 WL 1111970, *4 (S.D.N.Y. 2001).............................................................................................................................9

*Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008)..................9

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010) ....................................................................................................................................25

*Monster Commc'ns, Inc. v. Turner Broad. Sys. Inc.*, 935 F. Supp. 490 (S.D.N.Y. 1996)...........................................................................................................................9

*Red Label Music Publishing, Inc. v. Chila Productions.*, 388 F. Supp. 3d 975 (N.D.

Ill. 2019) ...................................................................................................9

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................................................16

*Southeast Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) .................................19

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969)........................................ 14, 22

*Sofa Entertainment, Inc. v. Dodger Productions, Inc.*, 782 F. Supp. 2d 898 (C.D.

Cal. 2010) ................................................................................................9

## STATUTES

17 U.S.C. § 1201(a) ........................................................... 5, 7, 12, 15, 16

17 U.S.C. § 1201(b). .............................................................................16

17 U.S.C. § 1201(d)-(g). ........................................................................16

17 U.S.C. § 1201(j). .............................................................................12

17 U.S.C. § 1204 .................................................................................10

## OTHER AUTHORITIES

37 C.F.R. § 201.40(b)(i).................................................................... 13, 16, 24

*Documentary Filmmakers' Statement of Best Practices in Fair Use*, Ctr. for Media

and Soc. Impact (Nov. 18, 2005), http://www.cmsimpact.org/sites/default/files

/fair_use_final.pdf. .............................................................................2

Film Independent et. al., *Comment on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (Dec. 18, 2017), https://cdn.loc.gov/copyright/1201/2018/comments-121817/class1/class-01-initialcomments-joint-filmmakers.pdf .......................................... 9, 10, 11, 13

International Documentary Association et. al., *Comment on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (Feb. 6, 2015) ....................................................... 9, 10, 12

International Documentary Association et al., *Comment on Section 1201 Study*, (Mar. 2, 2016), https://www.regulations.gov/comment/COLC-2015-0012-0063. ...................................................................................................................18

*Library of Congress Section 1201 Rulemaking Hearing* (May 7, 2009).......... 18, 26

R. Anthony Reese, *Will Merging Access Controls and Rights Controls Undermine the Structure of Anticircumvention Law?*, 18 BERKELEY TECH. L.J. 619, 647–50 (2003) ...............................................................................................................17

Register of Copyrights 2010 Recommendation, *Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* ..................................................................... 11, 18

Register of Copyrights 2012 Recommendation, *Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* ...........................................................................................11

Register of Copyrights 2015 Recommendation, *Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* ............................................................... 10, 11, 21

Register of Copyrights 2018 Recommendation, *Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* ...................................................................... 11, 16

Lawrence E. Strickling, *Re: Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, RM2011-7, NAT'L TELECOMM. AND INFO. AGENCY 23 (Sept. 21, 2012), http://copyright.gov/1201/2012/2012_NTIA_Letter.pdf. ......................................4

*WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 Before the Subcomm. on Courts and Intell. Prop. of the House Comm. on the Judiciary*, 105th Cong. 47 (1997) ..............................................................................................17

*WIPO Copyright Treaties Implementation And On-Line Copyright Infringement Liability Limitation*, H.R. Rep. No. 105-551 (1998) ...........................................17

## STATUTES AND REGULATIONS

Except for the following, all applicable statutes and regulations are either set forth in the body of this brief or contained in the Brief for Plaintiffs-Appellants Matthew D. Green, et al. This brief contains references to the recommendations of the Register of Copyrights in each of the triennial rulemakings considering exemptions pursuant to 17 U.S.C. § 1201(a)(1)(C); the recommendations are not available in the Federal Register or fully codified in the Code of Federal Regulations but can each be referenced in full at the Copyright Office's website dedicated to the rulemakings, https://www.copyright.gov/1201/, via the links labeled "[year] Recommendation."

# GLOSSARY OF ABBREVIATIONS

| Term | Abbreviation |
| --- | --- |
| Digital Millennium Copyright Act | DMCA |
| Technological Protection Measure | TPM |

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* Kartemquin Educational Films and the International Documentary Association state that their counsel authored this brief in whole. No party or their counsel contributed money to fund the preparation or submission of this brief. No other individual(s) or organization(s) other than *amici curiae* contributed financial support intended to fund the preparation or submission of this brief.

## INTEREST OF *AMICI CURIAE*

Independent film reaches millions of viewers across the United States every year. Filmmakers increasingly fulfill the role of traditional news organizations, informing the public about a range of important issues. Filmmakers depend on the doctrine of fair use to explore culture, history, and current events. To do so, they must utilize portions of digitized movies and other digitized content.

