No. 23-5159

---

IN THE

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Matthew D. Green, et al.,

*Plaintiffs-Appellants,*

v.

United States Department of Justice, et al.,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**AMICUS BRIEF OF ACCESSIBILITY, ARCHIVAL, AND SECURITY
FAIR USERS IN SUPPORT OF PLAINTIFFS-APPELLANTS**

---

Vivek Krishnamurthy
SAMUELSON-GLUSHKO TECHNOLOGY LAW
AND POLICY CLINIC AT COLORADO LAW

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

December 6, 2023

*This page intentionally left blank.*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1(a), amici curiae state that they have no parent corporations and that no publicly held entity owns ten percent (10%) or more of any amicus organization.

## Certificate as to Parties, Rulings Under Review, and Related Cases

**Parties and Amici.** The following were parties in the district court proceeding from which this appeal was taken and are the parties before this Court:

A.  Matthew D. Green

B.  Andrew Bunnie Huang

C.  Alphamax, LLC

D.  United States Department of Justice

E.  Library of Congress

F.  United States Copyright Office

G.  Carla Hayden

H.  Shira Perlmutter (successor to Maria A. Pallante, see Fed. R. Civ. P. 25(d))

I.  Merrick Garland (successor to Loretta E. Lynch, see Fed. R. Civ. P. 25(d))

J.  Digital Content Protection, LLC (amicus)

K.  Intel Corporation (amicus)

L.  Advanced Access Content System Licensing Administrator, LLC (amicus)

M.  DVD Copy Control Association (amicus)

N.  Association of American Publishers, Inc. (amicus)

O.  Entertainment Software Association (amicus)

P.  Motion Picture Association, Inc. (amicus)

Q.  Recording Industry Association of America, Inc. (amicus)

**Ruling Under Review.** The ruling under review is the district court's June 27, 2019 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. Nos. 24, 25). The ruling was entered by Hon. Emmet G. Sullivan, United States District Judge for the District of Columbia, in Case No. 1:16-cv-01492-EGS.

**Related Cases.** This case has previously been before this Court as Case No. 21-5195. There are no related cases currently before this court, or any other court.

## Table of Contents

**Corporate Disclosure Statement** .......................................................... 1

**Certificate as to Parties, Rulings Under Review, and Related Cases** ........... 2

**Table of Authorities** ........................................................................ 4

**Glossary of Abbreviations** ................................................................ 8

**Statutes and Regulations** ................................................................. 9

**Statement of Identity, Interest in Case, and Source of Authority to File** .. 10

**Statement of Authorship and Financial Contributions** ................................ 12

**Argument** ...................................................................................... 13

    1.   Section 1201 unduly burdens the First Amendment rights of amici to make fair uses of copyrighted works. ........................................................... 16

        1.1.   Participation in the Section 1201 process is excessively costly and time-consuming for amici and other exemption proponents. .......... 18

        1.2.   Section 1201 subjects the First Amendment rights of fair users to a hostile, degrading, and needlessly repetitive rulemaking process. . 20

        1.3.   Section 1201 burdens the First Amendment rights of Americans far more than comparable provisions in foreign nations with weaker free speech protections. ........................................................... 26

    2.   The triennial frequency of the Section 1201 rulemaking is fatal to its constitutionality. ................................................................................ 28

**Conclusion** .................................................................................... 31

**Appendix: List and Description of Amici** ........................................... 32

**Certificate of Compliance** ............................................................... 34

**Certificate of Service** ..................................................................... 35

## Table of Authorities

### Cases

*Authors Guild v. HathiTrust,* 755 F.3d 87 (2d Cir. 2014) ................................................. 16

*Bernstein v. United States,* 176 F.3d 1132 (9th Cir. 1999) ................................................. 29

*Eldred v. Ashcroft,* 537 U.S. 186 (2003) ................................................................................. 13

*Golan v. Holder,* 565 U.S. 302 (2012) ..................................................................................... 13

*Green v. Department of Justice,* 54 F.4th 738 (D.C. Cir. 2022) ..................................... 13

*Harper & Row v. Nation,* 471 U.S. 539 (1985) ................................................................... 13

*Hill v. Colorado,* 530 U.S. 703 (2000). ................................................................................... 14

*Local 32B-32J, Service Employees International Union, AFL-CIO v. Port Authority of New York and New Jersey,* 3 F. Supp 2d. 413 (S.D.N.Y. 1998)................................. 27

*N.A.A.C.P, Western Region v. City of Richmond,* 743 F.2d 1346 (9th Cir. 1984) ....... 27

*Packingham v. North Carolina,* 582 U.S. 98 (2017) .................................................... 13, 14

*Sony v. Universal City Studios,* 464 U.S. 417 (1984) ........................................................ 16

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ......................................................... 14

### Statutes

17 U.S.C. § 1201 ...................................................................................................................... passim

Digital Millennium Copyright Act of 1998, Pub. L. No. 105-304, 112 Stat. 2860 (1998) ...................................................................................................................................... 25

### Treaties

Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise Print Disabled, June 27, 2013, S. Treaty Doc. No. 114-6, VIP/DC/8/Rev. ................................................................................... 22

World Intellectual Property Organization Performances and Phonograms Treaty, Dec. 20, 1996, S. Treaty Doc. No. 105-17, 36 I.L.M. 76 (1997) ............................... 25

## Administrative Materials

3rd (Third) Triennial Rulemaking, Recommendation of the Register of Copyrights (2006) ................................................................................................ 17, 20, 22

