**[ORAL ARGUMENT NOT SCHEDULED]**

No. 23-5159

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

MATTHEW D. GREEN, et al.,

Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF JUSTICE, et al.,

Defendants-Appellees.

―――――――――――

On Appeal from the United States District Court
for the District of Columbia

―――――――――――

**BRIEF FOR APPELLEES**

―――――――――――

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

DANIEL TENNY
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.    Parties and Amici**

Plaintiffs-appellants are Matthew D. Green; Andrew Bunnie Huang; and Alphamax, LLC.

Defendants-appellees are the U.S. Department of Justice; the Library of Congress; the U.S. Copyright Office; Carla Hayden, in her official capacity as the Librarian of Congress; Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the Copyright Office; and Merrick B. Garland, in his official capacity as Attorney General of the United States.

Amici who appeared in district court are Digital Content Protection, LLC; Intel Corporation; Advanced Access Content System Licensing Administrator, LLC; DVD Copy Control Association; the Association of American Publishers, Inc.; the Entertainment Software Association; the Motion Picture Association, Inc.; and the Recording Industry Association of America, Inc.

Amici who appeared in this Court are Kartemquin Educational Films; International Documentary Association; Patricia Aufderheide; Michael

Karanicolas; Mark McKenna; Art Neill; Neil Netanel; Pamela Samuelson; Rebecca Tushnet; Public Knowledge; Digital Right to Repair Coalition; Software Freedom Conservancy; iFixit; Open Source Hardware Association; Jonathan Askin; Charles Duan; Aaron Perzanowski; Anthony Rosborough; American Foundation for the Blind; American Library Association; Andrew W. Appel; Association on Higher Education and Disability; Association of Research Libraries; Association of Transcribers & Speech-To-Text Providers; Software Preservation Network; Steven M. Bellovin; and Telecommunications for the Deaf and Hard of Hearing, Inc.

## B.    Rulings Under Review

The rulings under review were entered in *Green v. U.S. Department of Justice*, No. 16-cv-01492 (D.D.C.), by the Honorable Emmet G. Sullivan. They are the June 27, 2019 order and opinion granting the government's motion to dismiss in part (Dkt. Nos. 24, 25) and the May 9, 2023 minute order granting the motion for entry of final judgment.  The district court's opinion granting the government's motion to dismiss in part is available at *Green v. U.S. Department of Justice*, 392 F. Supp. 3d 68 (D.D.C. 2019).

ii

## C.    Related Cases

This case was previously before this Court on appeal from the district court's denial of plaintiffs' motion for a preliminary injunction.  *See Green v. U.S. Dep't of Justice*, No. 21-5195 (D.C. Cir.).  This Court affirmed the denial of a preliminary injunction and remanded for further proceedings.  *See Green v. U.S. Dep't of Justice*, 54 F.4th 738 (D.C. Cir. 2022).  Counsel is not aware of other pending related cases.

*/s/ Brian J. Springer*
Brian J. Springer

**TABLE OF CONTENTS**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 2

STATEMENT OF THE ISSUE ........................................................... 3

PERTINENT STATUTES AND REGULATIONS ....................................... 3

STATEMENT OF THE CASE ........................................................... 3

    A.   Statutory Background ...................................................... 3

    B.   Factual Background and Prior Proceedings ................................ 10

SUMMARY OF ARGUMENT .............................................................. 15

STANDARD OF REVIEW ................................................................ 18

ARGUMENT ................................................................................... 18

I.    The Digital Millennium Copyright Act Comports with the First Amendment. ........................................................................ 18

    A.   The prior appeal amply demonstrates the DMCA's plainly legitimate sweep. ................................................................ 18

    B.   Plaintiffs' arguments fail on their own terms. ........................... 25

II.   The Digital Millennium Copyright Act Does Not Effect a Prior Restraint on Speech. ...................................................... 33

CONCLUSION................................................................................. 39

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*American Civil Liberties Union of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ............................................................ 30

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051 (9th Cir. 2010) .......................................................... 30

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ........................................................................ 29

*Boardley v. U.S. Dep't of the Interior,*
  615 F.3d 508 (D.C. Cir. 2010) ......................................................... 34

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ........................................................ 12, 24, 25, 32

*Brown v. Entertainment Merchs. Ass'n,*
  564 U.S. 786 (2011).........................................................................29

*City Council of L.A. v. Taxpayers for Vincent,*
  466 U.S. 789 (1984)........................................................................12

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988) .................................................................... 34, 35

*Eldred v. Ashcroft,*
  537 U.S. 186 (2003) ........................................................................ 31

*Freedman v. Maryland,*
  380 U.S. 51 (1965) .......................................................................... 33

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215 (1990) ........................................................................ 33

*Green v. U.S. Dep't of Justice,*
  54 F.4th 738 (D.C. Cir. 2022) ................................... 1, 2, 13, 14, 15, 16, 18, 19,
                                                          20, 21, 23, 24, 26, 27, 33

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985) ........................................................................ 26

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978) ................................................ 30

*Irizarry v. Yehia*,
    38 F.4th 1282 (10th Cir. 2022) ............................ 30

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ................................ 5

*Members of the City Council of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ............................................ 21

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983) ............................................ 29

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ................................ 30

*Quincy Cable TV, Inc. v. F.C.C.*,
    768 F.2d 1434 (D.C. Cir. 1985) .......................... 28

*Roulette v. City of Seattle*,
    97 F.3d 300 (9th Cir. 1996) ................................ 25

*Rudder v. Williams*,
    666 F.3d 790 (D.C. Cir. 2012) ............................ 18

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ............................................ 34

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ............................................ 35

*Travis v. Reno*,
    163 F.3d 1000 (7th Cir. 1998) ............................ 30

*United States v. Hansen*,
    599 U.S. 762 (2023) ............................ 16, 19, 20, 32

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................ 20

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) .................... 1, 14, 22, 25, 29

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ............................................................... 16, 25

*Zemel v. Rusk*,
  381 U.S. 1 (1965) ...................................................................... 30

