ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-5159

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

MATTHEW D. GREEN, ET AL.,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellees.*

---

## BRIEF OF *AMICI CURIAE* ASSOCIATION OF AMERICAN PUBLISHERS, INC., ENTERTAINMENT SOFTWARE ASSOCIATION, MOTION PICTURE ASSOCIATION, INC., RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC., AND NEWS / MEDIA ALLIANCE IN SUPPORT OF APPELLEES AND AFFIRMANCE

---

On Appeal from the U.S. District Court for the District of Columbia
Case No. 1:16-cv-01492-EGS
Hon. Emmet G. Sullivan

---

JOHN MATTHEW DEWEESE WILLIAMS
LUCY HOLMES PLOVNICK
Mitchell Silberberg & Knupp, LLP
1818 N Street, N.W., 7th Floor
Washington, DC 20036
Telephone: (202) 355-7900
Email: mxw@msk.com

*Counsel for Amici Curiae*

## Corporate Disclosure Statement

Pursuant to Circuit Rule 26.1, *Amici Curiae* state that they have no parent corporations and that no publicly held corporation or other publicly held entity owns ten percent (10%) or more of any *amicus* organization.

i

## Certificate as to Parties, Rulings Under Review, and Related Cases

*(a)* ***Parties and Amici***. Except for the entities listed herein and any *amici curiae* who have not yet entered an appearance in this Court, all parties, intervenors, and *amici* appearing before the district court are listed in the Briefs for Appellants and Appellees.

*(b)* ***Rulings Under Review***. The rulings under review were made by the United States District Court for the District of Columbia, Hon. Emmet G. Sullivan, in Case No. 1:16-cv-01492-EGS:

1. Order and Opinion Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. Nos. 24, 25) (June 27, 2019);

2. Minute Order Granting Joint Motion for Entry of Final Judgment (May 9, 2023).

*(c)* ***Related Cases.*** This case was previously before this Court on appeal as Case No. 21-5195. To our knowledge, there are no other related cases currently pending in this Court or in any other court.

DATED: February 9, 2024                    /s/ John Matthew DeWeese Williams
                                           John Matthew DeWeese Williams

16235449.2

# TABLE OF CONTENTS

**Page(s)**

**Corporate Disclosure Statement**........................................................................ i

**Certificate as to Parties, Rulings Under Review, and Related Cases** .......... ii

**INTEREST OF *AMICI CURIAE*** ..................................................................... 1

**SUMMARY OF ARGUMENT**.......................................................................... 6

**ARGUMENT** ....................................................................................................... 9

**I.     BECAUSE SECTION 1201 ENCOURAGES FREE EXPRESSION, THE STATUTE IS CONSISTENT WITH COPYRIGHT'S TRADITIONAL CONTOURS** ............................................................ 9

    **A.     Section 1201 Encourages the Creation and Dissemination of Expressive Works** ................................................................. 12

    **B.     Congress Has Power to Define the Limits of Fair Use**............ 19

    **C.     Section 1201's Rulemaking Procedure Ensures that the Statute Conforms to Copyright's Traditional Contours** ........ 20

**II.    EVEN ASSUMING SECTION 1201 TRIGGERS HEIGHTENED SCRUTINY, THE COURT SHOULD APPLY INTERMEDIATE SCRUTINY** ................................................................................... 26

**CONCLUSION**................................................................................................... 27

**Certificate of Compliance**............................................................................... 28

**Certificate of Service**....................................................................................... 29

16235449.2

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004)................................................................27

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .............................................................................26

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)..................................................................................10, 27

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932)......................................................................................11

*Golan v. Holder*,
565 U.S. 302 (2012)......................................................................................10

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021)....................................................................................26

*Green v. U.S. Dep't of Justice*,
392 F. Supp. 3d 68 (D.D. C. 2019)......................................................................27

*Green v. United States Dep't of Just.*,
54 F.4th 738 (D.C. Cir. 2022)............................................................................26

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985).................................................................................4, 9, 12

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
629 F.3d 928 (9th Cir. 2010) ........................................................................10, 19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)......................................................................................13

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)...........................................................................8, 10, 19, 20

iv

# TABLE OF AUTHORITIES
<u>(continued)</u>

<u>Page(s)</u>

*Stewart v. Abend*,
    495 U.S. 207 (1990)................................................................12

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151 (1975)................................................................9

*United States v. Elcom Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002)................................27

*Universal City Studios, Inc. v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ............................1, 27

*Universal City Studios v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ........................................9, 25

## STATUTES

17 U.S.C.
    §1201............................................................................................1
    §1201(a) ....................................................................................14
    §1201(a)(1)(C) ..........................................................14, 20, 21
    §1201(a)(2) ................................................................................19

Act of 1891, Ch. 565, § 4952, 26 Stat. 1107 ..............................11

Act of Aug. 24, 1912, Pub. L. No. 62-303, ch. 356, sec. 5, § 5(l)–(m),
    37 Stat. 488, 488 (1912)........................................................11

Act of Feb. 3, 1831, ch. 16, 4 Stat. 436 ....................................11

Act of July 8, 1870, ch. 230, 16 Stat. 198..................................11

Act of May 31, 1790, ch. 15, 1 Stat. 124....................................11

Pub. L. No.
    92-140, 85 Stat. 391 (1971) ..................................................11
    96-517 (1980)..........................................................................11

v

## TABLE OF AUTHORITIES
<u>(continued)</u>

**<u>Page(s)</u>**

101-650, 701,703, 104 Stat 5128, 5133 (1990) ...................................................11

105-304, 112 Stat. 2860 (1998) ...........................................................................1

### OTHER AUTHORITIES

88 Fed. Reg. at 42891 (July 5, 2023) ....................................................................23

*Chapter 12 of Title 17, Hearing before the Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. On the Judiciary*, 113th Cong., 2d Sess. (Sept. 17, 2014) ......................................16, 17

