ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-5159

_____

**IN THE UNITED STATES COURT OF APPEALS**

_____

MATTHEW D. GREEN, ET AL.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellees*.

_____

**BRIEF OF AMICI CURIAE DVD COPY CONTROL ASSOCIATION, INC AND ADVANCED ACCESS CONTENT SYSTEM LICENSING ADMINISTRATOR, LLC IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMING THE DISTRICT COURT'S DECISION**

_____

On Appeal from the U.S. District Court for the District of Columbia

Case No. 1:16-cv-01492-EGS

_____

Michael B. Ayers
Michael B. Ayers Technology Law
5256 S. Mission Rd., Suite 703-2215
Bonsall, CA 92003-3622
(760) 607-6434
michael@ayerstechlaw.com

David Jonathan Taylor
Right Size Law PLLC
621 G St. SE
Washington, DC 20003
(202) 546-1536
david.taylor@rightsizelaw.com

*Counsel for Amici Curiae*

## CORPORATE DISCLSOURE STATEMENT

Pursuant to Circuit Rule 26.1, Amici DVD Copy Control Association, Inc. ("DVD CCA"), and Advanced Access Content System Licensing Administrator, LLC ("AACS LA"), state that they have no parent corporations and that no publicly held corporation or other publicly held entity owns ten percent (10%) or more of amici curiae.

**Nature and Purpose Relevant to the Case:**

Amicus Curiae DVD CCA is a not-for-profit corporation with its principal office in Morgan Hill, California. The founders of DVD CCA include companies representing the consumer electronics, information technology, and motion picture industries. DVD CCA licenses the Content Scramble System for use in protecting against unauthorized access to or use of prerecorded video content distributed on DVD discs. Its licensees include the owners of such content and the related authoring and disc replicating companies; producers of encryption engines, hardware and software decrypters; and manufacturers of DVD players and DVD-ROM drives for computers.

Amicus Curiae AACS LA, is a cross-industry limited liability company with its principal offices in Beaverton, Oregon. The founders of AACS LA are Warner Bros., Disney, Microsoft, Intel, Toshiba, Panasonic, Sony, and IBM. AACS LA licenses the Advanced Access Content System technology that it developed for the

ii

protection of high-definition audiovisual content distributed on optical media. That technology is associated with Blu-ray Discs. AACS LA's licensees include the owners of such content and the related authoring and disc replicating companies; producers of encryption engines, hardware and software decrypters; and manufacturers of Blu-ray Disc players and Blu-ray Disc drives.

AACS LA has also developed a separate technology for the distribution of audiovisual content in ultra-high-definition digital format. This distinct technology protects audiovisual content distributed on UHD Blu-ray discs, a distinct optical disc format which will not play on legacy Blu-ray players.

### CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Counsel for amici curiae certify as follows:

**(A)    Parties and amici:**

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellees.

**(B)    Rulings under review:**

References to the rulings under review appear in the Brief of Appellees.

**(C)    Related cases:**

Amici are unaware of any related cases.

/s/ David Jonathan Taylor
David Jonathan Taylor

iii

## TABLE OF CONTENTS

**CORPORATE DISCLSOURE STATEMENT** ......................................................ii

**CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW,  AND RELATED CASES** ............................................................ iii

**TABLE OF AUTHORITIES**...............................................................vi

**GLOSSARY OF ABBREVIATIONS** ..........................................vii

**SATUTES AND REGULATIONS** ............................................. viii

**STATEMENT OF IDENTITY, INTEREST OF AMICI, SOURCE OF AUTHORITY TO FILE** ............................................................ viii

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ..ix**

**SUMMARY OF ARGUMENT** ........................................................1

**ARGUMENT** ...................................................................................2

**I.    THE ACT ENABLES THE CREATION AND MAINTENCANCE OF A ROBUST DIGITAL MARKETPLACE FOR EXPRESSIVE WORKS**..................................................................................2

    A.    Congress Recognized the Digital Marketplace Required New Tools to Protect Copyrights...................................................3

    B.    Amici Licensors Exemplify the Success Congress Envisioned.................5

**II.    The Act Did Not Alter the Traditional Contours of Copyright Law**..........6

    A.    Legal Protection Against Hacking of Digital Locks Is Not a Copyright ....7

    B.    The Circumvention Prohibition Does Not Apply to Copy Controls.........11

**III.    The Act Does Not Diminish Fair Use**..................................................12

    A.    The Balance Between Copyright Protection and Fair Use Is Preserved Explicitly ....................................................12

    B.    The Circumvention Prohibition of Access Controls Does Not Prevent Fair Use...........................................................13

**IV.    The Failsafe Rulemaking Fundamentally Preserves the Built-In First Amendment Accommodations of Fair Use** .................................14

iv

A.    The Statutory Criteria Leaves Little Discretion .........................................16

B.    The Rulemaking Requirements Are Consistent with the Statute..............18

C.    The Rulemaking Is Effective and Responsive Fair Use-Safeguard ..........20

   1.    The Rulemaking Has Evolved to Permit Refined Classes of Works Based on Purpose and Use ..............................................................20

   2.    The Rulemaking Has Expanded the Application of Fair Use .................21

      a)    High Quality Images Require Circumvention..................................22

      b)    Alternatives to Circumvention Satisfy Other Non-Infringing Uses ....................................................................................23

   3.    Subsequent Proceedings Result in the Creation of More Exemptions................................................................................23

   4.    Exemption Proponents' Shortcomings....................................................24

**CONCLUSION**........................................................................................................**25**

