NO. 23-5159

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MATTHEW D. GREEN, ET AL.,

PLAINTIFFS- APPELLANTS,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

DEFENDANTS-APPELLEES.

Appeal from the United States District Court for the District of Columbia
No. 1:16-cv-01492-EGS
Hon. Emmet G. Sullivan

## APPELLANTS' REPLY BRIEF

Corynne McSherry
Kit Walsh
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: corynne@eff.org
Email: kit@eff.org
Email: mitch@eff.org

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Email: bwillen@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300,
San Francisco, CA 94105
Telephone: (415) 947-2000
Email: lwhite@wsgr.com

*Counsel for Plaintiff-Appellants Matthew D. Green, Andrew "bunnie" Huang, and Alphamax, LLC*

# TABLE OF CONTENTS

**Page**

GLOSSARY OF ABBREVIATIONS .............................................................vi

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................3

I.     PLAINTIFFS HAVE MET THEIR BURDEN TO STATE A
PLAUSIBLE CLAIM THAT SECTION 1201(a) BURDENS
EXPRESSIVE CONDUCT.........................................................................3

    A.     Section 1201(a) Targets Activities That Are Protected by the
First Amendment..........................................................................3

    B.     No Appeals Court Has Directly Addressed the Speech
Implications of Section 1201(a) ....................................................9

II.     THE TRIENNIAL RULEMAKING HAS ALL OF THE
CHARACTERISTICS OF A SPEECH-LICENSING REGIME AND
NONE OF THE SAFEGUARDS .........................................................10

III.     SECTION 1201(a) IS UNCONSTITUTIONALLY OVERBROAD ...................18

    A.     Section 1201(a)'s Burdens on Constitutionally Protected
Speech Outweigh Its "Plainly Legitimate Sweep"......................18

    B.     This Court's Decision in the Prior Appeal Does Not Govern
Plaintiffs' Overbreadth Challenge ..............................................25

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Alvarez*,
  679 F.3d 583 (7th Cir. 2012)................................................................5

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ............................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................2

*Bd. of Airport Comm'rs v. Jews for Jesus*,
  482 U.S. 569 (1987)......................................................................21, 25

*Boardley v. United States DOI*,
  615 F.3d 508 (D.C. Cir. 2010) ..........................................................24

*Brockett v. Spokane Arcades, Inc.*,
  472 U.S. 491 (1985)............................................................................25

*Brown v. Ent. Merch. Ass'n*,
  564 U.S. 786 (2011)..............................................................................4

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..........................................................................16

*Citizens United v. FEC*,
  558 U.S. 310 (2010)............................................................................12

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)..............................................................................7

*Edwards v. Dist. of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014)......................................................23, 24

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)............................................................................10

*Elsevier Inc. v. WWW.Schi-Hub.org,*
    15 Civ. 4282(RWS), 2015 U.S. Dist. LEXIS 147639
    (S.D.N.Y. Oct. 28, 2015) .................................................................. 22

*First Nat'l Bank of Bos. v. Bellotti,*
    435 U.S. 765 (1978) ........................................................................... 4

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ....................................................................... 7, 18

*Frederick Douglass Found., Inc. v. Dist. of Columbia,*
    82 F.4th 1122 (D.C. Cir. 2023) ........................................................ 2, 3

*Freedman v. Maryland,*
    380 U.S. 51 (1965) ........................................................................... 11

*Georgia v. Public.Resource.Org, Inc.,*
    140 S. Ct. 1498 (2020) ...................................................................... 10

*Golan v. Holder,*
    565 U.S. 302 (2012) .......................................................................... 10

*Green v. United States DOJ,*
    54 F.4th 738 (D.C. Cir. 2022) ............................................... 7, 8, 9, 26

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978) (plurality opinion) .................................................. 5

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) ............................................................... 8

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967) .......................................................................... 22

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ............................................................................ 4

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ...................................................................... 24

*Ness v. City of Bloomington,*
    11 F. 4th 914 (8th Cir. 2021) .............................................................. 5

*Roth v. United States DOJ*,
    642 F.3d 1161 (D.C. Cir. 2011) ............................................................ 17

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969) ............................................................................ 17

*Singletary v. Howard Univ.*,
    939 F.3d 287 (D.C. Cir. 2019) ............................................................... 2

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................ 10

*Travis v. Reno*,
    163 F.3d 1000 (7th Cir. 1998) ................................................................ 6

*United States v. Ford*,
    184 F.3d 566 (6th Cir. 1999) ................................................................ 17

*United States v. Hansen*,
    599 U.S. 762 (2023) .............................................................................. 7

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................... 18, 19, 26

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ....................................................... 6, 7, 10

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ........................................................................ 9, 25

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ............................................................................ 18

*Zemel v. Rusk*,
    381 U.S. 1 (1965) ................................................................................. 5

*Zukerman v. United States Postal Serv.*,
    961 F.3d 431 (D.C. Cir. 2020) ............................................................... 2