*Amici* are nonprofit organizations that produce and fund independent films, support the independent filmmaking community, and advocate for independent filmmakers in various fora. *Amici* led a group of organizations representing thousands of independent filmmakers nationwide that has participated in every rulemaking since 2008 conducted pursuant to the statute at issue in this case. They seek to share with this Court their unique experience with this statute.

As creators and rightsholders themselves, *amici* understand the importance of copyright protections and have been victims of copyright infringement. *Amici* have long exercised fair use rights with the acute understanding that their own content can also be used under the doctrine—and because filmmakers are also rightsholders, the norms they have set for themselves are carefully balanced to foster responsible use.[1]

---

[1] *See, e.g.*, *Documentary Filmmakers' Statement of Best Practices in Fair Use*, Ctr. for Media and Soc. Impact (Nov. 18, 2005), http://www.cmsimpact.org/sites/default/files/fair_use_final.pdf.

*Amicus curiae* Kartemquin Films is a not-for-profit media arts organization and collaborative center for documentary media makers who seek to foster a more engaged and empowered society. In 2016 Kartemquin celebrated 50 years of sparking democracy through documentary. A revered resource on issues of fair use, ethics, storytelling and civic discourse, Kartemquin is internationally recognized for crafting quality documentaries backed by innovative community engagement, and for its filmmaker development programs and media advocacy. The organization has won almost every major critical and journalistic prize for documentary filmmaking.

*Amicus curiae* International Documentary Association is an organization that seeks to assist the growth and development of documentary films and the overall documentary culture. IDA provides educational programs and resources to documentary makers of various skill levels. IDA's grant programs help filmmakers attain the financing necessary to create documentary films. IDA also advocates for major issues that affect documentary filmmakers, including free speech and fair use.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The experience of independent filmmakers with Section 1201 of the Digital Millennium Copyright Act reveals the severe constitutional defects inherent in that provision. Filmmakers depend on the doctrine of fair use to make commentary, criticism, instruction, and report on current events. This activity has been called "paradigmatic fair use,"[2] and without it, filmmaking as we know it would be impossible. To make fair use, filmmakers must access digitized movies and other content, the vast majority of which is protected by encryption and other technological protection measures ("TPMs"). Filmmakers fear that Section 1201 makes this illegal—even when the underlying use of encrypted content is clearly non-infringing, the act of obtaining that content could be subject to civil and criminal liability. The result is that Section 1201 impedes a wide range of lawful, expressive conduct, in violation of the First Amendment.

The Supreme Court has instructed that fair use is a constitutional doctrine "necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful Arts.'"[3] It is fair use that allows copyright law to coexist with the First

---

[2] Lawrence E. Strickling, *Re: Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies* (Sept. 21, 2012), http://copyright.gov/1201/2012/2012_NTIA_Letter.pdf.
[3] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (citing U.S. Const., Art. I, § 8).

Amendment's guarantee of freedom of speech. Thus, while Congress is free to shape copyright law, it may not do so in a way that upends an essential "First Amendment accommodation" that is "built-in" to copyright law.[4] Yet that is just what has been done here. Because Section 1201 effectively prohibits a wide range of protected expression—far in excess of any legitimate application of the statute—it is impermissibly overbroad and in violation of the First Amendment.

Congress recognized these defects at the time it passed Section 1201, but in attempting to solve one problem, it created another. Congress drew up a unique procedure in which the Register of Copyrights conducts a rulemaking every three years and then makes recommendations to the Librarian of Congress, who may lift Section 1201's prohibition on circumvention of TPMs for select classes of works.[5] This process, however, amounts to an unconstitutional speech licensing regime where decisions are made according to an open-ended, subjective, and evolving set of policy considerations. The process is long and arduous, taking between fifteen months and two years, and there is no opportunity for judicial review.

The triennial rulemaking process has been severely burdensome for filmmakers. The proceeding, which is styled as an adjudication with "petitions," "proponents," and "opponents," requires complex and highly technical legal

---

[4] *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).
[5] 17 U.S.C. § 1201(a)(1)(C).

argument and extensive fact-gathering, which imposes a severe financial burden and time commitment on *amici*. In the 2015-2016 rulemaking proceeding at issue in this appeal, counsel worked for nearly 2000 hours, filed over 130 pages of legal argument and evidentiary submissions, participated in live hearings, and responded to post-hearing correspondence from the Copyright Office. Organizational staff and hundreds of filmmakers also devoted hundreds of hours to the process. These efforts would be impossible without pro bono counsel.