4th (Fourth) Triennial Rulemaking, Recommendation of the Register of Copyrights (2010) ........................................................................ 17, 20, 21, 23

5th (Fifth) Triennial Rulemaking, Recommendation of the Register of Copyrights (2012) ................................................................................................ 22

6th (Sixth) Triennial Rulemaking, Recommendation of the Register of Copyrights (2015) ........................................................................................ 17, 22

7th (Seventh) Triennial Rulemaking, Recommendation of the Acting Register of Copyrights (2018) ....................................................................... 16, 22

8th (Eighth) Triennial Rulemaking, Ex Parte Communications (2021), https://www.copyright.gov/1201/2021/ex-parte-communications.html ............. 24

8th (Eighth) Triennial Rulemaking, Opposition Comments (Feb. 9, 2021), https://www.copyright.gov/1201/2021/comments/opposition/ ............................ 20

8th (Eighth) Triennial Rulemaking, Petitions for Newly Proposed Exemptions (Sept. 8, 2020), https://www.copyright.gov/1201/2021/petitions/proposed/ ...... 24

8th (Eighth) Triennial Rulemaking, Petitions to Renew Prior Exemptions (July 22, 2020), https://www.copyright.gov/1201/2021/petitions/renewal/ ....................... 24

8th (Eighth) Triennial Rulemaking, Post-Hearing Questions, (May 14, 2021), https://www.copyright.gov/1201/2021/post-hearing/ ........................................... 24

8th (Eighth) Triennial Rulemaking, Recommendation of the Register of Copyrights (Oct. 19, 2021) ......................................................... 16, 22, 23, 24

8th (Eighth) Triennial Rulemaking, Reply Comments (March 10, 2021), https://www.copyright.gov/1201/2021/comments/reply/ ..................................... 24

8th (Eighth) Triennial Rulemaking, Round 1 Comments (Dec. 14, 2020), https://www.copyright.gov/1201/2021/comments/ .................................................. 24

8th (Eighth) Triennial Rulemaking, Transcripts of Public Hearings (Apr. 5–21, 2021), https://www.copyright.gov/1201/2021/hearing-transcripts/ .................... 24

Exec. Order No. 14110, 88 Fed. Reg. 75191 (2023). ...................................... 29

Librarian of Congress, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 75 Fed. Reg. 43825 (July 27, 2010) ................................................................................................... 21

Petition of Jonathan Weiss for a New Exemption to Section 1201 of the DMCA for Security Research Pertaining to Generative AI Bias, 9th (Ninth) Triennial Rulemaking (2024), *available at* https://www.copyright.gov/1201/2024/petitions/proposed/New-Pet-Jonathan-Weiss.pdf ................................................................................................ 28

U.S. Copyright Office, *Section 1201 of Title 17* (2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ............... 18

## Rules

15 C.F.R. §742.15 ........................................................................................ 29

15 C.F.R. §750.04 ........................................................................................ 29

37 C.F.R. § 201.40 ....................................................................................... 20

## Other Authorites

*ChatGPT (Archived)*, Wikipedia, https://en.wikipedia.org/w/index.php?title=ChatGPT&oldid=1187493398 (archived version last edited Nov. 29, 2023, 16:11 UTC)......................................... 28

Copyright Act 1968 (Cth) (Austl.) ................................................................... 26

Copyright Act 1994 (N.Z.) .............................................................................. 26

Copyright Act, R.S.C. 1985, c. C-42 (Can.) ..................................................... 26

Copyright, Designs and Patents Act 1988, c. 48 (UK) ..................................... 26

Eric Barendt, *Free Speech in Australia: A Comparative Perspective*, 16 Sydney L. Rev. 149 (1994) ........................................................................................ 26

Jonathan Band, *The Complexity Dialectic: A 2021 Update*, PolicyBandwidth (Nov. 19, 2021), http://infojustice.org/archives/43776 [https://perma.cc/92SA-CJ6V] 14

*Laffey Matrix*, http://www.laffeymatrix.com/see.html [https://perma.cc/B9HB-Z5JG] (last visited Nov. 19, 2023) .............................................................. 18

Michael Geist, *Fairness Found: How Canada Quietly Shifted from Fair Dealing to Fair Use, in* The Copyright Pentalogy: How the Supreme Court of Canada Shook the Foundations of Canadian Copyright Law 157 (Michael Geist, ed., 2013) ............................................. 26

Reply Comments of GitHub, Eighth Triennial Rulemaking (March 10, 2021), http://www.copyright.gov/1201/2021/comments/reply/Class%2013_Reply_GitHub.pdf. .................................................................................................... 23

Rt. Hon. Beverley McLachlin, Chief Justice of Canada, Protecting Constitutional Rights: A Comparative View of the United States and Canada (Apr. 5, 2004) (available at https://www.scc-csc.ca/judges-juges/spe-dis/bm-2004-04-05-eng.aspx) [https://perma.cc/L34Y-YCFQ]. ................................................. 26

*Stable Diffusion (Archived),* Wikipedia, https://en.wikipedia.org/w/index.php?title=Stable_Diffusion&oldid=1186081466 (archived version last edited Nov. 20, 2023, 20:29 UTC) .................................... 28

Testimony of Prof. Blake E. Reid, *Are Reforms to Section 1201 Needed and Warranted?*, U.S. Senate Committee on the Judiciary, Subcommittee on Intellectual Property (Sept. 16, 2020), https://www.judiciary.senate.gov/download/reid-testimony ....................... passim