**Treaty:**

WIPO Copyright Treaty art. 11, Apr. 12, 1997,
  S. Treaty Doc. No. 105-17, 1997 WL 447232................................ 4

**Statutes:**

Administrative Procedure Act,
  5 U.S.C. § 702 ........................................................................... 2

Copyright Act:
  17 U.S.C. § 106 ......................................................................... 5
  17 U.S.C. § 107 ..................................................................... 9, 35
  17 U.S.C. § 107(1) ..................................................................... 9
  17 U.S.C. § 107(4) ..................................................................... 9
  17 U.S.C. § 107 ......................................................................... 9
  17 U.S.C. § 107 ......................................................................... 9

Digital Millenium Copyright Act:
  17 U.S.C. § 1201(a)(1) ............................................................ 23
  17 U.S.C. § 1201(a)(1)(A) .......................................................... 6
  17 U.S.C. § 1201(a)(1)(C) ......................................... 8, 9, 34, 35
  17 U.S.C. § 1201(a)(1)(D) .......................................................... 8
  17 U.S.C. § 1201(a)(2) ....................................................... 7, 24, 27
  17 U.S.C. § 1201(a)(3) .............................................................. 6
  17 U.S.C. § 1201(b) .................................................................. 7
  17 U.S.C. § 1201(c)(1) .............................................................. 9
  17 U.S.C. § 1201(d) .................................................................. 7
  17 U.S.C. § 1201(e) .............................................................. 7, 8
  17 U.S.C. § 1201(f)(1) .............................................................. 7
  17 U.S.C. § 1201(f)(2) .............................................................. 8
  17 U.S.C. § 1201(g)(2) .............................................................. 7
  17 U.S.C. § 1201(g)(4) .............................................................. 8
  17 U.S.C. § 1201(i) .................................................................. 7

17 U.S.C. § 1201(j)(2) ........................................................... 7

17 U.S.C. § 1201(j)(4) ........................................................... 8

28 U.S.C. § 1291 ................................................................... 3

28 U.S.C. § 1331 ................................................................... 2

**Rule:**

Fed. R. App. P. 4 (a)(1)(B) ................................................... 3

**Legislative Materials:**

H.R. Rep. No. 105-551 (1998) .........................................24, 31

S. Rep. No. 105-190 (1998) ........................................... 3, 4, 6

**Other Authorities:**

*Exemption to Prohibition on Circumvention of Copyright
   Protection Systems for Access Control Technologies,*
   80 Fed. Reg. 65,944 (Oct. 28, 2015) .......................... 31, 32

U.S. Copyright Office, Library of Congress, *Section 1201
   Rulemaking: Sixth Triennial Proceeding to Determine
   Exemptions to the Prohibition on Circumvention,
   Recommendation of the Register of Copyrights* (Oct. 2015),
   https://perma.cc/LRT4-GYGM ..................................37, 38

## GLOSSARY

| | |
|---|---|
| DMCA | Digital Millennium Copyright Act |
| JA | Joint Appendix |

## INTRODUCTION

In a prior appeal in this case, this Court held that the challenged provisions of the Digital Millennium Copyright Act (DMCA) are content-neutral regulations of conduct whose incidental effects on plaintiffs' expression are no greater than necessary to support the government's interest in cultivating a digital marketplace. *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 746-47 (D.C. Cir. 2022). This Court's prior decision undermines plaintiffs' attempt to claim that, even though the DMCA can be constitutionally applied to their conduct, the challenged provisions chill so much protected speech that they cannot be applied to anyone.

In addition to failing to engage with this Court's prior decision in this case, plaintiffs' facial challenges fail as a matter of common sense and First Amendment principles. As this Court and the Second Circuit have recognized, the DMCA's provisions serve the important goal of protecting digital works from piracy and promoting the development of a marketplace for such works. *Green*, 54 F.4th at 746-47; *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001). The DMCA thus promotes, rather than impedes, the marketplace of ideas. And the DMCA does so by restricting conduct; to the extent that provisions of the DMCA have the

effect of limiting speech in certain circumstances, that effect is incidental and readily justified.

This Court's prior decision in this case thus upheld an application that lies at the heart of the statute—one plaintiff's desire to distribute a device that would allow users to strip away a ubiquitous technological measure that protects digital content being delivered to a television screen. The device "would eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement, gutting the government's substantial interest in ensuring the broadest distribution of copyrighted materials." *Green*, 54 F.4th at 746-47 (citation and quotation marks omitted). The valid application of the statute to that device and others like it suffices to defeat plaintiffs' facial challenge, and this Court's reasoning in the prior appeal further confirms the multiple legal errors in plaintiffs' First Amendment theory. Plaintiffs' effort to resist this Court's prior decision should be rejected.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, raising constitutional claims and claims under the Administrative Procedure Act, 5 U.S.C. § 702. JA 16, ¶¶ 15-16. The district court granted

the government's motion to dismiss plaintiffs' facial constitutional challenges on June 27, 2019.  JA 254-55.  The district court entered final judgment on May 9, 2023.  JA 356.  Plaintiffs filed a timely notice of appeal on July 10, 2023.  JA 357-58; *see* Fed. R. App. P. 4(a)(1)(B) (providing 60-day time limit).  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether provisions of the Digital Millennium Copyright Act that restrict circumventing technological measures that protect against unauthorized access to copyrighted works and trafficking in the means to circumvent those measures are consistent with the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum submitted with plaintiffs' opening brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Digital Millennium Copyright Act was enacted in 1998 to promote the digital dissemination of copyrighted works.  The statute implements two international treaties aimed at protecting the rights of copyright owners to control access to creative works when those works are disseminated digitally.  *See* S. Rep. No. 105-190, at 2 (1998).  Notably, one of those treaties requires

3

contracting states to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights.  WIPO Copyright Treaty art. 11, Apr. 12, 1997, S. Treaty Doc. No. 105-17, 1997 WL 447232, at *8.