DAVID BLACKBURN, ET. AL., U.S. CHAMBER OF COMMERCE, IMPACTS OF DIGITAL PIRACY ON THE U.S. ECONOMY (June 2019)....................................6

ENTERTAINMENT SOFTWARE ASSOCIATION, 2023 ESSENTIAL FACTS ABOUT THE COMPUTER AND VIDEO GAME INDUSTRY (2023) ...........................18

H.R. REP. NO. 105-551, pt. 2 (1998)...................................................................19

*Library of Congress U.S. Copyright Office*
*DMCA Section 1201(a)(1) Hearing*, written statement of Dean Marks (May 18-19, 2000) ..................................................................................15

*Public Roundtable on Section 1201* (May 19 and 25, 2016).......................17, 18

*Section 1201 Roundtable* (Apr. 12, 2018) .........................................................16

*Section 1201 of Title 17: A Report of the Register of Copyrights* (June 2017)..........................................................................17, 22, 24

*Section 1201 Rulemaking Hearing before the Copyright Office Panel* (May 17, 2012) ...................................................................................15, 16

*Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (October 2021) ..............................................................................20, 21

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

OFFICE OF THE U.S. TRADE REPRESENTATIVE, 2022 REVIEW OF
NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY (Jan. 31,
2023) ...................................................................................................4

RECORDING INDUSTRY ASSOCIATION OF AMERICA, YEAR-END 2022
RIAA REVENUE STATISTICS (2023) ...................................................18

ROBERT STONER AND JÉSSICA DUTRA OF ECONOMISTS INCORPORATED,
PREPARED FOR THE INTERNATIONAL INTELLECTUAL PROPERTY
ALLIANCE (IIPA), COPYRIGHT INDUSTRIES IN THE U.S. ECONOMY:
THE 2020 REPORT 3 (2020) .................................................................6

S. REP. NO. 105-190, 8 (1998) ..............................................................12

STAFF OF THE H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-
BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE U.S. H. OF
REP. ON AUGUST 4, 1998, at 6 (Comm. Print 1998)...........................14

U.S. Dep't of Justice, *Public voice and principal salesperson for
notorious videogame piracy group sentenced to 3+ years in prison
for conspiracy*, Feb. 10, 2022 .........................................................4, 6

*WIPO Copyright Treaties Implementation Act and Online Copyright
Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280
before the Subcomm. on Courts and Intellectual Property of the H.
Comm. on the Judiciary*, 105th Cong., 1st Sess. (Sept. 16 and 17,
1997) ..............................................................................................13, 14

WIPO Copyright Treaty, S. Treaty Doc. No. 105-17, at 1, 36 I.L.M.
65 (Geneva, 1997) ...........................................................................13

WIPO Performances and Phonograms Treaty, S. Treaty Doc. No. 105-
17, at 18, 36 I.L.M. 76 (Geneva, 1997) ............................................13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

## **GLOSSARY**

Association of American Publishers                AAP

Digital Millennium Copyright Act                 DMCA

Digital Rights Management                        DRM

Entertainment Software Association               ESA

Motion Picture Association                       MPA

News / Media Alliance                            N/MA

Recording Industry Association of America        RIAA

Technological Protection Measure                 TPM

Visual Artists Rights Act                        VARA

World Intellectual Property Organization         WIPO

## **STATUTES AND REGULATIONS**

Relevant statutes and regulations are included in the Briefs for Appellants and Appellees.

16235449.2

## INTEREST OF *AMICI CURIAE*[1]

The Association of American Publishers, Inc. ("AAP"), the Entertainment Software Association ("ESA"), the Motion Picture Association, Inc. ("MPA"), the Recording Industry Association of America, Inc. ("RIAA"), and the News/Media Alliance ("N/MA") are trade associations whose members create and distribute some of the highest-value, most significant copyrighted works in the marketplace. *Amici* were founded to protect their members' copyright interests **and** First Amendment rights.  *Amici* submit this brief because reversing the district court's orders would eviscerate critical safeguards created by Section 1201 (17 U.S.C. § 1201) of the Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998), and thus undermine copyright's role as an important "engine of free expression."  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 330 (S.D.N.Y. 2000), *quoting Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

AAP represents book, journal, and education publishers in the United States on matters of law and policy, including major commercial houses, small and independent houses, and university presses and other noncommercial scholarly

---

[1] All parties have consented to the filing of this brief.  No counsel for a party authored this brief in whole or in part.  No party, counsel to any party, or any person other than *Amici* contributed money to fund preparation or submission of this brief.

publishers. AAP seeks to promote an effective and enforceable framework that enables publishers to create and disseminate a wide array of original works of authorship to the public on behalf of their authors and in furtherance of informed speech and public progress.[2]

ESA is the U.S. trade association that serves as the voice and advocate for the U.S. video game industry.  Its members are the innovators, creators, publishers, and business leaders that are reimagining entertainment and transforming how we interact, learn, connect, and play.  ESA works to expand and protect the dynamic marketplace for video games through innovative and engaging initiatives that showcase the positive impact of video games on people, culture, and the economy. The association has an unmatched track record in protecting the industry's First Amendment rights and its content from mass infringement.

MPA is the voice of the global film and television industry—a community of storytellers at the nexus of innovation, imagination, and creativity.  In the U.S. and around the world, the film and television industry drives the creative economy.

---

[2] As recent examples of AAP's dedication to the First Amendment, *see* Association of American Publishers, *Fifth Circuit Court of Appeals Affirms That Texas Book Ban Law is Unconstitutional* (January 17, 2024), https://publishers.org/news/fifth-circuit-court-of-appeals-affirms-that-texas-book-ban-law-is-unconstitutional/; *see also* Association of American Publishers, *Court Grants Preliminary Injunction Barring Implementation of Arkansas Act 372* (July 31, 2023), https://publishers.org/news/court-grants-preliminary-injunction-barring-implementation-of-arkansas-act-372/.