**CERTIFICATE OF COMPLIANCE** ...................................................................**27**

**CERTIFICATE OF SERVICE** ...........................................................................**27**

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*321 Studios v. Metro Goldwyn Studios, Inc.*,
  307 F. Supp.2d 1085 (N.D. Cal. 2004)..................................................................6

*Hecate Energy Greene Cnty. 3 LLC v. Fed. Energy Regulatory Comm'n*,
  72 F.4th 1307 (D.C. Cir. 2023) ..........................................................................17

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
  629 F. 3d 928 (9th Cir. 2010) .............................................................................10

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) ............................................................................................20

*RealNetworks, Inc. v. DVD Copy Control Ass'n*,
  641 F. Supp.2d 913 (N.D. Cal. 2009)...................................................................6

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ............................................................................................20

*Stenograph L.L.C. v. Bossard Associates, Inc.*,
  144 F.3d 96. 101-02 (D.C. Cir. 1998) ..................................................................7

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001)....................................................3, 6, 10, 13, 14, 22

*Universal City Studios, Inc. v. Reimerdes*,
  82 F. Supp.2d 211 (S.D. N.Y. 2000) ....................................................................6

**TREATIES**

*WIPO Copyright Treaty (1996) and WIPO Performances and Phonograms Treaty
  (1996)*, S. Treaty Doc. No. 105-17 (signed by the United States on April 12,
  1997)...........................................................................................................3, 4, 5

**STATUTES**

Administrative Procedures Act,
  5 U.S.C. § 556 ....................................................................................................20
  5 U.S.C. § 557 ....................................................................................................20

Audio Home Recording Act,
  17 U.S.C. §§ 1001 ................................................................................................9

Copyright Act
    17 U.S.C. § 102 .................................................................21
    17 U.S.C. § 106 ...................................................................8

Digital Millennium Copyright Act,
    17 U.S.C § 1201(a)(1)(C)..........................................2, 15, 20
    17 U.S.C § 1201(b)............................................................13
    17 U.S.C § 1201(c)...............................................13, 17, 18

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(1998) ........................2, 4, 9, 15, 17, 19
S. Rep. No. 105-190 (1998) ...........................................4, 11, 12

**OTHER AUTHORITIES**

U.S. Copyright Office, Library of Congress, Section 1201
    Rulemaking on Exemptions from Prohibition on Circumvention of
    Copyright Protection System for Access Controls,
    Recommendation of the Register of Copyrights(RM 2005-11)
    (Nov. 17, 2006), at https://cdn.loc.gov/copyright/1201/docs/1201_
    recommendation.pdf................................................21, 22, 23

U.S. Copyright Office, Library of Congress, Section 1201
    Rulemaking: Seventh Triennial Proceeding to Determine
    Exemptions to the Prohibition on Circumvention,
    Recommendation of the Register of Copyrights (Oct. 2018) at
    https://cdn.loc.gov/copyright/1201/2018/2018_Section_1201_
    Acting_Registers_Recommendation.pdf............................25

U.S. Copyright Office, Library of Congress, DMCA Section 104
    Report (2001).......................................................................7

U.S. Department of Commerce, Report of Working Group
    on Intellectual Property Rights of Information
    Infrastructure Task Force, Intellectual Property Rights and
    the National Information Infrastructure (Sept. 1995)..........9

**GLOSSARY OF ABBREVIATIONS**

Digital Millennium Copyright Act          DMCA

## SATUTES AND REGULATIONS

All applicable statutes, etc. are contained in the Brief for Appellees.

## STATEMENT OF IDENTITY, INTEREST OF AMICI, SOURCE OF AUTHORITY TO FILE

Amici are DVD CCA and AACS LA, entities engaged in the development, maintenance, and licensing of encryption-based technological protection measures upon which the motion picture, consumer electronics, and information technology industries rely to create a secure environment for the distribution of digital copies of expressive works to the public for its use and entertainment. As Amici overwhelmingly rely on the Digital Millennium Copyright Act (the "Act") for the legal protection of their technologies, an adverse ruling would effectively remove the cornerstone of legal support for the current digital marketplace that enables creators to deliver copies of their works securely in the digital environment, and Amici DVD CCA and AACS LA and their cross-industry licensees, like all other technological protection measure providers and distribution models, would be irreparably harmed.

Amici offered their views the first time Appellants were before this Court to challenge to the Act.[1] This amicus brief provides the Court with the opportunity to

---

[1] Corrected Amicus Brief for Appellee by Advanced Access Content System Licensing Administrator, *et. al*., *Green v. U.S. Department of Justice* (No. 21-5195) (May 23, 2022).

viii

consider fully how the Act makes a digital marketplace for copyrighted works possible from the perspective of the technological protection measure development and licensing entities and their licensees. DVD CCA's perspective is particularly important, as its technology, the Content Scramble System, has been at issue in the central line of cases challenging the Act as well as a primary target in the Section 1201 Rulemaking, since its inception. This brief is necessary because no other party can offer the perspective of these particular entities, made up of member companies from three relevant industries (i.e., consumer electronics manufacturers, information technology providers, and content creators). Working cooperatively, these companies have succeeded in ushering in an unparalleled era of innovation and choice for the public to make use of copyrighted works such that information, ideas, and speech have flourished.

Counsel for Matthew Green, Andrew "bunnie" Huang, and Alphamax LLC and counsel for the United States Department of Justice consent to the filing of this brief. Accordingly, Amici have filed a Notice of Intent to Participate as Amicus Curiae.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting

this brief, and no person - other than amici curiae, its members or its counsel - contributed money to fund preparation or submission of this brief.