## STATUTES

17 U.S.C. § 1201(a)(1) ................................................................................ 13

**OTHER AUTHORITIES**

U.S. Copyright Office, *Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights* (October 5, 2018), https://www.copyright.gov/1201/2018/ .......................................................... 15, 17

U.S. Copyright Office, *Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* (October 28, 2015), https://www.copyright.gov/1201/2015/ ............................................... 12, 14, 15, 16

# GLOSSARY OF ABBREVIATIONS

DMCA          Digital Millennium Copyright Act

**INTRODUCTION**

In 1998, Congress passed a law that was supposed to deter unauthorized uses of copyrighted movies and music. Twenty-five years later, with copyrighted works in our phones, our cars, and even our refrigerators, the reach of Section 1201 of the Digital Millennium Copyright Act ("DMCA") is virtually limitless. As a result, it presents researchers, creators, filmmakers, artists, disabled people, and ordinary tinkerers with a Hobson's choice: avoid whole swathes of expressive activity, or march to the Library of Congress every three years for permission to engage in that expression.

Section 1201(a) interferes with publishing books, making films, understanding and teaching about software, engaging in security research, archiving works that might otherwise be lost, and even reading e-books for those who need software assistance to do so. A law that interferes with such a broad range of expression—and directly bans acts of reading and communication—plausibly violates the First Amendment. It has only survived First Amendment review thus far because early courts that considered the statute's constitutionality did so based on a limited record, with inadequate guidance from the Supreme Court, and without occasion to directly consider the triennial process by which the Librarian of Congress ("Librarian") grants exemptions to favored speakers.

Not so here. Plaintiffs have plausibly alleged that Section 1201(a) burdens a broad array of expressive activity. That is, the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *see also Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) (reversing dismissal of a First Amendment claim where Plaintiffs "plausibly alleged" a constitutional violation); *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020) (reviewing dismissal of a First Amendment challenge to a Postal Service rule *de novo* based on whether Plaintiff satisfied the *Iqbal* standard). And to the extent the Court believes the Complaint falls short, leave to amend must be granted unless any deficiencies cannot be cured by amendment. *See Singletary v. Howard Univ.*, 939 F.3d 287, 303 (D.C. Cir. 2019).

The Government has made little attempt to engage with Plaintiffs' actual allegations and arguments, relying instead on conclusory assertions, gross misreadings of the law of this case, and a tired cliché about a burglar breaking into a bookstore. The question is not whether Congress may prohibit citizens from breaking a lock on a bookstore, but whether Congress may prohibit citizens from reading *their own books* in a way not intended by the books' publishers, and whether Congress may empower an unaccountable official to pick and choose what types of readers will be subject to that prohibition.

The answer to that question is no, and that answer is long overdue.

## ARGUMENT

I. **PLAINTIFFS HAVE MET THEIR BURDEN TO STATE A PLAUSIBLE CLAIM THAT SECTION 1201(a) BURDENS EXPRESSIVE CONDUCT**

A. **Section 1201(a) Targets Activities That Are Protected by the First Amendment**

The Government's overarching theme is that Section 1201(a) targets conduct and has only an incidental impact on First Amendment-protected speech or activities. *See, e.g.*, Answering Brief for Appellees ("Answering Br."), at 18, 23-25, 28, 33. The question in this appeal is whether Plaintiffs have "plausibly alleged" otherwise. *Frederick Douglass Found.*, 82 F.4th at 1131. Plaintiffs have met that burden. The Complaint and accompanying evidence, the testimony of *amici*, and statements from the Librarian all illustrate that Section 1201(a) inhibits numerous types of activities protected by the First Amendment, including the ability to read lawfully-owned texts, access information, and create and disseminate new expression. The Government's arguments to the contrary grossly misunderstand Plaintiffs' allegations and First Amendment jurisprudence.

The Government contends that "accessing digital content is not an expressive act." Answering Br. 23. Once again, it compares circumvention to breaking a lock on a bookstore, arguing that such conduct is not protected by the First Amendment. But that tired analogy fails to capture the reality of Section 1201(a)'s prohibitions,

which target efforts to understand and work around, for otherwise permissible purposes, barriers on digital content that a person has *lawfully acquired*. Forbidding circumvention in these circumstances is more like forbidding a person from reading the "elvish" sections of *The Lord of the Rings*—just as some individuals learn J.R.R. Tolkien's invented language so they can understand all the information contained in copies of books they have borrowed or purchased, others learn circumvention code so they can understand all the information contained in copies of expressive works they lawfully possess.

As Plaintiffs explained, courts have repeatedly held that the First Amendment protects such a right to read, access, and gather information. Opening Brief for Appellants ("Opening Br."), at 24-25 (citing cases); *see Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 792 n.1 (2011) (First Amendment protects "consuming" speech); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) (First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw"); *cf. Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("[T]he liberty guaranteed to the plaintiff in error by the 14th Amendment . . . denotes not merely freedom from bodily restraint, but also the right of the individual . . . to acquire useful knowledge . . . ."). These rights are particularly important where, as here, individuals seek to acquire information in order to facilitate their own subsequent expression. Such "step[s] in the 'speech process'" themselves "qualif[y]

[] as speech protected by the First Amendment." *Ness v. City of Bloomington*, 11 F. 4th 914, 923 (8th Cir. 2021); *accord Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010); *ACLU v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012).