Worse, the limited exemptions that have been granted still leave filmmakers uncertain as to how they can make fair use without fear of civil and criminal liability. Before using the exemption, filmmakers must rule out all non-circumventing alternatives, or research and investigate all available screen capture software and determine how that software works. In every triennial rulemaking since 2008, *amici* have presented copious evidence that no viable alternatives to circumvention exist, yet this burdensome obstacle remains.

In light of these constitutional defects, *amici* respectfully urge this Court to issue a narrowing construction. The Court should direct that liability under Section 1201 can attach only where there is a close nexus between infringing conduct and the act of circumventing a technological protection measure.

This Court should also examine the plain language of Section 1201 and its legislative history, which make clear that Congress intended to prohibit the act of

circumventing of TPMs that control *access*, like passwords or payment mechanisms; but it clearly meant not to prohibit the circumvention of TPMs that control *use*, like anti-copying controls. As rightsholders themselves, filmmakers do not seek to obtain unlawful access to copyrighted works: they obtain the media in question lawfully, and use tools like Blu-ray players or web browsers to view the content. Yet Section 1201 effectively prevents them from copying the content or otherwise making fair use of it because common technologies like encryption prevent both access and copying. For most of Section 1201's history, the distinction between access and copy protection technologies has been ignored or elided. This Court should direct that liability does not attach where the media in question is lawfully accessed, and the circumvention is conducted solely to make a lawful use.

## ARGUMENT

### I.     The experience of independent filmmakers demonstrates that Section 1201 is substantially overbroad and therefore violates the First Amendment.

Filmmakers depend on the doctrine of fair use to explore and analyze culture, history, and current events. In today's digital environment, filmmakers cannot make fair use without accessing digital materials. But Section 1201(a) severely restricts that right by preventing access to the very digital materials necessary to make fair use. It is therefore unconstitutionally overbroad and subject to First Amendment scrutiny. As a content-based restriction on speech, Section 1201 is subject to—and

fails to satisfy—strict scrutiny. But even if Section 1201 were subject to intermediate scrutiny, it would fail that test as well.

### A. Fair use is essential to filmmaking as we know it.

Filmmaking plays an important social and political role in American society. Filmmakers come from a wide range of perspectives and backgrounds and use the language of film to explore culture, history, politics, and society; encourage debate and the exchange of ideas and opinions; and raise awareness about issues facing underrepresented individuals who struggle to be heard. It has the power to illuminate problems that plague society and shine a light on developments around the world. Independent motion picture production generates billions of dollars annually for the United States economy; in the United States alone, several hundred productions are released each year.

Fair use is critically important to filmmaking. Without fair use, filmmakers cannot fully express themselves: they cannot comment on contemporary debates, critique or analyze culture, or explore the legacy of historical events. The independent filmmaking community has depended on the doctrine for decades. As creators and rightsholders themselves, filmmakers understand the importance of copyright protections and have long exercised fair use rights appropriately, and over time, the community has developed a robust and reliable practice of making fair use for purposes such as criticism, commentary, and historical analysis. Films

that make fair use are regularly insured, distributed, and broadcast.[6] Courts have consistently affirmed that the use of copyrighted material in films for the purposes of criticism, commentary, historical analysis, and similar purposes is a quintessential fair use.[7]

### B. To make fair use, filmmakers must be able to access high-quality digital materials.

In today's digital environment, filmmakers cannot make fair use without accessing digital materials. As *amici* have proven in numerous triennial rulemakings, filmmakers must be able to access high-quality digital material in order to conduct criticism, commentary, or make fair use in other ways with the visual detail necessary to make their point, as in close film analysis.[8] *Amici* have also provided detailed technical explanations for why high-definition or 4K content is necessary.

---

[6] Film Independent et al., *Comment on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 3 (Dec. 18, 2017) (hereinafter Film Independent et al. 2017 Comment); International Documentary Association et al., *Comment on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, (Feb. 6, 2015) pp.2-4, app. B (hereinafter International Documentary Association et al. 2015 Comment).

[7] *See, e.g.*, *Monster Commc'ns, Inc. v. Turner Broad. Sys. Inc.*, 935 F. Supp. 490 (S.D.N.Y. 1996); *Hofheinz v. Discovery Communications, Inc.*, 2001 WL 1111970, *4 (S.D.N.Y. 2001); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 322 (S.D.N.Y. 2008); *Sofa Entm't, Inc. v. Dodger Prod., Inc.*, 782 F. Supp. 2d 898, 910-11 (C.D. Cal. 2010); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975 (N.D. Ill. 2019).

[8] *See* Film Independent et al., 2017 Comment, 3; International Documentary Association et al., 2015 Comment, 1-2, 10-11, app. E, app. B. at 16.