## Glossary of Abbreviations

| Term | Abbreviation |
|------|-------------|
| Artificial Intelligence | AI |
| Digital Millennium Copyright Act | DMCA |
| Technological Protection Measure | TPM |
| World Intellectual Property Organization | WIPO |

## Statutes and Regulations

Except for the following, all applicable statutes and regulations are contained in the addendum to the Brief for Plaintiffs-Appellants Matthew D. Green, et al. This brief contains references to the recommendations of the U.S. Copyright Office in many of the triennial rulemakings promulgating exemptions from 17 U.S.C. § 1201; the recommendations are not available in the Federal Register or fully codified in the Code of Federal Regulations but can be referenced in full at the Copyright Office's website dedicated to the rulemakings, https://www.copyright.gov/1201/, via the links labeled "[year] Recommendation."

### Statement of Identity, Interest in Case, and Source of Authority to File

Amici are organizations and individuals who promote functional fair uses of copyrighted works for socially beneficial accessibility, archival, and security purposes.[1] While amici range widely in their missions, they share membership in communities whose First Amendment-protected activities do not infringe copyright. Even so, the constitutional rights of amici have been burdened by the anti-circumvention provisions of the Digital Millennium Copyright Act (DMCA) and harmed by the failure of the Copyright Office to protect them through the triennial rulemaking promulgating exemptions from Section 1201.[2]

Amici include organizations who advocate for equitable access to copyrighted works—including books, movies, television programming, software, educational materials, video games, and web content—for the tens of millions of Americans with disabilities. Equitable access requires ensuring that third parties can take the actions necessary—including circumvention of technological protection measures (TPMs)—to remediate inaccessible copyrighted works into accessible formats, such as creating audio versions of e-books or adding closed captions to video programming.

Amici also include organizations who engage in and advocate for the ability of libraries, archives, and other organizations to preserve copyrighted works for posterity—from literary and audiovisual works to software and software-

---

1.  A full list of amici appears in the appendix to this brief.
2.  *See* 17 U.S.C. § 1201.

dependent materials (i.e., digital files that can only be opened using particular computer programs). When such works are encumbered by TPMs, the fulfillment of the archival objectives of amici requires them and others similarly situated to circumvent those measures to make fair use of such works.

Amici also include individuals who engage in good-faith research to identify, diagnose, and fix security flaws and vulnerabilities in copyrighted software. Enabling good-faith security research that advances the important public interest in cybersecurity requires ensuring that researchers can circumvent TPMs without fear of legal risk.

## Statement of Authorship and Financial Contributions

All parties have consented to timely-filed amicus briefs. No counsel for a party authored this brief in whole or in part.[3] No party, counsel to any party, or any person other than amici curiae contributed money to fund preparation or submission of this brief.

---

3.  The Samuelson-Glushko Technology Law and Policy Clinic at Colorado Law, part of the Colorado Law Clinical Programs, counsel to amici, represented plaintiff-appellant Matthew Green before the Copyright Office during the 2015 triennial rulemaking evaluating petitions for exemption from the anti-circumvention measures of Section 1201, but the Clinic's representation of Dr. Green was limited to the rulemaking itself and ended after the completion of the rulemaking. The representation specifically did not extend to the litigation that is the subject of this appeal.

## Argument

Section 1201 violates the First Amendment by burdening a wide range of socially beneficial fair uses of copyrighted works protected by TPMs, such as making them accessible to people with disabilities and conducting good-faith security research on such works. Moreover, as the only means available to seek exemptions to its default rule against circumventing TPMs, Section 1201's triennial rulemaking procedures fail to alleviate the statute's fatal constitutional flaws—especially for accessibility, archival, and security research fair users.[4]

Fair use is one of copyright law's essential "built-in First Amendment accommodations" and serves as a "traditional First Amendment safeguard."[5] The Supreme Court has conceptualized fair use as a safety valve that prevents copyright law from suppressing the exercise of First Amendment rights.[6] Yet by effectively prohibiting uses requiring circumvention, Section 1201 eliminates fair use's capacity to serve as a First Amendment safeguard when copyrighted works are encumbered with TPMs.[7]

---

4.    See 17 U.S.C. § 1201(a)(1)(C)–(D).

5.    *Eldred v. Ashcroft,* 537 U.S. 186, 219–20 (2003); *Golan v. Holder,* 565 U.S. 302, 328 (2012) (citing *Eldred,* 537 U.S. at 219; *Harper & Row v. Nation,* 471 U.S. 539, 558 (1985)).

6.    *Harper & Row,* 471 U.S. at 560.

7.    17 U.S.C. § 1201(a)(1)(A).

Even if Section 1201 is held to be a content-neutral restriction on the right to free speech[8] that seeks to advance the "significant governmental interest[]"[9] in protecting copyright, the provision cannot withstand intermediate scrutiny because it is not narrowly tailored.[10] Content-neutral restrictions on free speech need not employ the "least restrictive or least intrusive means"[11] of advancing the government's interest, but they cannot "burden substantially more speech than is necessary to further the government's legitimate interests."[12]

An important indicator of whether a content-neutral restriction is overbroad is to examine whether it "leaves open ample alternative channels for communication...."[13] Section 1201's triennial rulemaking procedure is the *only* channel available to fair users to secure their First Amendment rights when copyrighted works are encumbered by TPMs. Yet the excessive burdens of participating in the rulemaking process, combined with the triennial frequency of the exemption rulemaking procedure, are fundamental facial flaws that are fatal to Section 1201's constitutionality under the First Amendment.