The treaties and implementing legislation were necessary because the possibility of digitally distributing copyrighted works simultaneously held great promise and posed significant risks for copyright owners.  As the Register of Copyrights explained in a 2017 report, "the same features that make digital technology a valuable delivery mechanism—the ability to quickly create and distribute near-perfect copies of works on a vast scale— also carry the potential to enable piracy to a degree unimaginable in the analog context."  JA 63.  Congress recognized that "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."  S. Rep. No. 105-190, at 8.

The DMCA is designed to support technological protection measures that industry has developed to address these concerns.  Many of these measures are familiar to anyone who accesses any form of digital content.

4

Subscription services are protected by passwords so that users cannot access digital content ranging from news articles to music to movies and television shows without obtaining authorization from the content provider. *See* JA 64. Other technological protection measures operate to allow copyright owners to limit access to or dissemination of works that are obtained lawfully, such as by limiting the period during which a rented movie will be available, protecting copyrighted software embedded in consumer products, or preventing unauthorized copying of digital works. *See* JA 113.

Neither existing law nor technology alone could fully resolve the problem. The Copyright Act restricts the reproduction, distribution, and public performance or display of copyrighted works, as well as the creation of derivative works. *See generally* 17 U.S.C. § 106 (enumerating exclusive rights granted to copyright owners). However, the Copyright Act does not make it illegal to gain unauthorized access to copyrighted works, and traditional laws against the theft of physical objects have little if any purchase when copies of works in digital form can proliferate without the transfer of physical objects. *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 947 (9th Cir. 2010) ("[B]ypassing a password . . . in order to . . . view a copyrighted work would not infringe on any of the copyright owner's

5

exclusive rights under § 106.").  Moreover, hackers could defeat technological protection systems, thereby permitting unauthorized users to access digital works and facilitating the mass distribution of unencrypted digital copies. The industry thus sought legal protection to make such unauthorized access unlawful, both through international treaties and through domestic law in the form of the Digital Millennium Copyright Act.  *See* S. Rep. No. 105-190, at 8.

The DMCA includes provisions that impose new restrictions on unauthorized access that supplement copyright law's traditional prohibition on unauthorized copying.  The anti-circumvention provision at issue in this case proscribes "circumvent[ing] a technological measure that effectively controls access to" a copyrighted work.  17 U.S.C. § 1201(a)(1)(A).  Under that provision, it is illegal to without permission "decrypt an encrypted work" or otherwise "avoid, bypass, remove, deactivate, or impair" a measure that requires a key or other "process" or "treatment" to "gain access to the work."  *Id.* § 1201(a)(3).  Congress also placed limits on disseminating tools designed to accomplish such circumvention.  The anti-trafficking provision at issue in this case proscribes "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof" that is "primarily designed or

6

produced for the purpose of," "has only limited commercially significant purpose or use other than," or "is marketed . . . for use in" circumventing a technological measure protecting access to a copyrighted work.  *Id.* § 1201(a)(2).  A materially identical set of restrictions, not challenged here, applies to tools designed to circumvent technological measures that protect a copyright owner's exclusive rights, like the rights to make or authorize reproductions, distributions, or public performances.  *Id.* § 1201(b).

These provisions are subject to a limited number of specific statutory exemptions.  The statute provides exemptions from the circumvention prohibition for nonprofit libraries, archives, or educational institutions that wish to gain access to a copyrighted work to determine whether to acquire a copy of it, 17 U.S.C. § 1201(d); for law-enforcement, intelligence, and other government activities, *id.* § 1201(e); for certain efforts to analyze the technological protection measure to achieve interoperability with other programs, *id.* § 1201(f)(1); for encryption research, *id.* § 1201(g)(2); for the purpose of identifying and disabling a technological protection measure's ability to collect or disseminate personally identifiable information, *id.* § 1201(i); and for security testing, *id.* § 1201(j)(2).  The trafficking prohibitions are subject to a narrow set of exemptions, with exemptions for

7

law-enforcement, intelligence, and other government activities, *id.* § 1201(e); certain reverse engineering, *id.* § 1201(f)(2); certain research activities, *id.* § 1201(g)(4); and certain security testing, *id.* § 1201(j)(4).

In addition, the statute directs the Librarian of Congress to authorize further exemptions from the anti-circumvention provision (but not the anti-trafficking provisions) in a rulemaking proceeding conducted every three years. After considering the recommendation of the Register of Copyrights, the Librarian determines "whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses . . . of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C). Where the Librarian determines that that standard is met as to "any class of copyrighted works," the Librarian grants an exemption from the circumvention prohibition "to such users with respect to such class of works for the ensuing 3-year period." *Id.* § 1201(a)(1)(D).

In making this determination, the Librarian is required to examine (i) "the availability for use of copyrighted works"; (ii) "the availability for use of works for nonprofit archival, preservation, and educational purposes"; (iii) the circumvention prohibition's impact "on criticism, comment, news

8

reporting, teaching, scholarship, or research"; (iv) "the effect of circumvention of technological measures on the market for or value of copyrighted works"; and (v) "such other factors as the Librarian considers appropriate."  17 U.S.C. § 1201(a)(1)(C).  Some of these factors parallel the Copyright Act provision codifying a fair-use defense to copyright infringement.  *See id.* § 107 (providing that the "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" does not constitute "an infringement of copyright"); *see also id.* § 107(1), (4) (requiring consideration of whether the use "is of a commercial nature or is for nonprofit educational purposes" and whether the use will affect "the potential market for or value of the copyrighted work").  Additionally, the DMCA does not affect "defenses to copyright infringement, including fair use."  *Id.* § 1201(c)(1).

In the wake of the DMCA's enactment, digital dissemination of copyrighted works has dramatically increased.  In the video industry, "DVDs, Blu-ray, and 4K Ultra HD Blu-ray discs compete with streaming services such as Hulu, Netflix, Amazon Instant Video, and Google Play," while in the music industry, "the majority of revenues now come from

9

streaming services like Spotify, Pandora, and Apple Music, displacing download revenues, which in turn previously displaced compact disc revenues." JA 64. In the field of computing, "cloud computing has become standard, and software as a service is now a leading licensing and delivery model for businesses and individuals." JA 64. These platforms depend on technological protection measures "to effectively operate in the marketplace," and "[c]opyright owners also credit the statute's anti-trafficking provisions with keeping circumvention technologies out of the mainstream." JA 64.