2

MPA's members are Walt Disney Studios Motion Pictures; Netflix Studios, LLC;

Paramount Pictures Corporation; Sony Pictures Entertainment Inc.; Universal City

Studios LLC; and Warner Bros. Entertainment Inc.

N/MA is a nonprofit organization that represents the interests of more than

2,200 news media organizations in the U.S. and internationally.  In total, N/MA's

membership accounts for nearly 90 percent of the daily newspaper circulation in

the United States, nearly 100 magazine media companies with over 500 individual

magazine brands, and dozens of digital-only properties.  The Alliance diligently

advocates for its members on issues including protecting press freedom and

intellectual property rights, and advocating for an open government.  The proper

interpretation of copyright's fair use defense and the DMCA's protections are

matters of urgent importance to N/MA and its members.

RIAA is a nonprofit trade organization that supports and promotes the

creative and financial vitality of recorded music and the people and companies that

create it in the United States.  RIAA's several hundred members—ranging from

major American music companies with global reach to artist-owned labels and

small businesses—make up the world's most vibrant and innovative music

community.  RIAA's members create, manufacture, and/or distribute the majority

of all legitimate recorded music produced and sold in the United States.  In

supporting its members, RIAA works to protect the intellectual property and First Amendment rights of artists and music labels.

The Supreme Court has repeatedly recognized that "the Framers intended copyright itself to be the engine of free expression." *Harper & Row*, 471 U.S., 539, 558. Since the advent of the digital age and the DMCA's enactment, Section 1201's prohibitions against circumvention of access controls and trafficking in circumvention tools have played—and continue to play—a vital role in furthering copyright's crucial role in fostering free speech. Section 1201 helps prevent devastating piracy and unauthorized access to copyrighted works, preserving the incentive for content creators and distributors like *Amici*'s members to continue to create and disseminate expressive works in the digital marketplace.[3] Technological protection measures also enable copyright owners to design innovative business models that benefit consumers by enabling lower-cost access to a more diverse

---

[3] Regarding the economic costs of piracy, *see, e.g.,* OFFICE OF THE U.S. TRADE REPRESENTATIVE, 2022 REVIEW OF NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY, at 6 (Jan. 31, 2023), https://ustr.gov/sites/ default/files/2023-01/2022%20Notorious%20Markets%20List%20(final).pdf (citing estimated impact of digital video piracy alone of "up to 230,000 jobs and $45.7 billion in reduced GDP"). For an example that highlights the importance of Section 1201's anti-circumvention provisions, *see* U.S. Dep't of Justice, *Public voice and principal salesperson for notorious videogame piracy group sentenced to 3+ years in prison for conspiracy* (Feb. 10, 2022), https://www.justice.gov/usao-wdwa/pr/public-voice-and-principal-salesperson-notorious-videogame-piracy-group-sentenced-3 (strong anti-piracy victory by DOJ against notorious hackers of video games).

16235449.2

variety of offerings, including subscription-based access to high-quality, digital entertainment content; on-demand viewing; downloadable eBooks; cloud-based storage and sharing; and secure, authenticated video game play.

Over time, each of the industries represented by *Amici* have relied on Section 1201 to expand their options for disseminating their content.  In the motion picture industry, studios or their licensees used software on DVDs and Blu-ray discs that disabled the ability to access the content on unauthorized players or to copy and distribute it onto computers or over the internet.  Today, the studios' streaming services, whether transactional or subscription-based, deploy content protection measures on internet and cable/satellite streams.  Recorded music was distributed through services like iTunes that initially encrypted streams and downloads.  Now, services like Spotify and Apple Music offer subscription access models that protect both time-limited downloads and unlimited streaming access.  DRM has for years protected videogame consoles and content.  Consoles like the Microsoft Xbox, Sony PlayStation and Nintendo Switch use various forms of technical protection measures, such as authentication software, to prevent piracy and to ensure a secure delivery platform to provide not only access to video games, but access to movies and music through various third-party services (including services such as YouTube and Hulu).  Literary works like those published by AAP and N/MA members have been offered with content protection measures through

e-book readers and are now also offered through website access subscriptions that require authentication and password protection.

The continued vitality of the businesses of *Amici*'s members directly depends upon the types of technological protection measures for which Section 1201 provides protection.[4]  As both copyright owners who use technology to deliver the digital access sought by consumers and as parties who regularly rely on the fair use defense, *Amici*'s members have a unique perspective regarding how Section 1201—consistent with the traditional contours of copyright—fosters, rather than hinders, free expression.

## SUMMARY OF ARGUMENT

The Copyright Clause, Art. I, § 8, cl. 8, exists to encourage the creation and dissemination of original works for the general public welfare.  Working in tandem

---

[4] According to a recent study, copyright industries contributed almost $3 trillion to the U.S. economy in 2021.  ROBERT STONER AND JÉSSICA DUTRA, SECRETARIAT ECONOMISTS, PREPARED FOR THE INTERNATIONAL INTELLECTUAL PROPERTY ALLIANCE (IIPA), COPYRIGHT INDUSTRIES IN THE U.S. ECONOMY: THE 2022 REPORT 8 (2022), https://www.iipa.org/files/uploads/2020/12/2020-IIPA-Report-FINAL-web.pdf In that year, core copyright industries accounted for 52.26% of the U.S. digital economy, while total copyright industries accounted for 64.87% of that value added.  *Id.* at 9.  Another study concluded that global online piracy of motion pictures alone costs the U.S. economy at least $29.2 billion in lost revenue each year.  DAVID BLACKBURN, ET. AL., U.S. CHAMBER OF COMMERCE, IMPACTS OF DIGITAL PIRACY ON THE U.S. ECONOMY (June 2019), https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf.