## SUMMARY OF ARGUMENT

Congress passed the Act – more specifically and most pertinently, the anticircumvention provisions and the antitrafficking provisions (the "Act's Prohibitions") – to create and maintain a stable marketplace for the distribution of digital copies of expressive works. Supreme Court precedent instructs that such changes to copyright law do not offend the First Amendment, provided the changes do not alter the traditional contours of copyright law. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003). The Act's Prohibitions clearly do not alter the traditional contours, but rather bring those contours into the new millennium.

Indeed, the Act's Prohibitions did not expand or in any way alter the traditional scope of copyright protection, but instead commanded respect for digital locks and thwarted the creation of a market for circumvention devices (i.e., tools that can "pick" the digital locks). This legal protection of technological measures was required so that the contours of copyright law could be preserved in the new digital environment. Congress drew careful distinctions between access controls and copy controls, such that the circumvention prohibition does not extend to copy controls. Finally, even though fair uses of protected works can certainly be made while nonetheless respecting the circumvention prohibition, Congress provided the Section 1201 Rulemaking as a fail-safe mechanism to regularly consider petitions for specific noninfringing uses that are adversely affected by the circumvention

1

prohibition.  *See* 17 U.S.C § 1201(a)(1)(C).  As every rulemaking thus far has resulted in an increasing number of exemptions permitting the circumvention of access controls, the 1201 Rulemaking is fulfilling its purpose – enabling those noninfringing uses while preserving the legitimate digital marketplace for copyrighted works.  Therefore, the Court should uphold the District Court's decision.

**ARGUMENT**

## I.  THE ACT ENABLES THE CREATION AND MAINTENCANCE OF A ROBUST DIGITAL MARKETPLACE FOR EXPRESSIVE WORKS

The Act fundamentally establishes and enforces reasonable rules of the road that make the digital marketplace possible.[2]  Specifically, the Act's Prohibitions enable creators to distribute copies of expressive works in the digital marketplace in both the traditional manner used to distribute copies in the physical analog world (i.e*.,* a single copy bound to a physical medium) as well as new, innovative distribution models leveraging the advantages of digital technology.  This has resulted in more widespread distribution of expressive works to the public than ever before.

---

[2] The House Commerce Committee explained that this "most important . . . legislation affecting electronic commerce . . . establishes a wide range of rules that will govern not only copyright owners in the marketplace for electronic commerce, but also consumers, manufacturers, distributors, libraries, educators, and on-line service providers."  H.R. Rep. No. 105-551, pt. 2 at 22 (1998), ("House Report").

A.    **Congress Recognized the Digital Marketplace Required New Tools to Protect Copyrights**

The evolution of digital technology challenged the historic reliance of selling copies of expressive work fixed on a physical medium.  Digital technology made each copy of the work transferrable to any computer or other digital storage device or medium.  And, unlike the analog world, in which pirated copies were often inferior to the original copy and constrained to physical media, digital technology threatens to unleash for unauthorized redistribution an unlimited number of perfect copies instantly, across the globe, and completely untethered to traditional physical media.  Congress, keenly aware of these facts,[3] ultimately approved implementing legislation for the World Intellectual Property Organization Internet Treaties ("WIPO Internet Treaties").

In its introduction of the implementing legislation for the treaties, the Senate Judiciary Committee explained:

> With this constant evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials.  The legislation implementing the treaties, Title I of this bill, provides this protection and creates the legal platform for

---

[3] "Even before the treaty, Congress had been devoting attention to the problems faced by copyright enforcement in the digital age. Hearings on the topic spanned several years."  *See Universal City Studios, Inc. v. Corley*, 273 F. 3d 429, 440 (2d Cir. 2001) (reciting Congressional hearings from 1995 to 1998).

3

launching the global digital on-line marketplace for copyrighted works.[4]

The WIPO Internet Treaties recognized the solution to the digital technology challenge was, itself, technology: technological protection measures.[5] Technological protection measures could preserve the one-copy distribution model for the vast majority of creators, who depended on that model to sell copies of their works, and technological protection measures would also allow for experimentation and creation of new distribution models for expressive works. However, for technological protection measures to be effective, the WIPO Internet Treaties recognized that a corresponding legal framework is necessary to support such measures and discourage the inevitable trafficking of tools used to circumvent those technological protection measures. Otherwise, a technological "arms race" would

---

[4] S. Rep. No. 105-190 at 9 (1996) ("Senate Report"). Similarly, the House Commerce Committee noted,

> an increasing number of intellectual property works are being distributed using a "client-server" model, where the work is effectively "borrowed" by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis). To operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy.

House Report, *supra* note 2 at 23.

[5] The Senate Judiciary Committee explained that the World Intellectual Property Organization Treaties require the "legal protection and effective legal remedies" of technological measures. Senate Report, *supra* note 4 at 5.

follow between content providers employing technological protection measures to distribute protected copies of works and purveyors of circumvention tools, who would promise pirates and consumers alike the ability to circumvent these measures to make multiple copies of works and thereby gain free access to paid services.

In implementing the World Intellectual Property Treaties and passing the Act, Congress rejected this unregulated and lawless vision of the digital marketplace and provided a structure and a level of predictability that has permitted a wide and diverse array of expressive works to flourish across a host of innovate distribution platforms. As a result, the public has undeniably reaped the constitutional benefits of the Copyright clause, as the engine of expression, more than in any other period of history.