The Government attempts to distinguish these cases by arguing that "[m]ost of them involve First Amendment challenges to restrictions on the dissemination of speech." Answering Br. 29. That argument is perplexing, as Section 1201(a) does exactly that by design—it restricts the dissemination of new expressive works by making it impossible for the public to access copyrighted works that are secured by anti-circumvention technologies, and to subsequently make and share fair or otherwise noninfringing uses of those works. *See, e.g.*, JA22-23 ¶¶ 39(a)-(f), 41(a)-(i), JA36 ¶ 114.

Equally specious is the Government's argument that the First Amendment affords less protection to the right to receive information "created or recorded by *others*" than the right to create expressive works. Answering Br. 30. The Government relies on cases in which the plaintiffs demanded that the government provide them access to places or documents within government control. *Id.* (citing cases). But this case is not like *Houchins v. KQED, Inc*., 438 U.S. 1, 16 (1978) (plurality opinion), which held that "the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally." Nor is it like *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), which held that a

citizen has no First Amendment right to a visa to visit Cuba. Nor is it like *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998), which held that "[p]eering into public records is not part of the 'freedom of speech' that the first amendment protects." Plaintiffs here are not asking for government documents, or a government writ to allow them access to the secret records of media companies, or government assistance to circumvent technological protection measures. Those who are burdened by Section 1201(a)—including Plaintiffs, *amici*, and the many others who petition the Librarian every three years—already have the media and devices they wish to access. And they already have the practical ability to circumvent technical protection measures using widely available tools—just as one might read foreign books with the aid of a dictionary, or examine the inside of an appliance with the aid of a screwdriver. *See, e.g.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435-36 (2d Cir. 2001) ("In November 1999, Corley posted a copy of the decryption computer program 'DeCSS' on his web site . . . DeCSS is designed to circumvent 'CSS,' the encryption technology that motion picture studios place on DVDs."). But Section 1201 imposes stiff civil and criminal penalties on individuals if they do so, which runs afoul of the First Amendment.

The Government also contends that "[m]anufacturing and selling the means to circumvent technological protection measures is not an expressive act." Answering Br. 24. But even where that is so, distributing the means of circumventing

technological protection measures is a predicate to speech with a "close . . . nexus to expression." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). Beyond that, ample evidence in the record illustrates that Section 1201(a)'s anti-trafficking provision also prohibits the publication of *knowledge* about how to circumvent technological measures, which is indisputably expressive. For example, the book Dr. Green intended to publish—which would include "examples of code capable of bypassing security measures, for readers to learn from, as well as instructions written in English," *Green v. United States DOJ*, 54 F.4th 738, 744 (D.C. Cir. 2022)—constitutes protected expression.[1] *See, e.g.*, *Corley*, 273 F.3d at 448

---

[1] It is necessary to correct an apparent error by the Government regarding Plaintiff/Appellant Matthew Green. In the background section of the Answering Brief, the Government states, "As discussed below, in a prior appeal, this Court concluded that only Mr. Huang had standing." Answering Br. 10. But standing is not "discussed below," or anywhere else in the Answering Brief. The apparent implication is that only Plaintiff Andrew Huang and his company Alphamax have standing to bring the instant appeal, while Professor Green lacks standing. That is incorrect. This Court previously held that Professor Green was "without standing *to obtain a preliminary injunction*." *Green*, 54 F.4th at 744 (emphasis added). Professor Green retains standing to bring the facial challenge at issue here. There can be no doubt that, having participated in the triennial rulemaking, Professor Green has been personally harmed by the burdens of 1201(a)'s speech-licensing regime. JA30. As to the overbreadth claim, the Government itself recognizes that "[o]verbreadth represents a departure from the ordinary principle that parties like plaintiffs to whom a statute can be lawfully applied may not assert that the statute is unlawful as to third parties." Answering Br. 19 (citing *United States v. Hansen*, 599 U.S. 762, 769 (2023)); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129-30 (1992) ("It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable.").

("Instructions that communicate information comprehensible to a human qualify as speech whether the instructions are designed for execution by a computer or a human (or both)."); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (holding that "[b]ecause computer source code is an expressive means for the exchange of information and ideas about computer programming," it is protected by the First Amendment).

Indeed, the Government conceded in the prior appeal that such instructions are expressive. *Green*, 54 F.4th at 745 ("[A]t oral argument [the Government] conceded that 'if you write code so somebody can read it,' it is 'expressive' speech.") (quoting Oral Arg. Rec. 48:32-48:55). While the Government stated its position at oral argument that Section 1201(a)'s anti-trafficking provision does not bar Dr. Green from publishing his specific book, the Government certainly did not suggest that *all* publications that include instructions for circumventing code—"even if the book includes enough code to allow someone to piece together a circumvention technology," *Green*, 54 F.4th at 744—are similarly outside the statute's scope. Such publications are yet another example of how Section 1201(a) burdens protected expression. As such, the prohibition on trafficking is not akin to "selling lock picks" (Answering Br. 24); it is more like outlawing the sale of Latin dictionaries to non-clergy in order to prevent laypeople from reading the Bible in Latin.