Without high-quality content, their films will not be seen: they will be rejected by broadcasters, streaming services, and theatrical distributors.[9] The Register of Copyrights has explicitly recognized that filmmakers cannot make fair use without access to high-quality content.[10]

### C. Section 1201 impedes fair use by making it impossible for filmmakers to access the material they need.

For filmmakers, Section 1201 creates a reasonable fear that obtaining digital material from encrypted media could lead to civil and even criminal liability. Filmmaking is *amici*'s livelihood—indeed, many independent film productions are structured as Limited Liability Companies—and as a result, *amici* are concerned that obtaining digital material could lead to criminal sanctions as circumvention "for purposes of commercial advantage or private financial gain."[11] Because the vast majority of digital motion picture material can only be obtained from encrypted

---

[9] *See* Film Independent et al., 2017 Comment, 3; International Documentary Association et al., 2015 Comment, 1-2.

[10] Register of Copyrights, *2015 Recommendation, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 90 (hereinafter Register's 2015 Recommendation) ("Joint filmmakers presented a detailed record to argue that standard-definition resolution is insufficient for film distribution purposes. . . . Based on this record, the Register finds that Joint Filmmakers have demonstrated they are likely to suffer adverse effects if they are unable to make use of material on Blu-ray in these cases.").

[11] 17 U.S.C. § 1204 (establishing criminal penalties for circumvention "for purposes of commercial advantage or private financial gain").

media,[12] Section 1201 has a chilling effect on filmmaking. The Register of

Copyrights has recognized this fact on numerous occasions.[13]

With Section 1201 in place, filmmakers have no viable alternative to access

the high-quality footage necessary to create their works. Filmmakers often cannot

obtain permission for use of copyrighted material, as rightsholders may refuse a

license, impose sweeping non-disparagement clauses,[14] charge prohibitive fees,[15] or

---

[12] Register's 2015 Recommendation at 83 ("[G]enerally speaking, copyrighted motion pictures are not widely available in formats not subject to technological protections.").

[13] Register of Copyrights, *2010 Recommendation, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 52, 65, 72 (hereinafter Register's 2010 Recommendation) ("filmmakers . . . have also provided persuasive evidence that non-circumventing alternative means of obtaining portions of DVDs cannot substitute for the decrypted content obtained through circumvention . . . ."); Register of Copyrights, *2012 Recommendation, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 138 (filmmakers "are, or likely will be, adversely affected by the prohibition against circumvention when there is a need to use high-quality motion picture material to convey intended criticism or commentary"); Register's 2015 Recommendation, 99 (filmmakers had "sufficiently established that various technological measures interfere with their ability to make desired uses of motion pictures and that a significant number of those uses are likely fair and noninfringing" and that filmmakers are adversely affected by Section 1201 "including when it is necessary to use high-quality motion picture material to convey intended criticism or commentary."); Register of Copyrights, *2018 Recommendation, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 22, 30, 73-75 (hereinafter Register's 2018 Recommendation) (filmmakers "had met their burden of showing that the statutory prohibition on circumvention of access controls limits their ability to engage in the proposed uses").

[14] *See* Film Independent et al., 2017 Comment, app. T.

[15] *Id.*

simply decline to engage with the filmmaker at all.[16] Copyright law and the Digital Millennium Copyright Act thus operate in tandem as a form of private censorship allowing a rightsholder to suppress speech it opposes.

### D. Filmmakers' experience with Section 1201 exposes the statute's constitutional defects.

Because Section 1201 heavily constrains filmmakers' ability to make fair use, it directly implicates the First Amendment and must be subject to constitutional scrutiny.[17] Section 1201(a) is a content-based restriction on speech. The statutory language itself identifies content-based categories that are eligible for exemptions, including non-profit libraries, law enforcement, and reverse engineering, among others.[18] In addition to the statutory exemptions, the triennial rulemaking allows the Librarian of Congress unbridled discretion to make content-based determinations. The Librarian may consider any "appropriate" factors deemed relevant, allowing content-based considerations to guide the decision-making process.[19]

---

[16] International Documentary Association et al., 2015 Comment, app. I. at 6.

[17] *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (holding that the ability to gather information is a "necessary predicate" to the exercise of "rights of speech, press, and political freedom."); *see also ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The right to publish . . . would be insecure, or largely ineffective" if the act of gathering information was "wholly unprotected."); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (the "process of creating" is protected by the First Amendment to the same degree as "the product of these processes.").

[18] 17 U.S.C. § 1201(d)-(g), (j).