---

8. *Green v. Department of Justice,* 54 F.4th 738, 746 (D.C. Cir. 2022).

9. *Packingham v. North Carolina,* 582 U.S. 98, 106 (2017).

10. *Id.*

11. *Ward v. Rock Against Racism,* 491 U.S. 781, 798 (1989).

12. *Id.* at 799.

13. *Hill v. Colorado,* 530 U.S. 703, 726 (2000).

Furthermore, the Copyright Office routinely denies or narrows proposed exemptions[14] intended to enable accessibility, archival, and security research fair uses (among others) in its conduct of the triennial rulemaking.[15] The Office also routinely and unfairly interrogates and dismisses the legitimacy of the constitutional rights of people with disabilities, disability services organizations, libraries, archives, museums, and security researchers to engage in the fair use of copyrighted material—thereby depriving them of their ability to exercise their First Amendment rights.

---

14. *See generally* Jonathan Band, *The Complexity Dialectic: A 2021 Update,* PolicyBandwidth (Nov. 19, 2021), https://infojustice.org/archives/43776 [https://perma.cc/92SA-CJ6V] (analyzing the complexity of the regulations released during the triennial rulemaking).

15. As a formal matter, Section 1201 obliges the Librarian of Congress to make the determination of exemptions following the triennial rulemaking in consultation with the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce. *See* 17 U.S.C. § 1201(a)(1)(C). As a practical matter, the Copyright Office exercises primary responsibility over conducting the proceeding and the Register's recommendations are typically approved without modification by the Librarian, though the Librarian overruled the Register in one notable instance involving e-book accessibility discussed *infra*, Part 1.1 & n.45. For convenience, this brief refers primarily to the Copyright Office as the effective superintendent of the triennial rulemaking even though each recommendation by the Register of Copyrights corresponds to a formal rulemaking action by the Librarian to grant and codify the recommendation in the Code of Federal Regulations.

1.  **Section 1201 unduly burdens the First Amendment rights of amici to make fair uses of copyrighted works.**

Successful participation in the triennial Section 1201 rulemaking conducted by the Copyright Office is the *only* channel available to fair users to vindicate their First Amendment right to access copyrighted works that are protected by TPMs. Yet the burdens that Section 1201 places on the First Amendment rights of amici and other fair users exceeds what intermediate scrutiny can bear.

The Copyright Office has concluded time and again in evaluating accessibility-focused exemption proposals that they entail fair use. The Office has relied on explicit statements from Congress in the legislative history of the Copyright Act and well-established precedent from the Supreme Court and the Second Circuit to recognize the uncontroversial proposition that making books, movies, and other copyrighted works accessible to people with disabilities is an unequivocal, archetypical fair use.[16]

Similarly, through several rounds of Section 1201 rulemakings, the Office has consistently held that fair use permits libraries, archives, and museums to engage in preservation activities that exceed the scope of the exception provided by Section 108 of the Copyright Act for such activities.[17] This reasoning applies to

---

16.  *See* 2021 Recommendation at 318 (citing *Sony v. Universal City Studios,* 464 U.S. 417, 455 n.40 (1984) (discussing the legislative history of the Copyright Act); *Authors Guild v. HathiTrust,* 755 F.3d 87, 101–02 (2d Cir. 2014)) (additional internal citations omitted).

17.  *See* 2018 Recommendation at 238-240; 2021 Recommendation at 88-94, 268-76.

the exemptions that such organizations have sought to circumvent TPMs to preserve audiovisual content stored on encrypted DVD and Blu-Ray discs,[18] as well as to preserve certain categories of video games and other computer software that are no longer commercially available.[19]

The Office has also consistently reached the uncontroversial conclusion that security-focused exemptions entail fair use. Deploying the familiar four-factor analysis, the Office has reached essentially the same conclusion throughout the evolution of the security research exemption—from narrowly enabling circumvention for research on vulnerabilities caused by computer-accessible audio recordings[20] and video games,[21] to a more general-purpose exemption allowing good-faith research of contemporary vulnerabilities in a wide range of computer software.[22]

Even so, fair users from the accessibility, archival, and security research communities cannot simply go about their activities lawfully under the protection of fair use.[23] Rather, the exercise of their First Amendment rights

---

18.  *See* 2021 Recommendation at 88.

19.  *See id.* at 271.

20.  *See* 2006 Recommendation at 63 (implying that security research is noninfringing).

21.  2010 Recommendation at 186.

22.  2015 Recommendation at 300.

23.  *See generally* Testimony of Prof. Blake E. Reid, *Are Reforms to Section 1201 Needed and Warranted?*, U.S. Senate Committee on the Judiciary, Subcommittee on Intellectual Property (Sept. 16, 2020),

depends on advocates for their interests petitioning the Copyright Office and seeking its permission to engage in constitutionally protected activity through a degrading, difficult, expensive, and time-consuming process. And they must do so not just once, but triennially, *ad infinitum*.[24]

## 1.1. Participation in the Section 1201 process is excessively costly and time-consuming for amici and other exemption proponents.

Exemption proponents—including amici—cannot seek exemptions from Section 1201 as the need arises.[25] Rather, they must bide their time and wait for a brief window to open once every three years to petition the Copyright Office for permission to exercise their First Amendment right to make fair uses of copyrighted works encumbered by TPMs.[26] They must then engage specialized legal assistance (typically provided only by a small number of pro bono law clinics) to make their case in the triennial rulemaking.[27]

For those proponents who are lucky enough to secure legal assistance, developing the case for a single exemption can take more than 500 hours of legal

---

https://www.judiciary.senate.gov/download/reid-testimony ("Reid Senate Testimony").