### B.     Factual Background and Prior Proceedings

1. Plaintiffs are Matthew Green, a professor at the Johns Hopkins Information Security Institute; Andrew "bunnie" Huang, an "electrical engineer, inventor, and owner of several small businesses"; and Alphamax, LLC, a company owned by Mr. Huang that "develops audiovisual media technology." JA 15, ¶¶ 5-7. As discussed below, in a prior appeal, this Court concluded that only Mr. Huang had standing.

Mr. Huang alleges that he has invented a device that allows users to save and manipulate video content, but that he would like to modify the device's functionality to allow it to access and manipulate original video

10

content that is protected by an access-control measure called High-bandwidth Digital Content Protection.  JA 32-33, ¶¶ 89-93.  This widely used measure uses authentication keys to protect digital content when it is transmitted from a source to a display device for viewing.  JA 33, ¶¶ 93-97. Mr. Huang seeks to commercially market and sell through his company Alphamax, LLC a device that effectively circumvents the protection on virtually all digital audiovisual content.  JA 33-34, ¶¶ 99-102.  The Digital Millennium Copyright Act generally prohibits such devices from being used or sold on the open market.  *See* JA 35, ¶¶ 108-10.

2.  Plaintiffs filed suit, and the district court granted in part and denied in part the government's motion to dismiss.  JA 254.  In a ruling not contested on appeal, the court dismissed plaintiffs' challenge to the 2015 triennial rulemaking proceeding because the Library of Congress is not an "agency" under the Administrative Procedure Act.  JA 306-16.  As relevant here, the district court denied the motion to dismiss plaintiffs' as-applied First Amendment claims but dismissed their claims that the anti-circumvention and anti-trafficking provisions are facially unconstitutional under the First Amendment.  JA 284-306.

11

The court explained that plaintiffs failed to state a claim that the challenged provisions are facially overbroad. The court recognized that invalidating a federal statute based on the First Amendment interests of parties not before the court "is 'strong medicine' and should be employed 'sparingly and only as a last resort.'" JA 286 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). The court, however, had no need to address whether the anti-circumvention and anti-trafficking provisions "are plainly legitimate" in a substantial number of applications because plaintiffs "failed to identify any significant difference between" their overbreadth and as-applied claims. JA 286-87 (quotation marks omitted). Because plaintiffs did not allege that "the DMCA 'will have any different impact on third parties' interests in free speech than it has on' their own," an overbreadth analysis was unnecessary. JA 287 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).

The court also rejected plaintiffs' argument that the triennial "rulemaking process is an unconstitutional speech-licensing regime." JA 288. The court noted that the Librarian's decisions about whether to exempt classes of copyrighted works from the anti-circumvention provision are based on distinguishing noninfringing uses from other uses, not on assessing "the

12

content of what those who sought exemptions wanted to say, their viewpoint, or who they are." JA 291. The court contrasted the rulemaking proceedings with licensing schemes that grant unbridled discretion for decisionmakers to make judgments "based on the content of what the speaker wanted to express." JA 291.

3. Following the resolution of the motion to dismiss, the district court denied plaintiffs' motion for a preliminary injunction. The court summarily denied a preliminary injunction as to the facial claims that had already been dismissed and determined that a preliminary injunction was not warranted as to the as-applied claims that remained pending. In reaching that decision, the court concluded that the government was likely to succeed on the merits because the anti-circumvention and anti-trafficking provisions further the government's substantial interest in "launch[ing] and protect[ing] the digital marketplace for copyrighted works and address[ing] the risk of massive piracy in the digital age," JA 337 (quotation marks omitted), and "do not burden substantially more speech than is necessary," JA 345-46.

On appeal from the denial of injunctive relief, this Court affirmed. This Court explained that the anti-circumvention and anti-trafficking provisions are "content neutral" restrictions aimed at conduct, not speech. *Green v.*

*U.S. Dep't of Justice*, 54 F.4th 738, 745-46 (D.C. Cir. 2022). These "provisions target not the expressive content of computer code, but rather the act of circumvention and the provision of circumvention-enabling tools." *Id.* at 745. Invoking the reasoning of a Second Circuit decision that upheld the constitutionality of the relevant provisions of the DMCA, this Court concluded that, while the provisions "may incidentally make it more difficult to express things with computer code," they regulate code in "'its capacity to instruct a computer'" rather than its capacity "'for conveying information to a human being.'" *Id.* at 745-46 (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 454 (2d Cir. 2001)).

This Court also determined that the circumvention and trafficking prohibitions advance "the government's substantial interest in ensuring the broadest distribution of copyrighted materials." *Green*, 54 F.4th at 747. Since its inception, the Digital Millennium Copyright Act has encouraged content creators "to make available via the Internet movies, music, software, and literary works" by "protecting the right of copyright owners to exercise meaningful control over the terms of access to their works online." *Id.* at 746 (alteration and quotation marks omitted). And this Court credited the evidence demonstrating "that without adequate protection against infringing

14

serial copying, content owners would not disseminate their valuable copyrighted digital content." *Id.* (alteration and quotation marks omitted). Because plaintiffs were "unlikely to succeed on the merits," they were not entitled to a preliminary injunction. *Id.* at 747.

4.  On remand, plaintiffs voluntarily dismissed with prejudice the pending claims in the case—*i.e.*, their as-applied First Amendment claims, JA 350—and the district court entered final judgment, JA 356.  Plaintiffs now challenge on appeal the dismissal of their facial First Amendment challenges, which at the time of their previous appeal "was not final and could not yet be appealed." *Green*, 54 F.4th at 743.