6

with the First Amendment, copyright promotes free speech. This salutary purpose depends on ensuring that copyright holders receive a fair return for investing in the creation of their copyrighted works. In our digital age, a single pirated, perfect copy of a copyrighted work can find its way onto the internet, where billions of people can access, reproduce, and distribute the infringing work without cost. Streaming video services, digital newspaper subscriptions, and unlimited streaming music services have become some of the most popular platforms on the internet and on mobile devices. Unauthorized access to these services gravely undermines the viability of these platforms. To encourage the development of these kinds of consumer-friendly content offerings, Congress enacted Section 1201, which, consistent with centuries-old precedent, expanded the rights of copyright owners where necessary to preserve and further copyright's core objectives.

Congress enacted this new safeguard to encourage the development of these kinds of consumer-friendly, content offerings. The economic harm to the copyright owner resulting from unauthorized access and concomitant widespread infringement increases the owner's cost of disseminating expressive works, making access to those works more difficult for many cost-conscious consumers. Since the statute's enactment more than twenty-five years ago, the free speech benefits resulting from Section 1201's protections have been legion. In challenging the constitutionality of Section 1201, Appellants and their supporting

7

amici ignore copyright's unique role in fostering the dissemination of creative content for the public's benefit.

Section 1201 does not trigger heightened scrutiny.  Because of copyright's free speech underpinnings, courts confronted with First Amendment challenges to copyright statutes give greater deference to Congress's enactments.  Indeed, the Supreme Court has recognized that Congress may sometimes limit or modify uses previously held to have been a fair use.  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 454 (1984) ("*Sony-Betamax*").  Moreover, Section 1201's prohibitions are consistent with the long-established principles that a copyright owner has the right to limit publication or not to publish at all; and that one who improperly gains access to a copyrighted work (just like stealing a book from a bookstore or home by picking the lock and breaking in) may not invoke fair use as a defense.  Finally, copyright law's history is replete with examples where Congress has expanded copyright owners' exclusive rights to further copyright's free speech objective.  Section 1201 and its rulemaking procedure in no way alter copyright's traditional contours but rather enhance them.

Even if Section 1201 triggered some type of heightened scrutiny, intermediate scrutiny—or something lower—would apply: no court has concluded that Section 1201 is content-based.  Indeed, this Court concluded that the statute is not content-based in the prior appeal in this case.  And all courts considering the

8

issue have concluded that the statute is constitutional. The statute serves a substantial governmental interest: encouraging dissemination of expressive works consonant with free speech principles by preventing piracy and unauthorized access. The statute encourages, rather than suppresses, speech by allowing copyright owners to exploit new technologies without fear of rampant piracy and unauthorized access. And the statute places minimal or no burden on speech by virtue of the rulemaking procedure and legitimate alternative avenues of access to copyrighted works. Fair use does not entitle a user to take from the user's preferred digital version of a work. *See Universal City Studios v. Corley*, 273 F.3d 429, 459 (2d Cir. 2001). *Amici* urge that the Court affirm the district court's judgment.

## ARGUMENT

## I. BECAUSE SECTION 1201 ENCOURAGES FREE EXPRESSION, THE STATUTE IS CONSISTENT WITH COPYRIGHT'S TRADITIONAL CONTOURS

"By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row*, 471 U.S., 539, 558, *citing Mazer v. Stein*, 347 U.S. 201, 209 (1954) (Copyright posits that "encouragement of individual effort by personal gain is the best way to advance public welfare"); *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 at 2043 (1975) (The ultimate aim of copyright is "to stimulate [the creation of

9

useful works] for the general public good.") (cleaned up).  "Evidence from the

founding, moreover, suggests that inducing *dissemination*—as opposed to

creation—was viewed as an appropriate means to promote science." *Golan v.*

*Holder*, 565 U.S. 302, 326 (2012) (emphasis in original).  As the Court has made

clear:

> "The Copyright Clause and First Amendment were adopted close in
> time. This proximity indicates that, in the Framers' view, copyright's
> limited monopolies are compatible with free speech principles.
> Indeed, copyright's purpose is to promote the creation and publication
> of free expression."

*Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Moreover, "[a]s the text of the

Constitution makes plain, it is Congress that has been assigned the task of defining

the scope of the limited monopoly that should be granted to authors or to inventors

in order to give the public appropriate access to their work product." *Sony-*

*Betamax*, 464 U.S. 417, 429.  *Accord*, *Eldred*, 537 U.S. 186, 190, ("The Copyright

Clause … empowers Congress to define the scope of the substantive right.…

Judicial deference to such congressional definition is but a corollary to the grant to

Congress of any Article I power.") (*quoting Graham v. John Deere Co. of Kansas*

*City*, 383 U.S. 1, 6 (1966)).

Section 1201 is consistent with Congress's historical pattern of granting

additional rights to copyright holders in the face of technological change and in

that way encouraging the creation and dissemination of free expression.  *See MDY*

*Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 946 (9th Cir. 2010) as amended

on denial of reh'g (Feb. 17, 2011), opinion amended and superseded on denial of

reh'g, No. 09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011) (Section 1201

"granted copyright owners a new weapon against copyright infringement"). Since

the enactment of the Copyright Act of 1790, Congress has granted copyright

owners new rights when necessary to advance copyright's free speech objectives.

The 1790 Act originally granted authors of maps, charts, and books "the sole right

and liberty of printing, reprinting, publishing and vending" their original works.

Act of May 31, 1790, ch. 15, 1 Stat. 124.  Over the ensuing centuries, Congress

legislated to protect new categories of works, including musical works (Act of Feb.