### B.    Amici Licensors Exemplify the Success Congress Envisioned

Amici DVD CCA and AACS LA are each developers and licensors of technological protection measures, and, more specifically, of access control technologies enabled and supported by the Act. As cross-industry organizations representing content creators, consumer electronic companies, and technology companies, the amici facilitate the distribution of two leading digital formats – the DVD and Blu-ray Disc optical disc formats. Specifically, the DVD encouraged creators to enter the digital format marketplace, and today's widespread availability of expressive works in the digital marketplace is owed in large part to the protection

5

the Act afforded to the Content Scramble System)in the early days of the digital marketplace.[6] Early cases resolving challenges to the Act and its application to the distribution of digital copies of copyrighted works on DVDs were fundamental to establishing rules of the road that have resulted in the creation of a historic and unprecedented market for expressive works.

## II.    The Act Did Not Alter the Traditional Contours of Copyright Law

In passing the Act, Congress simply made the traditional contours of copyright law applicable to the digital environment.  Historically, as copies of works were distributed on physical media, copyright law naturally concerned itself with the reproduction and distribution of copies of the work (i.e., the physical nature of the copy).  Lawful access to a copy of an expressive work was generally inherent in dominion over the physical medium in which the copy of the work was embodied. Other laws, such as tort and criminal law, were, at that time sufficient in governing the lawful ownership or possession of the physical medium containing the copy of the work.  These principles, developed in the context of distribution of analog

---

[6] *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp.2d 211 (S.D.N.Y. 2000); *aff'd Universal City Studios Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001); *321 Studios v. Metro Goldwyn Studios, Inc.*, 307 F. Supp.2d 1085 (N.D. Cal. 2004); *RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp.2d 913 (N.D. Cal. 2009).

physical media, could not be exactly mapped to the digital world and the unique demands of the digital marketplace.

The very nature of digital technology is in tension with the weight given by copyright to the reproduction right, in that digital technology inherently involves the making of additional copies[7] and moreover enables easily making unlimited, perfect reproductions of a work.[8]   Nevertheless, Congress sought a carefully weighted solution consistent with the traditional contours of copyright and other property law.

### A.   Legal Protection Against Hacking of Digital Locks Is Not a Copyright

Section 1201(a) of the Act prevents circumvention of technological measures used to control access to a copyrighted work.  This prohibition against circumvention

---

[7] In the Section 104 Report to Congress, the Copyright Office explained the inherent tension:

> All of the familiar activities that one performs on a computer — e.g., execution of a computer program, retrieval and display of information, browsing the World-Wide Web — necessarily entail making reproductions in RAM. These reproductions generally are made automatically, and transparently to the user—i.e., without the user being aware that copies are being made. The copies usually persist for as long as the activity takes place.

U.S. Copyright Office, Section 104 Report at 107 (2001).  The Copyright Office concluded that these RAM copies implicate the reproduction right.  *Id.* at 109. ("Reproducing a work in RAM therefore falls within the scope of a copyright owner's exclusive reproduction right if it results in a 'copy.'").

[8] *See Stenograph L.L.C. v. Bossard Associates, Inc.*, 144 F.3d 96, 101-02 (D.C. Cir. 1998) (reviewing authorities on how the reproduction right is implicated when loading a program).

7

does not expand copyright protections, but, rather, effectuates an established concept in the digital environment.  Before digital technology, copyright law never had the need to address lawful access to a copy of the work, because lawful access to analog copies is inherent in ownership of the copy.  However, once a copy of a work is distributed in a digital format, technological protection measures, which control and limit access to the copy, must be employed so that the reproduction and distribution of digital copies more closely approximate the traditional contours of copyright law (i.e., such measures preserve creators' existing rights).

Section 1201(a), which prohibits circumvention of access controls, permits creators to employ digital locks for the security of highly valued expressive works and demands that those digital locks are respected.  In fact, Congress explained that the Act's Prohibitions are "roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses."  S. Rep. No. 105-190 at 11.  Accordingly, when Congress established the Act's Prohibitions, it did not expand the exclusive rights granted to creators in Section 106, it instead authorized digital locks.

In fact, Congress put the Act's Prohibitions in a new Chapter 12 of Title 17 ("Copyright Protection and Management Systems"), outside the Copyright Act. This placement of the Act's Prohibitions in a new Chapter 12 immediately suggests that  Congress  viewed  the  provisions  governing  copyright  protection  and

8

management systems (i.e., technological protection measures) as not intended to expand those exclusive rights granted under Section 106. Rather, the provisions are more akin to those topics tangential to the Copyright Act such as rules governing digital audio recording devices.[9] Indeed, the House Report accompanying the Act stated that these provisions could stand on their own apart from Title 17 as the legislation approved by the Judiciary Committee "would regulate – in the name of copyright law – the manufacture and sale of devices that can be used to improperly circumvent technological protection measures" and the Act's Prohibitions "have little, if anything, to do with copyright law." H.R. Rep. No. 105-551 at 23-24.

Securing access to expressive works is not a new concept introduced by the Act. Creators and distributors of physical copies of expressive works - as well as consumers who purchased their own copies - regularly store copies in locked facilities to prevent theft. A gallery, for example, limits access to its works by locking its door and adding additional security measures. The notion of keeping

---

[9] 17 U.S.C. §§ 1001 (governing digital audio recording devices and media). In fact, the Administration's White Paper recognized that the precedent for the Act's Prohibitions were these provisions of the Audio Home Recording Act and also provisions found in the Communications Act. *See* Department of Commerce, Report of Working Group on Intellectual Property Rights of Information Infrastructure Task Force, Intellectual Property Rights and the National Information Infrastructure at 239-40 (Sept. 1995) (citing 47 U.S.C. § 605(e)(4) (1988)).

these copies of works secure does not offend any legal principle.[10]  Applying digital locks directly to the copy enables the digital market for copyrights and does so consistently with the basic ideas of property law, including copyright.