Because Plaintiffs have alleged more than enough to plausibly state a claim that Section 1201(a)'s effects on speech are not incidental, but rather are "specifically addressed to speech [and] to conduct necessarily associated with speech," *Virginia v. Hicks*, 539 U.S. 113, 124 (2003), their facial First Amendment challenge was improperly dismissed.

**B.    No Appeals Court Has Directly Addressed the Speech Implications of Section 1201(a)**

In an apparent effort to convince the Court to sidestep the analysis of the burdens on speech described above, the Government incorrectly asserts that this Court has already decided that Section 1201(a) only targets conduct. Not so. In the prior appeal, the Court *expressly declined* to consider either Section 1201(a)'s burdens on third-party expression or whether the triennial rulemaking is a speech-licensing regime, holding that it did not have jurisdiction over Plaintiffs' facial challenge. *Green*, 54 F.4th at 744. Accordingly, this Court has not yet had any occasion to consider Plaintiffs' numerous allegations and evidence illustrating Section 1201(a)'s widespread effects on protected expression and predicate activities. It should do so now.

Nor is *Corley* dispositive of Plaintiffs' facial challenge. *See* Answering Br. 14. *Corley* is dissimilar to the record and issues in this appeal in several respects. First, that court's discussion focused on code as speech and did not consider any of the expressive non-code activities at issue here. *Corley*, 273 F.3d at 450. Second, the

defendants in *Corley* did not assert claims that Section 1201 is facially overbroad or a prior restraint on speech; accordingly, the defendants did not present evidence of third-party harm, and the court's analysis was limited to a record reflecting the defendants' own activities. *Id.* at 436.

And finally, the *Corley* decision cannot be squared with subsequent Supreme Court guidance that bears directly on the issues presented here. The Court has since clarified that "the creation and dissemination of information are speech within the meaning of the First Amendment" and that the government may not forbid a private party from disclosing facts in their private possession. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). And in several cases, the Court stressed that fair use and the idea/expression dichotomy are essential First Amendment accommodations. *See Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Golan v. Holder*, 565 U.S. 302, 327-28 (2012); *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020). This Court is the first appellate court to consider whether a prohibition that disturbs the traditional contours of copyright can nonetheless withstand First Amendment scrutiny in light of that subsequent jurisprudence.

## II. THE TRIENNIAL RULEMAKING HAS ALL OF THE CHARACTERISTICS OF A SPEECH-LICENSING REGIME AND NONE OF THE SAFEGUARDS

Section 1201(a) makes a wide range of protected expressive activity unlawful unless expressly permitted by the Librarian in a so-called triennial "rulemaking" that

functions more like an informal process to provide exemptions to favored speakers. Unusual as that permission system may be, it bears all of the hallmarks of a classic speech-licensing regime, with none of the required safeguards. Opening Br. 27-29; *Freedman v. Maryland*, 380 U.S. 51, 58-60 (1965). The Government's arguments to the contrary cannot be reconciled with First Amendment jurisprudence or the practical realities of the exemption process as alleged in the Complaint and supporting exhibits.

*First*, the Government's argument that Section 1201(a)'s exemption process is not a speech-licensing regime because "the prohibition on circumvention . . . does not restrict speech but instead restricts conduct," Answering Br. 33, fails for the reasons described above. *See supra* Section II.A. Section 1201(a) prohibits a wide range of protected expression and activities necessarily associated with expression, and the exemption process requires individuals to seek government permission before engaging in that expression.

*Second*, the Government incorrectly suggests that *Freedman* and its progeny apply only to regimes that require "*individuals* [to] seek advance permission to engage in specific activities," rather than to regimes that deal with categories or classes of speech. Answering Br. 34 (emphasis added). The Government cites no cases in support of that argument, which runs contrary to foundational First Amendment principles. "[T]he First Amendment stands against" not only

"attempts . . . to distinguish among different speakers," but also "to disfavor certain subjects or viewpoints" more broadly. *Citizens United v. FEC*, 558 U.S. 310, 311 (2010) (category of political speech could not be banned, even if targeting corporate speech generally rather than individual speakers). Just as the First Amendment prohibits the government from requiring an individual to seek permission before making a particular film about climate change, so too does it bar a statute that would burden *all* filmmaking by environmentalists unless they seek a license from the government. Section 1201(a) cannot escape First Amendment scrutiny simply because it regulates "subjects" or categories of speech, thereby impacting a *greater* number of speakers, as opposed to regulating speakers one by one.