[19] *Id.* § 1201(a)(1)(C)(v).

Indeed, prior rulemaking decisions have done just that. Most notably, the Librarian has granted exemptions limited to "documentary filmmaking" that exclude other types of filmmaking, even though filmmakers have strenuously argued there is no clear way to distinguish between different genres of film.[20] In the 2017-2018 proceeding, *amici* presented nineteen different attempts to define the "documentary" genre made across nine decades by prominent filmmakers, critics, and scholars. *Amici* also provided examples of films not labeled or marketed as documentaries that could easily fit many of these definitions.[21] Yet the Librarian has continued to permit exemptions limited to certain genres or that turned on content-based distinctions. Most recently, the Librarian issued an exemption for "documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature."[22] Content-based speech regulations such as these are presumed unconstitutional and subject to First Amendment scrutiny.[23]

## II. Filmmakers' experience with Section 1201 demonstrates that the triennial rulemaking violates the First Amendment.

Since 2008, *amici* have participated in five rounds of the triennial rulemaking process, leading coalitions representing thousands of independent filmmakers

---

[20] Film Independent et al., 2017 Comment, 4-7.

[21] *Id.*

[22] 37 C.F.R. § 201.40(b)(i) (2018).

[23] *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64, 171 (2015) (content-based speech restrictions are presumptively unconstitutional and subject to strict scrutiny).

nationwide. *Amici* deeply appreciate the immense time and effort the Copyright Office staff has put into the exemption process. Unfortunately, the process has not been the "fail-safe" mechanism that was promised, and it falls far short as a remedy to Section 1201's First Amendment violations. As the Supreme Court has instructed, "a scheme making the 'freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'" [24] *Amici*'s experience with Section 1201 demonstrates that the triennial rulemaking meets this description.

### A. Section 1201's triennial rulemaking process lacks constitutionally required narrow, objective, and definite standards.

The triennial rulemaking process is not guided by "narrow, objective, and definite standards," as is required when subjecting First Amendment freedoms to a permission regime.[25] Section 1201 provides that in determining whether an exemption is warranted, the Librarian must determine whether groups of users have been "adversely effected" by Section 1201(a) "in their ability to make noninfringing uses." In practice, this means citizens must petition the Librarian in advance if they

---

[24] *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)).
[25] *Shuttlesworth*, 394 U.S. at 150-51.

want to make fair use. The Librarian then has the sole, unchecked power to decide whether petitioners' fair use claims are valid, and grant—or deny—temporary exemptions according to the Librarian's own interpretation of the law.

But Section 1201 does not stop there. The Librarian must also conduct a wide inquiry into a range of policy considerations. The statute requires that the Librarian consider "the effect of circumvention of technological measures on the market for or value of copyrighted works," "the availability for use of copyrighted works," and "the availability for use of works for nonprofit archival, preservation, and educational purposes."[26] The law also allows the Librarian to base the decision on "such other factors as the Librarian considers appropriate."[27] None of these factors are defined in the statute.

The open-ended nature of this rulemaking process has led to inconsistent reasoning that changes from one round to the next. A key example concerns the distinction between documentary filmmaking and other kinds of filmmaking.[28] Over the course of three rulemakings spanning nine years, *amici* have repeatedly argued that the distinction between documentary and narrative film is arbitrary and impossible to draw. The Register of Copyrights, who administers the rulemaking,

---

[26] *See* § 1201(a)(1)(C)(i)-(iii).
[27] *See* § 1201(a)(1)(C)(v).
[28] *See also* discussion above at page 13.

consistently rejected this argument,[29] and the Librarian of Congress granted exemptions only for "documentary filmmaking." Then, in 2018, the Librarian granted an exemption for "documentary filmmaking, or . . . where the motion picture clip is used in parody or for its biographical or historically significant nature."[30] Filmmakers did not ask for an exemption making these distinctions, and the Librarian did not further define "documentary," "biographical," or "historically significant."

Another example concerns the distinction Section 1201 makes between different kinds of technology. In 2012, the Register invoked the open-ended "such other factors as the Librarian considers appropriate" inquiry[31] to account for the difference between "access controls" such as password protection, and controls that "effectively protect[]a right of a copyright owner," such as anti-copying mechanisms.[32] But in subsequent rulemakings, this distinction was given no weight.

With Section 1201, Congress prohibited the circumvention of access controls, but it deliberately chose *not* to prohibit the circumvention of other types of controls (often called "use controls," "rights controls," or "copy controls") that that

---

[29] *See, e.g.,* Register's 2018 Recommendation, 38 (declaring that "the record did not support . . . that the use of motion picture clips in narrative films was, as a general matter, likely to be noninfringing").