24. *See id.*

25. Part 2, *infra*, describes the constitutional problems posed by the triennial frequency of the Section 1201 rulemaking in further detail.

26. *See* 17 U.S.C. § 1201 (a)(1)(C).

27. Reid Senate Testimony, *supra* note 23, at 7.

work across a single instance of the triennial rulemaking.[28] At prevailing market rates, advocacy for a single exemption under the triennial rulemaking might cost an individual proponent or advocate nearly $120,000 if performed entirely by law clerks, or nearly $450,000 if performed by a senior attorney.[29] These are prohibitive costs for many non-profit organizations and individuals whose activities are presumptively unlawful under Section 1201 absent an applicable exemption. Correspondingly, Section 1201's de facto requirement of such expenditures of time and money places a burden on the First Amendment rights of fair users that is as unconscionable as it is unconstitutional.[30]

The limited availability of *pro bono* legal counsel to represent exemption proponents likely means that some would-be proponents are unable to present meritorious exemption petitions to the Copyright Office, thereby chilling their speech.[31] While Section 1201 permits the Office to investigate exemptions *sua sponte*, the Office has *never* chosen to do so.[32]

---

28    *See* U.S. Copyright Office, *Section 1201 of Title 17* at 128 & n.697 (2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

29.   *See Laffey Matrix*, http://www.laffeymatrix.com/see.html [https://perma.cc/B9HB-Z5JG] (last visited Nov. 27, 2023) (specifying a $239 hourly rate for paralegals and law clerks and a $878 hourly rate for an attorney with eleven to nineteen years of experience).

30.   *See* Reid Senate Testimony, *supra* note 23, at 7.

31.   *Id.*

32.   *Id.*; *see* 17 U.S.C. § 1201(a)(1)(C).

1.2. SECTION 1201 SUBJECTS THE FIRST AMENDMENT RIGHTS OF FAIR USERS TO A
HOSTILE, DEGRADING, AND NEEDLESSLY REPETITIVE RULEMAKING PROCESS.

Even those proponents who possess the courage to brave the exemption process
and the good fortune to obtain legal help face an arduous task before them.[33] A
proponent must work with counsel to compile dozens of pages of detailed
justifications across numerous filings over the course of a year or more.[34] In
many cases, proponents must travel to Washington to undergo intensive
questioning about the legitimacy of their work and personal activities from
government officials in lengthy hearings.[35]

Exemption proponents also must face opposition and questioning from
professional lobbyists and high-powered attorneys representing opponents of
their First Amendment-protected activities who in some cases impugn their
character and reflexively criticize their proposals,[36] often without seriously
reviewing or even attempting to understand them.[37] As a result, the Office

---

33. Reid Senate Testimony, *supra* note 23, at 7.

34. *Id.*

35. *Id.*

36. Various organizations filed comments opposing or contesting aspects of
nearly every request for new and expanded exemptions filed in the 2021
triennial rulemaking. *See* Opposition Comments (Feb. 9, 2021),
https://www.copyright.gov/1201/2021/comments/opposition/.

37. *See* Reid Senate Testimony, *supra* note 23, at 8 & n.57.

routinely recommends exemptions riddled with vague and ambiguous language and caveats that preclude the certainty proponents seek.[38]

Consider the decades-long saga faced by advocates for the visually impaired in seeking exemptions under Section 1201 to make e-books accessible. Despite concluding that the proposed e-book accessibility exemption entailed fair use,[39] having granted essentially the same exemption in 2003 and 2006,[40] and "agree[ing] that as a matter of policy, access to e-books for the visually impaired should be encouraged,"[41] in 2010 the Office recommended denying an exemption allowing people who are blind, visually impaired, or print disabled to engage in self-help to remediate inaccessible e-books.[42]

Rejecting the blind community's explanations of its own members' needs, the Office complained that exemption proponents (including some amici) had not sufficiently demonstrated that renewing the exemption to ensure the right to read was warranted.[43] Expressing skepticism that blind people really lacked access to TPM-encumbered e-books, the Office concluded that the contentions of leading

---

38. The current exemptions occupy more than 4500 words in the Code of Federal Regulations. *See* 37 C.F.R. § 201.40.

39. *See* 2010 Recommendation at 248.

40. 2003 Recommendation at 70; 2006 Recommendation at 38. *See generally* 2010 Recommendation at 252–53 (describing the Office's 2010 perspective on the 2003 and 2006 rulemakings).

41. 2010 Recommendation at 261.

42. *Id.* at 260.

43. *Id.* at 256-266.

blind organizations, the sound policy arguments in favor of the exemption (with which the Office agreed), and the indisputably fair uses at issue were all simply not enough to meet the bar for an exemption under Section 1201.[44]

Even after the Librarian of Congress ultimately rejected the Register's recommendation,[45] the Office continued over the next four triennial rulemakings to demand burdensome justification of the proposed disability services exemption and modest, incremental updates to both accessibility exemptions.[46] These demands required extensive briefing and negotiation over changes including issues as uncontroversial as the removal of ableist language from the Office's regulations codifying the exemptions and bringing the e-book exemption into

---

44. *See id.* at 259-262.