## SUMMARY OF ARGUMENT

The district court correctly dismissed plaintiffs' facial First Amendment challenges to the Digital Millennium Copyright Act's protections for digital copyrighted content.  Addressing plaintiffs' as-applied challenges in the prior appeal, this Court determined that the DMCA's anti-circumvention and anti-trafficking provisions are content-neutral regulations of conduct whose incidental burdens on plaintiffs' expression are no greater than necessary to support the government's interest in cultivating a digital marketplace.  *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 746-47 (D.C.

15

Cir. 2022). Plaintiffs nonetheless seek a ruling that the challenged provisions chill so much protected speech that they cannot be applied to anyone.

This Court's previous decision undermines plaintiffs' claim that the DMCA is facially overbroad. This Court held that there was no First Amendment problem with restricting the manufacture and sale of a device that would "expos[e] valuable copyrighted video content to massive infringement" by eviscerating the protection measures on "virtually anything displayable on a modern television screen." *Green*, 54 F.4th at 746-47 (quotation marks omitted). That protection is at the core of the statute, and plaintiffs' invocation of hypotheticals at the fringes of the statute's application does not establish that the DMCA's "unconstitutional applications" are "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). That conclusion is inescapable in the context of a statute regulating conduct, not speech, for which the strong medicine of overbreadth will "[r]arely, if ever," be appropriate. *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Even on their own terms, plaintiffs' arguments suffer from multiple flaws. Plaintiffs largely ignore that the DMCA does not restrict expression, but rather restricts circumventing technological protection measures to

16

access copyrighted works without authorization.  Obtaining such access is not itself expressive, any more than breaking into a bookstore to read a book is an expressive act.  Any adverse effects on expression are indirect and amply justified.  Plaintiffs and their amici also mistakenly assume that third parties have a First Amendment right to gain unfettered access to digital works to make a fair or other noninfringing use of those works.  That premise is incorrect and cannot overcome the statute's permissible applications to restrict unlawful access to copyrighted works to ensure that authors continue to create digital works and make them available online.

The provision requiring the Librarian of Congress to make a determination regarding proposed exemptions to the anti-circumvention provision that facilitate noninfringing uses of particular classes of works does not render the statute constitutionally suspect.  The district court properly rejected plaintiffs' attempt to reconceptualize this process as a speech-licensing regime.  The rulemaking proceeding is not akin to a scheme under which individuals must seek the government's advance permission to engage in particular speech-related activities with the specter that officials will wield broad discretion to pass judgment on the content of a potential speaker's message.

17

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of plaintiffs' facial constitutional challenges for failure to state a claim. *See Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).

## ARGUMENT

### I. The Digital Millennium Copyright Act Comports with the First Amendment.

#### A. The prior appeal amply demonstrates the DMCA's plainly legitimate sweep.

In the prior appeal, this Court affirmed the district court's denial of a preliminary injunction with respect to plaintiffs' as-applied challenge to the Digital Millennium Copyright Act. This Court concluded that the DMCA's anti-circumvention and anti-trafficking provisions are content-neutral regulations of conduct whose incidental burdens on plaintiffs' expression are no greater than necessary to support the government's interests in protecting digital works from piracy and cultivating a marketplace of such works. *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 746-47 (D.C. Cir. 2022).

As the Court explained, the DMCA has encouraged content creators "to make available via the Internet movies, music, software, and literary works" by "protecting the right of copyright owners to exercise meaningful

18

control over the terms of access to their works online." *Green*, 54 F.4th at 746 (alteration and quotation marks omitted). It accomplishes that goal by prohibiting the circumvention of technological measures that protect against unauthorized access to a copyrighted work and the trafficking in tools that accomplish that circumvention. This Court concluded that the DMCA's prohibitions were essential to promoting the digital marketplace of ideas: "without adequate protection against infringing serial copying, content owners would not disseminate their valuable copyrighted digital content." *Id.* (alteration and quotation marks omitted).

On remand, plaintiffs agreed to dismiss their as-applied claims with prejudice based on this Court's decision. Thus, as the case comes to this Court, their remaining argument is that although the statute may be constitutional as applied to their own conduct, it is unconstitutional on its face based on the overbreadth doctrine.

Overbreadth represents a departure from the ordinary principle that parties like plaintiffs to whom a statute can be lawfully applied may not assert that the statute is unlawful as to third parties. *See United States v. Hansen*, 599 U.S. 762, 769 (2023). Accordingly, the Supreme Court has made clear that "[i]nvalidation for overbreadth is strong medicine that is not to be

19

casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (quotation marks omitted).  A statute may be struck down as facially overbroad under the First Amendment only if its "unconstitutional applications" are "substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770.

Here, the lawful applications of the anti-circumvention and anti-trafficking provisions are manifest.  Indeed, this Court's prior decision alone is sufficient to establish the statute's plainly lawful sweep.  Mr. Huang wants to sell a device "capable of circumventing High-Bandwidth Digital Content Protection, a technological protection measure that prevents digital content from being copied or played on unauthorized devices." *Green*, 54 F.4th at 742-43.  As this Court recognized, Mr. Huang's device would, "by design, permit virtually anything displayable on a modern television screen to be recorded in the clear and made available online by making obsolete the technological protection measure it targets." *Id.* at 746 (quotation marks omitted).  By doing so, it "would eviscerate virtually every single video content delivery protection system exposing valuable copyrighted video content to massive infringement, gutting the government's substantial

20

interest in ensuring the broadest distribution of copyrighted materials." *Id.* at 746-47 (citation and quotation marks omitted).

Providing that protection is at the heart of the statute, and this Court's determination in this very case that such an application of the DMCA is constitutional suffices to defeat plaintiffs' overbreadth challenge. As the district court correctly recognized, this challenge does not require extended treatment because it is not "significant[ly] differen[t]" from the reasons for rejecting plaintiffs' as-applied claims. *See* JA 286 (quoting *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984)).