3, 1831, ch. 16, 4 Stat. 436); photographic works (Act of July 8, 1870, ch. 230, 16

Stat. 198); certain derivative works (Act of 1891, Ch. 565, § 4952, 26 Stat. 1107);

motion pictures (Act of Aug. 24, 1912, Pub. L. No. 62-303, ch. 356, sec. 5, § 5(l)–

(m), 37 Stat. 488, 488 (1912)); sound recordings (Pub. L. No. 92-140, 85 Stat. 391

(1971)); computer software (Pub. L. No. 96-517 (1980)); and architectural works

(Pub. L. No. 101-650, 701,703, 104 Stat 5128, 5133 (1990)).

Copyright owners also traditionally have had the right to refrain from

disseminating their works.  *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)

("The owner of the copyright, if [it] pleases, may refrain from vending or licensing

and content [itself] with simply exercising the right to exclude others from using

11

[its] property.").  Indeed, "nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright."  *Stewart v. Abend*, 495 U.S. 207, 228–29 (1990).

Another longstanding principle of copyright law: accessing a work illegitimately weighs against fair use.  In *Harper & Row*, the defendant obtained a purloined copy of President Ford's memoirs and published a key excerpt.  In rejecting the defendant's claim of fair use, the Court noted: "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."  471 U.S. 539, 558 (citation omitted).

In light of these core principles, Section 1201 follows the traditional contours of copyright, encourages speech, and triggers no heightened scrutiny.

### A. Section 1201 Encourages the Creation and Dissemination of Expressive Works

The advent of the internet and the ability to make and distribute almost instantaneously infringing, perfect digital replicas of copyrighted works on a mass scale posed a threat to copyright holders who otherwise desired to explore new media and new distribution models.  After a lengthy legislative process, Congress concluded: "[C]opyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."  *See* S. REP. NO. 105-190, 8 (1998).  With the advent of file-

12

sharing software, Congress's concern about the effects of massive infringement

proved prescient.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 545

U.S. 913, 923 (2005) ("[B]ecause well over 100 million copies of the software in

question are known to have been downloaded, and billions of files are shared

across the FastTrack and Gnutella networks each month, ***the probable scope of

copyright infringement is staggering***.") (emphasis added).

 Congress enacted Section 1201 for very good reasons.  The U.S. had just

joined the World Intellectual Property Organization ("WIPO") Copyright Treaty, S.

Treaty Doc. No. 105-17, at 1, 36 I.L.M. 65 (Geneva, 1997), and the WIPO

Performances and Phonograms Treaty, S. Treaty Doc. No. 105-17, at 18, 36 I.L.M.

76 (Geneva, 1997), which required parties to "provide adequate legal protection

and effective legal remedies against the circumvention of effective technological

measures that are used by authors [or 'performers or producers of phonograms'] in

connection with the exercise of their rights …."   When Congress held hearings

regarding implementation of the treaties, copyright owners strongly supported

legislation creating a right against unauthorized access and protecting against

trafficking in circumvention devices.  They also emphasized the role such

legislation would play in helping to launch new business models for disseminating

creative expression.  *See, e.g.*, *WIPO Copyright Treaties Implementation Act and

Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280*

*before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 105th Cong., 1st Sess., at 79 (Sept. 16 and 17, 1997) (statement of Jack Valenti, MPAA) ("The same technology that will smooth the way for legitimate delivery of video on demand over digital networks will also prime the pump for copyright pirates."); *id.* at 204 (statement of Allan Adler, AAP) ("Without adequate safeguards for copyright, the promise of the Internet simply won't be fulfilled."). So, in passing Section 1201, Congress had substantial evidence that statutory prohibitions against unauthorized access and trafficking in circumvention tools were an essential supplement to existing law to protect copyright owners and thus incentivize online speech and prevent piracy. *See* STAFF OF THE H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE U.S. H. OF REP. ON AUGUST 4, 1998, at 6 (Comm. Print 1998) ("These technological measures … that this bill protects can be deployed, not only to prevent piracy and other harmful unauthorized uses of copyrighted materials, but also to support new ways of disseminating copyrighted materials to users ….").

As Congress envisioned when enacting the DMCA, the Copyright Office and the Librarian of Congress, through the triennial rulemaking process codified in Section 1201(a)(1)(C), have continued to hear from copyright owners regarding (i) ongoing risks presented by digital piracy and (ii) the ways in which Section 1201(a) has facilitated the launch of successful business models that have

increased the availability of digital access to creative content.[5]  The following are a few selected from many examples:

> [A]n underlying assumption of many of the remarks made in the course of this inquiry is that technological protection measures will be used to 'take' works away from users or to deny access.  I strongly believe that this assumption is fundamentally flawed.  Technological protection measures actually facilitate the making of works available to consumers.  DVD is a concrete example.  My company would not have released its motion pictures on the DVD format if DVD did not incorporate technical protection measures.

May 19, 2000 statement of Dean Marks, Warner Bros.[6]

> Video game consoles are platforms for the creation, distribution, and consumption of copyrighted works, and they rely on the TPMs at issue … to prevent infringement of those works.

May 17, 2012 statement of Christian Genetski, ESA.[7]

> Access control technologies are an integral part of our efforts to offer consumers the widest possible choice of platforms and terms at a corresponding range of price points to enjoy our movies and TV programs.

---

[5] During every triennial proceeding, *Amici* have submitted evidence to the Copyright Office concerning the innovative business models for distribution of their creative works that Section 1201 has facilitated, and about the ongoing threat posed by digital piracy.

[6] *Library of Congress U.S. Copyright Office DMCA Section 1201(a)(1) Hearing*, written statement of Dean Marks, at 2 (May 18-19, 2000), https://www.copyright.gov/1201/hearings/2000/dean_marks.pdf.