Likewise, applying digital locks enables the offering of expressive works via new services.  Every popular video-on-demand subscription service enjoyed by families today (such as Netflix, Amazon Prime, and Disney Plus) is protected by passwords and other technical means to limit access to content available on the service to authorized customers.  The Ninth Circuit explained that circumventing an access control

> is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book.  We note that bypassing a password and breaking into a locked room in order to read or view a copyrighted work would not infringe on any of the copyright owner's exclusive rights under § 106.[11]

These digital locks are thus not expanding the exclusive rights but enabling copyright law in the digital age to approximate the well-defined contours of the physical world.

---

[10] "Owners of all property rights are entitled to prohibit access to their property by unauthorized persons. Homeowners can install locks on the doors of their houses. Custodians of valuables can place them in safes."  *See Corley*, 273 F.3d at 452.

[11] *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F. 3d 928, 947 (9th Cir. 2010) (citing, in part, H.R. Rep. No. 105-551, pt. 1, at 17 (1998)) (internal quotations omitted).

**B.    The Circumvention Prohibition Does Not Apply to Copy Controls**

The distinction between types of technological protection measures clarifies that applying digital locks does not alter the traditional contours of copyright law. The Act distinguishes between two different types of technological protection measures – those measures that control access to a work (i.e., "access controls") governed by Section 1201(a) and those measures that protect rights belonging to the copyright owner (i.e., "copy controls") governed by Section 1201(b).  In treating these two types of measures separately, Congress underscored the distinction between employing digital locks to control access to a work and otherwise protecting the rights of a copyright owner under the Copyright Act.[12]

The Act does not treat access controls and copy controls the same.  The prohibition against circumvention applies only to access controls, and there is no equivalent prohibition against the circumvention of copy controls.  The Senate Judiciary Committee explained:

---

[12] The Senate Judiciary Committee observed that

> Although sections 1201(a)(2) and 1201(b) of the bill are worded similarly and employ similar tests, they are designed to protect two distinct rights and to target two distinct classes of devices. Subsection 1201(a)(2) is designed to protect access to a copyrighted work. Section 1201(b) is designed to protect the traditional copyright rights of the copyright owner.

Senate Report, *supra* note 4 at 12.

11

> It is anticipated that most acts of circumventing a technological copyright protection measure will occur in the course of conduct which itself implicates the copyright owners['] rights under title 17. This subsection is not intended in any way to enlarge or diminish those rights. Thus, for example, where a copy control technology is employed to prevent unauthorized reproduction of a work, the circumvention of that technology would not itself be actionable under 1201, but any reproduction of the work that is thereby facilitated would remain subject to the protections embodied in title 17.

S. Rep. No. 105-190 at 9.  Congress made this distinction between access controls and copy controls because Congress saw that the resulting infringement of circumventing a copy control would be adequately addressed by copyright law.[13] "[C]opyright law has long forbidden copyright infringement, so no new prohibition [against circumvention of copy controls] was necessary."[14]  However, access controls like digital locks had no other legal protection; therefore, the prohibition against circumvention of access controls is certainly necessary.

## III.    The Act Does Not Diminish Fair Use

### A.    The Balance Between Copyright Protection and Fair Use Is Preserved Explicitly

The statute preserves the traditional contours of copyright, including fair use. Immediately following the Act's Prohibitions found in subsections 1201(a) and

---

[13] The Senate Report confirms this, "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1) . . . .  The copyright law has long forbidden copyright infringement, so no new prohibition was necessary."  Senate Report, *supra* note 4 at 12.

[14] *Id.*

1201(b) is subsection 1201(c)(1) (Other Rights, Etc., Not Affected), which provides, "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." 17 U.S.C. § 1201(c)(1). The *Corley* court explained

> [the provision] clearly and simply clarifies that the DMCA targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the use of those materials after circumvention has occurred. Subsection 1201(c)(1) ensures that the DMCA is not read to prohibit the "fair use" of information just because that information was obtained in a manner made illegal by the DMCA.

*Corley*, 273 F.3d at 443. This explanation clarifies that a violation is more akin to a digital trespass, and that the trespass itself does not give rise to a claim of either copyright infringement or fair use.

## B. The Circumvention Prohibition of Access Controls Does Not Prevent Fair Use

*Corley* further demonstrates that fair use is not diminished by the circumvention prohibition. The *Corley* appellants argued that, by protecting the Content Scramble System from circumvention, the net effect was to prevent the appellants from making fair use of the protected works by directly copying excerpts in the same digital format. The court rejected the argument, explaining that

> the DMCA does not impose even an arguable limitation on the opportunity to make a variety of traditional fair uses of DVD movies, such as commenting on their content, quoting excerpts from their screenplays, and even recording portions of the video images and

> sounds on film or tape by pointing a camera, a camcorder, or a
> microphone at a monitor as it displays the DVD movie.

*Corley*, 273 F.3d at 459.  The Court went on to reject the argument that fair use

provides a constitutionally protected right to make perfect digital copies of a work:

> The fact that the resulting copy will not be as perfect or as manipulable
> as a digital copy obtained by having direct access to the DVD movie in
> its digital form, provides no basis for a claim of unconstitutional
> limitation of fair use.

*Id.*  Nor does fair use require that a user be permitted to make copies in their preferred

format.