Further, as a practical matter, Section 1201(a) *does* require individuals to seek permission from the Government to engage in their desired expression. As is the case with any other speech-licensing regime, a person who does not bring their specific proposed speech to the Librarian for approval, or fails to present sufficient evidence in the exemption process, runs a high risk that they will be left without legal authorization to engage in that speech. For example, certain types of nonprofits that did not participate in the 2015 triennial process were excluded from an exemption for their educational courses, while other nonprofits that did participate were included. *See* U.S. Copyright Office, *Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register*

*of Copyrights* ("2015 Recommendation"), at 74, 75 n.479 (October 28, 2015), https://www.copyright.gov/1201/2015/ (only accredited, nonprofit educational institutions considered because "proponents did not introduce specific evidence that [other identified] nonprofits are seeking to benefit from the proposed exemption" and record pertained "primarily" to such institutions). The requirement that would-be speakers participate in the triennial rulemaking in order to safeguard their First Amendment rights is particularly onerous for novel types of speech or speech using new media, where the opportunity to seek exemptions only once every three years means that legal permission will lag behind the advancement of culture and technology.

The Government also incorrectly contends (and the District Court incorrectly held) that because the Librarian's decisions apply to categories of speech, rather than to particular individuals, the Librarian does not have discretion to engage in content-based, speaker-based, or viewpoint-based discrimination. Answering Br. 34; JA 289-290. But Section 1201(a)'s *own language* expressly permits this kind of arbitrary discrimination through the catch-all authorization to consider "such other factors as the Librarian considers appropriate." 17 U.S.C. § 1201(a)(1)(C)(v).

Indeed, Plaintiffs' allegations and evidence show that denial of an exemption frequently *does* turn upon the nature of particular proposed speech or the identity of a particular speaker. The U.S. Copyright Office ("Office") has repeatedly

recommended denial of exemptions because it did not see the value of an applicant's proposed expressive activity, often overriding the explanations of educators, artists, and other would-be speakers with its own judgment. For example, the Office decided that video artists, educators and students had no particular need to access high-quality source material. *See* 2015 Recommendation at 86 (the Office opined that the acts of creating mash-up videos and adding original subtitles to transform an underlying video "do not obviously require high quality source material"); *id.* at 99 (the Office did not believe high-quality footage was "required" for educators' and students' expressive uses, only for "close analysis"); *see also id.* at 200 (denying exemption to read software operating game consoles in order to effect repairs because, in the Office's opinion, enough rightsholders offered reasonable prices for repair services); *id.* at 345 (concluding that single-player or local multiplayer game play was a "sufficient" alternative to preserving the ability to play games remotely). Notably, the triennial rulemaking in practice requires substantial evidence from exemption proponents, but little from opponents other than self-serving speculation about potential harm. *See, e.g.*, 2015 Recommendation at 93-94 (despite observing that the content industry had been wrong about circumvention of DVDs—*i.e.*, "'DVDs remain the dominant form of distribution' despite the wide availability of circumvention tools" and the "record suggests that the prior exemptions have not

harmed the market for DVDs"—the Office credited the same speculative assertion as to Blu-ray discs).

And often, the Office's recommendations to grant exemptions for certain types of speech but not others have little to do with Section 1201(a)'s supposed purpose: protecting copyright. In 2018, for example, after years of requests and testimony, the Office granted a limited exemption to fictional filmmakers to extract video footage for purposes of criticism or commentary, but not for other noninfringing expressive works. *See* U.S. Copyright Office, *Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights* ("2018 Recommendation"), at 55-56, 83 (October 5, 2018), https://www.copyright.gov/1201/2018/; *see also* 2015 Recommendation at 243-44 (opining that a variety of alleged, hypothetical environmental and safety concerns weighed against allowing vehicle owners to read and edit the software in their vehicles). Again, this illustrates that Section 1201(a) permits the Office to discriminate against speech in a way that has nothing to do with the statute's alleged benefits.

The identity of the would-be speaker has also shaped the Office's decision-making. Museums are allowed to preserve video games, for example; game enthusiasts are not. 2015 Recommendation at 351; *see also* 2018 Recommendation at 253 (only libraries, archives, and museums permitted to engage in preservation

activities, not "other cultural heritage institutions," informal associations, or individuals). That is consistent with the Office's suspicion of the general public and presumption that access to copyrighted works free from technological restrictions will naturally lead to infringement—despite the fact that rightsholders have never produced any evidence of an exemption leading to this outcome. *See, e.g.*, 2015 Recommendation at 93-94.

*Third*, contrary to the Government's claim, the triennial rulemaking is a far cry from a process that ensures that would-be speakers can express themselves within the traditional contours of fair use. *See* Answering Br. 35-37. Indeed, it flies in the face of the Supreme Court's repeated admonition that fair use determinations must depend on "case-by-case analysis." *E.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). That runs directly contrary to the Librarian's process for determining exemptions, where categorical presumptions are often applied to the detriment of would-be speakers. As the Government itself notes, the Librarian's 2015 denial of an exemption for use of video clips in narrative film was based on a broad presumption that any such film's primary purpose would not be criticism or commentary (and a corollary presumption that a documentary would necessarily have such a purpose). JA170, 192. Similarly, the Librarian overrode the pleas of educators and children's advocates and substituted their own opinion as to what

kinds of speech would be adequate for children's education in concluding that K-12 students did not need to use high-quality video as part of their schoolwork. *Id.* at 87.