[30] 37 C.F.R. § 201.40(b)(i) (2018).

[31] 17 U.S.C. § 1201(a)(1)(C)(v).

[32] *Compare* 17 U.S.C. § 1201(a) *with* 17 U.S.C. § 1201(b).

"effectively protect[]a right of a copyright owner". Congress drew this distinction in

significant part because it thought that doing so would preserve fair use. As the

Judiciary Committee said at the time,

> Paragraph (a)(1) [prohibiting the circumvention of "access controls"] does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures. **In a fact situation where the access is authorized, the traditional defenses to copyright infringement, including fair use, would be fully applicable.** So, an individual would not be able to circumvent in order to gain unauthorized access to a work, but would be able to do so in order to make fair use of a work which he or she has acquired lawfully.[33]

Encryption systems such as those found on Blu-ray, DVDs, and streaming media,

however, have always been considered by the Librarian as combined access *and*

copy controls, and therefore subject to Section 1201's prohibition on circumvention

no matter what the use. As a result, even though filmmakers lawfully acquire and

---

[33] *WIPO Copyright Treaties Implementation And On-Line Copyright Infringement Liability Limitation*, H.R. Rep. No. 105-551, pt. 1, at 18 (1998) (emphasis added); *see also WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 Before the Subcomm. on Courts and Intell. Prop. of the House Comm. on the Judiciary*, 105th Cong. 47 (1997 (statement of Marybeth Peters)); R. Anthony Reese, *Will Merging Access Controls and Rights Controls Undermine the Structure of Anticircumvention Law?*, 18 BERKELEY TECH. L.J. 619, 647–50 (2003) (showing that the decision not to prohibit circumvention of "rights" controls was a central component of Congress's efforts to ensure that Section 1201 did not undermine important rights such as fair use).

view the content,[34] they are still afraid that making a copy for fair use purposes could subject them to liability for breaking an "access control."

In 2010, the Register acknowledged that this interpretation undermines congressional intent, and cited it as a reason for granting an exemption for filmmakers:

> The fact that a technological measure that controls access is being used predominantly for the purpose of preventing reproduction and other rights of the copyright owner is a relevant consideration in this case. **The fact that Congress clearly distinguished between measures that control access and measures that protect the rights of the copyright owner is undisputed**. . . . In addition to the other four factors weighing in favor of designating a class of works, the fact that in this case **the effect of the access control is not to prevent unauthorized access, but rather to restrict uses** of motion pictures, is an additional factor weighing in favor of designating a class. . . . The fact that a technological measure that qualifies as an access control is affecting use, not access, is another relevant consideration for the Librarian.[35]

*Amici* view this as a critically important consideration, because to prohibit the circumvention of technologies that "merge" access and copy controls is fundamentally counter to congressional intent and the structure of the statute. To *amici*'s dismay, neither the Register nor the Librarian ever mentioned this issue again.[36]

---

[34] Register's 2010 Recommendation, 44.

[35] *Id.* at 71-72 (emphasis added).

[36] *Amici* discussed the issue of merged access and rights controls extensively in comments they filed in the Copyright Office's 2016 study on Section 1201. *See* International Documentary Association et al., *Comment on Section 1201 Study*, 15-17 (Mar. 2, 2016).

Finally, the lack of narrow, objective, and definite standards has a harmful impact even on filmmakers that do receive exemptions. Given that exemptions must be renewed every three years, the shifting rationales for the Librarian's decisions, adversarial setting, onerous burden of proof, and the absence of narrow and definite standards guiding the rulemaking process means filmmakers who have been granted an exemption can never be certain that they will have their exemption renewed. Instead, filmmakers operate under a cloud of uncertainty, and the threat of an expiration date hangs over their creative practice.

### B. Section 1201's triennial rulemaking process lacks constitutionally required procedural safeguards.

Any regulation that subjects First Amendment-protected speech to a permission regime must implement specific procedural provisions as safeguards to "reduce the danger of suppressing constitutionally protected speech."[37] The decision must be swift; there must be an opportunity for prompt judicial review; and the burden of proof justifying the speech restriction must rest on the state entity.[38] Section 1201's rulemaking process meets none of these requirements.

First, the triennial rulemaking process is anything but prompt. The entire process takes between fifteen months and two years, and is enormously costly. In the 2015-2016 rulemaking proceeding, pro bono counsel for filmmakers spent nearly

---

[37] *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).
[38] *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965).