45. The Librarian noted that the Office had ignored statements from the blind community, failed to develop the record, and recommended rejecting the exemption despite literally "no one oppos[ing]" it. Librarian of Congress, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 75 Fed. Reg. 43825, 43838–39 (July 27, 2010).

46. *See* 2012 Recommendation at 16–25 (lengthy analysis of expansions to e-book exemption); 2015 Recommendation 127–37 (lengthy analysis of renewal of e-book exemption); 2018 Recommendation at 89-111 (lengthy analysis of the disability services exemption); 2021 Recommendation at 64-79 (lengthy analysis of expansions to the disability services exemption), 125-34 (lengthy analysis of expansions to the e-book exemption).

compliance with the Marrakesh Treaty,[47] which the United States had already ratified.[48]

Much the same can be said of the experiences of security researchers with the Section 1201 rulemaking process. Despite its longstanding recognition that security research entails fair use,[49] in 2010 the Office rejected the entreaties of security researchers for an exemption that would permit them to investigate a wide range of vulnerabilities. Taking its cue from *Catch-22*, the Office held there was insufficient evidence of security vulnerabilities in software to justify a wider exemption—even though Section 1201 rendered the discovery of such vulnerabilities illegal.[50] Up through the 2021 rulemaking, the Office has continued to restrict the scope of the Section 1201 exemption for security researchers in a manner that lacks any obvious connection to the fairness of their uses.[51]

---

47. Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired or Otherwise Print Disabled, June 27, 2013, S. Treaty Doc. No. 114-6, VIP/DC/8/Rev. ("Marrakesh Treaty").

48. Copyright Office, Understanding the Marrakesh Treaty Implementation Act (Aug. 2020), https://www.copyright.gov/legislation/2018_marrakesh_faqs.pdf (stating that the United States deposited its instrument of ratification for the Marrakesh Treaty on February 8, 2019); 2021 Recommendation at 126; *see also* 2015 Recommendation at 132-34 (acknowledging the Marrakesh Treaty).

49. *See* 2006 Recommendation at 63.

50. *See* 2010 Recommendation at 176-78.

51. *See* 2021 Recommendation at 255 ("The Register does not find any actual or likely adverse effect from the Access, Use, or Lawfully Acquired limitations challenged by proponents.")

As with its treatment of accessibility exemptions, the Office's inability or unwillingness to authorize fair security research uses through the triennial rulemaking has burdened the First Amendment rights of security researchers and harmed our nation's cybersecurity. Independent researchers help make technological devices and software safer by identifying and reporting flaws and vulnerabilities that software vendors are unable or unwilling to discover and fix.[52] This reporting function is not only critical to promoting cybersecurity, but it is also a core exercise of the First Amendment by bringing criticism and commentary to bear on pressing societal problems.

Yet to obtain the Office's authorization to exercise their First Amendment right to engage in fair uses of copyrighted works, exemption proponents in the 2021 edition of the Section 1201 rulemaking were required to prepare:

---

52.  *See, e.g.,* Reply Comments of GitHub at 1-2, Eighth Triennial Rulemaking (March 10, 2021), http://www.copyright.gov/1201/2021/comments/reply/Class%2013_Reply_GitHub.pdf.

- A petition to renew an existing exemption;[53]
- A separate petition to request expansion of an existing exemption;[54]
- Detailed long-form comments;[55]
- Detailed long-form reply comments;[56]
- Hearing testimony across several weeks of hearings; [57]
- In some cases, additional responses to post-hearing questions posted by the Copyright Office, some of which requested proponents to engage in protracted negotiations with rightsholders to develop specific regulatory language or settle substantive disputes;[58] and
- In some cases, even further responses to post-hearing ex parte communications by exemption opponents.[59]

The Office has attempted to streamline the process for renewing existing exemptions over the past two rulemakings.[60] However, the regular need to make updates to narrowly-drawn exemptions replete with limitations means that

---

53. Petitions to Renew Prior Exemptions (July 22, 2020), https://www.copyright.gov/1201/2021/petitions/renewal/.

54. Petitions for Newly Proposed Exemptions (Sept. 8, 2020), https://www.copyright.gov/1201/2021/petitions/proposed/.

55. Round 1 Comments (Dec. 14, 2020), https://www.copyright.gov/1201/2021/comments/.

56. Reply Comments (March 10, 2021), https://www.copyright.gov/1201/2021/comments/reply/.

57. Transcripts of Public Hearings (Apr. 5–21, 2021), https://www.copyright.gov/1201/2021/hearing-transcripts/.

58. Post-Hearing Questions, (May 14, 2021), https://www.copyright.gov/1201/2021/post-hearing/.

59. Ex Parte Communications (2021), https://www.copyright.gov/1201/2021/ex-parte-communications.html.

60. *See generally* 2021 Recommendation at 12–15 (describing the "streamlined" renewal process).

existing exemptions must be rehashed anew through the Office's full, non-"streamlined" process for new exemptions.[61] And the exemptions expire after three years,[62] requiring proponents to repeat the process in a regulatory version of an endless loop.

1.3.   SECTION 1201 BURDENS THE FIRST AMENDMENT RIGHTS OF AMERICANS FAR MORE THAN COMPARABLE PROVISIONS IN FOREIGN NATIONS WITH WEAKER FREE SPEECH PROTECTIONS.

Congress need not choose the "least restrictive means" of advancing a significant governmental interest for a law to survive intermediate scrutiny. Yet it is hard to conceive of a more restrictive means than Section 1201 of reconciling the First Amendment rights of fair users with Congress's interest in protecting copyright in the digital age.