But in any event, the statute's constitutional applications are not limited to Mr. Huang's own device. The anti-circumvention provision prohibits someone from breaching the paywall of an Internet site that provides access to music by subscription in order to listen to the songs for free. It prohibits someone from renting a digital copy of a movie and overriding the timing restriction to maintain access to the movie forever. And it prohibits someone from borrowing an e-book subject to the condition that the e-book be read on a particular device and bypassing that restriction to access the e-book on various devices. None of these commonplace

21

examples involving the circumvention of access restrictions for personal convenience or benefit even arguably offends the First Amendment.

The same is true with respect to the anti-trafficking provision. Indeed, that provision primarily prevents the distribution of tools that would enable the sort of circumvention discussed above on a massive scale. *See* JA 64 (describing the salutary benefit of the statute's anti-trafficking provisions as "keeping circumvention technologies out of the mainstream"). The sale of Mr. Huang's device would have exactly that effect. And the Second Circuit has held that the anti-trafficking provision can constitutionally be applied to prohibit the online posting of computer software that decrypts digitally encrypted movies on DVDs. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 453-55 (2d Cir. 2001). These non-exhaustive examples amply demonstrate that the DMCA is plainly legitimate in countless applications.

Plaintiffs cannot overcome these plainly legitimate applications of the statute by invoking hypotheticals at the fringe of the statute's reach. Plaintiffs suggest that an individual who purchases software "may wish to decrypt the program so that she can read the code," or reporters "may wish to inspect a program protected by a technological protection measure in order to report true, newsworthy facts about security vulnerabilities or

22

privacy abuses." Pls. Br. 41. As explained below, the statute's application to these activities does not violate the First Amendment. But even if it did, these examples would, at most, permit an as-applied challenge by persons who wished to engage in these activities, none of whom is before the Court. They would not justify wholesale facial invalidation.

In addition to misunderstanding the relevant inquiry for a facial challenge, plaintiffs misstate the DMCA's effect on speech. The prohibition on circumventing technological protection measures that protect access to copyrighted works, 17 U.S.C. § 1201(a)(1), is fundamentally a restriction on conduct. *See Green*, 54 F.4th at 745 (explaining that the anti-circumvention provision targets "the act of circumvention"). While creating digital content can be an expressive act, accessing digital content is not an expressive act. Just as there is no constitutional right to break into a bookstore to read a book, there is no constitutional right to circumvent protections on digital works. And that is so even if the statute is applied to people who seek to access creative works for the purpose of creating further creative works: the constitutionality of prohibitions on breaking into a bookstore does not depend on what the person intends to do with what he learns from the books.

The prohibition on trafficking in tools that circumvent access controls, 17 U.S.C. § 1201(a)(2), similarly targets conduct and not speech. *See Green*, 54 F.4th at 745 (explaining that the anti-trafficking provision targets "the provision of circumvention-enabling tools"). Manufacturing and selling the means to circumvent technological protection measures is not an expressive act. Just as selling lock picks is not an expressive act, even if they might be used to break into a bookstore, selling the means to obtain unauthorized access to expressive works is not expressive. *See* H.R. Rep. No. 105-551, pt. 1, at 17 (1998) (describing circumvention software as "the electronic equivalent of breaking into a locked room in order to obtain a copy of a book"). And as this Court explained, even if some circumvention tools—such as computer code—may also be used for expression, "that expressive activity is not the statute's target." *Green*, 54 F.4th at 745.

Plaintiffs never come to grips with the fact that the DMCA is directed at non-expressive conduct with, at most, incidental effects on speech. The overbreadth doctrine is not designed to address this sort of situation where the concerns about chilling protected speech are "attenuate[d]." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). For laws like the one at issue here that are "not specifically addressed to speech or to conduct necessarily

24

associated with speech (such as picketing or demonstrating)," an overbreadth challenge will "[r]arely, if ever, . . . succeed." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003); *see also Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir. 1996) ("[T]he Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, 'by their terms,' sought to regulate 'spoken words,' or patently 'expressive or communicative conduct' such as picketing or handbilling." (quoting *Broadrick*, 413 U.S. at 612-13)).

### B. Plaintiffs' arguments fail on their own terms.

As discussed above, plaintiffs could not sustain an overbreadth challenge even if their contentions that certain isolated applications of the Digital Millennium Copyright Act would be unconstitutional were credited. But in any event, those arguments are mistaken on their own terms.

Plaintiffs largely ignore the DMCA's profound benefits in promoting expression in the digital marketplace. Congress recognized that in the absence of effective technological restrictions to prevent access, the risk of rampant piracy would diminish the willingness of creators to produce expressive works in digital form and to make them available online. *See* JA 70-71; *see also Corley*, 273 F.3d at 454 (noting that the DMCA helps prevent the rapid dissemination of unencrypted digital copies "at the click of

a mouse to any person in the world with access to the Internet").   Like other

provisions of copyright law, which the Supreme Court has described as "the

engine of free expression," the DMCA "supplies the economic incentive to

create and disseminate ideas" by creating "a marketable right to the use of

one's expression."  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471

U.S. 539, 558 (1985).

Plaintiffs cannot dismiss these weighty interests on the ground that the

DMCA is duplicative of "the Copyright Act" or other "existing law."  Pls. Br.

48.  By plaintiffs' admission, "copyright simply does not govern" certain acts

that fall within the anti-circumvention and anti-trafficking provisions.  Pls.

Br. 41.  And in 2017, the Register of Copyrights issued a comprehensive

study expressly finding that the DMCA "continues to serve the essential

purpose of protecting the right of copyright owners to exercise meaningful

control over the terms of access to their works online."  *Green*, 54 F.4th at

746 (quotation marks omitted).

Although plaintiffs briefly suggest that the DMCA interferes with the

"publication of code," Pls. Br. 42, this Court's prior opinion rejected the

reliance on any such interference.  As this Court explained, "that expressive

activity is not the statute's target" because the DMCA "applies to code solely

26

because of its capacity to instruct a computer." *Green*, 54 F.4th at 745-46 (quotation marks omitted). And the anti-trafficking provision would not prevent Dr. Green from "publish[ing] his book even if the book includes enough code to allow someone to piece together a circumvention technology." *Id.* at 744 (quotation marks omitted). Instead, that provision concerns only trafficking in any "technology, product, service, device, component, or part thereof" that is "designed," "produced," or "marketed" for circumventing access controls or that "has only limited commercially significant purpose or use other than" doing so. 17 U.S.C. § 1201(a)(2).