[7] *Library of Congress U.S. Copyright Office Section 1201 Rulemaking Hearing before the Copyright Office Panel*, at 18 (May 17, 2012), https://www.copyright.gov/1201/2012/hearings/transcripts/hearing-05-17-2012.pdf.

16235449.2

May 17, 2012 statement of Dan Mackechnie, 20th Century Fox Home

Entertainment.[8]

> So the deals historically that I was involved with when I was
> previously with Sony Music… we specified very precisely what kind
> of security measures we intended to have in place for sometimes
> called end-to-end or link, or whatever term you want to use, to protect
> the music.

April 12, 2018 statement of David Hughes, RIAA.[9]

Over the years, Congress has gathered additional evidence of the continued

need for, and the success of, Section 1201.  *See, e.g., Chapter 12 of Title 17,*

*Hearing before the Subcomm. on Courts, Intellectual Property and the Internet of*

*the H. Comm. On the Judiciary*, 113th Cong., 2d Sess., at 2 (Sept. 17, 2014)

(statement of Rep. Jerrold Nadler) (Section 1201 "has worked to encourage the

creation of new digital works and has allowed authors a way to protect against

copyright infringement while also helping to promote the development of new and

innovative business models."); *id.* (statement of Rep. Thomas Marino) ("The

digital economy has enabled wide distribution of movies, music, eBooks and other

---

[8] *Id.* at 72.

[9] *Library of Congress U.S. Copyright Office Section 1201 Roundtable*, at 102 (Apr.
12, 2018), https://www.copyright.gov/1201/2018/hearing-transcripts/1201-
Rulemaking-Public-Roundtable-04-12-2018.pdf.

16

digital content.  Chapter 12 seems to have a lot to do with the economic

growth ....").[10]

A 2017 report from the Register of Copyrights concerning how Section 1201

functioned in the marketplace confirmed that "[s]ince the enactment of section

1201, the use of technological measures has been useful in expanding consumer

choice and the avenues for dissemination of creative works …."  *See* U.S.

Copyright Office, Library of Congress, *Section 1201 of Title 17: A Report of the*

*Register of Copyrights*, at i (June 2017) ("1201 Study"), available at

https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.  The report

also concluded that the circulation of circumvention tools would cause increased

harm to copyright owners and the public.  *Id.* at 56 ("[T]he Office agrees … that it

would be impossible to control the downstream uses of any circumvention tools

once distributed, even if they were produced with the intent that they be used only

to assist authorized circumvention.").[11]

_____

[10] The hearing transcript is available at:
https://docs.house.gov/meetings/JU/JU03/20140917/102670/HHRG-113-JU03-
Transcript-20140917.pdf.

[11] *Amici*, and their members, submitted comments and testimony during the
Section 1201 Study process.  *See, e.g.*, *Library of Cong., The U.S. Copyright Office*
*Public Roundtable on Section 1201* ("§1201 Roundtable"), May 19, 2016 Tr. at 22-
23, https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-
2016.pdf (statement of Troy Dow, Walt Disney Co.) ("I can tell you that the
availability of these legal tools has been directly relevant to the decisions to get
into these markets … [T]he DMCA has been a factor in the willingness to engage

Section 1201 has allowed *Amici*'s members to transform their businesses in ways that have expanded the output of creative expression and have made that expression more widely accessible to consumers. *Amici*'s members constantly innovate to meet the demands of their customers and to provide choices to keep audiences growing and diversifying.[12] As one example, without legal protection for access controls, subscription-based, digital access to the vast majority of movies, television content, newspapers, books, magazines, music, and video games—along with inexpensive, time-limited access to downloads of such

---

in all of those things. And so, I think it, from our perspective, has been both necessary and successful."); §1201 Roundtable, May 25, 2016 Tr. at 35, https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf (statement of Ben Golant, ESA) ("I think that the statute has allowed members to be creative in ways to protect its content through DRM measures and then having 1201 on top of that gives them a modicum of assurance that they can go forward to create more and new things. In fact the entire system … leads not only to the creation of innovative products but also goodwill among our consumers."); *id.* at 15 (statement of Susan Chertkof, RIAA) ("It's been well publicized in the music industry that the industry is shifting from an ownership model to an access model and that access is really kind of where all the growth is.").

[12] *See generally* ENTERTAINMENT SOFTWARE ASSOCIATION, 2023 ESSENTIAL FACTS ABOUT THE COMPUTER AND VIDEO GAME INDUSTRY, https://www.theesa.com/wp-content/uploads/2023/07/ESA_2023_Essential_Facts_FINAL_07092023.pdf; MOTION PICTURE ASSOCIATION, 2021 THEME REPORT (2022), https://www.motionpictures.org/wp-content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf; Association of American Publishers, *Inclusive Access Supports Student Success* (Sept. 15, 2022), https://publishers.org/inclusive-access-supports-student-success/; RECORDING INDUSTRY ASSOCIATION OF AMERICA, YEAR-END 2022 RIAA REVENUE STATISTICS (2023), https://www.riaa.com/wp-content/uploads/2023/03/2022-Year-End-Music-Industry-Revenue-Report.pdf.

works—would no longer be a viable business model.  In designing their diverse offerings, authors and creative businesses need marketplace protection against widespread availability of hacking tools that render useless the limitations on digital access that make these offerings possible.[13]  Section 1201 provides that protection and serves copyright law's objective of promoting free expression.