> A film critic making fair use of a movie by quoting selected lines of
> dialogue has no constitutionally valid claim that the review (in print or
> on television) would be technologically superior if the reviewer had not
> been prevented from using a movie camera in the theater, nor has an art
> student a valid constitutional claim to fair use of a painting by
> photographing it in a museum.

*Corley*, 273 F.3d at 459.  In short, the Court concluded, "[f]air use has never been

held to be a guarantee of access to copyrighted material in order to copy it by the

fair user's preferred technique or in the format of the original."  *Corley,* 273 F.3d at

459.

## IV.    The Fail-Safe Rulemaking Fundamentally Preserves the Built-In First Amendment Accommodations of Fair Use

Having its inception in the House Commerce Committee, the Section 1201

rulemaking serves as a fail-safe mechanism to preserve fair use in those

circumstances in which the general prohibition against circumvention would

adversely affect the ability of persons to engage in noninfringing uses of a particular

14

class of works.  17 U.S.C. § 1201(a)(1)(C).  The House Commerce Committee explained:

> Given the threat of a diminution of otherwise lawful access to works and information, the Committee on Commerce believes that a "fail-safe" mechanism is required. This mechanism would monitor developments in the marketplace for copyrighted materials, and allow the enforceability of the prohibition against the act of circumvention to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials.

H.R. Rep. 105-551 at 36.  The Register of Copyrights convenes the rulemaking every three years to consider whether recommendations for specific exemptions particular to the record should be created and/or renewed to permit the circumvention of access controls with respect to identified classes of works for the next three-year period. Because the Content Scramble System was the earliest target of the Act's opponents, DVD CCA has participated in every rulemaking convened by the Register of Copyrights.  AACS LA has participated in all but the earliest proceedings.

The Register of Copyrights, supported by the expertise of the Copyright Office, is uniquely suited to parse through the multiple petitions and oppositions to recommend exemptions consistent with the law and the record evidence.  The threshold question in recommending an exemption is whether the petitioner's activity is indeed likely to be considered noninfringing, followed by an inquiry into whether the ability to engage in that activity with respect to a particular class of works is, in fact, adversely impacted by virtue of the Act's circumvention

15

prohibition. As the rulemaking process has matured along with the digital marketplace for copyrighted works, the increasing number of exemptions that are created and renewed each cycle proves that the rulemaking is indeed serving as the fail-safe mechanism that Congress intended.

### A.    The Statutory Criteria Leaves Little Discretion

Far from being a content-based process that favors some speakers over others, the Section 1201 rulemaking process focuses on identifying noninfringing uses and creating exemptions that enable those activities, which the record evidence shows to be likely noninfringing and adversely affected by the circumvention prohibition.

The statutory criteria to determine whether noninfringing uses of a class of works are adversely affected by the circumvention prohibition are:

(i)    the availability for use of copyrighted works;

(ii)    the availability for use of works for nonprofit archival, preservation, and educational purposes;

(iii)    the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv)    the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v)    such other factors as the Librarian considers appropriate.

17 U.S.C. § 1201(a)(1)(C). The first four factors clearly articulate unambiguous, intelligible principles that provide a firm foundation for rulemaking. And while the fifth factor is something of a catch-all for what Congress could not then predict

16

would be relevant, nothing suggests that the fifth factor is in any way weighted more than the first four factors.  In fact, this catch-all provision is itself limited by the scope of the first four factors.  *See, e.g., Hecate Energy Greene Cnty. 3 LLC v. Fed. Energy Regulatory Comm'n,* 72 F.4th 1307, 1313 (D.C. Cir. 2023*)* ("When a catch-all follows a list of enumerated items, courts read the catch-all to cover things closely related to the list.")   The House Commerce Committee, which designed the rulemaking, explained these criteria "are illustrative of the questions that the rulemaking proceeding should ask.  In each case the focus must remain on whether the implementation of technological protection measures (such as encryption or scrambling) has caused adverse impact on the ability of users to make lawful uses." H. R. Rep. No. 105-551 at 37.

The rulemaking proceeding has no ability to deviate from the statutory criteria as Congress instructed that the rulemaking "shall examine" the statutory criteria.  17 U.S.C. § 1201(c).  While Appellants and amici complain solely about the fifth factor – they cannot say that any determination has failed to consider the statutory criteria or even that the Register weighed the fifth factor disproportionately in any determination (to the extent it played a role in the determination at all).  Nor could they, because each determination is made on the record; the analysis for each determination is presented in the Register's recommendation; and ultimately, the

Librarian of Congress reviews the recommendation for sufficiency, as the Librarian is responsible for the determination.

### B.    The Rulemaking Requirements Are Consistent with the Statute

The fact that exemption proponents need to make certain showings, which need to be supported by specific evidence on the record, simply makes the rulemaking consistent with the statutory scheme.  Even the House Commerce Committee, which, of all the committees that considered this legislation, expressed the most concern about the alleged adverse effects on fair use, instructed that "[i]f the rulemaking has produced insufficient evidence to determine whether there have been adverse impacts with respect to particular classes of copyrighted materials, the circumvention prohibition goes into effect with respect to those classes." H.R. Rep. No. 105-551at 38.

Furthermore, requiring proponents to come forward with the evidence to support their proposed exemption is the only rational approach the Copyright Office could choose.  The point of the rulemaking proceeding is to provide a "fail-safe" for specific, noninfringing uses that may be thwarted as a result of the use of a particular technological protection measure.  The only parties who will know what uses are actually thwarted are the parties who wish to exploit those uses.