Moreover, exemption proponents must not only satisfy the Office that their proposed use will be fair, but prove multiple additional factors, including reassuring the Office that third parties will not be emboldened to commit copyright infringement. 2018 Recommendation at 53, 184 (denying exemptions in part because of the possibility of third parties choosing to infringe after using the exemption to make a fair use copy unencumbered by technological restrictions). And if they proceed without prior permission in the form of an exemption, Section 1201(a) provides no avenue to defend the legitimacy of their speech before an Article III court, as fair use does.

*Finally*, the Government does not respond at all to Plaintiffs' arguments that the Section 1201(a) exemption process (1) lacks the "narrow, objective, and definite" standards required by speech-licensing regimes (Opening Br. 31-33 (quoting S*huttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969)), and (2) fails to satisfy the *Freedman* factors (*id.* at 36-39). As such, the Government has waived any response to those arguments, and appears to concede that, if *Freedman* applies, then Section 1201(a) would fail the test. *See Roth v. United States DOJ*, 642 F.3d 1161, 1181 (D.C. Cir. 2011) ("[A]ppellees waive arguments by failing to brief them.") (quoting *United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999)).

Because Section 1201(a)'s triennial process functions as a speech-licensing regime without the necessary safeguards in place to ensure that would-be speakers' First Amendment rights are protected, the regime is unconstitutional.

## III.   SECTION 1201(A) IS UNCONSTITUTIONALLY OVERBROAD

Plaintiffs' Complaint and Opening Brief plausibly allege that Section 1201(a) is overbroad because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). The Government's conclusory arguments to the contrary fail.

### A.   Section 1201(a)'s Burdens on Constitutionally Protected Speech Outweigh Its "Plainly Legitimate Sweep"

Plaintiffs have provided numerous concrete examples of how Section 1201(a) "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth Cnty.*, 505 U.S. at 130. The Government's principal response is to downplay those burdens.

*First*, the Government attempts to dismiss Plaintiffs' examples of unconstitutionally burdened third-party speech as isolated, "hypothetical[]," "at the fringe of the statute's reach," and "much less significant than plaintiffs suggest." Answering Br. 22, 27. Not so. For one, to the extent that some of Plaintiffs' examples are hypothetical, that does not alone defeat their overbreadth claim: courts often

consider hypothetical applications of a statute in determining whether it is overbroad. *See, e.g.*, *Stevens*, 559 U.S. at 475. But more importantly, as explained in the Opening Brief, Plaintiffs have presented a wide swath of *concrete allegations and evidence* that Section 1201(a) burdens the protected speech of large numbers of creators, educators, researchers, and others, including (1) those who are dissuaded from taking part in the arduous triennial rulemaking process and decide not to seek exemptions, foregoing their ability to engage in lawful speech; (2) those who apply for and are denied exemptions and cannot engage in lawful expressive activity; and (3) those who take part in the triennial rulemaking and receive an exemption but were burdened in the process. Opening Br. 38, 45-46; *see* JA21-23 ¶¶ 37-42, JA24-29 ¶¶ 48-74, JA30-31 ¶¶ 79-87, JA34 ¶¶ 100-101, JA35 ¶¶ 107, 109, 110; JA179, 209 (acknowledging burdens on applicants). These burdens do not concern "fringe" expression (Answering Br. 22), but rather communications that lie at the heart of modern culture, including: making fair use of video clips to engage in political commentary, educate students, create video art, and make movies; researching and informing the public about security vulnerabilities; analyzing medical device data; accessing information one owns in a different format or on a different device; and restoring lawfully-acquired video games after they are no longer supported by the manufacturer. Opening Br. 10-11 (citing JA22-23 ¶¶ 38-39, 41(a)-(i)).

*Amici* have provided substantial additional evidence of expressive activity unlawfully burdened by Section 1201(a), illustrating that significant numbers of real-life people are frequently prevented or dissuaded from engaging in protected expression as a result of the statute. For instance, Nikon uses technological protection measures to prevent photographers from accessing raw "white-balance data" from photos taken on their cameras, despite the fact that the "[f]actual information about a photo's coloration is not copyright-protectable subject matter" and it is the photographer who owns the copyright in the photo she takes. Brief of Public Knowledge, The Digital Right to Repair Coalition, Software Freedom Conservancy, iFixit, The Open Source Hardware Association, and Scholars of Property and Technology Law as *Amici Curiae* in Support of Plaintiffs-Appellants ("Public Knowledge Amicus Brief"), at 14-15. Because of this encryption, photographers using Nikon cameras are forced to edit their photos with Nikon's proprietary photo-editing software rather than the software of their choice, and cannot fully access and edit their own copyrighted materials. *Id.* at 13-14. Nikon's use of technological protection measures is a clear burden on protected expression that in no way serves the government's interest in protecting copyrighted material—it merely serves to preserve Nikon's market control by "denying camera owners the unfettered right to use their own photographs." *Id.* at 15.