2000 hours advocating for an exemption. The effort required three attorneys, seven law students, and two interns. *Amici* filed over 130 pages of legal argument and evidentiary submissions, participated in in-person hearings, and responded to post-hearing correspondence from the Copyright Office. At market rates, such services would cost hundreds of thousands of dollars, and that figure does not include the time spent by hundreds of filmmakers, organizational staff, and administrative support who also contributed to the effort, including travel from Chicago to Los Angeles to participate in a hearing. If *amici* had not had pro bono counsel, they never would have been able to take part in the process.

Second, Section 1201's rulemaking process includes no judicial overview. Once the Librarian reaches a decision on an exemption request, those seeking exemptions have no recourse other than to launch a constitutional challenge in federal court.

Finally, the burden of proof during the rulemaking process rests not on the Librarian of Congress, but explicitly on "proponents" such as filmmakers. The Register of Copyrights, who administers this process, has styled it as an adjudication: those who have been affected by the statute must petition the Register; "proponents" of exemptions bear the burden of proof to show "distinct, verifiable and measurable impacts" on fair use "in the marketplace;" and "opponents" of proposed exemptions are given a dedicated round of comments and permitted to participate in adversarial

hearings.[39] Despite this quasi-adjudicative structure, the Register explicitly refuses to consider individual cases.

### C. Even when exemptions are issued for filmmakers, they come with burdensome and confusing conditions that impose uncertainty in practice.

Every exemption granted to *amici* thus far has come with burdensome and confusing conditions that create uncertainty for filmmakers. Before availing themselves of the exemption and accessing the content they need, filmmakers must investigate or try out ostensibly non-circumventing alternatives such as screen capture software, under the theory that such software might not circumvent TPMs. For example, the current exemption requires that, before obtaining encrypted content:

> the person engaging in circumvention . . . reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.[40]

In every triennial rulemaking since 2008, *amici* have presented voluminous evidence that no viable alternatives to circumvention exist,[41] and no credible

---

[39] Register's 2015 recommendation at 16.

[40] 37 C.F.R. § 201.40(b)(1)(i)(a) (2021).

[41] *See, e.g.*, *Library of Congress Section 1201 Rulemaking Hearing* 27-40 (May 7, 2009) (statement of Jim Morrissette, Technical Director, Kartemquin Educational Films), https://www.copyright.gov/1201/hearings/2009/transcripts/1201-5-7-09.txt;

evidence has ever been introduced that would rebut this assertion.[42] Yet this burdensome obstacle remains. Film editors, directors, and producers face uncertainty as to how to arrive at a "reasonable belief as to non-circumventing alternatives," and it is remarkably difficult to determine whether a screen capture technology enables reproduction "after content has been lawfully acquired and decrypted."[43] Thus, even while the independent filmmaking community takes some comfort in the fact that an exemption exists, filmmakers today still labor in uncertainty and with fear of liability.

As the Supreme Court has instructed, "a scheme making the 'freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'"[44] With its failure to satisfy constitutionally mandated safeguards, lack of objective and definite standards guiding decision-

---

International Documentary Association et al., 2015 Comment 2-4, app. B (Feb. 6, 2015).

[42] Nor, for that matter, has it ever even been alleged that filmmaker exemptions have harmed the market for motion pictures in any way.

[43] In 2013, counsel on this brief presented a workshop to over 100 documentary filmmakers with the intention of explaining how filmmakers could determine whether they were in compliance with the Section 1201 exemption then in effect. As an indicator of how complicated the filmmakers' exemptions have been, even the simplified process we presented to them was seven steps long.

[44] *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion) (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)).

making, and burdensome and confusing effects on those who do receive exemptions, Section 1201's rulemaking process is tantamount to a speech-licensing regime that impermissibly constrains the First Amendment rights of filmmakers.

### III.  Section 1201 merits close First Amendment scrutiny because it overrides copyright's traditional contours.

The Supreme Court has instructed that fair use is a constitutional doctrine "necessary to fulfill copyright's very purpose, 'to promote the Progress of Science and useful Arts.'"[45] It is fair use that allows copyright law to coexist with the First Amendment's guarantee of freedom of speech. Thus, while Congress is free to shape copyright law, it may not do so in a way that upends an essential "First Amendment accommodation" that is "built-in" to copyright law.[46] As *amici* discuss above, Section 1201 significantly constrains filmmakers' ability to make fair use, and the triennial rulemaking process does not remedy that harm. But the statute undermines this constitutional balance in more fundamental ways: it converts fair use from a lawful activity available to all to an indulgence that must be obtained in advance; and it inhibits the development of fair use doctrine by taking fair use determinations away from the courts and placing them with the Library of Congress.