Section 1201 implements[63] the World Intellectual Property Organization's (WIPO) Copyright and Performances and Phonograms Treaty,[64] yet none of our closest foreign brethren subject persons situated similarly to amici to anything resembling the burdens of Section 1201. For example, the copyright laws of

---

61.   *See* Reid Senate Testimony, *supra* note 23, at 7.

62.   *See* 17 U.S.C. § 1201(a)(1)(C)–(D).

63.   Title I of the DMCA, which includes Section 1201, is entitled the "WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998." *See* Digital Millennium Copyright Act of 1998, Pub. L. No. 105-304, § 101, 112 Stat. 2860 (1998).

64.   World Intellectual Property Organization Performances and Phonograms Treaty, Dec. 20, 1996, S. Treaty Doc. No. 105-17, 36 I.L.M. 76 (1997).

Australia, Canada, New Zealand, and the United Kingdom all contain default provisions that prohibit the circumvention of TPMs,[65] yet all four countries have enacted statutory provisions that permit persons with disabilities (or persons assisting them) to circumvent TPMs to render copyrighted works accessible.[66] This is so even though the protections provided in the constitutions of America's common law cousins in the Commonwealth for the right to free speech are *far* weaker than our First Amendment,[67] as are their doctrines of fair dealing as compared with fair use here in the United States.[68] Viewed in international context, the excessive burdens Section 1201 places on the rights of fair users are hard to square with the exceptional protections that the First Amendment is supposed to provide to all Americans—including persons with disabilities.

---

65. Copyright Act 1968 (Cth) s 116 (Austl.); Copyright Act, R.S.C. 1985, c. C-42, s. 41.1(1)(a) (Can.); Copyright Act 1994, s 226B (N.Z.); Copyright, Designs and Patents Act 1988, c. 48, § 296ZA (UK).

66. Copyright Act 1968 (Cth) s 113 (E)-(F) (Austl.); Copyright Act, R.S.C. 1985, c. C-42, s. 41.16(1) (Can.); Copyright Act 1994, s 69(A)-(B) (N.Z.); Copyright, Designs and Patents Act 1988, c. 48, § 31 (A)-(B) (UK).

67. *See, e.g.,* Eric Barendt, *Free Speech in Australia: A Comparative Perspective,* 16 SYDNEY L. REV. 149 (1994) (explaining the limited free speech protections provided by Australian law); Rt. Hon. Beverley McLachlin, Chief Justice of Canada, Protecting Constitutional Rights: A Comparative View of the United States and Canada (Apr. 5, 2004) (available at https://www.scc-csc.ca/judges-juges/spe-dis/bm-2004-04-05-eng.aspx) [https://perma.cc/L34Y-YCFQ].

68. Michael Geist, *Fairness Found: How Canada Quietly Shifted from Fair Dealing to Fair Use, in* THE COPYRIGHT PENTALOGY: HOW THE SUPREME COURT OF CANADA SHOOK THE FOUNDATIONS OF CANADIAN COPYRIGHT LAW 157, 157-58 (Michael Geist, ed., 2013) (explaining the limited scope of fair dealing rights in the copyright laws of Commonwealth realms as compared to the American doctrine of fair use).

2. **The triennial frequency of the Section 1201 rulemaking is fatal to its constitutionality.**

Section 1201 is not just one of an ample number of alternative means available to fair users who need to circumvent TPMs to engage in constitutionally protected activities to seek authorization to do so. Rather, it is the *only* means of doing so. That this means is available but once every three years is unconstitutionally restrictive.

Courts that have considered regulations requiring people to wait to exercise their First Amendment rights have struck them down if they impose more than a *de minimis* waiting period. The Southern District of New York upheld a 36-hour waiting period for a permit for a protest as necessary to permit the government to prepare for a potentially disruptive protest,[69] yet the Ninth Circuit struck down a 20-day waiting period for a protest permit as an unconstitutional burden on the First Amendment rights of peaceful protestors.[70] As the Court explained:

> The flaw in the Richmond ordinance is not simply that it includes within its sweep some impermissible applications, but that in all its applications, it operates on a fundamentally mistaken premise. It assumes that speech can permissibly be delayed at the discretion of governmental agencies because of the *substantial government interest* in regulating parades. *Twenty days of delay, however, is too long....* (Emphases added).[71]

---

69. *Local 32B-32J, Service Employees International Union, AFL-CIO v. Port Authority of New York and New Jersey,* 3 F. Supp 2d. 413 (S.D.N.Y. 1998).

70. *N.A.A.C.P, Western Region v. City of Richmond,* 743 F.2d 1346 (9th Cir. 1984)

71. *Id.* at 1358 (internal quotations and citations omitted).

By contrast, a prospective petitioner under Section 1201 may have to wait up to **three years** just for the opportunity to seek an exemption from the Copyright Office. And once they clear the high burdens that Section 1201 and the procedures of the Copyright Office impose on petitioners, they may need to wait a year or more to have their petitions grind their way through the rulemaking process.