Rather, the crux of plaintiffs' objection is that in some instances third parties would like to bypass access restrictions on copyrighted works to make noninfringing use of those works. In other words, plaintiffs seek to rely on the incidental effects of the DMCA. These effects are much less significant than plaintiffs suggest, and any such incidental limitations on speech are easily justified.

Plaintiffs attempt to elide the relevant inquiry by insisting that the "burdens are not incidental" because "[i]f they were, thousands of people would not have invested tens of thousands of hours pleading for exemptions from the Library of Congress." Pls. Br. 25. Burdens on speech are

27

incidental if the statute does not directly regulate speech and is not aimed at

suppressing protected speech, but instead regulates conduct and only

incidentally makes speech more difficult. *See Quincy Cable TV, Inc. v.*

*F.C.C.*, 768 F.2d 1434, 1450 (D.C. Cir. 1985) (describing "regulations that

evince a governmental interest unrelated to the suppression or protection of

a particular set of ideas" as imposing incidental burdens on speech). The

laws that prohibit theft and trespassing and thus require customers to pay to

purchase books and tickets for movies may have profound effects on the

ability to gather information and to create new expressive works. But those

provisions are regulations of conduct with only an incidental effect on speech.

For similar reasons, plaintiffs are wrong to assume (Br. 23-24) that

third parties have a right to gain unfettered access to digital works in order

to make noninfringing use of those works. Just as copyright protection

promotes First Amendment values by incentivizing authors to generate and

disseminate creative works, the DMCA provides incentives to generate and

disseminate digital works. These protections may make it more expensive or

burdensome to access the works of others to create a new work, but that does

not mean that they violate the First Amendment. Indeed, the DMCA does

not even regulate the creation of new works. Third parties remain free to

make various uses of lawfully acquired works—the DMCA simply limits their ability to access those works in their preferred "format" or to copy those works by their "preferred technique." *Corley*, 273 F.3d at 459.

The cases on which plaintiffs rely (Br. 24-25, 44) do not suggest otherwise. Most of them involve First Amendment challenges to restrictions on the dissemination of speech. In *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, for example, the Supreme Court considered a tax on ink and paper that "applie[d] only to certain publications protected by the First Amendment." 460 U.S. 575, 581 (1983). In *Brown v. Entertainment Merchants Association*, the Supreme Court scrutinized a restriction on selling or renting violent video games and observed in a footnote that direct regulations on "creating, distributing, or consuming speech" raise First Amendment concerns. 564 U.S. 786, 792 n.1 (2011). In one of plaintiffs' cited cases, the Supreme Court noted a relevant distinction between "speech by a law-abiding possessor of information" unlawfully acquired by someone else and "the interceptor's own use of information" in addressing a statutory prohibition on the intentional disclosure of illegally intercepted communications. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). Similarly, circuit courts have analyzed the First Amendment interests in

29

"speech-creation," such as audiotaping and videotaping, rather than accessing a creative work that already exists. *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) (filming police officers); *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (taking photographs and recording videos in public park); *American Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (recording police officers); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (tattooing).

None of these cases suggests that the mere act of obtaining unauthorized access to expressive works or information created or recorded by *others* receives the same First Amendment protection as the act of creating an expressive work. *Cf. Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (plurality opinion) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control."); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) (holding that First Amendment did not require access to information in public records). To the contrary, as discussed above, it would be antithetical

30

to First Amendment interests to stifle the creation of expressive works by allowing them to be accessed without authorization.  *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting that "copyright's purpose is to *promote* the creation and publication of free expression").

Plaintiffs similarly err in criticizing (Br. 50-51) the statutory exemptions, which do not relate to the content of expression and merely permit certain conduct (such as allowing programmers to use certain functionality for purposes of achieving program interoperability or conducting security testing) that would otherwise be prohibited.  Plaintiffs and their amici also take aim at the triennial rulemaking process, *see, e.g.*, Pls. Br. 45-46, but Congress established that process as a mechanism to accommodate fair use considerations by "selectively waiv[ing]" the circumvention prohibition as warranted "for the benefit of both copyright owners and users."  H.R. Rep. No. 105-551, pt. 2, at 26, 35-37.  Several exemptions address the precise sorts of concerns that amici raise, including exemptions for "blind or other person[s] with a disability" to circumvent e-book measures that "prevent the enabling of read-aloud functionality or interfere with screen readers" and for various types of filmmakers to use movie and television clips.  *Exemption to Prohibition on Circumvention of*

*Copyright Protection Systems for Access Control Technologies*, 80 Fed. Reg. 65,944, 65,961-62 (Oct. 28, 2015).  Disputes about whether the Librarian should have granted additional or broader exemptions do not render the DMCA constitutionally suspect.

Likewise, plaintiffs and their amici do not advance their argument by expressing frustration that they have to participate in a rulemaking on a periodic basis.  *See* Pls. Br. 46.  It makes eminent sense that Congress would provide for continuing reassessment of the exemptions to take account of developments in the marketplace for digital copyrighted works.  Even putting aside that the government has taken steps to streamline the exemption process, *see* JA 209-16, any need to expend resources as part of the administrative proceeding does not undermine the DMCA's "plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.  The statute's permissible applications to restrict unlawful access to copyrighted works to foster a digital marketplace for such works make clear that plaintiffs have not come close to demonstrating that "the ratio of unlawful-to-lawful applications is . . . lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 784 (quoting *Broadrick*, 413 U.S. at 613).