### B.     Congress Has Power to Define the Limits of Fair Use

Contrary to what Appellants and their amici assert, Section 1201 does not limit fair use but rather, through the rulemaking procedure, preserves it. And even assuming *arguendo* that the opposite were true, a false premise underlies their arguments: namely, that Congress may never, consistently with the First Amendment, alter the scope of fair use.  In *Sony-Betamax*, the Court held that recording of free, over-the-air television programming for later viewing, and then

---

[13] Section 1201(a)(2) "is aimed fundamentally at outlawing so-called 'black boxes' that are expressly intended to facilitate circumvention of technological protection measures for purposes of gaining access to a work[.]" H.R. Rep. No. 105-551, pt. 2, at 29 (1998).  "Congress was particularly concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses." *MDY Indus.*, 629 F.3d at 947. Appellant Dr. Huang's Alphamax's NeTVCR falls squarely within the ambit of that Congressional concern, because it would enable the equivalent of such unlawful activities.  After the device strips the HDCP encryption used to protect content transmitted through an HDMI cable, anything viewable on a television screen can be copied in perfect digital form quality and added to a permanent collection of movies, television shows, and music videos, regardless of the terms and conditions of access.

19

deleting the content ("time-shifting") constituted fair use, 464 U.S. 417, 454, but also emphasized:

> It may well be that Congress will take a fresh look at this new technology, ***just as it so often has examined other innovations in the past***.  But it is not our job to apply laws that have not yet been written.

*Id.* at 456 (emphasis added).  Thus, in the seminal case involving new technology and the scope of fair use, the Court expressly indicated that Congress, to promote copyright's purpose, may address technological innovation by circumscribing at least some variants of fair use.

Appellants' proposed uses fall squarely within the type of activity that, according to *Sony-Betamax*, Congress has every right to regulate.  In passing Section 1201, Congress concluded—as it had the constitutional right to do—that access controls are necessary to prevent rampant piracy and to preserve copyright's status as an engine of free expression.

### C.    Section 1201's Rulemaking Procedure Ensures that the Statute Conforms to Copyright's Traditional Contours

Since Congress enacted the DMCA, the Copyright Office and the Librarian of Congress, through the triennial rulemaking process codified in Section 1201(a)(1)(C), have balanced ongoing risks of piracy against the need for exemptions for certain noninfringing uses of certain classes of works.  *See Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (October 2021), available at

20

https://cdn.loc.gov/copyright/1201/2021/2021_Section_1201_Registers_Recomme

ndation.pdf.  Congress created the rulemaking proceeding to address lawful uses of

copyrighted works not covered by the permanent exemptions.  *Id.* at 3.  Section

1201(a)(1) requires the Librarian of Congress, following a rulemaking proceeding

conducted by the Copyright Office, to publish any class of copyrighted works as to

which the Librarian has determined that noninfringing uses by persons who are

users of a copyrighted work are, or are likely to be, adversely affected by the

prohibition against circumvention in the succeeding three-year period, thereby

exempting that class from the prohibition for that period.  *Id.*[14]

      To the extent that Appellants argue that the Copyright Office and Library of

Congress are ill-equipped to make such determinations as compared to a court, the

empirical evidence establishes otherwise. Since at least 2018, the Librarian of

Congress has renewed existing exemptions with scant, and sometimes no

opposition. This lack of controversy shows how the Government has successfully

implemented Congress's mandate as embodied in Section 1201.  Moreover, in the

---

[14] The Librarian must consider: "(i) the availability for use of copyrighted works;
(ii) the availability for use of works for nonprofit archival, preservation, and
educational purposes; (iii) the impact that the prohibition on the circumvention of
technological measures applied to copyrighted works has on criticism, comment,
news reporting, teaching, scholarship, or research; (iv) the effect of circumvention
of technological measures on the market for or value of copyrighted works; and
(v) such other factors as the Librarian considers appropriate."  17 U.S.C.
§1201(a)(1)(C).

16235449.2

recent 2024 rulemaking procedure, the Copyright Office received only 11 petitions for new exemptions and 13 first-round public comments—far fewer than in previous cycles. *See generally Rulemaking Proceedings Under Section 1201 of Title 17 section 1201, of the United States Code,* https://www.copyright.gov/1201/ (linking to current and past proceedings). This decline indicates that the Government has over the years addressed many of the concerns that some had regarding the effect of Section 1201.

Finally, the Copyright Office does not, as Appellants and some of their supporters claim, conduct the rulemaking process in a highly burdensome fashion. The Office even proactively changed its procedures, with support from *Amici* and other copyright owners, to allow for streamlined renewals of exemptions. The Office gives proponents every opportunity to build their cases. The Office does not reflexively deny petitions with poor support at the outset, instead opting to move forward and consider later submitted evidence. For the seventh rulemaking, the Office moved up the schedule for written comments to better align with academic calendars and, in that way, to allow participants to take advantage of representation by free legal clinics. *See* 1201 Study at 148. The 1201 Study contained many quotations from user-side groups and schools as to what they wanted out of the process, and public commentary after the 2018 rulemaking

praised the results.[15]  In the eighth cycle, in 2020-2021, COVID meant that schools

shortened their semesters so students could get home earlier, and the briefing

schedule accommodated those changes.  In the current, ninth proceeding, the

Office granted petitioners an extension of time to file petitions for new and

expanded exemptions.  *See* 88 Fed. Reg. 42891 (July 5, 2023),

https://www.govinfo.gov/content/pkg/FR-2023-07-05/pdf/2023-14133.pdf at

42891 ("To ensure that members of the public, including those represented by law

school clinics, have sufficient time to submit written petitions for new exemptions,

and to ensure that the Office has the benefit of a complete record, the Office is

extending the deadline for the submission of written petitions for new exemptions

….").

The Office also has consulted with the clinics in advance of setting the

schedule to make sure the intended schedule worked.  The Office now allows for,

and this cycle requires, remote participation in hearings.  Nor does the Copyright

Office unduly narrow or reject exemptions, as some of the amici allege.

---

[15] *See, e.g.,* Stan Adams, *Getting Better All the Time: Security Research and the DMCA* (Oct. 26, 2018)*,* https://cdt.org/insights/getting-better-all-the-time-security-research-and-the-dmca/ ("Overall, this round of the 1201 triennial rulemaking has been a great success. CDT applauds the Copyright Office and Acting Register's efforts to improve both the process and the exemptions. It worked.…").

As to the timing of the rulemaking procedure, the Copyright Office concluded:

> While some suggested that the rulemaking should be amended to allow a process to evaluate "out-of-cycle" exemptions, overall, there was not a strong demand for such a change. Commenters did not comment substantively on a proposal in the Breaking Down Barriers to Innovation Act that would provide the Librarian with discretion to conduct a rulemaking outside of the triennial review process. While the Office recognizes the current cycle is an imperfect fit for some needs, reforms would seem to also fall short. A longer cycle would not be as responsive to the pressing needs of proponents. A shorter cycle would be more demanding of participants and would make it difficult to determine whether any exceptions were working as intended.

1201 Study at 148. The Office has accepted evidence from proponents of exemptions submitted for the first time at hearings that take place late in the process and even by letter after those hearings—although the Office could have exercised its discretion to reject such late evidence.

Neither do copyright owners reflexively oppose every proposed exemption, as one amicus asserts. Indeed, *Amici* have not opposed true renewals of any exemptions for multiple cycles;[16] have supported changing the procedure to allow for streamlined renewals with very little evidence submitted by proponents; have frequently offered compromises (especially on important accessibility issues); and

---

[16] *Amici* note that they have on occasion opposed proposed *expansions* of exemptions disguised as renewals.

have chosen not to file responses to new petitions that do not present significant threats to creative industries.

Appellants and their amici also largely ignore the well-ingrained principle that there is "no authority for the proposition that fair use, as protected by the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original." *Corley*, 273 F.3d, 429, 459.  In many cases, there are readily available alternative—and legal—means to access the content at issue.  For example, a review of the 2018 triennial rulemaking record demonstrates that almost all of the conduct Dr. Huang identifies, other than copying full-length movies and shows in an unencrypted, digital format, is already possible using lawful devices currently available in the marketplace.  Split-screen televisions, digital-video-recorders, and video game consoles that allow for recording gameplay are all commonplace. Individuals with print disabilities have access to formats through various channels.

Finally, the triennial rulemaking procedures provide more certainty and cost-effectiveness than an unfettered regime where users would circumvent and make digital copies and then assert fair use if challenged.  Circumvention under those circumstances would result in frequent, expensive litigation and little legal certainty and would have a much greater chilling effect on those wishing to engage in circumvention.  A decision in one case would not create certainty for the next

25

dispute.  For example, Appellant Huang claims that he wants to circumvent to

"space shift" and "format shift."  However, the courts have held that these uses are

not fair uses.  *See, e.g., Disney Enters., Inc. v. VidAngel, Inc.,* 869 F.3d 848, 862

(9th Cir. 2017).  But for the DMCA, proponents of space-shifting or format-

shifting might mistakenly rely on fair use as a justification for circumventing and

(perhaps inadvertently) cause devastating digital piracy.  Section 1201 provides

much more certainty for copyright owners and would-be circumventers alike.[17]

## II.  EVEN ASSUMING SECTION 1201 TRIGGERS HEIGHTENED SCRUTINY, THE COURT SHOULD APPLY INTERMEDIATE SCRUTINY

Even if the Court were to decide that Section 1201 triggers heightened

scrutiny—which it should not—the statute is, at most, subject to intermediate

scrutiny.  As this Court previously concluded: "We turn then to whether the DMCA

'target[s] speech based on its communicative content'—that is, if it 'applies to

particular speech because of the topic discussed or the idea or message expressed.'

*It does not*."  *Green v. United States Dep't of Just*., 54 F.4th 738, 745 (D.C. Cir.

---

[17] Neither is there merit to the contention that the rulemaking process is prohibitively expensive and results in delays.  Lawsuits involving allegations of copyright infringement and issues of fair use can be extremely expensive and can take years to resolve.  For an extreme case, *see Google LLC v. Oracle Am., Inc.,* 141 S. Ct. 1183 (2021) (litigation decided on fair use grounds lasted approximately eleven years).  The rulemaking also provides a fresh bite of the apple every three years, unlike civil litigation. And the rulemaking has been arranged to accommodate representation of exemption seekers by law students.

16235449.2

2022) (internal citation omitted, emphasis added). *See also Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 92-93 (D.D.C. 2019). Other courts considering whether Section 1201 triggers heightened scrutiny have applied intermediate scrutiny and found the provision constitutional. *See Reimerdes*, 111 F. Supp. 2d, 294, 330, *aff'd Corley*, 273 F.3d, 429, 454-55; *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1089 (N.D. Cal. 2004); *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1131 (N.D. Cal. 2002).

## CONCLUSION

In enacting Section 1201, Congress appropriately passed a law essential to preserving copyright's role in promoting free expression. *See Eldred*, 537 U.S., 186,205. The district court's judgment should be affirmed.

MITCHELL SILBERBERG & KNUPP LLP
John Matthew DeWeese Williams
Lucy Holmes Plovnick


By: /s/ John Matthew DeWeese Williams
     John Matthew DeWeese Williams

Counsel for *Amici Curiae*

27

## <u>Certificate of Compliance</u>

This document complies with the word limit because, excluding the parts of the document exempted, this document contains 6,245 words.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point Times New Roman for Microsoft Word Professional Plus 2016.

DATED:  February 9, 2024            By:    <u>/s/ John Matthew DeWeese Williams  </u>
                                                        John Matthew DeWeese Williams

16235449.2

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: February 9, 2024 /s/ John Matthew DeWeese Williams

John Matthew DeWeese Williams

16235449.2