This approach is consistent with the legislative history.  The House Commerce Committee report states that the goal of the proceeding is to "assess whether the

18

implementation of technological protection measures . . . is adversely affecting the ability of individual users to make lawful use of copyrighted works." H.R. Rep. No. 105-551 at 37. It goes on to suggest that the rulemaking "will solicit input to consider a broad range of evidence of past or likely adverse impacts." *Id.* As the goal is to look at individual users' ability to make lawful use, the Copyright Office has correctly solicited proposed exemptions from the public as only an individual knows whether his or her particular noninfringing use is being adversely affected.

The Librarian and Register have correctly proceeded with caution to develop specific exemptions on a case-by-case basis, ensuring that each exemption was warranted following a review of the statutory factors. They have done so by exercising an agency's prerogative to choose how best to implement a rulemaking. *See SEC v. Chenery Corp*., 332 U.S. 194, 202-03 (1947) (explaining that agencies must enjoy significant discretion to choose between rulemaking and adjudication); *NLRB v. Bell Aerospace Co*., 416 U.S. 267, 295 (1974) (holding that the choice between rulemaking and adjudication lies within the administrative agency's discretion). That prerogative has led them to include a hearing, and adopt some elements of an Administrative Procedures Act adjudication, such as the burden of proof, yet not all of the other legal elements such as sworn testimony, cross examination, and submissions of finding of facts and conclusions of law. *See generally* 5 U.S.C. §§ 556, 557. Thus, the Librarian and Register have implemented

19

a rulemaking consistent with the statute, its legislative history, and principles of administrative law.

### C.    The Rulemaking Is Effective and Responsive Fair Use-Safeguard

Congress provided the Section 1201 rulemaking as a more flexible, responsive, and recurring mechanism to determine when the circumvention prohibition should be relaxed to enable noninfringing uses demonstrated to be adversely affected by the circumvention prohibition, rather than relying on Congress to repeatedly revisit the Act's Prohibitions.[15]

#### 1.    The Rulemaking Has Evolved to Permit Refined Classes of Works Based on Purpose and Use

In the first two rulemakings, the Register's interpretation of the statute premised classes of work on the statutory reading of "class" as one of the categories of work found in Section 102 the Copyright Act.  At that time, the Register indicated that a class could not be predicated on a specific use (purpose) or user.  However, in 2006, the Register announced that a class could be further "refined" by reference to specific uses or by specific users (e.g., libraries or scholarly research).[16]

---

[15] 17 U.S.C. §§ 1201(a)(1)(C)-(D).

[16] U.S. Copyright Office, Library of Congress, Section 1201 Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection System for Access Controls, Recommendation of the Register of Copyrights at 17 (RM 2005-11) (Nov. 17, 2006), available at https://cdn.loc.gov/copyright/1201/docs/1201_recommendation.pdf.

In that proceeding, film studies professors put forth a compelling case demonstrating that their identified use was noninfringing and that the Content Scramble System employed on DVDs prevented the film studies professors from making and incorporating relevant clips from the DVDs to include in class lectures. This evidentiary showing led the Register to conclude that a well-refined class was indeed adversely affected by the circumvention prohibition. [17]

## 2.   The Rulemaking Has Expanded the Application of Fair Use

The Rulemaking expanded the notion of fair use beyond judicial observation. As discussed above, the *Corley* court found that fair use did not entitle the would-be

---

[17] The Register distinguished how the analysis of the statutory factors differed between a well-refined class built on the evidentiary record and those previously proposed classes that were solely or primarily defined by reference to use. On the first factor (the availability of copyrighted works), the Register found that motion picture studios "are not likely to be deterred from releasing works on DVDs when "the class of works is more narrowly defined, permitting circumvention only by college and university film and media studies professors for classroom teaching[.]" 2006 Recommendation, *supra* note 16 at 19. As for the second factor (the use of works for nonprofit archival preservation), the Register reasoned, this "statutorily favored purpose would be more clearly served by an exemption" for a class consisting of motion pictures in the educational library or a college or university's film or media studies department" (the well-refined class) than in the case of a class "consisting of all motion pictures on DVDs . . . ." *Id*. at 19-20. The Register further reasoned that this finding would also be true for the third factor (the use of the work for criticism, comment, news reporting, teaching, scholarship, or research). On the final factor (the effect on the market for or value of the work), the Register suggested that "the analysis will be very different depending upon whether that class consists of all motion pictures on DVDs or only of motion pictures used by film and media studies professors for classroom teaching." *Id*. at 20.

fair users to make use of the actual copy of the work distributed on DVDs. *Corley,* 273 F.3d at 459. The Rulemaking however, on the basis of a solid evidentiary record, was able to provide exemption proponents with the use that they desired. The fundamental inquiry is whether the exemption proponents satisfactorily demonstrate that their desired noninfringing use requires high-quality images.

### a)    High Quality Images Require Circumvention

In the 2006 Proceeding, the film professors' demonstrated need for high-quality images spurred the Register to expand doctrine of fair use to include making use of the copy distributed on the DVD.[18] The Register noted that those needs could not be satisfied with alternatives to circumvention.

> The record does not reveal sufficient viable alternatives to the DVD version of the motion pictures for this purpose. For instance, VHS versions of the films altered the color balance and aspect ratio. Similarly, the demonstration at the hearing of screen shots with a digital video recorder revealed dramatic color distortions and greatly reduced picture quality. While these options may have satisfied the needs of many types of noninfringing users and even many noninfringing educational uses – e.g., those wanting to comment on the historical context of a film or create a parody, or to show a film clip in class unrelated to cinematographic significance – the reduced quality of alternative formats was wholly insufficient for the pedagogical purposes for which the clips were sought in film and media studies classes.[19]

---

[18] 2006 Recommendation, *supra* note 16 at 20.

[19] *Id.*

### b)   Alternatives to Circumvention Satisfy Other Non-Infringing Uses

At the same time the Register acknowledged that alternatives to circumvention were insufficient for the needs of film professors who required high-quality images, the Register also noted that the alternatives to circumvention <u>could satisfy</u> other uses identified in the hearings, such as "those wanting to comment on the historical context of a film or create a parody, or to show a film clip in class unrelated to cinematographic significance"[20]  Thus, the demonstrated need for high-quality images not only warranted a fundamental change in how the Office understood its own rulemaking, but it also has been the benchmark for determining which uses warranted circumvention and which uses were sufficiently enabled with alternatives to circumvention.

### 3.   Subsequent Proceedings Result in the Creation of More Exemptions

To no one's surprise, new exemption proponents advanced similar arguments that the film professors had made in 2006.  Each successful exemption proponent has demonstrated that the proposed use is likely noninfringing, the class can be further refined by uses (purpose) and particular users, that applying the statutory criteria the circumvention prohibition is adversely affecting the uses, the users have

---

[20] 2006 Recommendation, *supra* note 16 at 20.

a need for high quality images and that need cannot be satisfied by alternatives to circumvention.

### 4.    Exemption Proponents' Shortcomings

Overwhelmingly, proposed activities that are denied the benefit of a rulemaking-created exemption are for uses that the Register cannot conclude are indeed *likely* noninfringing (either by specific limitations enumerated in the Copyright Act or under the fair use doctrine). Typically, these proponents - failing to understand the constraints of the rulemaking – (i) seek broad exemptions for what they believe or want to be fair use, (ii) fail to proffer the quantum of specific evidence to demonstrate that the proposed activity is indeed likely noninfringing, and/or (iii) are unable to point to relevant, settled case law that provides the legal authority that the specific activity is likely to be noninfringing.

Indeed, Appellant Huang is part of this very small group of unsuccessful exemption proponents. Despite the analytical framework being in place since 2006, and countless examples since then of proponents successfully putting forth evidence on the record in their respective cases to garner an exemption, Appellant Huang pursued an "all or nothing" approach to his proposed exemption without regard to the precedent and constraints of the rulemaking.

> While some of Huang's illustrative uses may potentially be fair use depending upon factual circumstances, that mere possibility is not enough. Instead, "[t]he statutory language requires that the use *is* or *is likely* to be noninfringing, not merely that the use might plausibly be

24

considered noninfringing." Here, the record lacks the requisite detail and legal support for the Acting Register to conclude that the uses listed by Huang are or are likely to be noninfringing.[21]

**CONCLUSION**

Twenty-five years have passed since Congress passed the Act, and more creative works, and the associated services, media, and devices via which consumers enjoy these works - including the very successful DVD, Blu-ray Disc, and UHD Blu-ray Disc formats protected by Amici's technological protection measures - are available in a legitimate market at affordable prices. Indeed, the Act has realized Congress' vision. Despite the instant challenge to the Act, the robust marketplace is due in part to Congress' carefully crafted solution for those instances where the general circumvention prohibition was shown to interfere with specific noninfringing uses. The fail-safe mechanism has worked, providing numerous exemptions to the circumvention prohibition over the twenty-five years. Indeed, many of the amici curiae for appellants are indeed beneficiaries of these exemptions. Thus, by approving the Act, Congress not only provided the framework for a robust, legitimate digital marketplace but a reasonable approach to enable circumvention

---

[21] U.S. Copyright Office, Library of Congress, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights at 134 (Oct. 2018) (internal citation omitted) at https://cdn.loc.gov/copyright/1201/2018/2018_Section_1201_Acting _Registers_Recommendation.pdf. .

exemptions that relieves genuine burdens without risking the entire marketplace.

The Court therefore should affirm the decision of the District Court.


Date:  February 9, 2024

Respectfully submitted,

/s/ Michael B. Ayers
Michael B. Ayers
Michael B. Ayers Technology Law
5256 S. Mission Rd., Suite 703-2215
Bonsall, CA 92003-3622
(760) 607-6434
michael@ayerstechlaw.com

/s/ David Jonathan Taylor
David Jonathan Taylor
Right Size Law PLLC
621 G ST SE
Washington, DC 20003
202-546-1536
david.taylor@rightsizelaw.com

*Counsel to DVD CCA and AACS LA*

**CERTIFICATE OF COMPLIANCE**

This document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitation. In compliance with Rule 32(a)(7)(B), it contains 6437 words, excluding the parts exempted by Rule 32(b) and Circuit Rule 32(e)(1), and it has been prepared in proportionately spaced typeface using Times New Roman, 14-point, in Microsoft Word for Mac Version 16.81.

/s/ David Jonathan Taylor
David Jonathan Taylor
Right Size Law PLLC
621 G ST SE
Washington, DC 20003
david.taylor@rightsizelaw.com
202-546-1536

**CERTIFICATE OF SERVICE**

I certify that on February 9, 2024, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system. Paper copies of this brief will also be filed with the Clerk of the Court as the Clerk requests.

/s/ David Jonathan Taylor
David Jonathan Taylor
Right Size Law PLLC
621 G ST SE
Washington, DC 20003
david.taylor@rightsizelaw.com
202-546-1536