*Second*, the Government argues that even if some of Plaintiffs' examples are protected speech, "these examples, at most, permit an as-applied challenge by persons who wished to engage in these activities, none of whom is before the Court," rather than facial invalidation. Answering Br. 22. This argument is nonsensical; the entire purpose of an overbreadth challenge is to allows plaintiffs to "challenge a statute on its face 'because it also threatens others not before the court.'" *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574 (1987).

As for the Government's suggestion that Section 1201's constitutional applications outweigh its unconstitutional ones, that claim is based almost entirely on speculation that is divorced from Section 1201(a) actual text and operation. Answering Br. 21-22. For example, the Government claims that Section 1201(a)'s anti-circumvention provision can be constitutionally applied to "commonplace" activities such as "renting a digital copy of a movie and overriding the timing restriction to maintain access to the movie forever." Answering Br. 21. This sidesteps the issue. 1201(a) does not only bar people from accessing material they do not own in a way that is likely to violate copyright law; it bars people from accessing and fully using content they do own, in ways that do not violate anyone's copyright. For example, the anti-circumvention provision prevents a person from accessing clips of music they already own to overlay with film—a lawful step in the speech-making process. It prevents a person from translating an e-book they own into their native

language. And, in a real-world example presented by *amici*, it prevents a consumer from using circumvention to read a lawfully-purchased e-book after that e-book was removed from their library due to an unrelated dispute between the publisher and Amazon. Public Knowledge Amicus Brief at 17. Compared to the many examples of lawful burdened expressive activity alleged by Plaintiffs and *amici*, the Government's few hypotheticals are insufficient to show that Plaintiffs have failed to plausibly allege that Section 1201(a) has more constitutional applications than unconstitutional ones.

Moreover, the Government's limited examples all arguably illustrate unauthorized access, which, as Plaintiffs explained in their Opening Brief, is already prohibited by existing civil and criminal laws. Opening Br. 48 (citing *Elsevier Inc. v. WWW.Schi-Hub.org*, 15 Civ. 4282(RWS), 2015 U.S. Dist. LEXIS 147639, at *6-7 (S.D.N.Y. Oct. 28, 2015); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 609, (1967)). Those statutory frameworks—including the Copyright Act and the Computer Fraud and Abuse Act[2]—protect copyright owners' rights regarding piracy and render Section 1201(a) superfluous in relation to the Government's concerns.

---

[2] The Answering Brief completely ignores the existence of the Computer Fraud and Abuse Act, suggesting instead that "traditional laws against the theft of physical objects have little if any purchase" in the context of digital works. Answering Br. 5. But preventing theft of digital works is precisely what the Computer Fraud and Abuse Act does.

The Government responds only by noting that (1) "[b]y plaintiffs' admission, 'copyright simply does not govern' certain acts that fall within the anti-circumvention and anti-trafficking provisions," and (2) the Register of Copyrights concluded in 2017 that the DMCA serves the purpose of protecting copyright. Answering Br. 26. The former argument proves Plaintiffs' point: as explained in the Opening Brief, Section 1201(a) bars completely lawful protected activities that have nothing to do with copyright *because they do not implicate any rights protected by the Copyright Act*—for example, reading a copy of a work someone already owns, or reporting on uncopyrightable ideas or facts. Opening Br. 41. As to the latter argument, while the 2017 Report may have concluded that the DMCA serves the purpose of protecting copyright, it also documented that Section 1201 places extensive burdens on noninfringing and protected speech. *See* Opening Br. 12-13. And it is for the courts, not the Register of Copyright, to decide whether those burdens render the statute unconstitutionally overbroad.

*Third*, the Government argues that Plaintiffs "largely ignore the DMCA's profound benefits in promoting expression in the digital marketplace." Answering Br. 25. But this Court has held that a statute's current burdens must be justified by current evidence. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1004 (D.C. Cir. 2014). Whatever one might say about whether Section 1201(a)'s burdens were justified in 1998, they are not justified now. Neither the Government nor its supporting *amici*

offer any actual evidence, other than self-serving assertions, that Section 1201 ever accomplished its stated purpose, much less that it is doing so today when it reaches so much further than Congress could possibly have intended. There is, however, substantial evidence and plausible allegations that its burdens on speech are far from incidental, warping the traditional contours of copyright.

But beyond that, as Plaintiffs explained in their Opening Brief, any hypothetical prosecution of the speech activities described in the Complaint would fail both strict and intermediate scrutiny—even assuming Section 1201(a) does serve a valid government interest in protecting copyright—both because the statute targets far more than the "source of the 'evil' it seeks to remedy," *Boardley v. United States DOI*, 615 F.3d 508, 519 (D.C. Cir. 2010), and because its exemptions render it under-inclusive, suggesting that "the asserted interests either are not pressing or are not the real objects animating the restriction on speech," *Edwards*, 755 F.3d at 1007. Opening Br. 49-50. In other words, Section 1201(a) is not precise, and "[t]he First Amendment does not permit the State to sacrifice speech for efficiency." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018).

The Government cannot credibly dispute that Plaintiffs have alleged a plausible case, bolstered by numerous concrete examples, that Section 1201(a)'s applications to protected speech outweigh its legitimate sweep, rendering the statute unconstitutionally overbroad.

**B.** **This Court's Decision in the Prior Appeal Does Not Govern Plaintiffs' Overbreadth Challenge**

Nor can the Government steer this Court away from considering Plaintiffs' overbreadth challenge by suggesting that "this Court's prior decision alone is sufficient to establish the statute's plainly lawful sweep." Answering Br. 20. The Court's prior holding that Section 1201(a) can constitutionally be applied to a *single example* of proposed circumvention—Dr. Huang's development and distribution of the NeTVCR device—is insufficient to defeat Plaintiffs' overbreadth claim. Indeed, the overbreadth doctrine expressly permits "an individual whose own speech or conduct may be prohibited . . . to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Bd. of Airport Comm'rs*, 482 U.S. at 574 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)). As discussed above, *see supra* Section II, the Court in the prior appeal expressly declined to consider Plaintiffs' evidence that Section 1201(a) burdens a large swath of protected third-party expression beyond the functional aspects of code embodied in Dr. Huang's device—including "speech [and] conduct necessarily associated with speech" that is the proper target of an overbreadth challenge. *See* Answering Br. 24-25 (quoting *Virginia v. Hicks*, 539 U.S. 113, 124 (2003)). That evidence is crucial to the analysis of Plaintiffs' overbreadth argument and, as

discussed above, demonstrates that Section 1201(a)'s unconstitutional applications outweigh "the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473; *supra* Section IV.A. This Court should review the issue of overbreadth de novo, considering Plaintiffs' numerous examples of harm to third parties.

The Government also argues that Plaintiffs are prohibited from basing any part of their overbreadth challenge on Section 1201(a)'s burdens on the "publication of code" because this Court ruled (1) that the statute applies only to the functional aspects of code, and (2) the anti-trafficking provision does not bar Dr. Green from publishing his book. Answering Br. 26-27. But again, as discussed, this Court has only had occasion to consider the application of Section 1201(a) to code in relation to Dr. Huang's NeTVCR device, not the numerous other examples underlying Plaintiffs' overbreadth challenge. And the Court by no means held that Section 1201(a) can *never* be applied to prohibit the publication of a book that "includes enough code to allow someone to piece together a circumvention technology." Answering Br. 27 (quoting *Green*, 54 F.4th at 744); *see supra* Section II.A. Accordingly, Plaintiffs' examples involving burdens on reading and publishing code are not so easily dismissed. Furthermore, as discussed, the overbreadth claim challenges Section 1201(a)'s application to a much wider range of protected speech activities. *Supra* Section II.A.

Finally, the Government suggests that Plaintiffs' overbreadth challenge "does not require extended treatment because it is not 'significant[ly] differen[t]' from" the as-applied challenge that the Court addressed in the prior appeal. Answering Br. 21 (quoting JA 286). That conclusory statement is wrong for the reasons just discussed, and entirely ignores Plaintiffs' lengthy argument as to why the district court erred in holding that Plaintiffs failed to distinguish their facial and as-applied claims. Opening Br. 40-44. For example, Plaintiffs explain that their overbreadth challenge is different from their as-applied challenge because, among other things: (1) copyright plays a significantly different role in the various types of speech-predicate activities third parties engage in compared to the activities at the heart of Plaintiffs' as-applied challenge (*id.* at 41); (2) numerous instances of third-party speech are unconstitutionally regulated by Section 1201(a) in ways Plaintiffs' speech is not, including through content- and speaker-based discrimination and interference with political commentary (*id.* at 41-42); and (3) some of Section 1201(a)'s burdens must be analyzed as direct bans on speech or reading, while others target close predicates of speech (*id.* at 42-43). The Government does not meaningfully engage with any of these arguments and fails to show that Plaintiffs' overbreadth claim rises and falls with the as-applied claims that were the subject of the prior appeal.

## CONCLUSION

For these reasons, and those detailed in Plaintiffs-Appellants' Opening Brief, the District Court erred in dismissing Plaintiffs' facial First Amendment challenges. The Court should reverse and remand for further proceedings.

Dated:  February 23, 2024

Respectfully submitted,

By:  */s/ Corynne McSherry*
Corynne McSherry
Kit Walsh
Mitchell L. Stoltz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: corynne@eff.org
Email: kit@eff.org
Email: mitch@eff.org

Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Email: bwillen@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
One Market Plaza, Spear Tower, Suite 3300, San Francisco, CA 94105
Telephone: (415) 947-2000
Email: lwhite@wsgr.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I, Corynne McSherry, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 6,378 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in Times New Roman 14-point font, a proportionately spaced typeface, using Microsoft Word 2021.

Dated: February 23, 2024          */s/ Corynne McSherry*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 23, 2024          */s/ Corynne McSherry*