---

[45] *Campbell*, 510 U.S. at 575 (1994) (citing U.S. Const., Art. I, § 8).
[46] *Eldred*, 537 U.S. at 219 (2003); *see also Golan v. Holder*, 565 U.S. 302 (2012).

Fair use has always been "exclusively judge-made doctrine,"[47] decided on a case-by-case basis. As the Supreme Court has observed, when Congress recognized fair use in the Copyright Act of 1976, "Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication."[48] Section 1201 alters that tradition by creating a barrier to fair use, and then giving the Librarian of Congress the power to decide whether and when to lift that barrier.

Throughout the triennial rulemaking process, in deciding whether to recommend an exemption, the Register of Copyrights makes determinations as to whether particular activities qualify as fair use—an exercise that should be reserved to the judiciary. To make matters worse, the overall decision-making process looks nothing like the "common-law tradition of fair use adjudication."[49] The Librarian, through the Register, has decided that even if the activity at issue is unquestionably fair use, exemptions can only be granted where there is a critical mass of users being harmed. In addition, the Librarian also considers a range of additional policy considerations not directly related to the fair use claim in question. In short, Section 1201 represents a fundamental shift in how fair use works. Because fair use is an

---

[47] *Campbell*, 510 U.S. at 576.

[48] *Id.*, quoting H.R. Rep. No. 94-1476, p. 66 (1976) and S. Rep. No. 94-473, p. 62 (1975).

[49] *Id.*

essential "First Amendment accommodation," the statute merits heightened scrutiny.

### IV. Constitutional avoidance and congressional intent mandate a narrowing construction.

This Court can remedy much of Section 1201's First Amendment harm with a narrowing construction. *Amici* urge this Court to clarify that Section 1201(a) is bounded by the traditional contours of copyright doctrine, which allow for fair use and other exceptions and limitations, and to hold that liability under Section 1201 can only attach where there is a connection between infringing conduct and the act of circumventing a technological protection measure—as the United States Court of Appeals for the Federal Circuit did in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*[50]

This Court should also examine the plain language of Section 1201 and its legislative history, which make quite clear that Congress intended to prohibit the act of circumventing of TPMs that control *access*, like passwords or payment mechanisms; but it clearly meant not to prohibit the circumvention of TPMs that control *use*, like anti-copying controls. As *amici* discuss extensively above at pages

---

[50] 381 F.3d 1178, 1202-03 (Fed. Cir. 2004). In *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010), the Ninth Circuit declined to adopt the Federal Circuit's rule. However, in that case the Court did not consider Section 1201's impact on the First Amendment, and the case did not involve expressive conduct such as filmmaking.

16-18, Congress saw this distinction as a key means by which to preserve fair use. For most of Section 1201's history the distinction between access and copy protection technologies has been ignored or elided. It should not have been. This Court should remedy that mistake by directing that liability does not attach where the media in question is lawfully accessed, and the circumvention is conducted solely to make a lawful use.

## CONCLUSION

In 2009, Gordon Quinn, the Founder and former Artistic Director of *amicus* Kartemquin Educational Films, testified in a Section 1201 hearing at the Library of Congress. Fair use, he explained, is "something that we need as documentary filmmakers, as storytellers, to be able to participate in the culture of the community, to critique things in our society. It's something that I shouldn't have to ask permission for."[51] The same holds true today. We live in a digital age, and a law that restricts filmmakers' ability to make fair use of digital materials harms their ability to express themselves. Filmmakers need to be able to analyze, explore, and make

---

[51] *Library of Congress Section 1201 Rulemaking Hearing* 20 (May 7, 2009) (statement of Gordon Quinn, Founder and Artistic Director, Kartemquin Educational Films).

arguments about the world, our culture, and our history, and that project is at the heart of democracy. Section 1201 places that project in jeopardy.

Respectfully submitted,

UCI INTELLECTUAL PROPERTY, ARTS, AND TECHNOLOGY CLINIC

Dated: December 6, 2023     */s/ Jack I. Lerner*        .
Jack I. Lerner

University of California, Irvine School of Law
401 E. Peltason
Irvine, CA 92697
(949) 824-7684
jlerner@law.uci.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I, Jack I. Lerner, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 6,088 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in Times New Roman 14-point font, a proportionately spaced typeface, using Microsoft Word for Microsoft 365. This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules.

Dated: December 6, 2023            */s/ Jack I. Lerner*                    .
                                   Jack I. Lerner

                                   *Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 6, 2023          */s/ Czarina Ellingson*                     .
                                 Czarina Ellingson

                                 UCI INTELLECTUAL PROPERTY,
                                 ARTS, AND TECHNOLOGY CLINIC