The triennial frequency of the Section 1201 rulemaking causes significant and tangible First Amendment harms. Consider the exemption petition submitted in the current triennial rulemaking to permit researchers to circumvent TPMs encumbering generative artificial intelligence ("AI") systems to study whether they exhibit racial, gender, and other forms of bias.[72] Generative AI systems such as Stable Diffusion (a system that generates unique images from textual descriptions) and ChatGPT (a system that generates human-like text based on the input it is given) have been the subject of intense public controversy since their release on August 22, 2022[73] and November 30, 2022[74] respectively. On October

---

72.  *See* Petition of Jonathan Weiss for a New Exemption to Section 1201 of the DMCA for Security Research Pertaining to Generative AI Bias, 9th (Ninth) Triennial Rulemaking (2024), *available at* https://www.copyright.gov/1201/2024/petitions/proposed/New-Pet-Jonathan-Weiss.pdf.

73.  *See Stable Diffusion (Archived)*, WIKIPEDIA, https://en.wikipedia.org/w/index.php?title=Stable_Diffusion&oldid=1186081466 (archived version last edited Nov. 20, 2023, 20:29 UTC).

74.  *See ChatGPT (Archived)*, WIKIPEDIA, https://en.wikipedia.org/w/index.php?title=ChatGPT&oldid=1187493398 (archived version last edited Nov. 29, 2023, 16:11 UTC).

30, 2023, President Biden signed a sweeping Executive Order that, among other provisions, requires federal agencies to "use their respective civil rights and civil liberties offices and authorities [...] to prevent and address unlawful discrimination and other harms that result from uses of AI in Federal Government programs and benefits administration."[75] Yet independent research to determine whether generative AI systems encumbered by TPMs exhibit such bias cannot lawfully proceed in the United States unless and until the Copyright Office determines whether to grant an exemption for such research under Section 1201. The year it will take the Copyright Office to evaluate this exemption request, combined with the many months that petitioners had to wait to even file their petition, are delays that the First Amendment cannot bear.

As with the export licenses[76] that were at issue in *Bernstein v. United States*, 176 F.3d 1132 (9th Cir. 1999), Congress could have designed Section 1201 to allow proponents to apply for exemptions as the need arises. Congress could have also subjected determinations under Section 1201 to strict time limits—similar to the 90-day timeline that the Department of Commerce's Bureau of Industry and Security must comply with in evaluating export license applications.[77] That Congress failed to do either furnishes additional independent grounds to hold

---

75. Exec. Order No. 14110, 88 Fed. Reg. 75191, 75212 (2023).

76. 15 C.F.R. §742.15.

77. 15 C.F.R. §750.04 requires export license applications to be "resolved or referred to the President no later than 90 calendar days" after the license application is registered by the Department of Commerce's Bureau of Industry and Security.

that Section 1201 imposes unconstitutional burdens on the First Amendment rights of amici, other would-be exemption proponents, and the millions of Americans they represent.

## Conclusion

For the foregoing reasons, amici respectfully urge this court to reverse the District Court's decision to grant the appellees' motion to dismiss, and to remand this matter for further proceedings.

*Respectfully submitted,*

*/s/ Vivek Krishnamurthy*

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

December 6, 2023

## Appendix: List and Description of Amici

The **American Foundation for the Blind** (AFB) advocates for better policies that promote accessibility, equity, and opportunity for people who are blind or visually impaired.

The **American Library Association** (ALA) has a mission of providing leadership for the development, promotion, and improvement of library and information services and the profession of librarianship in order to enhance learning and ensure access to information for all.

**Andrew W. Appel** is the Eugene Higgins Professor of Computer Science at Princeton University; his research focuses on computer security, software verification, technology policy, and voting machines. (‡)

The **Association on Higher Education and Disability** (AHEAD) is the leading professional membership association for individuals committed to equity for persons with disabilities in higher education.

The **Association of Research Libraries** (ARL) is a membership organization of libraries and archives in major public and private universities, federal government agencies, and large public institutions in the United States and Canada.

The **Association of Transcribers & Speech-To-Text Providers** (ATSP) is a non-profit organization devoted to advancing the delivery of real-time speech-to-text services to deaf or hard-of-hearing people by establishing a national standard of excellence for real-time transcribers and captionists.

The **Software Preservation Network** (SPN) is a non-profit organization established to advance software preservation through collective action. Its 20 institutional members are libraries, museums, and archives that rely on fair use to permit almost every aspect of their software preservation practice.

**Steven M. Bellovin** is the Percy K. and Vida L.W. Professor of Computer Science at Columbia University and affiliate faculty at Columbia Law School; his research focuses on network security, privacy, and related legal and policy questions. (‡)

**Telecommunications for the Deaf and Hard of Hearing, Inc.** (TDI) has a mission of promoting equal access in telecommunications and media for people who are deaf, hard of hearing, late deafened, or deaf blind.

(‡) *Affiliation listed for identification purposes only.*

## Certificate of Compliance

This document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitation. In compliance with Rule 32(a)(7)(B), it contains 5037 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1). It has been typeset in a proportionally spaced typeface (14-point Linux Libertine) using Microsoft Word for Mac version 16.79.1 (23111614).

/s/ *Vivek Krishnamurthy*

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*

December 6, 2023

## Certificate of Service

I certify that this brief was filed using the Court's CM/ECF system on December 6, 2023. All participants in the case are registered CM/ECF users and will be served electronically via that system. Paper copies of this brief will also be filed with the Clerk of this Court as the Clerk requests.

<u>/s/ *Vivek Krishnamurthy*</u>

Vivek Krishnamurthy
Samuelson-Glushko Technology Law
and Policy Clinic at Colorado Law

Wolf Law Building | 404 UCB
2450 Kittredge Loop Dr.
Boulder, CO 80309–0404
303-492-0209
vivek.krishnamurthy@colorado.edu

*Counsel for amici curiae*