32

## II.     The Digital Millennium Copyright Act Does Not Effect a Prior Restraint on Speech.

Plaintiffs cannot salvage their case by reprising their argument that the triennial rulemaking process constitutes an unconstitutional prior restraint on speech.  *See* JA 292; Appellants' Opening Brief at 38-44, *Green v. U.S. Dep't of Justice*, No. 21-5195 (D.C. Cir. Jan. 12, 2022).  Plaintiffs' effort to characterize this proceeding as a "speech-licensing regime," Pls. Br. 27, fails on multiple levels.

As an initial matter, the exemption process relates to the prohibition on circumvention, which as discussed above does not restrict speech but instead restricts conduct.  *See Green*, 54 F.4th at 746 (explaining that the DMCA "applies to code solely because of its capacity to instruct a computer" (quotation marks omitted)).  The process thus in no respect provides a mechanism for "would-be speakers [to] ask the government for permission before engaging in a host of lawful speech activities."  Pls. Br. 28.  The statute does not resemble paradigmatic speech-licensing schemes, like a preapproval process for screening films at movie theaters or operating a sexually oriented business, *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 224-27 (1990); *Freedman v. Maryland*, 380 U.S. 51, 57 (1965), or a permit requirement for placing newsracks, demonstrating, or leafletting on public

33

land, *see City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59

(1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149 (1969);

*Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 512 (D.C. Cir. 2010).

Even apart from its focus on conduct rather than speech, the

exemption process is not a licensing regime in any relevant sense.  As

plaintiffs acknowledge (Br. 33), the Librarian does not consider applications

by individuals who seek advance permission to engage in specific activities

(much less speech-related activities).  Instead, the DMCA requires a

"rulemaking proceeding" to identify certain "class[es] of copyrighted works"

for which users will be exempt from the statutory prohibition on

circumvention.  *See* 17 U.S.C. § 1201(a)(1)(C).  Individuals seeking to take

advantage of an exemption need not ask for the government's approval or

prove to the government's satisfaction that their proposed conduct falls

within the exempted categories.  The creation of rules of general application

through a rulemaking proceeding is not a licensing regime.

It is therefore unsurprising that, as the district court recognized, the

exemption process does not raise any of the concerns commonly associated

with speech-licensing regimes.  The government is not making individualized

determinations at all, and thus plainly does not have "unconfined authority to

34

pass judgment on the content of speech," JA 289 (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320 (2002)), or "to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers," JA 289 (quoting *City of Lakewood*, 486 U.S. at 759). The district court properly highlighted plaintiffs' failure to establish that "the rulemaking defendants, in declining to grant certain exemptions, have engaged in censorship based on what plaintiffs want to express, their viewpoint, or who they are." JA 290.

And even the categorical determinations that the government is making rely on factors similar to those used in a fair-use inquiry, and thus permissibly attempt to identify the statute's effect on uses that would not infringe the copyright laws, rather than passing judgment on the content of a potential speaker's message. *See* JA 291. The DMCA charges the Librarian with distinguishing "noninfringing uses" from other uses, and it directs the Librarian to consider factors like those used to analyze statutory fair use. *Compare* 17 U.S.C. § 1201(a)(1)(C), *with* 17 U.S.C. § 107. If the fair-use provision—which plaintiffs concede (Br. 22) is a First Amendment virtue, not a vice—does not constitute impermissible content discrimination, the

35

Librarian's consideration of the same criteria for similar purposes can hardly be condemned on that ground.

The dismissal of plaintiffs' challenge to the Librarian's determination regarding exemptions in the 2015 rulemaking proceedings, *see* JA 306-16, is not at issue in this appeal, and any quibble with the Librarian's record-specific determinations provides no basis for striking down the statute as unconstitutional.  As noted, the Librarian determines whether the type of proposed use is likely to be noninfringing under copyright law by analyzing factors that have to do with the general market for certain uses of copyrighted works and the availability of those works for noninfringing uses. To the extent the Librarian's determinations are relevant here, they merely illustrate plaintiffs' error in equating the exemption process with impermissible content discrimination.

For example, the Librarian's decision to grant an exemption for "documentary film" but not for "narrative film," Pls. Br. 35, relied in part on a recommendation of the Register of Copyrights, which analyzed the statutory fair-use factors.  As the Register explained, "the use of motion picture clips in narrative films diverges from educational uses and uses in documentaries because there is no presumption that their primary purpose is

36

to offer criticism or commentary, as opposed to being included for entertainment purposes." U.S. Copyright Office, Library of Congress, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* 79 (Oct. 2015), https://perma.cc/LRT4-GYGM. Unlike with documentaries or educational use, a concern arises "that copyrighted works will be used in a manner that may supplant the existing, robust licensing market for motion picture clips." *Id.* The exemption for use of short movie clips in noncommercial films was similarly justified by the reduced risk of "usurp[ing] the market for a work." *Id.* at 70. Applying the fair-use factors in these contexts promotes, rather than diminishes, First Amendment interests.

Other exemption denials that plaintiffs raise (Br. 35) are to the same effect. For instance, the Register found that the rulemaking record did "not offer evidence that K-12 students engage in" the "same types of film-related educational activities as university students" and that there were "easy, low-to-no-cost" alternatives to circumvention "for those students' educational needs." *Sixth Triennial Proceeding*, *supra*, at 87; *see id.* at 88 (drawing the same conclusion for out-of-school programs, like adult education programs

37

and online courses).  Similarly, the Register found that "[t]he record clearly establishe[d]" the value of allowing libraries, archives, and museums "to restore and maintain access to video games that might otherwise be lost" and make them freely available "to the public and/or to outside researchers," but not of adopting a freewheeling exemption to engage in circumvention "for more general 'preservation' purposes."  *Id.* at 348, 351-52.  At base, plaintiffs' disagreements with the Librarian's decisions to deny or limit certain exemptions based on the evidence submitted in the rulemaking proceeding do not expose an overall flaw in the statutory scheme.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
      *Attorney General*

DANIEL TENNY

*/s/ Brian J. Springer*
BRIAN J. SPRINGER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7537*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 616-5446*
   *brian.j.springer@usdoj.gov*

February 2024

39

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,513 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer